## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| **FORD MOTOR CREDIT COMPANY LLC,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.: 5:18-cv-00186** |
| | § | |
| **BART REAGOR AND RICK DYKES,** | § | |
| **Defendants.** | § | |

### APPENDIX TO DEFENDANTS' BRIEF IN SUPPORT OF RULE 56(d) MOTION TO DEFER CONSIDERATION OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND TO TAKE DISCOVERY

Defendants Bart Reagor and Rick Dykes file this their Appendix to their Brief in Support of Rule 56(d) Motion to Defer Consideration of Ford Motor Credit Company, LLC's Motion for Summary Judgment and to Take Discovery.

| EXHIBIT | ITEM | PAGE NO. |
|---|---|---|
| | Declaration of Robert Schleizer | App. 001 - 002 |
| | Declaration of Scott Wiehle | App. 003 - 004 |
| A | Deposition Excerpts from Gary Byrd, Jr. Deposition of August 15, 2018 | App. 005 - 031 |
| B | Email from Ford Credit Employee Gwen Schmucker to Mr. Reagor and Other Employees Dated June 29, 2018 | App. 032 - 035 |
| C | Deposition Excerpts from Gwen Schmucker Deposition of August 15, 2018 | App. 036 - 055 |
| D | Deposition Excerpts from James Conlan Deposition of August 15, 2018 | App. 056 - 074 |
| E | Deposition Excerpts from Rene Leal Deposition of August 15, 2018 | App. 075 - 099 |

Respectfully submitted,

_/s/ Marshall M. Searcy, Jr._
Marshall M. Searcy, Jr.
State Bar No. 17955500
marshall.searcy@kellyhart.com
Scott R. Wiehle
State Bar No. 24043991
scott.wiehle@kellyhart.com
KELLY HART & HALLMAN, LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopy: (817) 878-9280

**ATTORNEYS FOR BART REAGOR**


_/s/ Tom Kirkendall_
Tom Kirkendall
State Bar No. 11517300
Law Office of Tom Kirkendall
2 Violetta Court
The Woodlands, Texas 77381-4550
Telephone: (281) 364-9946
Telecopy: (888) 582-0646
bigtkirk@kir.com

**ATTORNEY FOR RICK DYKES**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered to the following parties in accordance with the Federal Rules of Civil Procedure on January 25, 2019.

Keith A. Langley
Brandon K. Bains
Langley LLP
1301 Solana Blvd
Bldg 1, Ste 1545
Westlake, TX 76262
Email: klangley@l-llp.com
Email: bbains@l-llp.com

Craig A Leslie
Joanna Dickinson
Phillips Lytle LLP
One Canalside
125 Main Street
Buffalo, NY 14203
Email: cleslie@phillipslytle.com
Email: jdickinson@phillipslytle.com

*/s/ Marshall M. Searcy, Jr.*
Marshall M. Searcy, Jr.

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| **FORD MOTOR CREDIT COMPANY LLC,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **Civil Action No.: 5:18-cv-00186** |
| | § | |
| **BART REAGOR AND RICK DYKES,** | § | |
| **Defendants.** | § | |

## DECLARATION OF ROBERT SCHLEIZER

1.     My name is Robert Schleizer.  I am over eighteen (18) years of age, am of sound mind and am competent to make this declaration.  The facts stated herein are within my personal knowledge and are all true and correct.

2.     I am the Managing Partner of BlackBriar Advisors LLC ("BlackBriar"). The bankruptcy court approved BlackBriar to be the Chief Restructuring Officer ("CRO") to the Reagor-Dykes dealerships in bankruptcy.  Part of that process is reviewing the financial records of the Reagor-Dykes dealerships to determine the amounts owed to creditors.  Another part of that process is reviewing and proposing a sale or recapitalization of the dealership assets, the proceeds of which would be used to fund a reorganization plan to pay claims or creditors.  The CRO is also responsible for any claims or damages that the Reagor-Dykes dealerships bankruptcy estates may have against third parties.

3.     As the CRO, BlackBriar has been working diligently with bankruptcy counsel to prepare a Chapter 11 plan of reorganization for the Reagor-Dykes dealerships,

Declaration of Robert Schleizersigned

which was filed with the bankruptcy court on or about January 7, 2019. [Case 18-50214-rlj11, Doc. 795]   ]   Negotiations relating to the plan between all parties in interest, including the Reagor-Dykes dealerships and Ford Motor Credit are ongoing at this time.

4.     Administering the estate of the Reagor-Dykes dealerships and providing information to Ford Motor Credit have consumed all of the CRO's efforts.  The CRO could not have performed its job if it had to provide access to documents and information to Reagor and Dykes.  Thus, the CRO, which is in possession and control of all documents of the Reagor-Dykes dealerships, has not permitted Bart Reagor ("Reagor") (or his counsel) or Rick Dykes ("Dykes") or his counsel to inspect the documents of the Reagor-Dykes dealerships.

5.     The CRO (working with bankruptcy counsel) has also refrained from seeking (a) Ford Motor Credit documents, (b) Ford Motor Credit communications (including those between Shane Smith ("Smith") and Gary Byrd ("Byrd"), who is the Ford Motor Credit employee that managed the Reagor-Dykes dealerships account with Ford Motor Credit), (c) Ford Motor Credit's audit results; and (d) Byrd's private communications with Smith.

6.     Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct."

Executed on January 25, 2019.

_____
Robert Schleizer

Declaration of Robert Schleizersigned

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| FORD MOTOR CREDIT COMPANY LLC, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | Civil Action No.: 5:18-cv-00186 |
| | § | |
| BART REAGOR AND RICK DYKES, | § | |
| Defendants. | § | |

## DECLARATION OF SCOTT WIEHLE

1.      My name is Scott Wiehle.  I am over eighteen (18) years of age, am of sound mind and am competent to make this declaration.  The facts stated herein are within my personal knowledge and are all true and correct.

2.      I am a licensed attorney in the State of Texas and am currently an attorney in the law firm of Kelly Hart & Hallman LLP (the "Kelly Hart firm").  I represent Bart Reagor in this matter.

3.      On August 15, 2018, I attended the depositions of Ford Motor Credit employees Gary Byrd, Gwen Schmucker, James Conlan, and Rene Leal.  The depositions were taken in the bankruptcy case of the Reagor-Dykes auto dealerships.  The subjects of the depositions were limited to information relevant to a cash and collateral hearing to be held in the bankruptcy court the following day, August 16, 2018.  I did not ask any questions because my client, Mr. Reagor, is not a party to the bankruptcy case.

4.      Attached hereto as Exhibit A is a true and correct copy of excerpts of the limited deposition of Gary Byrd.

2842603_1

**App. 003**

5.      Attached hereto as Exhibit B is a true and correct copy of an email dated June 29, 2018, from Ford Credit employee Gwen Schmucker to Mr. Reagor and other Reagor-Dykes employees, which was Exhibit 4 to Gary Byrd's deposition.

6.      Attached hereto as Exhibit C is a true and correct copy of excerpts of the limited deposition of Gwen Schmucker.

7.      Attached hereto as Exhibit D is a true and correct copy of excerpts of the limited deposition of James Conlan.

8.      Attached hereto as Exhibit E is a true and correct copy of excerpts of the limited deposition of Rene Leal.

9.      Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct."

Executed on January 25, 2019.

_____
Scott Wiehle

2842603_1

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

IN RE:                                    )
REAGOR-DYKES MOTORS, LP,   )Case No. 18-50214-rlj11
                                          )
    Debtor.                               )

IN RE:                                    )
REAGOR-DYKES IMPORTS, LP,   )Case No. 18-50215-rlj11
                                          )
    Debtor.                               )

IN RE:                                    )
REAGOR-DYKES AMARILLO, LP,  )Case No. 18-50216-rlj11
                                          )
    Debtor.                               )

IN RE:                                    )
REAGOR-DYKES AUTO COMPANY, )
LP,                )Case No. 18-50217-rlj11
                                          )
    Debtor.                               )

IN RE:                                    )
REAGOR-DYKES PLAINVIEW, LP, )Case No. 18-50218-rlj11
                                          )
    Debtor.                               )

IN RE:                                    )
REAGOR-DYKES FLOYDADA, LP,  )Case No. 18-50219-rlj11
                                          )
    Debtor.                               )

## Page 2

```
 1    _____
 2                ORAL DEPOSITION OF
 3                GARY BYRD, JR.
 4                AUGUST 15, 2018
 5                   Volume 1
 6    _____
 7         ORAL DEPOSITION OF GARY BYRD, JR., produced as a
 8    witness at the instance of the DEBTOR, and duly sworn,
 9    was taken in the above-styled and numbered cause on
10    AUGUST 15, 2018, from 11:01 a.m. to 12:28 p.m., before
11    Kailee Pereida, CSR in and for the State of Texas,
12    reported by machine shorthand, at the law offices of
13    Mullin, Hoard & Brown, L.L.P., 1500 Broadway, Suite 700,
14    Lubbock, Texas, pursuant to the Federal Rules of Civil
15    Procedure.
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                A P P E A R A N C E S
 2
 3    FOR THE DEBTORS:
 4       MR. DAVID MULLIN
            -AND-
 5       MR. DAVID R. LANGSTON
         MULLIN, HOARD & BROWN, L.L.P.
 6       1500 Broadway, Suite 700
         P.O. Box 2585 (79408)
 7       Lubbock, Texas 79401
         (806) 765-7491
 8       dmullin@mhba.com
 9    FOR FORD MOTOR CREDIT COMPANY, L.L.C.:
10       MR. KEITH LANGLEY
         LANGLEY LLP
11       1301 Solana Boulevard
         Building 1, Suite 1545
12       Westlake, Texas 76262
         (214) 722-7162
13       klangley@l-llp.com
14          -AND-
15       MR. CRAIG A. LESLIE
         PHILLIPS LYTLE LLP
16       One Canalside
         125 Main Street
17       Buffalo, New York 14203
         (716) 847-7012
18       cleslie@phillipslytle.com
19    FOR GM FINANCIAL:
20       MR. STEPHEN P. STROHSCHEIN
         MCGLINCHEY STAFFORD, P.L.L.C.
21       301 Main Street
         Fourteenth Floor
22       Baton Rouge, Louisiana 70801
         (225) 383-9000
23       sstroh@mcglinchey.com
24
25
```

## Page 4

```
 1    FOR AIM BANK:
 2       MR. JEFF R. LASHAWAY
         BOERNER, DENNIS & FRANKLIN, P.L.L.C.
 3       920 Avenue Q
         Lubbock, Texas 79401
 4       (806) 763-0044
         jlashaway@bdflawfirm.com
 5
      FOR FIRST CAPITAL BANK:
 6
         MR. JOHN F. MASSOUH
 7       SPROUSE, SHRADER, SMITH, P.L.L.C.
         701 South Taylor
 8       Suite 500
         Amarillo, Texas 79105
 9       (806) 468-3337
         john.massouh@sprouselaw.com
10
      FOR VISTA BANK:
11
12       MR. FERNANDO BUSTOS
         BUSTOS LAW FIRM, P.C.
13       1001 Main Street
         Suite 501
14       Lubbock, Texas 79401
         (806) 780-3976
15       fbustos@bustoslawfirm.com
16
      FOR FIRST BANK & TRUST:
17
         MR. MARK S. CARDER
18       STINSON, LEONARD, STREET, L.L.P.
         1201 Walnut
19       Suite 2900
         Kansas City, Missouri 64106
20       (816) 691-3415
         mark.carder@stinson.com
21
      FOR BART REAGOR:
22
         MR. SCOTT R. WIEHLE
23       KELLY, HART & HALLMAN, L.L.P.
         201 Main Street
24       Suite 2500
         Fort Worth, Texas 76102
25       (817) 332-2500
         scott.wiehle@kellyhart.com
```

EXHIBIT

**A**

Page 5

1
2  FOR IBC BANK
      MR. JOHN D. DALE
3     GABLE GOTWALS
      1100 ONEOK Plaza
4     100 West Fifth Street
      Tulsa, Oklahoma 74103
5     (918) 595-4828
6     jdale@gablelaw.com
   FOR RICK DYKES:
7     MR. DAVID M. GUINN, JR.
      LAW OFFICE OF HURLEY & GUINN
8     1805 13th Street
      Lubbock, Texas 79401
9     (806) 771-0700
      david@hurleyguinn.com
10
   ALSO PRESENT:
11
      Mr. Brad Burgess
12    Mr. Mike Cannon
      Mr. Toby Cecil
13    Mr. Rick Dykes
      Mr. Jonathan Hill
14    Mr. Audin Herrera
      Mr. Howie Ravitz
15    Mr. Scott Wade
16
17
18
19
20
21
22
23
24
25

Page 6

1              INDEX
                            PAGE
2  Appearances........................... 3
3  Instructions for Signing a Deposition............... 7
4  GARY BYRD, JR.
5     EXAMINATION BY MR. MULLIN.............. 8
      EXAMINATION BY MR. BUSTOS ........... 60
6     EXAMINATION BY MR. CARDER.............. 65
7
   Signature and Changes.................... 68
8  Reporter's Certificate.................... 71
9              EXHIBITS
10 NO. DESCRIPTION              PAGE
11  1  Notice of Oral Deposition of Gary Byrd, Jr..... 8
    2  Floor-Plan Debt Listing..................... 30
12  3  Out of Trust Listing......................... 31
    4  Copy of E-mails and Audit Report.............. 41
13  5  GM VSSM - Trial balance Edit Application....... 49
    6  Lane Gorman Trubitt, LLC, 2016 Year-End
14     Audit.................................... 58
    7  Reagor-Dykes Auto Group Combined Financial
15     Statements and Independent Auditor's Report
       December 31, 2015....................... 58
16
17        CERTIFIED QUESTIONS
18 NO.              PAGE/LINE
19 1........................... 16   7
   2........................... 50   20
20
21
22
23
24
25

Page 7

1
2       INSTRUCTIONS FOR SIGNING A DEPOSITION
3     Rules of Civil Procedure under which this
   deposition was taken provide that the deposition
   transcript shall be made available to the witness or his
4  attorney of record for examination and signature by the
   witness.
5
      This deposition condensed transcript is provided
6  for your review.  It is yours to keep.  Read it
   carefully before making any changes or corrections.
7  Make transcript corrections on the Witness Signature
   Page.
8
9     Changes and/or corrections must be made in the
   following manner:
10
      (1) Indicate by number the page and line you wish
11        to alter;
      (2) Indicate your change or correction;
12    (3) Give the reason for making the change.
13    When you have followed the instructions above, sign
   the Witness Signature Page before a Notary Public and
14 return it as soon as possible.
15    When we have received the signed and notarized
   transcript, we will forward all attorneys of record a
16 copy of the completed Witness Signature Page and deliver
   the original transcript to Mr. David Mullin for
17 safekeeping and use at trial.
18    If you have any questions about this procedure,
   please call my office at (806) 795-4202.
19
      Kailee Pereida, CSR
20    Caprock Court Reporting, Inc.
      1112 Texas, Suite 200
21    Lubbock, Texas 79401
      (806) 795-4202
22
23
24
25

Page 8

1       (Exhibit 1 marked.)
2       (Witness sworn by court reporter.)
3          GARY BYRD, JR.,
4  having been first duly sworn, testified as follows:
5          EXAMINATION
6  BY MR. MULLIN:
7     Q.  Please state your full name.
8     A.  Gary Keith Byrd, Jr.
9     Q.  Okay.  Mr. Byrd, Exhibit No. 1 is the notice
10 of your deposition.  Have you seen that before?
11    A.  This is the first time I've seen it.
12    Q.  Have you — are you represented by Ford Motor
13 Credit's counsel, Mr. Langley, here today?
14       MR. LANGLEY:  Yeah, I'll make my
15 appearance.  I'm Keith Langley.  I'm counsel for Ford
16 Credit and for Mr. Byrd here today.
17       MR. MULLIN:  Does everybody else want to
18 make their appearance?
19       David Mullin and David Langston for the
20 Debtors.
21       MR. BUSTOS:  Fernando Bustos for Vista
22 Bank.
23       MR. STROHSCHEIN:  Steve Strohschein for GM
24 Financial.
25       MR. CARDER:  Mark Carder, First Bank &

Page 9

1 Trust.

2      MR. LASHAWAY: Jeff Lashaway, AimBank.

3      MR. MASSOUH: John Massouh, First Capital

4 Bank of Texas.

5      MR. DALE: John Dale, IBC Bank.

6      MR. WIEHLE: Scott Wiehle, Bart Reagor –

7 for Bart Reagor.

8      MR. HILL: Jonathan Hill, AimBank.

9      MR. WADE: Scott Wade, AimBank.

10      MR. HERRERA: Audin Herrera, Vista Bank.

11      MR. CECIL: Toby Cecil, Vista Bank.

12      MR. DYKES: Rick Dykes, Reagor-Dykes.

13   Q. (BY MR. MULLIN) Have you ever given your

14 deposition before?

15   A. No.

16   Q. Do you understand that the court reporter is

17 taking down your answers and my questions and will put

18 them into a booklet that could be read back at a hearing

19 or a trial in this case?

20   A. I do.

21   Q. And do you understand that you're under oath?

22   A. Yes, I do.

23   Q. Okay. And do you – let me just tell you,

24 there could be objections during your deposition, but

25 those objections are for the Judge. And unless your

Page 10

1 counsel tells you not to answer, you should answer.

2      And you are represented by Mr. Langley

3 today?

4   A. Yes.

5   Q. If there's any time during the deposition that

6 you need a break, just let me know. I only ask that

7 you – my only request is that you would answer the

8 pending question before we take a break.

9   A. Okay.

10   Q. And there may be times when you feel like you

11 know what the question is before I finish it and you

12 want to answer right away. But if you'll just wait for

13 me to finish my question, and I'll try to wait for you

14 to finish your answer.

15   A. Okay.

16   Q. And that'll make the record a little easier

17 for the court reporter to take down.

18      What did you do to prepare for your

19 deposition?

20   A. Answer some questions from my attorneys.

21   Q. Did you review any documents?

22   A. No.

23   Q. Have you communicated with Shane Smith in any

24 way since July 27th?

25   A. That was a Saturday, correct?

Page 11

1   Q. I think that's a Friday, but we can

2 double-check that.

3   A. 28th was Saturday, correct?

4   Q. Yeah.

5   A. So you said – can you repeat the question?

6   Q. Yeah. Have you communicated with Shane Smith

7 since July 27th?

8   A. Yes.

9   Q. Okay. And what was the – when did you do

10 that?

11   A. Saturday.

12   Q. The 28th? Or do you mean this past Saturday?

13      MR. LANGLEY: Saturday is July 28th.

14   A. The 28th.

15   Q. (BY MR. MULLIN) Okay. And what did you talk

16 to Mr. Smith about on the 28th?

17   A. I called him to let him know that his boss had

18 threatened me.

19   Q. And meaning Mr. Reagor?

20   A. Yes.

21   Q. And what did Mr. Smith say about that?

22   A. Silence and apologized.

23   Q. And what else did you talk about with

24 Mr. Smith that day?

25   A. Nothing. It was a very short call.

Page 12

1   Q. Is that the last time you've talked to

2 Mr. Smith?

3   A. Yes, it is.

4   Q. Have you communicated in any way with

5 Mr. Smith since then?

6   A. No.

7   Q. No e-mails, no texts, nothing?

8   A. No.

9   Q. Are – is Mr. Smith on your Facebook?

10   A. Don't know. I'd have to look.

11   Q. Are you on his Facebook –

12   A. I don't know.

13   Q. – as his Facebook friend?

14   A. I don't know.

15   Q. How about Twitter? Do you do Twitter or any

16 other kind of social media –

17   A. Very limited.

18   Q. – with Mr. Smith?

19   A. No.

20   Q. Did you, in the past, communicate with

21 Mr. Smith via his SBC Global e-mail account?

22   A. Yes.

23   Q. Okay. And we would ask that Ford Motor and

24 you preserve all e-mail, texts, records of any kind of

25 communications with Mr. Smith.

Page 13

1      MR. LANGLEY: We'll respond to those
2   requests.
3          MR. WIEHLE: Could y'all speak up some?
4   It's hard to hear everyone there. I apologize for
5   interrupting.
6      Q. (BY MR. MULLIN) I'm sorry. If I speak up too
7   much, it's almost like we're yelling in each other's
8   face.
9          All right. How long have you known
10  Mr. Smith?
11     A. Since early two-thousands.
12     Q. And did you go to school together?
13         MR. LANGLEY: We're not going to go
14  further into these areas. They don't relate to the
15  issues before the bankruptcy court tomorrow.
16     Q. (BY MR. MULLIN) Have you ever -- you and
17  Mr. Smith socialized together?
18         MR. LANGLEY: We're not going to respond
19  to any such questions that don't relate to the cash
20  sources and uses or the collateral positions of Ford
21  Credit.
22         MR. MULLIN: I think it goes to the
23  credibility of witnesses and --
24         MR. LANGLEY: We won't respond.
25         MR. MULLIN: -- information -- okay.

Page 14

1   Well, I understand. But I'm going to finish my
2   statement.
3          MR. LANGLEY: Oh, please do.
4          MR. MULLIN: We are seeking information
5   that is relevant because it goes to the credibility of
6   Ford's witnesses on the very issues that are before the
7   Court tomorrow.
8          MR. LANGLEY: Okay. For the record --
9   I'm sorry.
10         MR. MULLIN: Go ahead.
11         MR. LANGLEY: For the record, I don't
12  represent Ford Motor Company. When you say Ford, I hear
13  Ford Motor Company. I represent Ford Credit and
14  Mr. Byrd. We're here on behalf of Ford Credit and
15  Mr. Byrd.
16         MR. MULLIN: Okay. Well, I'm talking
17  about Ford Credit. So that's who we're talking about
18  right now, not Ford Motor.
19     Q. (BY MR. MULLIN) Have you and Mr. Smith,
20  within the last two years, traveled or vacationed
21  together?
22         MR. LANGLEY: We won't respond to any
23  such questions today.
24     Q. (BY MR. MULLIN) Are you going to follow your
25  counsel's advice?

Page 15

1          MR. LANGLEY: I'm instructing you not to
2   answer.
3      A. I'm following his advise.
4      Q. (BY MR. MULLIN) And have you -- have you, in
5   the last two years, received anything of value from
6   Mr. Smith?
7          MR. LANGLEY: Same instruction. We will
8   not respond.
9      Q. (BY MR. MULLIN) Are you going to follow your
10  counsel's instruction?
11     A. I am.
12     Q. Have you -- has -- have you given anything of
13  value to Mr. Smith in the last two years?
14         MR. LANGLEY: Move on, Counsel. Do you
15  have anything related to the cash collateral hearing?
16         MR. MULLIN: I've got plenty related to
17  the cash collateral hearing.
18         MR. LANGLEY: Same instruction.
19     Q. (BY MR. MULLIN) Have you had any
20  communications with Mr. Smith in the last six months
21  about vehicles being out of trust or double-flooring of
22  vehicles?
23     A. Yes.
24     Q. Okay. When were those?
25     A. Friday, July 27th.

Page 16

1      Q. Was that the first time you had ever talked to
2   Mr. Smith about vehicles being out of trust?
3      A. Yes.
4      Q. And was that the first time you've ever talked
5   to Mr. Smith about double-flooring of vehicles?
6      A. No.
7      Q. Okay. When was the first time you talked to
8   Mr. Smith about double-flooring of vehicles?
9          MR. LANGLEY: Instruct the witness not to
10  answer.
11     A. I'm going to follow my counsel's advice.
12         MR. LANGSTON: Certify.
13     Q. (BY MR. MULLIN) Tell me what you discussed
14  with Mr. Smith about vehicles being out of trust on
15  July 27th.
16     A. I discussed with him the amounts that were due
17  to Ford Credit. I discussed with him some examples of
18  vehicles being floor-planned that were sold. And I
19  discussed the need for the dealerships to give us the
20  keys and MSO's when I verified that he didn't have the
21  funds to pay Ford Credit for what was owed to Ford
22  Credit.
23     Q. Let's take those -- take each of those pieces.
24         First, on the out-of-trust vehicles, did
25  you quantify the amount at that time for him?

App. 008

Page 17

1    A.  Roughly.
2    Q.  And roughly what was the amount?
3    A.  Well, the amount owed to Ford Credit was --
4   I'm going to round up and call it $40 million.
5    Q.  Okay.  And what was Mr. Smith's response to
6   that --
7    A.  We will pay --
8    Q.  -- $40 million?
9    A.  We've always paid you what we owe you, and
10  we're going to pay you what we owe you.
11   Q.  And how did you respond to his statement that
12  we always pay -- we're always going to pay you and we
13  always pay you what we owe you?
14   A.  I told him that I needed to see proof that
15  they had the money for the EFTs that were entered.  I
16  needed proof that they were going to clear.
17   Q.  And what did Mr. Smith say to that?
18   A.  He provided me an Excel spreadsheet.
19   Q.  Do you have that?
20   A.  I do not.
21   Q.  Did you keep it?
22   A.  I did not.
23   Q.  You looked at an Excel spreadsheet.  And what
24  did the Excel spreadsheet show?
25   A.  It had various entities with receivables and

Page 18

1   cash balances and contracts and transits, etcetera.
2    Q.  And -- and what did you say to Mr. Smith after
3   you reviewed the Excel spreadsheet?
4    A.  That that wasn't going to be good enough, they
5   needed to see proof of funds and the Excel spreadsheet
6   was insufficient to do that.
7    Q.  And what did Mr. Smith say to that?
8    A.  He said, "That's what I have."  And I said, "I
9   need to see bank balances.  I need to see proof of
10  funds."
11   Q.  Did he show you any bank balances?
12   A.  He did.
13   Q.  And what -- how did you respond to that?
14   A.  After we went through them all, it wasn't --
15  it wasn't near enough money.  And I communicated to him
16  that that's not enough money.
17   Q.  How much was it?
18   A.  In the 13- to 15-million-dollar range, what he
19  showed me.
20   Q.  And do you know what happened to that 13 to 15
21  million dollars?
22   A.  I do not.
23   Q.  Okay.  So what further conversation did you
24  have with Mr. Smith that day?
25   A.  Once we verified that there wasn't enough

Page 19

1   money to pay for what was owed, I communicated to him
2   that he needed to instruct the dealerships to give us
3   keys and MSO's and possession of the inventory --
4   inventory and titles.
5    Q.  And what did -- how did he respond to your
6   request?
7    A.  Turned red a few times, put his head and arms
8   on the desk and laid there for 30 to 45 seconds, and
9   then started making some phone calls.
10   Q.  Who did he -- who did he call or who did he
11  tell you he was calling?
12   A.  I don't know who he called.
13   Q.  What was he saying on the phone?
14   A.  He was calling the dealerships to instruct
15  them to cooperate with Ford Credit.
16   Q.  Did you speak with Mr. Reagor or Mr. Dykes on
17  the 27th?
18   A.  Yes.
19   Q.  Who did you talk to?
20   A.  Both.
21   Q.  Okay.  And tell me about your conversation
22  with Mr. Reagor.
23   A.  Mr. Reagor was coming back from Bermuda to
24  Washington, D.C.  I think he mentioned Dulles Airport.
25  And then from Dulles to Dallas and then from Dallas to

Page 20

1   Lubbock.  So he told me about that.  And then we were
2   texting.  I think he was in flight.  I'm not sure, but I
3   think he was.  And we were texting back and forth about
4   our findings.
5    Q.  So you had text messages going back and forth
6   between you and Mr. Reagor?
7    A.  Yes.
8    Q.  Did you have any -- anything else that was
9   exchanged between you orally?
10   A.  A phone call.
11   Q.  And what did you discuss?
12   A.  We discussed -- and this is when -- after he
13  had landed in Dallas.  And he told me he was on the
14  tarmac.  And he told me he was getting ready to catch
15  his flight to Lubbock, which was -- it sounded like a
16  private flight.  And I told him about the 40 million.
17  He adamantly disagreed with my statement that he owed us
18  $40 million.
19       I told him that we had found some examples
20  where vehicles were floored that were previously sold.
21  I told him that we had some examples of vehicles being
22  floor-planned on more than one credit line.  And I also
23  told him -- and he continued to disagree with the amount
24  that was due.  And then I said, "Well, Bart, we're going
25  to come back on Tuesday to count the vehicles again.

**App. 009**

Page 21

1   And we can verify and solidify the amount that was due."
2        And he became enraged. He started
3   screaming and yelling at me. And he said, "No, you
4   won't. I'll shoot your fucking ass." And I immediately
5   ended the phone call, followed by a phone call to Rick
6   Dykes to tell him what had happened, followed by a phone
7   call to Shane Smith to let him know what had happened,
8   followed by a phone call to my boss to let him know what
9   happened.
10       Q.  Who's your boss?
11       A.  Paul Boudreau.
12       Q.  What explanation did Mr. Smith give to you for
13  the 40 million out of trust?
14       A.  None.
15       Q.  What about the double-pledging?
16       A.  None.
17       Q.  Did you -- did you ask him for an explanation?
18       A.  Absolutely.
19       Q.  And what did he do? Did he sit there
20  silently?
21       A.  He said, "I'm going to have to research it. I
22  don't know."
23       Q.  And then you called Mr. Dykes. Tell me about
24  that conversation.
25       A.  I called Rick to tell him about what had

Page 22

1   happened with Bart.
2        Q.  And what did you discuss with Mr. Dykes at
3   that time?
4        A.  I told him what Bart said to me.
5        Q.  Had -- did you tell Mr. Dykes about the
6   out-of-trust situation and the double-pledging?
7        A.  I believe he was already aware of it.
8        Q.  How was he aware of it?
9        A.  Because he came to the office Friday night and
10  met with Shane and I.
11       Q.  Okay. Is it true that you spent the whole day
12  in Shane Smith's office on July 27th?
13       A.  I got to the office around 10:00. And I was
14  there quite a while, yes.
15       Q.  Did you go have lunch with Mr. Smith that day?
16       A.  I did.
17       Q.  Where did you go?
18       A.  I don't know the name of the restaurant. It
19  was an Italian restaurant downstairs from their office.
20       Q.  Okay. And what time did you leave?
21       A.  Lunch or --
22       Q.  After you left Mister -- what time did you
23  leave Mr. Smith's office?
24       A.  It was sometime after Rick got there. And I
25  believe it was 6:30, 7:00, something like that. We were

Page 23

1   there pretty late. I don't have the exact time. But I
2   met with Shane and Rick and left sometime after that.
3        Q.  Okay. So was it just you and Mr. Smith in
4   that office for at least seven hours that day?
5        A.  There were people in and out, and he was in
6   and out. And he would allow me to use his office to
7   make private phone calls. I was in their corporate
8   office all day, but not necessarily in Shane Smith's
9   office the entire time.
10       Q.  You were in their office most of -- in his
11  office -- in Shane Smith's office most of the day; isn't
12  that true?
13       A.  I was in his office a lot that day. And I was
14  out in the hall and making phone calls elsewhere as
15  well.
16       Q.  What time -- what time of day was that you
17  told Mr. Smith about the out of trust?
18       A.  It was later in the day. Probably 4:30 to
19  5:00, somewhere around in there. I can't quote the
20  exact time. But it was later in the afternoon.
21       Q.  Tell me about your conversation with
22  Mr. Boudreau. What did you discuss?
23       A.  Which one?
24       Q.  Well, the one you said you -- you just told us
25  about, you reporting --

Page 24

1        A.  So to clarify --
2        Q.  -- your conversation with Mr. Reagor.
3        A.  To clarify the call after I was threatened.
4        Q.  And what did Mr. Boudreau say?
5        A.  I don't recall exactly what he said. It
6   was -- there was a long pause after I told him what had
7   happened. And we talked about what had happened and the
8   circumstances, and we ended the call. And he had some
9   phone calls that he needed to make to notify some people
10  as to what happened.
11       Q.  Okay.
12       A.  It wasn't a long call. It was a brief call.
13       Q.  Who -- who else was he going to notify?
14       A.  I don't know.
15       Q.  Have you ever been convicted of a felony?
16       A.  No.
17       Q.  How about a misdemeanor involving moral
18  turpitude? Have you ever been convicted of one of
19  those?
20       A.  No.
21       Q.  Have you been contacted by the U.S. Attorney
22  in connection with the Reagor-Dykes matter?
23       A.  No.
24       Q.  How about the FBI?
25       A.  No.

Page 25

1    Q.  Tell me what your job is at Ford Motor Credit.
2    A.  I'm the Dallas regional manager.
3    Q.  Okay.  What does the Dallas regional manager
4    do?
5    A.  I manage a territory which includes all of
6    Oklahoma and the top half of Texas.  I have roughly 130
7    dealerships that I manage, 10 employees.  I manage the
8    relationships with those dealers and business
9    development and generating revenue and volume for Ford
10   Credit.
11   Q.  And is your boss Mr. Boudreau?
12   A.  He is.
13   Q.  Is he your only boss, or are there other
14   bosses?
15   A.  He's my only boss.
16   Q.  What's Mr. Boudreau's title?
17   A.  General manager of the central market area.
18   Q.  And there are three other people being deposed
19   today; Ms. Schmucker, Mr. Leal, and Mr. Conlan.  Are
20   they all people who report up to you?
21   A.  Just one.
22   Q.  Which one?
23   A.  Gwen.
24   Q.  And then what about Mr. Leal and Mr. Conlan?
25   How are they --

Page 26

1    A.  Coworkers.
2    Q.  Just coworkers?
3    A.  Colleagues, coworkers.
4    Q.  Okay.  What's Ms. Schmucker's title?
5    A.  Business development manager West Texas.
6    Q.  And what about Mr. Leal?  What's his title?
7    A.  He is the financial services manager for the
8    central market area.
9    Q.  And what about Mr. Conlan?  What's his title?
10   A.  I don't know his title.  He's --
11   Q.  Do you know what he does?
12   A.  He's a Black Belt -- a Master Black Belt for
13   Six Sigma process.
14   Q.  So that's a computer program you're talking
15   about?
16   A.  It's a process where you identify defects per
17   million opportunities.  It's a well-known process
18   improvement plan.
19   Q.  So when you're saying, "defects," you're
20   talking about red flags, something wrong?
21   A.  It's what it is, defects per million on any
22   application you want to apply it to.
23   Q.  And was that applied in this case to the
24   Reagor-Dykes inventory?
25   A.  I believe it was, yes.

Page 27

1    Q.  How did that come about?
2    A.  I don't know.
3    Q.  Who directed it to occur?
4    A.  I don't know.
5    Q.  Who informed you it was going to occur?
6    A.  I wasn't informed it was going to occur.
7    Q.  Well, why were you at Reagor-Dykes on July the
8    27th?
9    A.  Because I was asked to come to Lubbock.
10   Q.  By?
11   A.  My boss.
12   Q.  Mr. Boudreau?
13   A.  Yes.
14   Q.  And did he mention Black Belt to you?
15   A.  No.
16   Q.  When was the first time you heard about Black
17   Belt being associated with Reagor-Dykes?
18   A.  Sometime after June 28th.  I don't know
19   exactly when.
20   Q.  And what were you told?
21   A.  That they -- there -- that they applied this
22   process to the June 28th audit and there were some
23   irregularities and discrepancies uncovered.  And those
24   were reviewed with us at that time.
25   Q.  And the -- so the -- the June 28th audit was

Page 28

1    of the Reagor-Dykes inventory.  Who was that provided to
2    within Ford Motor Credit?
3    A.  Multiple stakeholders.
4    Q.  Okay.  Who would they be?  Name them.
5    A.  The BDM, the regional manager, the dealer
6    credit supervisor, the dealer credit operations manager,
7    the wholesale audit folks, multiple stakeholders.  I
8    can't name them all.
9    Q.  Okay.  Could you tell me who these people are,
10   though, for instance, the BDM?
11   A.  That's Gwen Schmucker.
12   Q.  Okay.  And the regional manager --
13   A.  That's me.
14   Q.  -- is you.  So you get it.
15      And who are these other people you're
16   talking about?  What are their names?
17   A.  Dealer credit supervisor is Scott Carter.
18   Q.  Okay.  Anyone else?
19   A.  The center operations manager for dealer
20   credit is Bill Delancy.
21   Q.  Okay.
22   A.  Rene Leal would get those as well.  He's our
23   financial services manager.  And Dennis Neely, our
24   dealer credit manager in Nashville, would also
25   potentially see the audit results as well.

Page 29

1    Q.  And you don't know who made the decision to
2    either consider applying Black Belt to the Reagor-Dykes
3    audit findings or actually directed that that occur?
4    A.  I have no idea.
5    Q.  It wasn't you?
6    A.  No.
7    Q.  Did you discuss the Black Belt program with
8    Rick Dykes?
9    A.  I discussed findings. I didn't specifically
10   mention Black Belt.
11   Q.  When was that?  On the 27th of July?
12   A.  That Friday and/or Saturday. I can't remember
13   exact times of discussions, but around those two days.
14   Q.  Okay.
15   A.  It was discussed on Friday evening in the
16   meeting with him and Shane, some of the high-level
17   findings.
18   Q.  Did Shane used to work for Ford Motor Credit?
19       MR. LANGLEY:  We're not going to get
20   further into these issues than relate to the cash
21   collateral hearing. Instruct the witness not to answer.
22   A.  I'm going to follow my counsel's advice.
23   Q.  (BY MR. MULLIN)  How much does Ford contend
24   that Reagor-Dykes – the Reagor-Dykes Auto Group owes
25   Ford Motor Credit?

Page 30

1    A.  I don't have the exact amount because I
2    haven't been involved with anything regarding the group
3    since the bankruptcy filing.
4    Q.  Okay. Let me show you a document.
5       (Exhibit 2 marked.)
6    Q.  Why haven't you been involved?
7    A.  The decision was made that once the bankruptcy
8    occurred, that I needed to get back in my job duties and
9    run a very large and important region for the company.
10   It's a full-time job. So once the bankruptcy was filed,
11   we have people at Ford Credit that specialize in
12   handling these situations. It was turned over to them.
13   And I went back to my regional manager duties.
14   Q.  Who made that decision? You said the decision
15   was made.
16   A.  I know who communicated it to me, but I don't
17   know who made the decision.
18   Q.  Okay. Who communicated it to you?
19   A.  Paul Boudreau.
20   Q.  All right. Let me show you Exhibit No. 2.
21   Are you familiar with that document?
22   A.  I am not.
23   Q.  Okay.
24   A.  Let me – let me – what is this? A listing
25   of the inventory?

Page 31

1    Q.  I think it's a -- supposed to be a listing of
2    the debt -- the floor-plan debt broken down by
3    dealership.
4    A.  As I said, I haven't been involved since the
5    bankruptcy was filed. So, no, I have not -- I have not
6    seen this.
7    Q.  Okay. Do you know the total amount out of
8    trust?
9    A.  As of right now?
10   Q.  As of right now?
11   A.  I do not. Again, I haven't been involved
12   since the bankruptcy was filed.
13       (Exhibit 3 marked.)
14   Q.  Can you tell me if you've seen Exhibit 3?
15   A.  I haven't seen this before.
16   Q.  Okay. Okay. So you haven't seen Exhibit 3,
17   the list of the --
18   A.  I have not seen --
19   Q.  -- out of trust --
20   A.  -- all of these pages detailing specific VIN
21   numbers and units like this. The only thing I've seen
22   is very high-level information. And it was prior to the
23   filing. In fact, I was on vacation from August 3rd
24   through August 12th.
25   Q.  Did you reach any conclusions about how

Page 32

1    Reagor-Dykes came to have $39 million out of trust?
2    A.  I have no idea.
3    Q.  And do you have any -- did you reach any
4    conclusions about how the double-flooring occurred?
5    A.  I have no idea.
6    Q.  Has anybody that you work with at Ford
7    communicated to you how those things occurred?
8    A.  No.
9    Q.  Were you in charge of the quarterly audits of
10   the inventory at Reagor-Dykes --
11   A.  No.
12   Q.  -- by Ford Motor Credit?
13   A.  What do you mean by --
14       MR. LANGLEY:  Hold on just a minute.
15       I'm going to object to vague and ambiguous
16   on questioning.
17       You can answer.
18   A.  What specifically are you asking? I want to
19   make sure I understand your question.
20   Q.  (BY MR. MULLIN)  Well, let me -- let me step
21   back a page.
22       Ford Motor Credit had quarterly audits
23   done of the inventory of Reagor-Dykes Auto Group; is
24   that right?
25   A.  Yes.

Page 33

1    Q.   Okay  Were you the person that directed those
2    audits?
3    A.   No.
4    Q.   Who directed them?
5    A.   Multiple stakeholders.
6    Q.   Tell me who they are.
7    A.   Well, it would be a very long list.  The file
8    was last approved in '16, and it probably had, wow, 15
9    people involved.  I'm just -- that's a total guess on
10   the number  But it's multiple stakeholders that make
11   the decision in this case.
12   Q.   To conduct the quarterly audits?
13   A.   It's approved in a -- in a review, correct, by
14   multiple stakeholders.
15   Q.   How often are the reviews?
16   A.   Annually or every two years depending on the
17   risk associated with the account.
18   Q.   Were the audits at Reagor-Dykes actually every
19   quarter?
20   A.   I don't recall exactly when they were.  I'm
21   not in charge of setting the schedule
22   Q.   Was --
23   A.   But they were on a quarterly schedule.
24   Q.   They were on a schedule to be audited every --
25   every quarter?

Page 34

1    A.   Correct.
2    Q.   And there was a group of people at Ford Motor
3    Credit that made that decision on how often the audits
4    would occur?
5    A.   Multiple.  Multiple input and multiple
6    stakeholders.
7    Q.   Okay.  And were you one of the 15?
8    A.   Yes.
9    Q.   And can you tell me the names of any of the
10   other 15 -- any of the other people that are in the 15?
11   A.   Okay  Gwen Schmucker, business development
12   manager; me; Rene Leal, the financial services manager;
13   David Center, the sales operations manager -- or it
14   would have been a different sales operations manager at
15   that time -- the financial services manager; the
16   regional manager; the dealer credit analyst, the dealer
17   credit --
18   Q.   Give me names if you can because I'm -- you
19   know, I --
20   A.   I don't know that I can do that.  I mean,
21   that's a lot of names and --
22   Q.   Well, if you don't know the name, give me the
23   title  But if you know the name, I prefer the name.
24   A.   Okay
25   Q.   Yeah.

Page 35

1    A.   The dealer credit analyst.  Don't know -- I
2    can't remember which one did it.
3    Q.   Okay
4    A.   The dealer credit supervisor, Scott Carter;
5    the center operations manager of dealer credit, Bill
6    Delaney; the dealer credit manager, which I'm not sure
7    who the person was at that point in time; our commercial
8    risk department in Dearborn, which probably had two to
9    three reviewers, and then various vice presidents and
10   senior executives and managers of Ford Credit
11   Q.   Okay.  Do these 15 people meet together as a
12   group to make this decision, or is it done e-mail?  Or
13   how is that done?
14   A.   The credit file process goes -- is completed
15   over a long period of time, weeks.  And people review
16   the file at various different stages along the way.  And
17   then in this case, due to the credit commitments, it was
18   reviewed by our NACRC, our national operating committee.
19   And I presented the file in a meeting to all of these
20   folks.  And then they decide if they want to approve it
21   or not.
22   Q.   Okay  Is it -- the quarterly audit -- is that
23   standard for Ford Motor Credit on dealerships, or is
24   it -- is that unusual?
25   A.   That's proprietary information, and I don't

Page 36

1    think I need to discuss that.  That's confidential to my
2    company on how we audit dealers.
3    Q.   So you're refusing to answer that one?
4    MR. LANGLEY:  I'm instructing him not to
5    answer.
6    A.   I don't think it's relevant.
7    Q.   (BY MR. MULLIN)  Did -- but I'm just asking
8    you:  Does this committee ever meet face to face, or is
9    it just --
10   A.   No.
11   Q.   It's all handled via e-mail --
12   A.   Various people are face to face in a certain
13   area of the country if they're able to get together;
14   otherwise, it's multiple people dialing in.
15   Q.   Okay.  Do the same 15 people all get the
16   audit, the report?
17   A.   No.  No.
18   Q.   All right.
19   MR. LANGLEY:  David, let's take a break
20   when you're ready.
21   MR. MULLIN:  Sure.  That's fine.  We'll
22   take a break right here.
23   MR. LANGLEY:  Go off the record.
24   (Break from 11:37 a.m. to 11:42 a.m.)
25   Q.   (BY MR. MULLIN)  Do you know if Ford has

**App. 013**

Page 37

1  received any payments on the Reagor-Dykes indebtedness
2  since July 27th?
3      A.  Are you saying Ford or Ford Credit?
4      Q.  Ford Credit.
5      A.  I'm not aware of any.  Again, I haven't been
6  involved.
7      Q.  Do you know if Ford Credit has any of the
8  collateral for the Reagor-Dykes debt in its possession?
9      A.  Can you repeat the question?
10     Q.  Does Ford have -- Ford Credit have any of the
11 collateral for the Reagor-Dykes debt in its possession?
12     A.  What do you mean by "have"?
13     Q.  Well, have in their possession.  I mean, do
14 you have it, custody, control?
15     A.  We're monitoring it.  But it's still on the
16 dealership premises.
17     Q.  Okay.
18     A.  Does that answer your question?
19     Q.  Well, in a way.  But I want to know if there's
20 anything that's not on the dealer's premises that you
21 have taken.
22     A.  I'm not aware of any.
23     Q.  Okay.  So are you aware of Ford liquidating
24 any of the collateral for the Reagor-Dykes debt since
25 July 27th?

Page 38

1      A.  I have not been involved since the bankruptcy
2  filing on August 1st, I believe it was.  So, no, I'm not
3  aware of anything that's occurred since August 1st.
4      Q.  What is the current value of Ford's collateral
5  for the Reagor-Dykes debt?
6      A.  I don't know.
7      Q.  Who would know at Ford Credit?
8      A.  Probably Rene Leal since he's running the
9  situation.
10     Q.  Okay.
11     A.  He could probably get you to the exact penny.
12     Q.  Do you know if Ford has received anything for
13 units in transit since the bankruptcy?
14     A.  You mean Ford Credit?
15     Q.  Right.
16     A.  Not -- you've got to be specific with me.
17     Q.  Ford Credit --
18     A.  We're two totally different companies.
19     Q.  I know.  But unless I tell you Ford Motor
20 Company, I'm talking about Ford Credit, okay?  Because
21 Ford Motor Company --
22         MR. LANGLEY:  That's fine.
23     A.  Okay.  Can you repeat the question?
24     Q.  (BY MR. MULLIN)  Has Ford Credit received
25 anything for units in transit?

Page 39

1      A.  I don't know.
2      Q.  Who would know that?
3      A.  Probably Rene Leal.
4      Q.  Okay.  What is Mr. Leal in charge of?  I think
5  you used the word "in charge."
6      A.  He is in charge of the situation.
7      Q.  The situation of collecting the Reagor-Dykes
8  debt?
9      A.  He's in charge of trying to collect whatever
10 the amount of money is that's owed to us, protecting
11 Ford Credit's interest.
12     Q.  Well, is Paul Boudreau supervising Rene Leal?
13     A.  He does.
14     Q.  Ford claims a lien on property other than
15 vehicles, correct?
16         MR. LANGLEY:  Objection; calls for a
17 legal conclusion.
18         You can answer if you know.
19     A.  We have UCC financing statements, and we
20 have -- I believe we have security agreements for all
21 locations we do business with.
22     Q.  (BY MR. MULLIN)  Okay.  So is Ford -- do you
23 know if Ford is claiming a lien on any property other
24 than vehicles?
25     A.  I don't know.

Page 40

1      Q.  Do you know what Ford's plan for liquidation
2  of the collateral would be if it were to have its motion
3  for relief from stay granted?
4      A.  I do not.
5      Q.  Who would know that?
6      A.  Rene Leal.
7      Q.  Were you aware of any red flags of fraud at
8  Reagor-Dykes before July 27th?
9          MR. LANGLEY:  Objection; vague and
10 ambiguous.
11         You can answer if you know what a red flag
12 is, if you know what indices of fraud are.
13     A.  No comment.
14     Q.  (BY MR. MULLIN)  Do you know what a red flag
15 is?
16         MR. LANGLEY:  Same objection.
17     A.  It can mean many things.
18     Q.  (BY MR. MULLIN)  So you don't have any idea
19 what the term, "red flag," would mean in the context of
20 discovering a fraud?
21         MR. LANGLEY:  Same objection.
22         THE WITNESS:  Are you instructing me not
23 to answer?
24         MR. LANGLEY:  No.  If you know what he
25 means by "red flags," you can try to help him with his

Page 41

1  question.
2       A. I know what a red flag is, yeah.
3       Q. (BY MR. MULLIN) Okay.
4       A. So can you repeat the question?
5       Q. I'm just asking if you saw any red flags of
6  fraud before July 27th at Reagor-Dykes?
7       A. Of fraud? Specifically fraud?
8       Q. Well, let's say fraud, out of trust,
9  double-pledging.
10         MR. LANGLEY: Objection; compound.
11      Q. (BY MR. MULLIN) You can answer.
12         MR. LANGLEY: Answer if you can, yeah.
13      A. Repeat the question, please.
14      Q. (BY MR. MULLIN) Did you see any red flags of
15  fraud, double-pledging, out of trust before July 27th?
16      A. No.
17      Q. I'm going to mark this as --
18         MR. MULLIN: Let me borrow an exhibit
19  sticker here.
20         What's our last number over there?
21         MR. LANGLEY: It's 3.
22         MR. MULLIN: So we're on 4?
23         MR. LANGLEY: Yes, sir.
24         (Exhibit 4 marked.)
25      Q. (BY MR. MULLIN) Let me show you Exhibit

Page 42

1  No. 4. See if you've seen that before. It was marked
2  for the previous depositions as Exhibit 10 by Ford
3  Credit counsel.
4         MR. LANGSTON: It ws premarked.
5         MR. MULLIN: Oh, it was premarked. But
6  who marked it?
7         MR. LANGSTON: We did.
8         MR. MULLIN: Oh, we did. Okay.
9         (Witness looks at document.)
10      A. Okay. Your question is?
11      Q. (BY MR. MULLIN) Have you seen this document
12  before?
13      A. Well, yes. I was copied on it right there
14  (pointing).
15      Q. Right. And -- so Exhibit 4 contains, at the
16  very bottom, an e-mail from Gwen Schmucker to Bart
17  Reagor and Rick Dykes and Shane Smith with a copy to
18  you, correct?
19      A. Yes.
20      Q. And that's dated June the 29th, 2018, correct?
21      A. Yes. I received it on June 29th.
22      Q. And Ms. Schmucker writes, "Attached is the
23  Group Summary from the audit we conducted at each of
24  your stores yesterday. These results really are
25  fantastic and your entire organization should be

Page 43

1  commended for their hard work and their efforts. Thank
2  you all very, very much. We greatly appreciate you and
3  value our partnership with the Reagor-Dykes
4  organization."
5         Is that -- is that correct? Is that what
6  she said?
7       A. On June 29th, that's what she said.
8       Q. Of this year, right --
9       A. Correct.
10      Q. -- 2018?
11      A. Yes.
12      Q. And did you voice any disagreement with
13  Ms. Schmucker regarding her statements here either after
14  receiving this e-mail or any time?
15      A. You know, I get about 200 e-mails a day, so I
16  don't know if I -- I don't think I did. I probably just
17  filed it away.
18      Q. Okay. Did you have any discussion with
19  Ms. Schmucker about the June 28th audit of the
20  Reagor-Dykes Group?
21      A. Not that I recall.
22      Q. Did you have any discussion with her about her
23  commentary on the Ford -- Ford Credit audit of the
24  Reagor-Dykes Group?
25      A. I don't recall any.

Page 44

1       Q. Did Ford Motor Credit conduct the audit of the
2  Reagor-Dykes Group, or did it have somebody do it? Did
3  they outsource it to someone else to do the audit?
4       A. We have a vendor that conducts our audits for
5  us.
6       Q. And who is that?
7       A. AiM. I believe it's called AiM, A-I-M.
8       Q. Where is that company out of?
9       A. I don't know.
10      Q. Do you know who the lead auditor was?
11      A. I do not.
12      Q. Did AiM conduct all the audits of Reagor-Dykes
13  in the last two years for Ford Motor Credit?
14      A. I think so.
15      Q. Okay. Did you have anybody that you talked to
16  at AiM?
17      A. No.
18      Q. But you-all received the audits, correct?
19      A. Yes.
20      Q. And did you review the audits when you
21  received them?
22      A. Of course.
23      Q. I'd like to look at the audit for June 28th.
24  I had a couple questions about it.
25         Look at -- I wanted to focus in on

Page 45

1    Reagor-Dykes Chevrolet.
2        A.  Which page are you looking at?  The last one
3    or the third one?
4        Q.  I think I'm on the third page, yeah.
5        A.  This one?
6        Q.  Yeah.  Is that the page you're looking at?
7        A.  Yeah.
8        Q.  Okay.  Do you see where it says, "Reagor-Dykes
9    Chevrolet," on Exhibit 4?
10       A.  Yes.
11       Q.  And it says -- Reagor-Dykes Chevrolet, that's
12   the dealership in Floydada, right?
13       A.  Yes.
14       Q.  And it shows here that there's 225 vehicles as
15   of June 28th, 2018, that have been sold, but Ford has
16   not yet received the money.
17       A.  Okay.
18       Q.  And is that -- that's what it says, right?
19   That's what the audit says?
20       A.  It says number sold not due.
21       Q.  Right.  It's not due yet because it's due
22   during the following week, correct?
23       A.  Could be.
24       Q.  Well, let's look at that.
25           It says the dollars sold not due are --

Page 46

1    for that 225 vehicles is $9,401,090, correct?
2        A.  It does.
3        Q.  And then it tells you when that money is due
4    by day, correct?
5        A.  The -- yes, it does.
6        Q.  So it tells you that on the 29th, $997,437 is
7    due, correct?
8        A.  That's what it says.
9        Q.  And then it tells you how much is due
10   July 2nd, July 3rd, July 5th, 6th, 9th, and 10th,
11   correct?
12       A.  It does.
13       Q.  All right.  So this report indicates then that
14   during the week prior to the audit, that the
15   Reagor-Dykes Chevrolet dealership in Floydada had sold
16   225 vehicles, correct?
17       A.  You said, "prior to the audit."  What exactly
18   do you mean by "prior to the audit"?
19       Q.  Well, that would mean in -- you know, seven
20   days prior, right?  Because isn't the -- aren't they
21   responsible for getting the money -- in other words, how
22   do they know that the money is due on June 29th, for
23   instance?  Does that mean that the vehicles were sold on
24   the 22nd?
25       A.  It's based on the sales date that was provided

Page 47

1    to the auditors by the dealerships.
2        Q.  Right.  And that would be what?  Seven days?
3    That's the seventh day?
4        A.  Seven business days.
5        Q.  Yeah.  Okay.  So seven -- in the seven
6    business days preceding the audit, there were 225
7    vehicles sold off of the Floydada lot.  That's what the
8    audit is telling us, isn't it?
9        A.  If the dates we were provided were accurate,
10   that would be correct.
11       Q.  Okay.  And the dollar amount, that would be
12   the -- the dollar amount of the sales, the 9.4 million?
13       A.  It would be the 225 units added up.
14       Q.  It would add up to 9.4 million, correct?
15       A.  I haven't run the numbers and I haven't seen
16   that, but it should.
17       Q.  It shows that on the report -- on the audit
18   report if the audit report --
19       A.  I haven't double-checked those numbers, but
20   that's what it should be.
21       Q.  Okay.  And -- so do you know how many cars --
22   excuse me.  I should say vehicles or units -- how many
23   units were on the lot when the lot was full at Floydada?
24       A.  I have no idea.
25       Q.  Well, you received reports, didn't you, from

Page 48

1    Reagor-Dykes indicating how much inventory -- what the
2    inventory was at the Floydada lot, didn't you?
3        A.  I -- I don't recall receiving specific
4    inventory runs, no.
5        Q.  Did -- did Ford keep track of what the
6    inventory was at the Floydada lot?
7        A.  What do you mean by "keep track of"?
8        Q.  Well, did you have reports to you of what the
9    inventory was at dates -- at various dates at the
10   Floydada lot?
11       A.  That information is available at all times.
12       Q.  Wouldn't that be part of your responsibility
13   as the regional manager to know what the capacity of the
14   lot was?
15           MR. LANGLEY:  I'm going to object to the
16   line of questioning.  And at this point, we have had
17   more than enough questioning that doesn't relate to the
18   issues before the bankruptcy judge tomorrow.  Instruct
19   the witness to answer no further questions in this area.
20           MR. MULLIN:  This goes directly to what
21   the collateral is, so I don't know if you can get away
22   with that.
23           MR. LANGLEY:  If you have a question
24   about the value of the collateral or the amount of the
25   indebtedness, which you've already asked and he says he

Page 49

1  doesn't know, you'll have to ask somebody else, go
2  ahead.
3        MR. MULLIN: Well, you're trying to
4  testify for him. But I think it's a very interesting
5  fact.
6     Q. (BY MR. MULLIN) Okay. Let's -- let's go into
7  it a little further.
8        Are you going to follow his advice and not
9  answer?
10       MR. LANGLEY: You're instructed not to
11  answer any further questions in this line.
12    A. Absolutely I'm following his advice.
13    Q. (BY MR. MULLIN) Okay. Let's see here.
14       (Exhibit 5 marked.)
15    Q. Let me show you Exhibit No. 5, which is the
16  balance sheet for the Floydada lot as of June 30th,
17  2018. Have you ever seen this document before?
18    A. No.
19       MR. LANGLEY: Did you mark it as 5?
20       MR. MULLIN: 5.
21    Q. (BY MR. MULLIN) Do you see what the -- the
22  financial statement reflects as the total inventory at
23  the Floydada lot?
24       MR. LANGLEY: We'll object. He's not
25  seen the document. He's not familiar with the document.

Page 50

1     Q. (BY MR. MULLIN) Do you see that? Can you
2  read that?
3        MR. LANGLEY: Have you seen the document?
4  Do you know what it is?
5        THE WITNESS: Yeah. It's their financial
6  statements -- their direct financial statement.
7        MR. LANGLEY: Go ahead.
8     A. What's the question?
9     Q. (BY MR. MULLIN) Does -- does Exhibit No. 5
10  reflect that the total inventory at the Floydada lot as
11  of June 30th, 2018, was $10.4 million?
12    A. You're talking about inventory or the debt
13  associated with the inventory? Notes payable or
14  inventory?
15    Q. Down here where it says, "Total Inventory," on
16  that --
17    A. Total inventory is 10.4 million.
18    Q. Yes.
19    A. Yes, I see that.
20    Q. Okay. Isn't it true, sir, that if 225
21  vehicles were sold off the Floydada lot in seven
22  business days before this audit, that would be virtually
23  the entire inventory of the Floydada lot having been
24  sold in that theory?
25       MR. LANGLEY: Objection; argumentative,

Page 51

1  speculative, instruct the witness not to go further in
2  this area.
3        MR. MULLIN: I'm just asking what he
4  knows.
5        MR. LANGSTON: Certify.
6        MR. LANGLEY: I'm instructing him not to
7  answer. Do you have any other questions?
8        MR. LANGSTON: Certify that.
9        MR. MULLIN: So he won't answer questions
10  about the vehicles. I don't know what the -- how that
11  couldn't relate to cash collateral, but --
12       MR. LANGLEY: Objection to the sidebar.
13       MR. MULLIN: Well, it's not a sidebar.
14       MR. LANGLEY: Objection to this sidebar.
15       MR. MULLIN: I'm begging you not to
16  instruct my questioning of the witness.
17       MR. LANGLEY: Do you want to go back to
18  the Court now?
19       MR. MULLIN: I'll go back to the Court
20  any time you want, Mr. Langley. I love going to the
21  Court when I've got ridiculous objections.
22       MR. LANGLEY: It didn't go so well for
23  you this morning. If you want to try it again, let's
24  go.
25       MR. MULLIN: I thought it went just fine

Page 52

1  this morning. I thought it went just fine this morning.
2  I have no problem with what happened this morning.
3     Q. (BY MR. MULLIN) So let me ask you a couple
4  more questions here about this.
5        Wouldn't -- wouldn't you have been the
6  person responsible at Ford Motor Company to determine
7  whether these audit results that were -- you received
8  showing the 225 vehicles had been sold off the Floydada
9  lot in seven business days prior to the audit, whether
10  that was a red flag of fraud?
11       MR. LANGLEY: Objection. He's not going
12  to answer. I instruct the witness not to answer this.
13    Q. (BY MR. MULLIN) Wouldn't you be the person
14  responsible to determine if the collateral -- if that
15  was actually an accurate statement of what the sales had
16  been from the collateral?
17       MR. LANGLEY: Instruct the witness --
18    A. I'm following my counsel's advice.
19    Q. (BY MR. MULLIN) Did you even notice that
20  225 --
21       MR. LANGLEY: We're done. Do you have
22  anything further?
23       MR. MULLIN: I've got plenty further.
24  Stop interrupting my questions, Mr. Langley.
25       MR. LANGLEY: He's not going to answer.

Page 53

1      MR. MULLIN: Well, you can -- you can
2  object after I speak, sir.
3      MR. LANGLEY: Sir, go ahead. Speak.
4      MR. MULLIN: Okay. I'm going to ask my
5  questions.
6      MR. LANGLEY: Go ahead.
7      MR. MULLIN: You can do whatever you
8  want. You can get up and run out of here. But there
9  will be a day when you and Ford Motor Credit is going to
10 have to answer these questions. You'll either answer
11 them today, or you'll answer them another day.
12     MR. LANGLEY: Do you have another
13 question?
14     MR. MULLIN: I've got plenty of
15 questions.
16     MR. LANGLEY: Proceed.
17 Q.  (BY MR. MULLIN) Well, my question is: Did
18 you or anyone else at Ford note that a sale of 225 units
19 off of the Floydada lot in the seven business days
20 before June 28th would be a sale of practically the
21 entire inventory of the lot?
22     MR. LANGLEY: Don't respond.
23 Q.  (BY MR. MULLIN) In seven business days?
24     MR. LANGLEY: Don't respond.
25 A.  I'm going to take his advice.

Page 54

1  Q.  (BY MR. MULLIN) Well, it was Ford Motor
2  Company's position with these gentlemen, with Mr. Reagor
3  and Mr. Dykes, that the audit was fantastic, right?
4  A.  Okay. You said, "Ford Motor Company."
5      MR. LANGLEY: Don't respond. Don't
6  quibble. Don't respond.
7      THE WITNESS: Okay.
8  Q.  (BY MR. MULLIN) Wasn't it Ford Motor Credit's
9  position that the -- this audit that we just read from
10 was a fantastic audit?
11     MR. LANGLEY: Don't respond.
12 A.  I'm going to take his advice.
13 Q.  (BY MR. MULLIN) And that was what Ford Motor
14 Credit told Mr. Dykes and Mr. Reagor --
15     MR. LANGLEY: Don't respond.
16 Q.  (BY MR. MULLIN) -- correct?
17     Was Ford Motor Credit's June 28th, 2018,
18 audit of Reagor-Dykes Auto Group, Exhibit No. 5 to your
19 deposition, accurate?
20     MR. LANGLEY: I think it's 4.
21 A.  Are you talking about this? You said
22 Exhibit 5.
23 Q.  (BY MR. MULLIN) I'm sorry. Exhibit 4. Let
24 me re-ask the question.
25     Was Exhibit 4 to your deposition, the Ford

Page 55

1  Motor Credit audit of the inventory of Reagor-Dykes Auto
2  Group at June 28th, 2018, accurate?
3  A.  You're asking if these results were accurate?
4  Q.  True. Were they accurate?
5  A.  At what point in time?
6  Q.  Were they accurate as of June 28th, 2018?
7  A.  To my recollection as of that particular date
8  and time, yes.
9  Q.  Were the other Ford Motor Credit audits of
10 Reagor-Dykes Auto -- Auto Group in the previous
11 quarters -- were they accurate?
12 A.  I don't know.
13 Q.  Did you ever make any comments to Mr. Smith or
14 anyone else at Reagor-Dykes that the payoff amounts on
15 floored vehicles with Ford Motor Credit increased
16 greatly during the days preceding Ford Motor Credit's
17 audits?
18 A.  I don't recall exact conversations.
19 Q.  Do you recall the -- that being the gist of
20 any conversation you had with Mr. Smith or anyone else
21 at Ford Motor -- at Reagor-Dykes?
22 A.  Can you repeat the question? I want to make
23 sure I'm understanding exactly what you're asking and
24 that I answer it correctly.
25 Q.  Was the -- did you ever have a conversation

Page 56

1  with anybody at Reagor-Dykes, the gist of which was that
2  you were noting or stating that the amount of sales of
3  floor-planned units with Ford Motor Credit by
4  Reagor-Dykes increased substantially during the week
5  before the audit?
6  A.  I didn't say it like that. I said there's
7  some irregularities that we've noticed.
8  Q.  Okay. When did you make that statement?
9  A.  I can't recall exactly when I made the
10 statement.
11 Q.  Was it this year?
12 A.  Probably.
13 Q.  Who would -- who did you make it to?
14 A.  I don't recall exactly who I discussed --
15 Q.  Did you ever make such a statement like that
16 to Mr. Dykes or Mr. Reagor?
17 A.  When I met with Rick and Shane that Friday
18 evening, I did explain that the number of payoffs that
19 they were making in a seven-day period was a high
20 percentage of their inventory, and it was unusual.
21 Q.  That was July 27th of 2018, correct?
22 A.  Yes.
23 Q.  Did you ever --
24 A.  When Rick -- when Rick came back to the office
25 and he met with me and Shane that Friday evening -- I

Page 57

1   don't have the exact time, but we all three met in
2   Rick's office. And I did make that comment to Rick and
3   Shane that there were some irregularities, and the
4   number of payoffs in a seven-day period was high.
5       Q. Did you -- before July 27th, 2018, did you
6   ever tell Mr. Reagor or Mr. Dykes that there were any
7   irregularities?
8       A. I don't recall exact discussions, but I
9   believe so.
10      Q. When?
11      A. I don't recall exact times.
12      Q. Was any of that in writing?
13      A. I don't know.
14      Q. Did you ever tell Shane Smith when the audits
15  were coming?
16      A. Absolutely not.
17      Q. Do you know if --
18          MR. LANGLEY: All right. We're not going
19  to go into this area any further.
20      Q. (BY MR. MULLIN) Do you know if the AiM
21  auditor, Mr. Tyson, ever did -- ever told anybody at
22  Reagor-Dykes when --
23      A. I'm going to take my counsel's advice.
24      Q. -- when the audits were coming?
25      A. I'm going to take my counsel's advice.

Page 58

1       Q. Have you been criticized or disciplined by
2   anybody at Ford Motor Credit for your handling of the
3   Reagor-Dykes matter?
4           MR. LANGLEY: I'm going to instruct you
5   not to answer.
6           MR. MULLIN: What are we up to? 6?
7           THE REPORTER: Yes, sir.
8           MR. LANGLEY: I'll go ahead and tell you
9   now, we're not going to get into any issues with respect
10  to the audit or otherwise.
11          (Exhibit 6 marked.)
12          (Exhibit 7 marked.)
13      A. Can I have my Exhibit 5 back, please?
14      Q. (BY MR. MULLIN) Yeah.
15      A. Thank you.
16      Q. Mr. Byrd, I'm going to hand you Exhibit 6 and
17  7, which are the year-end 2015 and 2016 audits of the
18  financial statements of Reagor-Dykes Auto Group, reports
19  on those audits by Lane Gorman Trubitt.
20          Can you tell me if you've ever seen those
21  before?
22          MR. LANGLEY: I'm instructing you not to
23  review the documents. Don't answer the questions.
24      A. I'm going to take his advice.
25      Q. (BY MR. MULLIN) Can you tell me if Ford Motor

Page 59

1   Credit ever received those documents?
2           MR. LANGLEY: I'm instructing you not to
3   answer.
4       A. I'm going to take my attorney's advice.
5       Q. (BY MR. MULLIN) Do you know if Ford has
6   conducted any kind of investigation to sort out the lien
7   priority between the various creditors --
8       A. I don't know.
9       Q. -- in the bankruptcy?
10      A. I don't know.
11      Q. Were you aware, during your supervision of the
12  Reagor-Dykes accounts, that Reagor-Dykes had floor plans
13  with other lenders such as Vista, First Capital, and GM?
14      A. All I know is they had other dealerships that
15  weren't floor-planned with us. And I have no idea where
16  they were floored or what their arrangements were.
17      Q. Okay.
18          MR. MULLIN: I'm going to take a little
19  break.
20          MR. LANGLEY: Ten minutes?
21          MR. MULLIN: Yeah.
22          (Break from 12:14 p.m. to 12:20 p.m.)
23      Q. (BY MR. MULLIN) Mr. Byrd, we're almost
24  finished.
25          Do you know if the schedule of payments

Page 60

1   that appears on the bottom of page -- the last page of
2   Exhibit 4 -- do you know if that schedule of payments
3   was actually met by the dealership?
4       A. To my understanding, it was.
5           MR. MULLIN: I'll pass the witness.
6           EXAMINATION
7   BY MR. BUSTOS:
8       Q. Mr. Byrd, I'm Fernando Bustos, and I represent
9   Vista Bank, one of the creditors in this case.
10      A. Good morning.
11      Q. Good morning. I have a few follow-up
12  questions for you.
13          You had talked about receiving an Excel
14  spreadsheet from Mr. Shane Smith earlier; is that right?
15      A. Yes.
16      Q. And you said you no longer have it; is that
17  right?
18      A. That's correct.
19      Q. Did you receive it in electronic format?
20      A. No. He handed it to me on paper in his
21  office.
22      Q. What else did he hand to you during that
23  meeting?
24      A. He -- he printed off some bank balances off of
25  the Internet. But I didn't take any of them with me.

Page 61

1    Q.  Okay. You did take the Excel spreadsheet
2    though?
3    A.  I did not.
4    Q.  Oh, you left it all there?
5    A.  Yeah.
6    Q.  Okay.
7    A.  I didn't take anything.
8    Q.  Okay. Were there any witnesses to that
9    conversation you had with him in that meeting, or was it
10   just you and he?
11   A.  About the Excel spreadsheet?
12   Q.  Yes.
13   A.  It was just me and him.
14   Q.  During the day that you spent with him, were
15   there any witnesses to conversations that you two had
16   together?
17   A.  Just Rick when he showed up that night. There
18   was no one else involved.
19   Q.  Do you know for a fact how often Ford Credit
20   did audit the Reagor-Dykes dealerships?
21       THE WITNESS:  Can I answer that?
22       MR. LANGLEY:  You may.
23       You're talking basically last two years?
24       MR. BUSTOS:  Yes.
25   A.  It was a quarterly frequency.

Page 62

1    Q.  (BY MR. BUSTOS)  And that was a standard
2    Reagor audit rate?
3    A.  That's the frequency that we applied to this
4    dealer group.
5    Q.  Okay. Was that out of the average in terms of
6    the frequency for the Reagor-Dykes Group relative to
7    other groups?
8    A.  That's going to be proprietary to Ford Credit,
9    and I can't discuss that.
10   Q.  I think you talked about a 15-person team that
11   reviewed audit information with Ford Credit, right?
12   A.  It's a lot of people. I don't have the exact
13   number. But it's a guesstimate.
14   Q.  And you were part of that team, right?
15   A.  Yes.
16   Q.  Were any of those Ford Credit members actually
17   physically present for any of the physical inspections
18   that were conducted by your outside auditor?
19   A.  I don't think so. It's usually -- it's
20   handled by our vendor.
21   Q.  Okay. You relied wholly on your outside
22   auditor?
23       (The witness nods head.)
24   Q.  Has Ford Credit made any demand upon that
25   auditor in connection with the audits they performed?

Page 63

1        MR. LANGLEY:  We're going to object to
2    that question. And I'll instruct the witness not to go
3    into any of those areas.
4    Q.  (BY MR. BUSTOS)  Are you going to follow your
5    lawyer's advice?
6    A.  Yes.
7    Q.  Do you know if Ford Motor Credit has analyzed
8    its lien position on the liens it's asserting relative
9    to other creditors in this case?
10   A.  I believe we have.
11   Q.  And who within Ford has been part of that lien
12   analysis team?
13   A.  The same type list that we mentioned before.
14   A lot of people.
15   Q.  Okay. The same list as the audit people?
16   A.  No, not audit people; the people that prepare
17   the credit reviews.
18   Q.  And if you could, just name those persons to
19   the extent you remember those names on the lien analysis
20   issue.
21   A.  Scott Carter, Bill Delaney, Dennis Neely. And
22   then I think we have an outside vendor that actually
23   pulls the UCC searches for us and --
24   Q.  What's that vendor's name?
25   A.  I don't know.

Page 64

1    Q.  Okay. Keep going.
2    A.  And I think our legal team got a copy of the
3    UCC searches as well.
4    Q.  I think you had mentioned that you were taking
5    a vacation before July 28th; is that right?
6    A.  No.
7    Q.  Oh, you didn't --
8    A.  I went on vacation on Friday, August the 3rd
9    and came back on Sunday, August the 12th.
10   Q.  Was that a prescheduled vacation for you?
11   A.  Yes. It had been on my calendar for quite a
12   while.
13   Q.  Months?
14   A.  Yes.
15   Q.  And this may have been asked before, and I
16   apologize if it has.
17       Before July 28th of this year, when was
18   the last time you had spoken with Shane Smith?
19       MR. LANGLEY:  Objection. I'm going to
20   instruct the witness not to answer.
21   A.  I'm going to follow his advice.
22   Q.  (BY MR. BUSTOS)  Did you and Mr. Smith used to
23   work together at Ford Motor Credit?
24       MR. LANGLEY:  Objection. Instruct the
25   witness not to answer.

Page 65

1    Q. (BY MR. BUSTOS) Did you send any -- how many
2    e-mails did you send to Shane Smith in the month before
3    July 28th, 2018?
4    A. I don't recall any.
5    Q How often would you normally have occasion to
6    e-mail Mr. Smith?
7         MR. LANGLEY: I'm going to instruct the
8    witness not to answer.
9    A. I'll follow his advice.
10        MR. BUSTOS: I'll pass the witness at this
11   time.
12        MR. STROHSCHEIN: We'll reserve.
13             EXAMINATION
14   BY MR. CARDER:
15   Q. How often are you pulled off of relationships
16   with dealers when they file bankruptcy?
17   A. Can you tell me who you are and who you're
18   with?
19   Q. I don't think you have a right to ask. But
20   I'll tell you.
21   A. Oh, okay.
22   Q. I'm Mark Carder for First Bank & Trust.
23   A. Okay. Fair enough. I'm Gary Byrd. Nice to
24   meet you.
25        MR. CARDER: Can you read the question

Page 67

1    you're free to go.
2         (Deposition concluded at 12:28 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 66

1    off the transcript?
2         (Reporter reads back requested portion.)
3         MR. LANGLEY: It's your question -- it
4    didn't get fully on, if you want to go ahead and ask it
5    again.
6    Q. (BY MR. CARDER) Are you always removed from
7    the dealership when it files bankruptcy?
8         MR. LANGLEY: Objection. I instruct you
9    not to answer.
10   A. I'm going to take his advice.
11   Q. (BY MR. CARDER) How about since August 1st?
12   A. Since August 1st?
13   Q. Have there been any bankruptcies?
14   A. Since August 1st what?
15   Q. Have there been any bankruptcies on
16   dealerships you were involved with since August 1st?
17   A. None that I'm aware of.
18   Q. Other than this one?
19   A. Correct.
20        MR. CARDER: Pass the witness.
21        MR. LASHAWAY: I'll reserve.
22        MR. MASSOUH: Reserve.
23        MR. MULLIN: Is that it? Okay. Well,
24   we're done subject to seeking the Court to having
25   answers to the questions he hasn't answered. And -- so

Page 68

1         CHANGES AND SIGNATURE
2    WITNESS NAME: GARY BYRD, JR.
3    DATE OF DEPOSITION: AUGUST 15, 2018
4    PAGE LINE   CHANGE        REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

Page 69

I, GARY BYRD, JR., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

GARY BYRD, JR.

THE STATE OF _____ )
COUNTY OF _____ )

Before me, _____, on this day personally appeared GARY BYRD, JR., known to me (or proved to me under oath or through _____ ) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____ .

NOTARY PUBLIC IN AND FOR
THE STATE OF _____
COMMISSION EXPIRES: _____

Page 71

REPORTER'S CERTIFICATION
DEPOSITION OF GARY BYRD, JR.
AUGUST 15, 2018

I, Kailee Pereida, CSR No. 8398, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was requested;

That $_____ is the deposition officer's charges to Mr. David Mullin, Attorney for Debtors, for preparing the original deposition transcript and any copies of exhibits;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Texas that the foregoing is true and correct.
Dated this 15th day of August, 2018.

Kailee Pereida, Texas CSR 8398
Expiration Date: December 31, 2019
Caprock Court Reporting, Inc.
Firm Certificate Number: 374
1112 Texas, Suite 200
Lubbock, Texas 79401
(806) 795-4202

Page 70

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

IN RE:                              )
                                    )
REAGOR-DYKES MOTORS, LP,   )Case No. 18-50214-rlj11
                                    )
Debtor                              )

IN RE:                              )
                                    )
REAGOR-DYKES IMPORTS, LP,  )Case No. 18-50215-rlj11
                                    )
Debtor                              )

IN RE:                              )
                                    )
REAGOR-DYKES AMARILLO, LP, )Case No. 18-50216-rlj11
                                    )
Debtor                              )

IN RE:                              )
                                    )
REAGOR-DYKES AUTO COMPANY, )
LP,                        )Case No. 18-50217-rlj11
                                    )
Debtor                              )

IN RE:                              )
                                    )
REAGOR-DYKES PLAINVIEW, LP, )Case No. 18-50218-rlj11
                                    )
Debtor                              )

IN RE:                              )
                                    )
REAGOR-DYKES FLOYDADA, LP, )Case No. 18-50219-rlj11
                                    )
Debtor                              )

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

IN RE:                              )
                                    )
REAGOR-DYKES MOTORS, LP,            )Case No. 18-50214-rlj11
                                    )
        Debtor.                     )

---

IN RE:                              )
                                    )
REAGOR-DYKES IMPORTS, LP,           )Case No. 18-50215-rlj11
                                    )
        Debtor.                     )

---

IN RE:                              )
                                    )
REAGOR-DYKES AMARILLO, LP,          )Case No. 18-50216-rlj11
                                    )
        Debtor.                     )

---

IN RE:                              )
                                    )
REAGOR-DYKES AUTO COMPANY,          )
  LP,                               )Case No. 18-50217-rlj11
                                    )
        Debtor.                     )

---

IN RE:                              )
                                    )
REAGOR-DYKES PLAINVIEW, LP,         )Case No. 18-50218-rlj11
                                    )
        Debtor.                     )

---

IN RE:                              )
                                    )
REAGOR-DYKES FLOYDADA, LP,          )Case No. 18-50219-rlj11
                                    )
        Debtor.                     )

---

**CORRECTION PAGES**

Page 2

1        --------------------------------------

2                 ORAL DEPOSITION OF

3                  GARY BYRD, JR.

4                 AUGUST 15, 2018

5                    Volume 1

6        --------------------------------------

7        ORAL DEPOSITION OF GARY BYRD, JR., produced as a

8    witness at the instance of the DEBTOR, and duly sworn,

9    was taken in the above-styled and numbered cause on

10   AUGUST 15, 2018, from 11:01 a.m. to 12:28 p.m., before

11   Kailee Pereida, CSR in and for the State of Texas,

12   reported by machine shorthand, at the law offices of

13   Mullin, Hoard & Brown, L.L.P., 1500 Broadway, Suite 700,

14   Lubbock, Texas, pursuant to the Federal Rules of Civil

15   Procedure.

16

17

18

19

20

21

22

23

24

25

1                    A P P E A R A N C E S

2

3    FOR THE DEBTORS:

4        MR. DAVID MULLIN
         -AND-
5        MR. DAVID R. LANGSTON
         MULLIN, HOARD & BROWN, L.L.P.
6        1500 Broadway, Suite 700
         P.O. Box 2585 (79408)
7        Lubbock, Texas 79401
         (806) 765-7491
8        dmullin@mhba.com

9    FOR FORD MOTOR CREDIT COMPANY, L.L.C.:

10       MR. KEITH LANGLEY
         LANGLEY LLP
11       1301 Solana Boulevard
         Building 1, Suite 1545
12       Westlake, Texas 76262
         (214) 722-7162
13       klangley@l-llp.com

14           -AND-

15       MR. CRAIG A. LESLIE
         PHILLIPS LYTLE LLP
16       One Canalside
         125 Main Street
17       Buffalo, New York 14203
         (716) 847-7012
18       cleslie@phillipslytle.com

19   FOR GM FINANCIAL:

20       MR. STEPHEN P. STROHSCHEIN
         MCGLINCHEY STAFFORD, P.L.L.C.
21       301 Main Street
         Fourteenth Floor
22       Baton Rouge, Louisiana 70801
         (225) 383-9000
23       sstroh@mcglinchey.com

24

25

Page 4

```
 1    FOR AIM BANK:

 2        MR. JEFF R. LASHAWAY
          BOERNER, DENNIS & FRANKLIN, P.L.L.C.
 3        920 Avenue Q
          Lubbock, Texas 79401
 4        (806) 763-0044
          jlashaway@bdflawfirm.cpm
 5
      FOR FIRST CAPITAL BANK:
 6
          MR. JOHN F. MASSOUH
 7        SPROUSE, SHRADER, SMITH, P.L.L.C.
          701 South Taylor
 8        Suite 500
          Amarillo, Texas 79105
 9        (806) 468-3337
          john.massouh@sprouselaw.com
10
      FOR VISTA BANK:
11
          MR. FERNANDO BUSTOS
12        BUSTOS LAW FIRM, P.C.
          1001 Main Street
13        Suite 501
          Lubbock, Texas 79401
14        (806) 780-3976
          fbustos@bustoslawfirm.com
15
      FOR FIRST BANK & TRUST:
16
          MR. MARK S. CARDER
17        STINSON, LEONARD, STREET, L.L.P.
          1201 Walnut
18        Suite 2900
          Kansas City, Missouri 64106
19        (816) 691-3415
          mark.carder@stinson.com
20
      FOR BART REAGOR:
21
          MR. SCOTT R. WIEHLE
22        KELLY, HART & HALLMAN, L.L.P.
          201 Main Street
23        Suite 2500
          Fort Worth, Texas 76102
24        (817) 332-2500
          scott.wiehle@kellyhart.com
25
```

```
 1    FOR IBC BANK:

 2         MR. JOHN D. DALE
           GABLE GOTWALS
 3         1100 ONEOK Plaza
           100 West Fifth Street
 4         Tulsa, Oklahoma 74103
           (918) 595-4828
 5         jdale@gablelaw.com

 6    FOR RICK DYKES:

 7         MR. DAVID M. GUINN, JR.
           LAW OFFICE OF HURLEY & GUINN
 8         1805 13th Street
           Lubbock, Texas 79401
 9         (806) 771-0700
           david@hurleyguinn.com
10
      ALSO PRESENT:
11
           Mr. Brad Burgess
12         Mr. Mike Cannon
           Mr. Toby Cecil
13         Mr. Rick Dykes
           Mr. Jonathan Hill
14         Mr. Audin Herrera
           Mr. Howie Ravitz
15         Mr. Scott Wade

16

17

18

19

20

21

22

23

24

25
```

Page 68

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  GARY BYRD, JR.

3    DATE OF DEPOSITION:  AUGUST 15, 2018

4    PAGE LINE       CHANGE            REASON
        PAGE

5    6 12 NO TO YES        TEXT SON' JULY 29

6    NOTIFYING FMCC OF THEIN' LEGAL

7    COUNSEL TIM ARDEMORE

8    17-20      YES     RECEIVED VIA E-MAIL

9    AND I FORGOT ABOUT IT (FROM SHANE)

10   17-22      YES    I FORGOT ABOUT

11   RECEIVING IT + SAVED IT IN MY EMAIL

12   43-15     26 TO 16 IR SO OVERSTATE

13   6L - 16    NO TO YES   I FORGOT IT

14   WAS EMAILED TO ME AND I SAVED

15   IT IN MY E-MAIL

16   6L 20    NO TO YES   SAVED IN MY EMAIL

17

18

19

20

21

22

23

24

25

**App. 028**

1        I, GARY BYRD, JR., have read the foregoing
deposition and hereby affix my signature that same is
2  true and correct, except as noted above.

3

4

5                   GARY BYRD, JR.

6

7  THE STATE OF _Texas_ )
    COUNTY OF _Collin_ )

8

        Before me, _Valeta M. Audrick_ , on this day
9  personally appeared GARY BYRD, JR., known to me (or
    proved to me under oath or through
10  _Texas Drivers License_ ) (description of identity
    card or other document)) to be the person whose name is
11  subscribed to the foregoing instrument and acknowledged
    to me that they executed the same for the purposes and
12  consideration therein expressed.
        Given under my hand and seal of office this
13  _20th_ day of _August_ , _2018_ .

14

15

16  NOTARY PUBLIC IN AND FOR
    THE STATE OF _Texas_
17  COMMISSION EXPIRES: _2-21-19_

18

19

20

21

22

23

24

25

VALETA M. AUDRICK
Notary Public, State of Texas
Comm. Expires 02-21-2019
Notary ID 12852865-6

1          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                   LUBBOCK DIVISION

3               IN RE:                              )

4      REAGOR-DYKES MOTORS, LP,      )Case No. 18-50214-rlj11
                                      )
5           Debtor.                   )

6      ─────────────────────────────────────────────────────
                IN RE:                              )
7
       REAGOR-DYKES IMPORTS, LP,     )Case No. 18-50215-rlj11
8                                     )
            Debtor,                   )
9

10     ─────────────────────────────────────────────────────
                IN RE:                              )
11
       REAGOR-DYKES AMARILLO, LP,    )Case No. 18-50216-rlj11
12                                    )
            Debtor,                   )
13

       ─────────────────────────────────────────────────────
14              IN RE:                              )

15     REAGOR-DYKES AUTO COMPANY,    )
       LP,                           )Case No. 18-50217-rlj11
16                                    )
            Debtor.                   )
17

       ─────────────────────────────────────────────────────
18              IN RE:                              |

       REAGOR-DYKES PLAINVIEW, LP,   )Case No. 18-50218-rlj11
19                                    )
            Debtor.                   )
20

21     ─────────────────────────────────────────────────────
                IN RE:                              )

22     REAGOR-DYKES FLOYDADA, LP,    )Case No. 18-50219-rlj11
                                      )
23          Debtor.                   )

24     ─────────────────────────────────────────────────────

25

Page 71

1                    REPORTER'S CERTIFICATION
                 DEPOSITION OF GARY BYRD, JR.
2                      AUGUST 15, 2018

3

              I, Kailee Pereida, CSR No. 8398, Certified
4    Shorthand Reporter in and for the State of Texas, hereby
     certify to the following:
5
              That the foregoing proceedings were taken before me
6    at the time and place therein set forth, at which time
     the witness was put under oath by me;
7
              That the testimony of the witness, the questions
8    propounded, and all objections and statements made at
     the time of the examination were recorded
9    stenographically by me and were thereafter transcribed;

10            That a review of the transcript by the deponent was
     requested;
11
              That $ 1128.10    is the deposition officer's
12   charges to Mr. David Mullin, Attorney for Debtors, for
     preparing the original deposition transcript and any
13   copies of exhibits;

14            That the foregoing is a true and correct transcript
     of my shorthand notes so taken.
15
              I further certify that I am not a relative or
16   employee of any attorney of the parties, nor financially
     interested in the action.
17
              I declare under penalty of perjury under the laws
18   of Texas that the foregoing is true and correct.

19            Dated this 15th day of August, 2018.

20

                         Kailee Pereida
21            _____
                 Kailee Pereida, Texas CSR 8398
22               Expiration Date:   December 31, 2019

23               Caprock Court Reporting, Inc.
                 Firm Certificate Number:   374
24               1112 Texas, Suite 200
                 Lubbock, Texas 79401
25               (806) 795-4202

dwards

Boudreau, Paul (P.A.) <pboudrea@ford.com>
Thursday, August 9, 2018 10:55 AM
Rachel Edwards
FW: Reagor Dykes Group Audit Summary 6/28/18.xlsx.
ts:        Reagor Dykes Group Summary 20180629.xlsx; Untitled attachment 00019.htm

dreau
nager
rket Area
Credit Company
) 633-7781
732-7641
udrea@ford.com



ucker, Gwen (G.R.)
esday, August 8, 2018 2:32 PM
au, Paul (P.A.)
d: Reagor Dykes Group Audit Summary 6/28/18.xlsx

you're looking for?

ucker
- Dallas Region



EXHIBIT
B

Exhi

evelopment Mgr
'21

ny iPhone

arded message:

m: "Schmucker, Gwen (G.R.)" <gschmuck@ford.com>
te: June 29, 2018 at 3:22:55 PM CDT
: "breagor@aol.com" <breagor@aol.com>, "dykesrick@yahoo.com" <dykesrick@yahoo.com>, "ssmith@reagordykes.com"
mith@reagordykes.com>
"Byrd, Gary (G.K.)"
oject: Reagor Dykes Group Audit Summary 6/28/18.xlsx

ached is the Group Summary from the audit we conducted at each of your stores yesterday.

ese results really are fantastic and your entire organization should be commended for their hard work and their efforts!!

nk you all very, very much!! We greatly appreciate you and value our partnership with the Reagor Dykes organization!!

pe you all have a very Happy 4th of July!!

wen Schmucker
d Motor Credit – Dallas Region
siness Development Manager
l: 361-446-0721
hmuck@ford.com
E FORD • ONE TEAM • ONE PLAN • ONE GOAL

App. 033

Audit: 06/28/2018

| | | FRAC | Violations | Units | Violation % | Min - Max Violation Days | Paid to BC | # Test Drive | # WTA |
|---|---|---|---|---|---|---|---|---|---|
| | 83885 | 2 | 12 | 847 | 1.42% | 4 - 14 | $361,288 | 5 | 5 |
| LINCOLN TOYOTA | 84603 | 0 | 0 | 484 | 0.00% | n/a | $57,226 | 9 | 28 |
| IBISHI | 161558 | 0 | 0 | 330 | 0.00% | n/a | $16,696 | 2 | 15 |
| IBISHI OF LUBBOC | 161560 | 0 | 1 | 473 | 0.21% | 16 - 16 | $102,760 | 8 | 0 |
| TA | 152377 | 0 | 0 | 420 | 0.00% | n/a | $0 | 1 | 16 |
| HOLET | 132789 | 0 | 1 | 420 | 0.24% | 20 - 20 | $3,075 | 4 | 0 |
| | | 2 | 14 | 2974 | 0.47% | | $540,984 | 32 | 65 |

App. 034

Audit: 06/28/2018

| | | # Sold Not Due | $ Sold Not Due | % Sold Not Due | Due 6/29 | Due 7/2 | Due 7/3 | Due 7/5 | Due 7/6 | Due 7/9 | Due 7/10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 83865 | 106 | $3,699,707 | 12.51% | $416,397 | $511,027 | $559,516 | $720,578 | $832,356 | $719,807 | $83,725 |
| LINCOLN TOYOTA | 84803 | 60 | $2,682,425 | 17.08% | $290,779 | $310,787 | $719,856 | $301,065 | $339,674 | $599,929 | $121,524 |
| JBISHI | 151569 | 105 | $2,929,252 | 30.65% | $301,675 | $048,709 | $549,227 | $427,283 | $377,570 | $408,840 | $521,088 |
| JBISHI OF LUBBOC | 1515N0 | 124 | $2,990,931 | 25.94% | $319,315 | $466,888 | $505,611 | $382,501 | $437,229 | $634,031 | $245,376 |
| TA | 152377 | 105 | $3,409,883 | 25.24% | $333,571 | $735,580 | $596,095 | $548,256 | $586,196 | $495,457 | $114,721 |
| ROLET | 152739 | 225 | $9,401,680 | 53.07% | $997,437 | $865,776 | $1,304,271 | $1,528,529 | $2,133,057 | $1,451,867 | $1,050,154 |
| | | 744 | $25,073,299 | 25.02% | $2,681,174 | $3,237,817 | $4,232,382 | $4,008,213 | $4,505,684 | $4,272,541 | $2,136,088 |

**App. 035**

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

IN RE:   )
)
REAGOR-DYKES MOTORS, LP,   )Case No. 18-50214-rlj11
)
Debtor.   )

IN RE:   )
)
REAGOR-DYKES IMPORTS, LP,   )Case No. 18-50215-rlj11
)
Debtor.   )

IN RE:   )
)
REAGOR-DYKES AMARILLO, LP,   )Case No. 18-50216-rlj11
)
Debtor.   )

IN RE:   )
)
REAGOR-DYKES AUTO COMPANY,   )
LP,   )Case No. 18-50217-rlj11
)
Debtor.   )

IN RE:   )
)
REAGOR-DYKES PLAINVIEW, LP,   )Case No. 18-50218-rlj11
)
Debtor.   )

IN RE:   )
)
REAGOR-DYKES FLOYDADA, LP,   )Case No. 18-50219-rlj11
)
Debtor.   )

## Page 2

```
 1   _____
 2
 3            ORAL DEPOSITION OF
 4             GWEN SCHMUCKER
 5             AUGUST 15, 2018
 6               Volume 1
 7   _____
 8
 9       ORAL DEPOSITION OF GWEN SCHMUCKER, produced as a
10   witness at the instance of the DEBTORS, and duly sworn,
11   was taken in the above-styled and numbered cause on
12   AUGUST 15, 2018, from 1:29 p.m. to 2:15 p.m., before
13   Kailee Pereida, CSR in and for the State of Texas,
14   reported by machine shorthand, at the law offices of
15   Mullin, Hoard & Brown, L.L.P., 1500 Broadway, Suite 700,
16   Lubbock, Texas, pursuant to the Federal Rules of Civil
17   Procedure.
```

## Page 3

```
 1              APPEARANCES
 2
 3    FOR THE DEBTORS:
 4       MR. DAVID MULLIN
         MULLIN, HOARD & BROWN, L.L.P.
 5       1500 Broadway, Suite 700
         P.O. Box 2585 (79408)
 6       Lubbock, Texas 79401
         (806) 765-7491
 7       dmullin@mhba.com
 8    FOR FORD MOTOR CREDIT COMPANY, L.L.C.:
 9       MR. KEITH LANGLEY
         LANGLEY LLP
10       1301 Solana Boulevard
         Building 1, Suite 1545
11       Westlake, Texas 76262
         (214) 722-7162
12       klangley@l-llp.com
13           -AND-
14       MR. CRAIG A. LESLIE
         PHILLIPS LYTLE LLP
15       One Canalside
         125 Main Street
16       Buffalo, New York 14203
         (716) 847-7012
17       cleslie@phillipslytle.com
18    FOR GM FINANCIAL:
19       MR. STEPHEN P. STROHSCHEIN
         MCGLINCHEY STAFFORD, P.L.L.C.
20       301 Main Street
         Fourteenth Floor
21       Baton Rouge, Louisiana 70801
         (225) 383-9000
22       sstroh@mcglinchey.com
23
24
25
```

## Page 4

```
 1    FOR AIM BANK:
 2       MR. JEFF R. LASHAWAY
         BOERNER, DENNIS & FRANKLIN, P.L.L.C.
 3       920 Avenue Q
         Lubbock, Texas 79401
 4       (806) 763-0044
         jlashaway@bdflawfirm.com
 5
      FOR FIRST CAPITAL BANK:
 6
         MR. JOHN F. MASSOUH
 7       SPROUSE, SHRADER, SMITH, P.L.L.C.
         701 South Taylor
 8       Suite 500
         Amarillo, Texas 79105
 9       (806) 468-3337
         john.massouh@sprouselaw.com
10
      FOR VISTA BANK:
11
12       MR. FERNANDO BUSTOS
         BUSTOS LAW FIRM, P.C.
13       1001 Main Street
         Suite 501
14       Lubbock, Texas 79401
         (806) 780-3976
15       fbustos@bustoslawfirm.com
16    FOR FIRST BANK & TRUST:
17       MR. MARK S. CARDER
         STINSON, LEONARD, STREET, L.L.P.
18       1201 Walnut
         Suite 2900
19       Kansas City, Missouri 64106
         (816) 691-3415
20       mark.carder@stinson.com
21    FOR BART REAGOR:
22       MR. SCOTT R. WIEHLE
         KELLY, HART & HALLMAN, L.L.P.
23       201 Main Street
         Suite 2500
24       Fort Worth, Texas 76102
         (817) 332-2500
25       scott.wiehle@kellyhart.com
```

EXHIBIT
**C**

Page 5

```
 1     FOR IBC BANK:
 2        MR. JOHN D. DALE
          GABLE GOTWALS
 3        1100 ONEOK Plaza
          100 West Fifth Street
 4        Tulsa, Oklahoma 74103
          (918) 595-4828
 5        jdale@gablelaw.com
 6     FOR RICK DYKES:
 7        MR. DAVID M. GUINN, JR.
          LAW OFFICE OF HURLEY & GUINN
 8        1805 13th Street
          Lubbock, Texas 79401
 9        (806) 771-0700
          david@hurleyguinn.com
10
       ALSO PRESENT:
11
          Mr. Toby Cecil
12        Mr. Rick Dykes
          Mr. Jonathan Hill
13        Mr. Howie Ravitz
          Mr. Scott Wade
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1              INDEX
                                PAGE
 2     Appearances........................ 3
 3     Instructions for Signing a Deposition.......... 7
 4     GWEN SCHMUCKER
 5        EXAMINATION BY MR. MULLIN.......... 8
          EXAMINATION BY MR. BUSTOS....... 32
 6        EXAMINATION BY MR. STROHSCHEIN ....... 33
          EXAMINATION BY MR. CARDER...... 35
 7        EXAMINATION BY MR. MASSOUH.... 35
          EXAMINATION BY MR. MULLIN ...... 38
 8
 9     Signature and Changes........... 40
       Reporter's Certificate........ 43
10
              EXHIBITS
11
       NO.  DESCRIPTION              PAGE
12
        8   Notice of Deposition of Gwen Schmucker .. 8
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1             INSTRUCTIONS FOR SIGNING A DEPOSITION
 2
          Rules of Civil Procedure under which this
 3     deposition was taken provide that the deposition
       transcript shall be made available to the witness or his
 4     attorney of record for examination and signature by the
       witness.
 5
          This deposition condensed transcript is provided
 6     for your review.  It is yours to keep.  Read it
       carefully before making any changes or corrections.
 7     Make transcript corrections on the Witness Signature
       Page.
 8
 9        Changes and/or corrections must be made in the
       following manner:
10
          (1) Indicate by number the page and line you wish
11            to alter;
          (2) Indicate your change or correction;
12        (3) Give the reason for making the change.
13        When you have followed the instructions above, sign
       the Witness Signature Page before a Notary Public and
14     return it as soon as possible.
15        When we have received the signed and notarized
       transcript, we will forward all attorneys of record a
16     copy of the completed Witness Signature Page and deliver
       the original transcript to Mr. David Mullin for
17     safekeeping and use at trial.
18        If you have any questions about this procedure,
       please call my office at (806) 795-4202.
19
20        Kailee Pereida, CSR
          Caprock Court Reporting, Inc.
          1112 Texas, Suite 200
21        Lubbock, Texas 79401
          (806) 795-4202
22
23
24
25
```

Page 8

```
 1              (Exhibit 8 marked.)
 2              (Witness sworn by court reporter.)
 3              GWEN SCHMUCKER,
 4     having been first duly sworn, testified as follows:
 5              EXAMINATION
 6     BY MR. MULLIN:
 7        Q.  Would you state your full name?
 8        A.  Gwen Renee Schmucker.
 9        Q.  Ms. Schmucker, I'm going to hand you Exhibit
10     No. 8, which is the notice of your deposition, and just
11     ask you if you've seen that previously?
12        A.  Yes, I've seen it.
13        Q.  And have you ever given a deposition before?
14        A.  No.
15        Q.  The court reporter is taking down my
16     questions, your answers.  And do you understand that
17     they are -- they will be printed up in a booklet, and
18     they may be read back in connection with a motion or a
19     hearing or a trial in this case?
20              (The witness nods head.)
21        Q.  And you have to answer verbally because
22     otherwise it's just, "Witness nodded."
23        A.  Yes.
24        Q.  Okay.  And during the course of the
25     deposition, if you need a break for any reason, you can
```

## Page 9

1  just ask for it. I only ask that you answer any pending
2  question before you break. Is that fair enough?
3      A.  Yes.
4      Q.  And if you find that I'm cutting you off when
5  I'm asking a question because I'm anticipating your
6  answer or you interrupt me, I mean, we'll -- let's agree
7  that I'll let you finish your answer, and you'll let me
8  finish my questions.
9      A.  Okay.
10     Q.  Did -- what did you do to prepare for your
11 deposition?
12     A.  The only thing I did to prepare for it was to
13 meet with our lawyers.
14     Q.  Okay. Did you review any documents?
15     A.  I did not review any documents.
16     Q.  Okay. Can you tell me what your position is
17 with Ford Motor Credit?
18     A.  I am a business development manager.
19     Q.  And what are your duties as business
20 development manager?
21     A.  My main duties are to advise the finance
22 managers of the current plans and programs with Ford
23 Credit, to monitor market share, as well as marginal
24 mix, and to focus on e-contracting penetration.
25     Q.  Okay. When you say, "advise the financial

## Page 10

1  managers," are you talking the financial managers at the
2  dealerships?
3      A.  Yes.
4      Q.  Okay. And so those would be customers or
5  potential customers?
6      A.  No. The finance managers at each dealership.
7      Q.  Okay. Who would -- who themselves would be
8  potential customers that they -- their dealership would
9  be a potential customer of Ford Motor Credit?
10     A.  Their dealership is -- is a customer of Ford
11 Credit, yes.
12     Q.  Okay. All right. And have you had any role
13 since this bankruptcy was filed in trying to analyze
14 Ford Motor Credit's collateral position or the amount of
15 the debt?
16     A.  No.
17     Q.  Tell me what role you had with respect to
18 Reagor-Dykes. What were you doing with respect to
19 Reagor-Dykes?
20     A.  During what time frame?
21     Q.  Let's just talk about 2018 for now.
22     A.  My role with Reagor-Dykes was to meet with the
23 two Ford stores on a monthly basis. I met with the
24 finance managers and occasionally the general manager
25 and reviewed the items that I had stated earlier; market

## Page 11

1  share, marginal mix, e-contracting share.
2      Q.  And marginal mix, what does that mean?
3      A.  Marginal mix is the -- the amount of high-risk
4  credit customers, contracts, that we purchase versus
5  low-risk contracts.
6      Q.  Is there some standard that Ford Credit
7  applies to determine what's high risk and what's low
8  risk?
9      A.  We have -- we monitor FICO score, as well as
10 we have a tiering system.
11     Q.  And what FICO score puts you into the high
12 risk?
13     A.  619 and below.
14     Q.  Okay. All right. And was Reagor-Dykes, in
15 terms of the mix -- its marginal mix, was it high risk
16 compared to other dealerships?
17     A.  There was discussions at the Plainview store
18 because we were purchasing a high mix of marginal
19 business.
20     Q.  And what was -- what is e-contracting?
21     A.  E-contracting is an electronic way to send the
22 contract to Ford Credit for funding. So we monitor the
23 number of paper contracts that we fund versus
24 electronically funding a contract.
25     Q.  Okay. So would you be the person that

## Page 12

1  actually reviews the contract with the dealer's
2  customer, with the buyer of the unit?
3      A.  No.
4      Q.  Who would that go to?
5      A.  The finance manager does that.
6      Q.  Okay. And where -- are those contracts sent
7  on to Ford?
8      A.  Yes.
9      Q.  Okay. Who receives them at Ford Motor Credit?
10     A.  The funding department in the Nashville
11 business center.
12     Q.  Is there a person that would be the person for
13 looking at those contracts in the Reagor-Dykes case?
14     A.  No, no assigned person.
15     Q.  Just --
16     A.  It's --
17     Q.  -- a group of people?
18     A.  Correct.
19     Q.  And who were the -- you said there were two
20 Ford stores. Which -- which two were the two that you
21 met with?
22     A.  I call on the Ford store in Lamesa and the
23 Ford store in Plainview.
24     Q.  And who were the finance manager and general
25 manager that you met with?

Page 13

1    A.   I met with Spencer Dickey and Brian Melakian
2  in Lamesa.  And I met with Ryan Reinhart, Lee Peebles,
3  and Eddie Ashburn in Plainview.
4    Q.   Did you have any other role with respect to
5  Reagor-Dykes?
6    A.   The -- being the local person in the field,
7  anything that I may be asked to deliver to the
8  message -- I'm sorry -- any messages to deliver to the
9  dealer or documents that we may need signed, I do that
10  on occasion or as requested.
11    Q.   Do you -- do you live here in Lubbock?
12    A.   No.
13    Q.   Do you have an office here?
14    A.   No.
15    Q.   Okay.  Where is your office?
16    A.   In my house in Nazareth, Texas.
17    Q.   Oh, okay.  Yes.  Okay.
18         Did you have any interactions with Shane
19  Smith?
20    A.   Yes.
21    Q.   Okay.  Tell me what those were or what the
22  context was.
23    A.   I -- on a weekly basis, he was included in an
24  e-mail I sent to each of the Ford stores.  And those
25  e-mails contain wholesale incentive updates, as well as

Page 14

1  e-contracting standings.
2    Q.   Did you ever have any other type of
3  communications with him other than that, Shawn Smith --
4  Shane Smith?  Excuse me.
5    A.   Right.
6    Q.   Yeah.
7    A.   Nothing other than saying hi to him if I saw
8  him in the corporate office.  But I did not have any
9  other reason to meet with Shane Smith.
10    Q.   So you -- other than what you've just told me
11  about, the e-mails to him and maybe saying hi to him
12  once in a while, did you have any other interactions or
13  communications with Shane Smith?
14    A.   The only other is the audit summary report
15  that I sent out to him at -- after each wholesale audit.
16    Q.   Okay.  And why were you the person that was
17  sending out the audit summaries?
18    A.   Because I'm the local sales rep.  I'm the
19  local contact.
20    Q.   And how long have you been in that position of
21  being the local contact who would send out the audit
22  summaries?
23         MR. LANGLEY:  As to Reagor-Dykes?
24         MR. MULLIN:  Yeah, as to Reagor-Dykes.
25  Yeah.

Page 15

1    A.   The -- roughly a year and a half.
2    Q.   (BY MR. MULLIN)  Okay.  Have you ever had any
3  contact or communication with Rick Dykes or Bart Reagor?
4    A.   Yes.
5    Q.   Okay.  In what context?
6    A.   I went to the corporate offices and met with
7  both of them to have some loan documents signed.
8    Q.   When was that?
9    A.   The best I can remember, that was about a year
10  ago.
11    Q.   And was that for the floor plan?
12    A.   That was for a capital loan.
13    Q.   Do you know how the funds were to be used?
14    A.   No.
15    Q.   Do you know how big the loan was?
16    A.   A $5 million capital loan.
17    Q.   Do you remember any conversation at that time?
18    A.   No.  It was just the signing of the documents,
19  no other conversation about business that I can recall.
20    Q.   Okay.  Did you have any other -- is that the
21  only time you've ever spoken to Rick Dykes or Bart
22  Reagor?
23    A.   I spoke with each of them recently out at
24  Lamesa and at Plainview when Ford presented them with a
25  President's Award.

Page 16

1    Q.   When was that?
2    A.   June or July.
3    Q.   Of 2018?
4    A.   Yes, sir.
5    Q.   Tell me what the President's Award is.
6    A.   It's a Ford award that I -- I'm not sure the
7  criteria.  It's not a Ford Credit award.
8    Q.   Ford Motor Company award?
9    A.   Yes.
10    Q.   And what president are they referring to?  The
11  president of Ford Motor?
12    A.   I don't know.
13    Q.   But you gave them the award in person?
14    A.   No.  I was just there -- just there to support
15  Ford and the dealer on behalf of Ford Credit.  I was not
16  administering the award.  I was not delivering the
17  award.  I was strictly there as a representative of Ford
18  Credit.
19    Q.   Okay.  And who -- who actually delivered the
20  award -- the President's Award to Mr. Dykes and
21  Mr. Reagor?
22    A.   It was their Ford rep or -- and the parts and
23  service rep was there as well.
24    Q.   And you mean a Ford Motor Company rep, right?
25    A.   Right, Ford Motor.

Page 17

1    Q.  Do you know his name?
2    A.  Eric Cooper.
3    Q.  And then the parts and service rep was?
4    A.  I can't remember her name.
5    Q.  Okay.  Is it a common thing for a dealer to
6  win the President's Award?
7    A.  No.
8    Q.  Are they the only ones in your region that won
9  it?
10   A.  Yes, sir.
11   Q.  Let me talk to you about Exhibit 4, which is
12  in this stack.  Take a look at that a second.
13         Have you seen that before, Exhibit 4?
14   A.  Yes.
15   Q.  All right.  When did -- when did you see it?
16   A.  When I sent it.
17   Q.  All right.  And how did -- how did you come to
18  have the Reagor-Dykes Group audit summary?
19   A.  The business center sends it to me after the
20  audit is conducted.  And I'm instructed to forward it on
21  to the owners, as well as the CFO.
22   Q.  So during the 18 months that you were
23  responsible for the Reagor-Dykes account, you would have
24  received the quarterly audit summaries for Reagor-Dykes?
25   A.  I receive it as each audit is completed.

Page 18

1    Q.  Okay.  But during your whole 18-month period?
2        (The witness nods head.)
3    Q.  Verbal or yes or --
4    A.  Can you --
5    Q.  -- no.  You're shaking your head.
6    A.  Okay.
7    Q.  That's what I'm concerned about.
8    A.  I'm not sure the question you're asking me.
9    Q.  I'm just asking you:  During your 18-month
10  period, every quarter you would receive the Reagor-Dykes
11  Group audit summary?
12   A.  I -- it's not on a set basis.  I don't know if
13  it was every quarter.  But as we conducted an audit at
14  the stores, then I was sent the group summary, which I
15  forwarded on --
16   Q.  Okay.
17   A.  -- to the owners.
18   Q.  So you would have received all group audit
19  summaries --
20   A.  Yes.
21   Q.  -- during that time period?  Okay.
22         And did you review the Reagor-Dykes Group
23  audit summary of June 28th, 2018, that's attached?
24   A.  I looked at the violation percentage on the
25  report.

Page 19

1    Q.  Which is very low, right?
2    A.  On that one, yes.
3    Q.  And did you look at the rest of the report?
4    A.  No.
5    Q.  Okay.  So you didn't look at the third page at
6  all?
7    A.  No.
8    Q.  Okay.  And you told Mr. Dykes and Mr. Reagor
9  that these results really are fantastic?
10   A.  Yes.
11   Q.  Okay.  Is the -- is the audit report that's
12  attached accurate -- the report that's attached to
13  Exhibit 4?
14         MR. LANGLEY:  Objection to
15  qualifications.  Objection; vague and ambiguous.
16   A.  I can't speak to whether it's accurate.  I
17  just pass along the information that I receive.
18   Q.  (BY MR. MULLIN)  Okay.  Well, did you ever
19  come to the conclusion it was inaccurate?
20         MR. LANGLEY:  Same objection.
21   A.  No.
22   Q.  (BY MR. MULLIN)  Did anybody ever discuss with
23  you that the sales reflected on here at the Floydada
24  store were of 225 vehicles for $9.4 million in the last
25  seven business days, whether it was either improbable or

Page 20

1  impossible?
2    A.  No.
3    Q.  Was it part of your responsibilities to review
4  the whole report or just the first page?
5    A.  My responsibility is to look at the violation
6  percentage.
7    Q.  But your e-mail doesn't refer to the violation
8  percentage or the first page only.  It just says the
9  results are fantastic, right?
10         MR. LANGLEY:  Objection; argumentative.
11  Objection; the document speaks for itself.
12   Q.  (BY MR. MULLIN)  Right?
13   A.  The e-mail doesn't -- it doesn't specifically
14  address what area I'm looking at.
15   Q.  Do you -- do you know how much Ford is
16  claiming Reagor-Dykes owes it at this time?
17   A.  I do not know the specific, exact number.
18   Q.  Okay.  Have you -- I'm going to show you some
19  reports and just ask you if you've ever seen them.
20         Have you seen Exhibit No. 2?
21   A.  No.
22   Q.  Okay.  How about Exhibit No. 3?  Have you seen
23  that?
24   A.  No.
25   Q.  Okay.  Did you ever receive this report,

Page 21

1    Exhibit No. 5?
2        A.  No.
3        Q.  Have you ever seen any of the audited
4    financial statements for Reagor-Dykes?
5        A.  No.
6        Q.  Okay.  Have you seen any reports from
7    Reagor-Dykes reflecting the amount of funds in transit,
8    transactions that are in transit?
9        A.  No.
10       Q.  Have you seen any reports from Reagor-Dykes
11   listing un-floored vehicles?
12       A.  No.
13       Q.  Do you know if Ford Motor Credit received
14   audited financials from Ford Motor Credit?
15       A.  I don't know.
16       Q.  I mean -- excuse me -- from Reagor-Dykes?
17       A.  I don't know.
18       Q.  Do you -- have you seen any analysis by Ford
19   Motor Credit of the value of its collateral for the
20   Reagor-Dykes indebtedness?
21       A.  No.
22       Q.  Do you have any information about how large
23   amount of out-of-trust lending Ford has with
24   Reagor-Dykes?
25       A.  No.

Page 22

1        Q.  Did you participate at all in the
2    July 26th-27th audit of Reagor-Dykes?
3        A.  Yes.
4        Q.  Tell me what you did there.
5        A.  I was assigned to be in Lamesa on Friday
6    morning, the twenty -- I don't know what date that was.
7        Q.  I think the 7th is the -- 27th is Friday, and
8    the 26th is a Thursday.
9        A.  I was assigned to be in Lamesa on Friday, the
10   27th, that morning.  I worked with the auditors to
11   locate any missing units that we needed to inspect.
12       Q.  So did you have a list you worked off of?
13       A.  I did not have a specific list.
14       Q.  Did the people you were working with have a
15   list?
16       A.  The auditors had a list.
17       Q.  Okay.  Who were those -- who were the people
18   you worked with?
19       A.  It was employees of our outside auditing
20   company, AiM.
21       Q.  AiM?
22           (The witness nods head.)
23       Q.  But you didn't -- you don't know their names?
24       A.  I don't recall the auditors' names.
25       Q.  Was one of their last names Tyson?

Page 23

1        A.  I don't know.
2        Q.  And then did you actually inspect vehicles and
3    check them off the list?  Is that what you were doing?
4        A.  Just one or two that were missing that maybe
5    the dealer employee had found the vehicle or it had --
6    was on the lot.  So I would go out and look at it and
7    verify that the VIN matched with what we were looking
8    for.
9        Q.  Do you know how the July 27th audit came to
10   take place at Reagor-Dykes?  How did that happen?
11       A.  Can -- can you clarify that?
12       Q.  Well, I mean, the audits -- from what we've
13   heard, the audits were quarterly.  So the audit on
14   July 27th was not quarterly, right?
15           (The witness nods head.)
16       Q.  You've got --
17       A.  Yes.
18       Q.  And so why was Ford conducting a non-quarterly
19   audit?
20       A.  I was advised by Gary Byrd on Monday of that
21   week that we had some concerns with the information that
22   we were provided at the previous audit, and we were
23   going to conduct a surprise audit at the stores.
24       Q.  Okay.  And what was the source of the concerns
25   with the information provided at the previous audit?

Page 24

1            MR. LANGLEY:  Objection; calls for
2    speculation.
3        A.  I wasn't given the details or any further
4    information.
5        Q.  (BY MR. MULLIN)  Did Mr. Byrd tell you where
6    this request for a surprise audit came from?
7        A.  He did not.
8        Q.  Do you have any idea where it came from?
9        A.  No.
10           MR. LANGLEY:  Objection; calls for
11   speculation.
12       A.  I don't.
13       Q.  (BY MR. MULLIN)  Did you ever hear of anything
14   called Black Belt?
15       A.  Yes.
16       Q.  What is that?
17       A.  I don't -- I don't have a description of it.
18   I've just heard employees in the business center are
19   given that title.  But I have no knowledge of what that
20   entails.
21       Q.  Okay.  Do you know if Black Belt had anything
22   to do with the audit on the 26th and 27th?
23       A.  Not that I'm aware of.
24       Q.  So during the audit on the 26th and 27th, you
25   and people from AiM and perhaps other Ford Credit

## Page 25

1 employees went out and inspected the vehicles?
2     MR. LANGLEY: Objection; assumes facts
3 not in evidence.
4     A. The -- I was the only Ford Credit employee at
5 the store in Lamesa on Friday. And I was sent to assist
6 the auditors with anything they may need.
7     Q. (BY MR. MULLIN) Do you know if any other Ford
8 Credit employees were sent out to assist the AiM
9 auditors?
10     A. At --
11     Q. At Reagor-Dykes that -- on the 26th, 27th,
12 28th.
13     A. In Lamesa?
14     Q. Well, no, in other places. You know what
15 happened in Lamesa. But what about other places? Do
16 you know?
17     A. I was told that one Ford Credit employee would
18 be assigned to each of the stores to be there Friday.
19     Q. Do you know who that other Ford Credit
20 employee was at any of the other stores?
21     A. I don't.
22     Q. And since that date -- since you were in
23 Lamesa, did you have any further involvement with
24 Reagor-Dykes?
25     A. With the -- with the owners? With the --

## Page 26

1     Q. Yeah, anybody. Did you talk to anybody? Did
2 you have any -- you know, do anything with respect to
3 collecting the debt?
4     A. I was assigned to stay in Lamesa and collect
5 keys, MSO's, and titles.
6     Q. Did you do that?
7     A. I did.
8     Q. And what are MSO's?
9     A. It's a certificate of origin on a new unit.
10     Q. Okay. And titles?
11     A. On used vehicles.
12     Q. All right. And what did you do with the
13 MSO's, keys, and titles that you gathered?
14     A. I kept them in my possession.
15     Q. Do you still have them?
16     A. No.
17     Q. Well, what happened to them?
18     A. I handed them -- when I left Lamesa, I handed
19 them off to the people who were taking my place.
20     Q. Who were?
21     A. Ford -- the Ford Credit employee assigned.
22     Q. Who was that?
23     A. Chad Prejean.
24     Q. How do you spell that last name?
25     A. P-R-E-J-E-A-N.

## Page 27

1     Q. Okay.
2     MR. MULLIN: Let's take a quick break.
3     (Break from 1:57 p.m. to 2:01 p.m.)
4     Q. (BY MR. MULLIN) Had you ever participated in
5 an audit like the one that occurred on July 27th before?
6 Had you ever --
7     A. No.
8     Q. Okay. Was that unusual to you, that event,
9 that audit?
10     A. Unusual --
11     Q. In the sense that you -- that you just hadn't
12 seen anything like that done before by Ford.
13     A. Yes.
14     Q. Okay. After the handoff -- when you handed
15 off the keys and the titles and the -- and the MSO's,
16 did you have anymore involvement with Reagor-Dykes?
17     A. Yes.
18     Q. What was it?
19     A. Well, I'm currently assigned to work in the
20 Plainview store.
21     Q. Okay. And what are you doing there?
22     A. Physically counting the inventory and
23 accounting for all keys, MSO's, and titles.
24     Q. Okay. On the one report -- I think it's here.
25 I think the Plainview -- I think the Plainview store

## Page 28

1 is -- let me see if I can find -- yeah, the -- and
2 you're talking about this Plainview store -- this
3 would -- would you be responsible for knowing what was
4 out of trust at the Plainview store? I think the second
5 one down is Plainview.
6     A. This is the Ford store in Plainview, which is
7 the one I'm assigned to.
8     Q. The one that's marked what, DD --
9     A. DDAAH5.
10     Q. Okay. But would you have been the one that
11 came up with that 183 number for the number of
12 vehicles --
13     A. No.
14     Q. -- that were out of trust?
15     A. No.
16     Q. Okay. Have -- were you responsible to do a
17 valuation of the inventory at the Plainview store?
18     A. No.
19     Q. Have you seen any reports on that?
20     A. No.
21     Q. But you are supposed to keep track of what the
22 total inventory is?
23     A. I am responsible for the inventory that is
24 sitting on the ground.
25     Q. All right.

## Page 29

1    A.  So the physical inventory on the lot.

2    Q.  All right.  Have you -- is there a document

3  that you have that keeps track of that?

4    A.  Yes.

5    Q.  Okay.  Have you -- have you shared that with

6  Reagor-Dykes?

7    A.  No.

8    Q.  Okay.

9        MR. MULLIN:  We would request that

10 document.

11       MR. LANGLEY:  Very good.  We'll -- we

12 will respond.

13   Q.  (BY MR. MULLIN)  Can you tell me what the --

14 what the inventory is in terms of total vehicles at the

15 Plainview store at this time?

16   A.  I believe it is 313 units.

17   Q.  Can you give me the value in round numbers?

18   A.  No.

19   Q.  Do you know what the cost figure is on them or

20 the advances?

21   A.  No.

22   Q.  Okay.  You just know the number of vehicles?

23       (The witness nods head.)

24   Q.  Are -- are there any sales taking place

25 there --

## Page 30

1    A.  There are --

2    Q.  -- at Plainview?

3    A.  -- occasional sales.

4    Q.  And are you monitoring the sales?

5    A.  I will be, yes.

6    Q.  Okay.  Do you know what's happening to the

7  proceeds from the sales?

8    A.  We are overnighting them to our business

9  center.  And that's the extent of my involvement with

10 it.

11   Q.  To the Ford Motor Business Center?

12   A.  Yes, Ford Motor Credit.

13   Q.  Ford Motor Credit Business Center.  All right.

14       So at this time when there are sales of

15 Ford's collateral, Ford is getting the proceeds?

16   A.  Yes.

17   Q.  All right.  And who are you working with at

18 the Plainview store?

19   A.  The dealership employees?

20   Q.  Yeah.

21   A.  Eddie Ashburn and Ryan Reinhart.

22   Q.  Ryan Reinhart?

23       THE WITNESS:  Is it Rhinehart or

24 Reinhart?

25       MR. DYKES:  Reinhart.

## Page 31

1    A.  Reinhart.

2    Q.  (BY MR. MULLIN)  And have they been treating

3  you the way you want to be treated?

4    A.  Yes.

5    Q.  Okay.  And is there anybody else from Ford

6  working there -- Ford Credit?

7    A.  Yes.

8    Q.  Who is that?

9    A.  Mindy Kincaid, Larry Larson, Sarah -- I can't

10 recall her last name at the moment -- and Adam Niemeyer.

11   Q.  And what are they doing?

12   A.  We're all working together to do physical

13 audits on the inventory, to account for all keys and

14 MSO's and titles.

15   Q.  Okay.  Do you -- has anybody shared with you

16 what Ford intends to do if the Court were to grant its

17 relief from stay so that it could take possession of the

18 collateral?

19   A.  No.

20   Q.  Have you had any communications with Gary Byrd

21 concerning Reagor-Dykes since July 27th?

22   A.  No.

23   Q.  And your supervisor is Paul Boudreau?

24   A.  That's -- Paul Boudreau and Rene Leal.

25   Q.  Okay.  Is Rene Leal your immediate supervisor?

## Page 32

1    A.  No.

2    Q.  Okay.

3    A.  Above -- Gary Byrd would be my immediate

4  supervisor.  Paul Boudreau is above Gary.

5    Q.  Okay.  And where does Rene Leal fit into the

6  picture?

7    A.  Well, he's kind of a sideline -- him and Gary

8  Byrd are on the same level.

9    Q.  Okay.

10       MR. MULLIN:  I'll pass the witness.

11       EXAMINATION

12 BY MR. BUSTOS:

13   Q.  Ma'am, my name is Fernando Bustos, and I

14 represent Vista Bank.  I have a few questions for you.

15       Did you ever have occasion to communicate

16 with Shane Smith before?

17       MR. LANGLEY:  It's been asked and

18 answered.  Are you asking a different question?

19   Q.  (BY MR. BUSTOS)  Before July 28th, 2018, did

20 you have occasion to speak with Shane Smith before?

21   A.  As I stated, he was included on my weekly

22 e-mails that I sent out to the two Ford stores.  And

23 then I would send -- he was included on the audit

24 summary that I would send out as well.

25   Q.  Would you describe what things you normally

Page 33

1    would communicate with Mr. Smith as part of your job
2    duties?
3         A.   Every Friday, I would send an e-mail that
4    contained the wholesale incentive checkup, so wholesale
5    incentive standings, as well as the e-contracting
6    penetration at the two Ford stores.
7         Q.   Do you know what e-mail address Mr. Smith
8    would use when he would communicate with you? Was it a
9    Reagor-Dykes address --
10        A.   Yes.
11        Q.   -- or a Gmail or Yahoo address?
12        A.   No, Reagor-Dykes. It was a corporate e-mail
13   address.
14        Q.   Did he ever send you text messages?
15        A.   No.
16             MR. BUSTOS: I pass the witness.
17             THE WITNESS: I'm sorry?
18             EXAMINATION
19   BY MR. STROHSCHEIN:
20        Q.   Ms. Schmucker, my name is Steve Strohschein.
21   I represent GM Financial.
22             In your role as a business development
23   person with Ford Motor Credit, did you stay generally
24   aware of the wholesale side of the borrowings of the
25   Reagor-Dykes entities from Ford Motor Credit?

Page 34

1         A.   That's not part of my daily job duties.
2         Q.   But were you generally aware of the -- how
3    much the Reagor-Dykes entities were borrowing from Ford
4    Motor Credit?
5         A.   It wasn't common -- it wasn't common knowledge
6    to me. If I needed to look that up, I could. But it's
7    not something that I looked at or concerned myself with
8    on a -- even a monthly basis.
9         Q.   You mentioned you met with Mr. Reagor and
10   Mr. Dykes to execute some loan documents. And that was
11   for a capital loan that was being made by Ford Motor
12   Credit to Reagor-Dykes?
13        A.   Yes.
14        Q.   And that was in the amount of how much?
15        A.   5 million.
16        Q.   And the timing of that roughly?
17        A.   The best I can remember, it was a year ago.
18        Q.   Last summer sometime?
19        A.   Yes.
20        Q.   Do you remember the purpose for that loan?
21        A.   No.
22        Q.   Were there other capital loans made by Ford
23   Motor Credit to the Reagor-Dykes entities?
24        A.   Not that I'm aware of.
25        Q.   To your knowledge, the current indebtedness

Page 35

1    owed by the Reagor-Dykes entities to Ford Motor Credit,
2    that would be the only capital loan?
3         A.   To my knowledge.
4         Q.   Everything else would be floor plan
5    indebtedness?
6         A.   Yes.
7              MR. STROHSCHEIN: No other questions.
8              EXAMINATION
9    BY MR. CARDER:
10        Q.   I'm Mark Carder for First Bank.
11             Have you seen or done any analysis on
12   double-flooring of collateral claimed by Ford and other
13   third-party lenders?
14        A.   No.
15             MR. CARDER: I pass the witness.
16             MR. LASHAWAY: Reserve.
17             EXAMINATION
18   BY MR. MASSOUH:
19        Q.   Hi. I'm John Massouh with First Capital Bank
20   of Texas. I just want to clarify a few things.
21             On July 27th, you were assigned to visit
22   the Lamesa store?
23        A.   Yes.
24        Q.   And when you picked up the keys and MSO's and
25   titles, did you just pick up everything that was there

Page 36

1    and hand it off to Chad, or was there any segregation as
2    between keys, titles, and MSO's by you?
3         A.   There was no segregation. I picked up every
4    MSO and title that the -- that I could find and as many
5    of the keys as I could get my hands on.
6         Q.   Did you or anyone else cross-check those
7    titles as against vehicles that were floor-planned by
8    Ford Motor Credit?
9         A.   Yes.
10        Q.   And who did that?
11        A.   Chad and I worked together the following days
12   to verify -- we went through the titles and verified if
13   they belonged to a unit that we had floored.
14        Q.   Okay. Did you come across any titles that did
15   not belong to a unit you had floored?
16        A.   Yes.
17        Q.   What did you do with those titles?
18        A.   We still have those in our possession.
19        Q.   Have those been segregated from the other
20   titles to your knowledge?
21        A.   They're still all in the same folder.
22        Q.   But there has been a differentiation made as
23   between units floored by Ford Motor Credit and units not
24   floored by Ford Motor Credit with regard to those
25   titles?

Page 37

1    A.  Yes.
2    Q.  And with regard to your current duties at
3    the -- is it the Plainview store?
4    A.  Yes.
5    Q.  Are you going through that same process of
6    cross-checking units floored by Ford Motor Credit and
7    not floored by Ford Motor Credit with regard to those
8    titles?
9    A.  Yes.
10   Q.  And are there units at the Plainview store
11   that you have titles for that were not floored by Ford
12   Motor Credit?
13   A.  Yes.
14   Q.  Okay.  And have those been segregated out in
15   the folder or a different folder compared to the other
16   titles to your knowledge?
17   A.  I -- I'm not sure how the titles are -- how
18   we're storing the titles in Plainview.
19   Q.  Okay.  Can you tell me the -- approximately
20   the number of non-Ford Motor Credit floor plan titles
21   you acquired from the Lamesa store?
22   A.  No.  I don't know.
23   Q.  Okay.  Do you know how many from the Plainview
24   store?
25   A.  No.

Page 38

1    Q.  With regard to the occasional sales that are
2    occurring at the Plainview store, are any of those sales
3    related to vehicles that were not floor-planned by Ford
4    Motor Credit?
5    A.  Not that I'm aware of.
6    Q.  Are you tracking that, as you're monitoring
7    these sales, whether or not the vehicle is floor-planned
8    by Ford Motor Credit or someone else?
9    A.  Yes.
10       MR. MASSOUH:  Pass the witness.
11       MR. MULLIN:  Come back to me?
12       MR. LANGLEY:  Back to you.
13          EXAMINATION
14   BY MR. MULLIN:
15   Q.  Can you give me -- I know you said you didn't
16   know the number.  But can you say -- can you tell me is
17   it single digits and are we talking something that's 1
18   to 9 or are we talking 10 to 99 or are we talking 100 or
19   above?
20   A.  On?
21   Q.  On these titles that Ford Credit has that are
22   for vehicles they didn't floor.
23   A.  I -- I don't know the specific number above
24   10.
25   Q.  But it's above 10?

Page 39

1    A.  Yes.
2    Q.  Okay.  But under 100?
3    A.  Yes.
4    Q.  All right.  All right.  That's all we have
5    right now.
6        MR. LANGLEY:  All right.  Keith Langley
7    on behalf of Ford Credit and the witness, and we'll
8    reserve questions.
9        (Deposition concluded at 2:15 p.m.)

Page 40

1          CHANGES AND SIGNATURE
2    WITNESS NAME:  GWEN SCHMUCKER
3    DATE OF DEPOSITION:  AUGUST 15, 2018
4    PAGE LINE   CHANGE       REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

Page 41

```
1        I, GWEN SCHMUCKER, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5        _____
6                GWEN SCHMUCKER
7   THE STATE OF _____)
    COUNTY OF _____)
8
9        Before me, _____, on this day
    personally appeared GWEN SCHMUCKER, known to me (or
10  proved to me under oath or through
    _____) (description of identity
11  card or other document)) to be the person whose name is
    subscribed to the foregoing instrument and acknowledged
12  to me that they executed the same for the purposes and
    consideration therein expressed.
13       Given under my hand and seal of office this
14  _____ day of _____, _____
15
16       NOTARY PUBLIC IN AND FOR
         THE STATE OF _____
17       COMMISSION EXPIRES:_____
18
19
20
21
22
23
24
25
```

Page 42

```
1   IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2              LUBBOCK DIVISION
3   IN RE:                    )
                              )
4   REAGOR-DYKES MOTORS, LP,  )Case No. 18-50214-rlj11
                              )
5      Debtor.                )
6   _____
    IN RE:                    )
7                             )
8   REAGOR-DYKES IMPORTS, LP, )Case No. 18-50215-rlj11
                              )
9      Debtor.                )
10  _____
    IN RE:                    )
11                            )
    REAGOR-DYKES AMARILLO, LP, )Case No. 18-50216-rlj11
12                            )
       Debtor.                )
13  _____
    IN RE:                    )
14                            )
    REAGOR-DYKES AUTO COMPANY, )
15  LP,             )Case No. 18-50217-rlj11
                              )
16     Debtor.                )
17  _____
    IN RE:                    )
18                            )
    REAGOR-DYKES PLAINVIEW, LP, )Case No. 18-50218-rlj11
19                            )
       Debtor.                )
20  _____
    IN RE:                    )
21                            )
22  REAGOR-DYKES FLOYDADA, LP, )Case No. 18-50219-rlj11
                              )
23     Debtor.                )
24
25
```

Page 43

```
1            REPORTER'S CERTIFICATION
2        DEPOSITION OF GWEN SCHMUCKER
             AUGUST 15, 2018
3
     I, Kailee Pereida, CSR No. 8398, Certified
4   Shorthand Reporter in and for the State of Texas, hereby
    certify to the following:
5
        That the foregoing proceedings were taken before me
6   at the time and place therein set forth, at which time
    the witness was put under oath by me;
7
        That the testimony of the witness, the questions
8   propounded, and all objections and statements made at
    the time of the examination were recorded
9   stenographically by me and were thereafter transcribed;
10      That a review of the transcript by the deponent was
    requested;
11
        That $_____ is the deposition officer's
12  charges to Mr. David Mullin, Attorney for Debtors, for
    preparing the original deposition transcript and any
13  copies of exhibits;
14      That the foregoing is a true and correct transcript
    of my shorthand notes so taken.
15
        I further certify that I am not a relative or
16  employee of any attorney of the parties, nor financially
    interested in the action.
17
        I declare under penalty of perjury under the laws
18  of Texas that the foregoing is true and correct.
19      Dated this 15th day of August, 2018.
20
21      _____
        Kailee Pereida, Texas CSR 8398
22      Expiration Date:  December 31, 2019
        Caprock Court Reporting, Inc.
23      Firm Certificate Number: 374
24      1112 Texas, Suite 200
        Lubbock, Texas 79401
25      (806) 795-4202
```

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

IN RE:

REAGOR-DYKES MOTORS, LP,          ) Case No. 18-50214-rlj11

Debtor.

IN RE:

REAGOR-DYKES IMPORTS, LP,         ) Case No. 18-50215-rlj11

Debtor.

IN RE:

REAGOR-DYKES AMARILLO, LP,        ) Case No. 18-50216-rlj11

Debtor.

IN RE:

REAGOR-DYKES AUTO COMPANY,        ) Case No. 18-50217-rlj11
LP,

Debtor.

IN RE:

REAGOR-DYKES PLAINVIEW, LP,       ) Case No. 18-50218-rlj11

Debtor.

IN RE:

REAGOR-DYKES FLOYDADA, LP,        ) Case No. 18-50219-rlj11

Debtor.

**CORRECTION PAGES**

Page 2

1       ----------------------------------------

2                   ORAL DEPOSITION OF

3                     GWEN SCHMUCKER

4                     AUGUST 15, 2018

5                        Volume 1

6       ----------------------------------------

7            ORAL DEPOSITION OF GWEN SCHMUCKER, produced as a

8       witness at the instance of the DEBTORS, and duly sworn,

9       was taken in the above-styled and numbered cause on

10      AUGUST 15, 2018, from 1:29 p.m. to 2:15 p.m., before

11      Kailee Perelda, CSR in and for the State of Texas,

12      reported by machine shorthand, at the law offices of

13      Mullin, Hoard & Brown, L.L.P., 1500 Broadway, Suite 700,

14      Lubbock, Texas, pursuant to the Federal Rules of Civil

15      Procedure.

16

17

18

19

20

21

22

23

24

25

1                            A P P E A R A N C E S

2

3    FOR THE DEBTORS:

4        MR. DAVID MULLIN
         MULLIN, HOARD & BROWN, L.L.P.
5        1500 Broadway, Suite 700
         P.O. Box 2585 (79408)
6        Lubbock, Texas 79401
         (806) 765-7491
7        dmullin@mhba.com

8    FOR FORD MOTOR CREDIT COMPANY, L.L.C.:

9        MR. KEITH LANGLEY
         LANGLEY LLP
10       1301 Solana Boulevard
         Building 1, Suite 1545
11       Westlake, Texas 76262
         (214) 722-7162
12       klangley@l-llp.com

13           -AND-

14       MR. CRAIG A. LESLIE
         PHILLIPS LYTLE LLP
15       One Canalside
         125 Main Street
16       Buffalo, New York 14203
         (716) 847-7012
17       cleslie@phillipslytle.com

18   FOR GM FINANCIAL:

19       MR. STEPHEN P. STROHSCHEIN
         MCGLINCHEY STAFFORD, P.L.L.C.
20       301 Main Street
         Fourteenth Floor
21       Baton Rouge, Louisiana 70801
         (225) 383-9000
22       sstroh@mcglinchey.com

23

24

25

Page 4

 1    FOR AIM BANK:

 2          MR. JEFF R. LASHAWAY
            BOERNER, DENNIS & FRANKLIN, P.L.L.C.
 3          920 Avenue Q
            Lubbock, Texas 79401
 4          (806) 763-0044
            jlashaway@bdflawfirm.cpm

 5

 6    FOR FIRST CAPITAL BANK:

            MR. JOHN F. MASSOUH
 7          SPROUSE, SHRADER, SMITH, P.L.L.C.
            701 South Taylor
 8          Suite 500
            Amarillo, Texas 79105
 9          (806) 468-3337
            john.massouh@sprouselaw.com
10

      FOR VISTA BANK:
11
            MR. FERNANDO BUSTOS
12          BUSTOS LAW FIRM, P.C.
            1001 Main Street
13          Suite 501
            Lubbock, Texas 79401
14          (806) 780-3976
            fbustos@bustoslawfirm.com
15

      FOR FIRST BANK & TRUST:
16
            MR. MARK S. CARDER
17          STINSON, LEONARD, STREET, L.L.P.
            1201 Walnut
18          Suite 2900
            Kansas City, Missouri 64106
19          (816) 691-3411
            mark.carder@stinson.com
20

      FOR BART REAGOR:
21
            MR. SCOTT R. WIEHLE
22          KELLY, HART & HALLMAN, L.L.P.
            201 Main Street
23          Suite 2500
            Fort Worth, Texas 76102
24          (817) 332-2500
            scott.wiehle@kellyhart.com
25

```
 1    FOR IBC BANK:

 2         MR. JOHN D. DALE
           GABLE GOTWALS
 3         1100 ONEOK Plaza
           100 West Fifth Street
 4         Tulsa, Oklahoma 74103
           (918) 595-4828
 5         jdale@gablelaw.com

 6    FOR RICK DYKES:

 7         MR. DAVID M. GUINN, JR.
           LAW OFFICE OF HURLEY & GUINN
 8         1805 13th Street
           Lubbock, Texas 79401
 9         (806) 771-0700
           david@hurleyguinn.com
10
      ALSO PRESENT:
11
           Mr. Toby Cecil
12         Mr. Rick Dykes
           Mr. Jonathan Hill
13         Mr. Howie Ravitz
           Mr. Scott Wade
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 40

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  GWEN SCHMUCKER

3    DATE OF DEPOSITION:  AUGUST 15, 2018

4    PAGE LINE      CHANGE            REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Page 41

1        I, GWEN SCHMUCKER, have read the foregoing
deposition and hereby affix my signature that same is
2   true and correct, except as noted above.

3

4

5                        GWEN SCHMUCKER

6

7   THE STATE OF Texas    )
    COUNTY OF Castro      )
8
        Before me,   Gwen Schmucker      , on this day
9   personally appeared GWEN SCHMUCKER, known to me (or
    proved to me under oath or through
10   drivers license      ) (description of identity
    card or other document)) to be the person whose name is
11 · subscribed to the foregoing instrument and acknowledged
    to me that they executed the same for the purposes and
12   consideration therein expressed.
        Given under my hand and seal of office this
13   21st   day of    August      ,  2018   .

14

15                       Barbara Schulte
16                   NOTARY PUBLIC IN AND FOR
                     THE STATE OF   Texas
17                   COMMISSION EXPIRES:  9/14/2018

18                        BARBARA SCHULTE
                          NOTARY PUBLIC
19                        State of Texas
                          Comm. Exp. 03/14/2018
20

21

22

23

24

25

Page 42

1          IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                    LUBBOCK DIVISION

3                  IN RE:                              )
                                                       )
4     REAGOR-DYKES MOTORS, LP,       )Case No. 18-50214-rlj11
                                                       )
5          Debtor.                                     )

6     _____

7                  IN RE:                              )
                                                       )
      REAGOR-DYKES IMPORTS, LP,      )Case No. 18-50215-rlj11
8                                                      )
           Debtor.                                     )
9

10                 IN RE:                              )
                                                       )
11    REAGOR-DYKES AMARILLO, LP,     )Case No. 18-50216-rlj11
                                                       )
12         Debtor.                                     )

13    _____

14                 IN RE:                              )
                                                       )
      REAGOR-DYKES AUTO COMPANY,     )
15    LP,                            )Case No. 18-50217-rlj11
                                                       )
16         Debtor.                                     )

17    _____

18                 IN RE:                              )
                                                       )
      REAGOR-DYKES PLAINVIEW, LP,    )Case No. 18-50218-rlj11
19                                                     )
           Debtor.                                     )
20

21                 IN RE:                              )
                                                       )
22    REAGOR-DYKES FLOYDADA, LP,     )Case No. 18-50219-rlj11
                                                       )
23         Debtor.                                     )

24    _____

25

Page 43

1
                    REPORTER'S CERTIFICATION
                  DEPOSITION OF GWEN SCHMUCKER,
2                        AUGUST 15, 2018

3

        I, Kailee Pereida, CSR No. 8398, Certified
4   Shorthand Reporter in and for the State of Texas, hereby
    certify to the following:
5
        That the foregoing proceedings were taken before me
6   at the time and place therein set forth, at which time
    the witness was put under oath by me;
7
        That the testimony of the witness, the questions
8   propounded, and all objections and statements made at
    the time of the examination were recorded
9   stenographically by me and were thereafter transcribed;

10      That a review of the transcript by the deponent was
    requested;
11
        That $ **713.80**    is the deposition officer's
12  charges to Mr. David Mullin, Attorney for Debtors, for
    preparing the original deposition transcript and any
13  copies of exhibits;

14      That the foregoing is a true and correct transcript
    of my shorthand notes so taken.
15
        I further certify that I am not a relative or
16  employee of any attorney of the parties, nor financially
    interested in the action.
17
        I declare under penalty of perjury under the laws
18  of Texas that the foregoing is true and correct.

19      Dated this 15th day of August, 2018.

20

21                        *Kailee Pereida*
                    _____
22                    Kailee Pereida, Texas CSR 8398
                      Expiration Date:  December 31, 2019

23                    Caprock Court Reporting, Inc.
                      Firm Certificate Number:  374
24                    1112 Texas, Suite 200
                      Lubbock, Texas 79401
25                    (806) 795-4202

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

```
IN RE:                      )
                            )
REAGOR-DYKES MOTORS, LP,    )Case No. 18-50214-rlj11
                            )
     Debtor.                )

IN RE:                      )
                            )
REAGOR-DYKES IMPORTS, LP,   )Case No. 18-50215-rlj11
                            )
     Debtor.                )

IN RE:                      )
                            )
REAGOR-DYKES AMARILLO, LP,  )Case No. 18-50216-rlj11
                            )
     Debtor.                )

IN RE:                      )
                            )
REAGOR-DYKES AUTO COMPANY,  )
LP,               )Case No. 18-50217-rlj11
                            )
     Debtor.                )

IN RE:                      )
                            )
REAGOR-DYKES PLAINVIEW, LP, )Case No. 18-50218-rlj11
                            )
     Debtor.                )

IN RE:                      )
                            )
REAGOR-DYKES FLOYDADA, LP,  )Case No. 18-50219-rlj11
                            )
     Debtor.                )
```

## Page 2

```
 1   -------------------------------------
 2            ORAL DEPOSITION OF
 3              JAMES CONLAN
 4             AUGUST 15, 2018
 5                Volume 1
 6   -------------------------------------
 7        ORAL DEPOSITION OF JAMES CONLAN, produced as a
 8   witness at the instance of the DEBTOR, and duly sworn,
 9   was taken in the above-styled and numbered cause on
10   AUGUST 15, 2018, from 4:00 p.m. to 4:44 p.m., before
11   Kailee Pereida, CSR in and for the State of Texas,
12   reported by machine shorthand, at the law offices of
13   Mullin, Hoard & Brown, L.L.P., 1500 Broadway, Suite 700,
14   Lubbock, Texas, pursuant to the Federal Rules of Civil
15   Procedure
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              A P P E A R A N C E S
 2   FOR THE DEBTORS:
 3        MR. DAVID MULLIN
          MULLIN, HOARD & BROWN, L.L.P
 4        1500 Broadway, Suite 700
          P.O. Box 2585 (79408)
 5        Lubbock, Texas 79401
          (806) 765-7491
 6        dmullin@mhba.com
 7   FOR FORD MOTOR CREDIT COMPANY, L.L.C.:
 8        MR. CRAIG A. LESLIE
          PHILLIPS LYTLE LLP
 9        One Canalside
          125 Main Street
10        Buffalo, New York 14203
          (716) 847-7012
11        cleslie@phillipslytle.com
12             -AND-
13        MR. DONALD H. CRAM, III
          SEVERSON & WERSON, P.C.
14        One Embarcadero Center
          26th Floor
15        San Francisco, California 94111
          (415) 398-3344
16
17   FOR GM FINANCIAL:
18        MR. STEPHEN P. STROHSCHEIN
          MCGLINCHEY STAFFORD, P.L.L.C.
19        301 Main Street
          Fourteenth Floor
20        Baton Rouge, Louisiana 70801
          (225) 383-9000
21        sstroh@mcglinchey.com
22   FOR AIM BANK:
23        MR. JEFF R. LASHAWAY
          BOERNER, DENNIS & FRANKLIN, P.L.L.C.
24        920 Avenue Q
          Lubbock, Texas 79401
25        (806) 763-0044
          jlashaway@bdflawfirm.com
```

## Page 4

```
 1   FOR FIRST CAPITAL BANK:
 2        MR. JOHN F. MASSOUH
          SPROUSE, SHRADER, SMITH, P.L.L.C.
 3        701 South Taylor
          Suite 500
 4        Amarillo, Texas 79105
          (806) 468-3337
 5        john.massouh@sprouselaw.com
 6   FOR VISTA BANK:
 7        MR. FERNANDO BUSTOS
          BUSTOS LAW FIRM, P.C.
 8        1001 Main Street
          Suite 501
 9        Lubbock, Texas 79401
          (806) 780-3976
10        fbustos@bustoslawfirm.com
11   FOR FIRST BANK & TRUST:
12        MR. MARK S. CARDER
          STINSON, LEONARD, STREET, L.L.P.
13        1201 Walnut
          Suite 2900
14        Kansas City, Missouri 64106
          (816) 691-3415
15        mark.carder@stinson.com
16   FOR BART REAGOR:
17        MR. SCOTT R. WIEHLE
          KELLY, HART & HALLMAN, L.L.P.
18        201 Main Street
          Suite 2500
19        Fort Worth, Texas 76102
          (817) 332-2500
20        scott.wiehle@kellyhart.com
21
22   FOR IBC BANK:
23        MR. JOHN D. DALE
          GABLE GOTWALS
24        1100 ONEOK Plaza
          100 West Fifth Street
25        Tulsa, Oklahoma 74103
          (918) 595-4828
```

EXHIBIT

**D**

Page 5

```
1    ALSO PRESENT:
2        Mr. Mike Cannon
         Mr. Toby Cecil
3        Mr. Jonathan Hill
         Mr. Howie Ravitz
4        Mr. Scott Wade
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1    INSTRUCTIONS FOR SIGNING A DEPOSITION
2
3    Rules of Civil Procedure under which this
     deposition was taken provide that the deposition
     transcript shall be made available to the witness or his
4    attorney of record for examination and signature by the
     witness.
5
     This deposition condensed transcript is provided
6    for your review. It is yours to keep. Read it
     carefully before making any changes or corrections.
7    Make transcript corrections on the Witness Signature
     Page.
8
9    Changes and/or corrections must be made in the
     following manner:
10
         (1) Indicate by number the page and line you wish
11           to alter;
         (2) Indicate your change or correction;
12       (3) Give the reason for making the change.
13       When you have followed the instructions above, sign
     the Witness Signature Page before a Notary Public and
14   return it as soon as possible.
15       When we have received the signed and notarized
     transcript, we will forward all attorneys of record a
16   copy of the completed Witness Signature Page and deliver
     the original transcript to Mr. David Mullin for
17   safekeeping and use at trial.
18       If you have any questions about this procedure,
     please call my office at (806) 795-4202.
19
         Kailee Pereida, CSR
20       Caprock Court Reporting, Inc.
         1112 Texas, Suite 200
21       Lubbock, Texas 79401
         (806) 795-4202
22
23
24
25
```

Page 6

```
1                INDEX
                        PAGE
2    Appearances..........................3
3    Instructions for Signing a Deposition...........7
4    JAMES CONLAN
5        EXAMINATION BY MR. MR. MULLIN..............8
         EXAMINATION BY MR. BUSTOS..............32
6        EXAMINATION BY MR. STROHSCHEIN.........33
         EXAMINATION BY MR. MASSOUH.............35
7
8    Signature and Changes.............38
     Reporter's Certificate............41
9
             EXHIBITS
10
     NO. DESCRIPTION                 PAGE
11
     10  Notice of Oral Deposition of James Conlan.....9
12   11  Registration Data Report (RDR) Audit
         Triggering Reporting Enhancement BB Project
13       #73597...............30
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
1        (Witness sworn by court reporter.)
2            JAMES CONLAN,
3    having been first duly sworn, testified as follows:
4            EXAMINATION
5    BY MR. MR. MULLIN:
6        Q.  State your full name.
7        A.  James Edward Conlan.
8        Q.  Mr. Conlan, have you ever given a deposition
9    before?
10       A.  I have not.
11       Q.  Okay. In the deposition procedure, the court
12   reporter is taking down my questions, your answers.
13   You're under oath. The testimony will be printed up in
14   a booklet. And it can be read back at a trial or a
15   hearing or in connection with a motion in the case.
16          So it's very important that you understand
17   my questions and that you answer that question, not some
18   other question.
19       A.  Okay.
20       Q.  If at any time you don't understand my
21   question, just tell me you don't understand the
22   question, and I'll try to explain it.
23          If you will let me finish my questions,
24   I'll let you finish your answers. Is that fair enough?
25       A.  That is.
```

Page 9

1    Q.  Okay.  And are you represented by counsel for
2    Ford Motor Credit today?
3    A.  Yes, I am.
4    Q.  Okay.  What did you do to prepare for your
5    deposition?
6    A.  I -- we met briefly with them and just told me
7    about kind of what to expect for the --
8         MR. LESLIE:  Objection --
9    Q.  (BY MR. MULLIN)  Don't tell me what --
10        MR. LESLIE:  Don't tell him anything
11   about what we talked about.
12   Q.  (BY MR. MULLIN)  Don't say what he told you.
13   Just like you met with your lawyers, and then did you
14   look at any documents?
15   A.  No.
16   Q.  Okay.
17        (Exhibit 10 marked.)
18   Q.  This is Exhibit No. 10.  And that is your
19   deposition notice.  Have you seen that document before
20   today?
21   A.  I have.
22   Q.  All right.  If you need a break at any time,
23   just let me know, and as long as you -- I'd like you to
24   finish your answer -- whatever answer you have to the
25   pending question, but then you can take a break whenever

Page 10

1    you want.
2    A.  Okay.
3    Q.  Tell me what your job title is at Ford Motor
4    Credit.
5    A.  I'm a Six Sigma Black Belt.
6    Q.  Okay.  How do you -- how are you spelling Six
7    Sigma?
8    A.  S-I-X, S-I-G-M-A.
9    Q.  And what does it mean to be a Six Sigma Black
10   Belt?
11   A.  It's a certification that you receive
12   accreditation for going through a process.
13   Q.  Okay.  And what is that process?
14   A.  It consists of completing projects and also
15   taking an online certification.
16   Q.  Okay.  And what does it certify you to be able
17   to do?
18   A.  To run Six Sigma projects.
19   Q.  Okay.  And what is a Six Sigma project?
20   A.  It's a process of using data to drive all your
21   decisions.  It's a data-driven approach to process
22   improvement.
23   Q.  Okay.  Well, I'm sure most people would claim
24   at least that they use data to drive all their
25   decisions.  So what's unique about this use of data?

Page 11

1    A.  It -- the data speaks for itself.  We say in
2    Six Sigma, the data will set you free.
3    Q.  Okay.  Is -- at Ford Motor Credit, are you
4    focused on one area of data?  I mean, do you go around
5    the company and say, hey, we could make more profit if
6    we did this or this dealer is going to be a problem if
7    you look at his data?  Or what kind of projects do you
8    do for Ford with the Six Sigma data?
9    A.  Any project that I'm assigned.  It doesn't
10   have to be with dealers.  It's a lot with customers.
11   But any process.  It can be how we send out our mail,
12   for example, about our process, a more efficient way of
13   doing that.
14   Q.  Okay.
15   A.  It can be how we process any kind of paperwork
16   that the customer sends a dealer.
17   Q.  Okay.  Is there some place online or -- that
18   kind of describes this Six Sigma Black Belt in more
19   detail?
20   A.  Yeah.  You could go to isixsigma.com.
21   Q.  Okay.  All right.  Let's -- let's just jump
22   ahead to -- well, how long have you been working for
23   Ford Motor Credit?
24   A.  It'll be 29 years in October.
25   Q.  And for how many of those years have you been

Page 12

1    a Six Sigma Black Belt?
2    A.  Over six off and on.
3    Q.  All right.  Tell me how you got involved with
4    Reagor-Dykes Auto Group.
5    A.  It was a -- there was a recent dealer status
6    that they asked us to kind of do a postmortem on and
7    determine if we could use data to identify any other
8    potential issues.
9    Q.  Okay.  And who asked you to do that?
10   A.  Steve Gracz.
11   Q.  How does he spell his last name?
12   A.  G-R-A-C-Z.
13   Q.  Okay.  And what's his position with Ford Motor
14   Credit?
15   A.  He's the director of consumer risk.
16   Q.  And where is he located?
17   A.  In Dearborn, Michigan.
18   Q.  Do you know how Mr. Gracz got involved in
19   looking at Reagor-Dykes?
20   A.  I don't.
21   Q.  Okay.  So he just contacted you kind of out of
22   the blue?
23   A.  He contacted me on a different dealer to
24   research and do a postmortem on.  And using data, that's
25   how I came across the Reagor-Dykes as another potential

Page 13

1  dealer to look at.
2      Q.  Oh, okay.  So you were -- you were actually
3  looking at a different dealer that Mr. Gracz had asked
4  you to look at?
5      A.  Correct.
6      Q.  And in the course of that, you came across
7  Reagor-Dykes data?
8      A.  Correct.
9      Q.  Okay.  All right.  And was the report that
10  you're looking at -- that you were looking at, at that
11  time on Reagor-Dykes -- was it Exhibit No. 4?
12          I think these are in order.  These are the
13  exhibits so far.  And there's a -- there's a report,
14  Exhibit 4, attached to this e-mail, is an audit report.
15      A.  What was your question?
16      Q.  Is that the audit report that you were looking
17  at that caused you to say, I think I ought to look
18  further at this?
19      A.  No.
20      Q.  Okay.  What was it you were seeing?
21      A.  I used a different set of data that we have to
22  identify this dealer.
23      Q.  Okay.  And what was that different set of
24  data?
25      A.  It's called the RDR, registration data report.

Page 14

1      Q.  Okay.  And what does that report show?
2      A.  It shows dealers that have floor plan vehicles
3  that could be sold according to public sources.
4      Q.  That are available for sale or that they're
5  already sold?
6      A.  Correct.
7      Q.  All right.
8      A.  Floor plan and then potentially registered or
9  titled after flooring.
10      Q.  All right.  In somebody else's name?
11      A.  Yes.
12      Q.  All right.  All right.  So this would be a
13  title -- Joe Jones has title to a vehicle that you have
14  floor-planned?
15      A.  Yes.
16      Q.  All right.  So what do you do when you find
17  that out, that Joe Jones has the title?  What do you do?
18      A.  The initial report just would tell us how many
19  vehicles and what the VINs were.
20      Q.  Okay.  So there's a certain number of vehicles
21  that were floor-planned by Ford Motor Credit with
22  Reagor-Dykes, and now those vehicles are owned by
23  somebody else?
24      A.  Yes.
25      Q.  All right.  And what -- what was the number or

Page 15

1  percentage or degree that raised your eyebrows or caused
2  you to become more interested in the Reagor-Dykes?
3          MR. LESLIE:  Objection; compound.
4          You can answer.
5          THE WITNESS:  Go ahead?
6      A.  It was a percentage.
7      Q.  (BY MR. MULLIN)  Okay.  And what -- do you
8  remember what the percentage was?
9      A.  It was over 8 percent.
10      Q.  9 percent.
11          So was it 8 percent of the total floor
12  plan was titled in somebody else's name, or was it 8
13  percent of what?
14      A.  8 percent of the vehicles on the RDR report
15  out of the dealer's total floor plan amount.
16      Q.  Okay.  So out of Reagor Dykes' total floor
17  plan amount with Ford Motor Credit, more than 8 percent
18  were titled in the name of someone other than
19  Reagor-Dykes?
20          MR. LESLIE:  Objection; form.
21      Q.  (BY MR. MULLIN)  True?
22          MR. LESLIE:  You can answer.
23      A.  Yes.
24      Q.  (BY MR. MULLIN)  All right.  And so you were
25  looking at the registration data report on Reagor-Dykes

Page 16

1  as part of your analysis of another dealership?
2      A.  Yes.
3      Q.  Okay.  And in seeing this 8 percent then, did
4  you call that to the attention of Mr. Gracz?
5      A.  Once my analysis was complete, yes.
6      Q.  Okay.
7      A.  And I just want to be clear.  The 8 percent
8  was on one location.
9      Q.  So -- but let's be clear about that.  Is it 8
10  percent of the total floored at that one location, or is
11  it 8 percent of the entire universe?
12      A.  8 percent of that location.
13      Q.  Okay.
14      A.  Apples to apples.
15      Q.  Okay.  Apples to apples.
16          And so did you look at the other locations
17  before you called Mr. Gracz, or did you just -- after
18  you looked at that one location, you called Mr. Gracz?
19      A.  I looked at all of them first.
20      Q.  Okay.  And what did you find after you looked
21  at all of the locations?
22      A.  The total was 150 vehicles on all their
23  locations.
24      Q.  Okay.  And what percentage did that
25  constitute?

Page 17

1    A. I don't -- I don't know the percent.
2    Q. Okay. But there were 150 vehicles that were
3    registered to people or entities other than Reagor-Dykes
4    that were floor-planned with Ford Motor Credit?
5    A. Yes.
6    Q. And was that -- was the as-of date what date?
7    A. It was late June.
8    Q. Okay. All right. So you didn't actually ever
9    look at the -- the AiM -- the audit report that had been
10   done on June 28th?
11   A. After, I did.
12   Q. After you had done --
13   A. Yes.
14   Q. -- the other? Okay.
15        So you called Mr. Gracz after you had
16   found the 150 vehicles. And what did you tell him?
17   A. I explained 147 of those had different sold
18   and registration information than what was provided on
19   that prior June audit.
20   Q. Okay. Okay. So at the time you called
21   Mr. Gracz, you had looked at the audit that's Exhibit 4?
22   A. Yes.
23        MR. LESLIE: Objection; form.
24   Q. (BY MR. MULLIN) And at the time -- I'm
25   talking about the time when you reported to Mr. Gracz

Page 18

1    the -- about the 147 vehicles, you had already looked at
2    the audit that's attached to Exhibit 4?
3        MR. LESLIE: Objection. If you want to
4    excuse the witness, I can explain to you that objection.
5        MR. MULLIN: I don't need -- I don't
6    really need it.
7        MR. LESLIE: Objection; foundation and
8    form.
9    Q. (BY MR. MULLIN) Go ahead. You can answer
10   A. Repeat the question.
11   Q. The question is: I'm talking about when you
12   called Mr. Gracz to tell him about the 147 vehicles that
13   had different sale dates than the dates of sale that had
14   been reported to you by the dealership, you -- you had
15   already look at the June 28th, 2018, audit report that's
16   marked as Exhibit 4?
17       MR. LESLIE: Objection; form.
18   A. Yeah.
19       MR. LESLIE: And foundation.
20       You can answer.
21   A. Yes.
22   Q. (BY MR. MULLIN) All right. And can you tell
23   me what you said to Mr. Gracz in that call or the gist
24   of it?
25   A. I -- I told him that it looked like there

Page 19

1    could be a potential issue with this particular dealer.
2    Q. Okay. Did you think the 147 vehicles with
3    having different sales dates for the public records
4    versus the information that had been provided to the
5    dealership was a red flag that there might be some kind
6    of a fraud?
7        MR. LESLIE: Objection to form.
8    A. It was an anomaly. Either the auditors had
9    incorrect data or the dealer provided incorrect data.
10   Q. (BY MR. MULLIN) Okay. And when you looked at
11   the audit of June 28th, 2018, if you'll turn -- turn
12   with me to page -- the last page of Exhibit 4, did you
13   notice that for one of the lots, the last one listed,
14   Reagor-Dykes Chevrolet, there were 225 units with a
15   floor plan balance of $9.4 million that had -- were
16   listed as being sold and not -- funds not due as of the
17   date of the audit?
18       MR. LESLIE: Objection to form and
19   relevance.
20       Do you understand the question?
21       THE WITNESS: No.
22   Q. (BY MR. MULLIN) Okay. Did you -- when you
23   looked at this audit that had been performed -- the
24   summary audit that had been performed June 28th, 2018,
25   did you notice that the -- the auditors had found that

Page 20

1    at the Reagor-Dykes Chevrolet store, which is in
2    Floydada, Texas, there were reported to be 225 vehicles
3    having an amount -- floor plan amount of $9,401,000 that
4    had been sold and for which Ford had not yet been paid?
5    A. I did see that.
6    Q. Okay. Did -- were you aware that that was --
7    the 225 vehicles and $9.4 million would be virtually the
8    entire inventory of the Floydada lot?
9        MR. LESLIE: Objection. What relevance
10   does that have to the hearing tomorrow?
11       MR. MULLIN: Well, it goes to the
12   question of what the inventory is.
13       MR. LESLIE: Well, objection beyond the
14   scope of tomorrow's hearing. Instruct you not to
15   answer. The document speaks for itself.
16       MR. MULLIN: That's so ridiculous. These
17   objections are so utterly ridiculous.
18       MR. LESLIE: I object to the sidebar.
19       MR. MULLIN: It's not a sidebar.
20       MR. LESLIE: I've stated my objection,
21   Counselor. Move on.
22       MR. MULLIN: You've instructed the
23   witness not to answer, which is thoroughly
24   inappropriate. And there's no reason to drag this
25   witness back here for another deposition when he could

## Page 21

1  easily answer the question. It's just being done
2  through a rase and to avoid reaching any of the issues
3  in the case.
4          MR. LESLIE: I'll object and move to
5  strike the sidebar.
6          MR. MULLIN: It's not sidebar. I'm --
7  it's for the Judge.
8      Q.  (BY MR. MULLIN) So are you going to follow
9  counsel's instructions and refuse to answer?
10     A.  Yes, I am.
11     Q.  Okay.  Would it be, in your experience, a red
12 flag of fraud if the dealer was reporting that it had
13 sold substantially the entire inventory of its lot -- of
14 one of its lots in the last seven business days?
15         MR. LESLIE: Objection; beyond the scope.
16 Instruct the witness not to answer.
17     A.  I'm not going to answer.
18     Q.  (BY MR. MULLIN) Okay  So what did
19 Mr. Gracz -- how did Mr. Gracz respond to your report?
20     A.  They agreed with the emergency audit that I
21 recommended.
22     Q.  And the emergency audit was going to consist
23 of what?
24     A.  Normal audit that we do at the dealership, but
25 verification of all vehicles that weren't seen.

## Page 22

1      Q.  Okay.
2      A.  And also any flooring requests would be
3  touched also.
4      Q.  Any what?
5      A.  Flooring --
6      Q.  Flooring.
7      A.  Vehicle flooring requests.
8      Q.  Okay.  Okay.  And the -- did you discuss the
9  emergency audit with Mr. Byrd and Mr. Leal?
10     A.  Yes.
11     Q.  Okay.  Did you attend the emergency audit?
12     A.  No.
13     Q.  Okay.  Did you help structure it?
14     A.  No.
15     Q.  What was your role with respect to it other
16 than recommending it?
17     A.  I -- when the audit was going on, I was
18 collecting data on missing units.
19     Q.  Okay.  Tell me what that means.
20     A.  When they conduct an audit, the first run
21 through, not all vehicles will be seen at the
22 dealership.  And that's normal.  In this case, there was
23 1470 missing units.  So I got -- started working on
24 looking up the information on all those vehicles.
25     Q.  1470?

## Page 23

1      A.  Yes.
2      Q.  And so you were looking to see when those
3  vehicles had been sold?
4      A.  Correct.
5      Q.  And what did you determine?
6      A.  A substantial number of those were sold --
7  appeared to be sold.
8      Q.  Okay.  Per the DMV records?
9      A.  Yes, and Fast Data.
10     Q.  And did you have any further involvement with
11 the emergency audit?
12     A.  Continued analysis on the data.
13     Q.  Okay.  What kind of analysis did you do?
14     A.  Looking up, you know, all the -- 1470 records
15 takes a long time to manually look up and do.  So that
16 analysis took several days.
17     Q.  Where were you looking to get that
18 information?
19     A.  From the Texas DMV and from Fast Data and
20 dealers' records.
21     Q.  Okay.  What's Fast Data?
22     A.  It's an online tool that uses public
23 information to pull back information on -- by VINs on
24 vehicles that are registered and sold.
25     Q.  Okay.  All right.  And when you completed that

## Page 24

1  analysis, did you come to any other conclusions except
2  the information about the -- other than the information
3  about the 1470 missing units?
4      A.  Yes.  It appeared that the vehicles were
5  floor-planned after they were titled to an individual
6  with a lien from a financial institution.
7      Q.  Okay.  So you're telling me that the vehicle
8  is sold to Joe Jones.  Joe Jones gets a loan to buy the
9  vehicle from Lubbock Bank.  And then the vehicle is
10 again floor-planned while it's owned by Joe Jones?
11     A.  Yes.
12     Q.  So the dealership doesn't own it anymore, but
13 it's being floor-planned?
14     A.  Correct.
15     Q.  Okay.  And what was the volume of those
16 instances?
17     A.  I don't recall a number, but it was a lot.
18     Q.  Okay.  Was it -- are we talking --
19     A.  Hundreds.
20     Q.  Hundreds of vehicles?
21     A.  Yes.
22     Q.  Did you have any other conclusions?
23     A.  Vehicles appeared to be floored two times.
24     Q.  Okay.  And tell me what you found on that.
25     A.  It was -- there's a report that shows

## Page 25

1  duplicate flooring within Ford Credit. And this dealer
2  had, I want to say, 15 or so on the report that looked
3  like they were floored on two locations at the same
4  time.
5      Q.  Okay. 15 vehicles?
6      A.  Yes.
7      Q.  Okay. And then what else did you conclude?
8      A.  Potentially it appeared that they've floored
9  vehicles that they did not have in inventory.
10      Q.  Okay. And that would be -- well, the first
11  thing you told me about with the vehicles that were
12  titled in someone else's name, is that the same thing
13  or --
14      A.  That is similar.
15      Q.  Okay. Okay. All right. Any other
16  conclusions that you recall?
17      A.  The other thing -- the only other possibility
18  I could see with the vehicles being titled and floored
19  would be a quick trade-in from a customer.
20      Q.  And what do you mean by that?
21      A.  If they got a vehicle and for whatever reason
22  didn't like it and brought it back, very -- you know,
23  might happen one or two times, but not to this extent --
24      Q.  Yeah.
25      A.  -- just in a general -- in a dealership -- any

## Page 26

1  dealership in general.
2      Q.  Okay.
3      A.  So that data was different.
4      Q.  Did you write up your conclusions in some kind
5  of report?
6      A.  There was -- there's a summary report of the
7  initial findings. I did not write up one after this
8  emergency audit.
9      Q.  Okay. Okay. So you did make a report of your
10  initial findings?
11      A.  The initial --
12      Q.  The 147 --
13      A.  June --
14      Q.  Yeah.
15      A.  The June -- yes.
16      Q.  Okay. But you didn't do a written report
17  after the July audit?
18      A.  No. That's the auditing team to do that.
19      Q.  Okay. Okay. All right. Did you communicate
20  any of your findings to anybody at Reagor-Dykes?
21      A.  No.
22      Q.  Did you communicate your findings internally
23  in Ford Motor Credit?
24      A.  Yes.
25      Q.  To whom?

## Page 27

1      A.  The -- the -- the preaudit or the day of the
2  audit, the July --
3      Q.  Well --
4      A.  -- or the June?
5      Q.  Well, the preaudit first, who did you tell
6  about the June -- your evaluation of the June findings?
7      A.  That would be the same people that we talked
8  about earlier; Steve Gracz, Rene Leal, Gary Byrd, and I
9  believe Paul Boudreau.
10      Q.  Did you talk with Gwen Schmucker?
11      A.  No.
12      Q.  And then in the -- connection with the
13  emergency audit, to whom did you communicate your
14  findings?
15      A.  After the audit, I don't communicate the audit
16  results. I just recommend it, and they approved it.
17      Q.  Okay. But the things you just told me about,
18  the double-flooring, who did you tell about that, the --
19  the double-flooring and the vehicles that were titled in
20  somebody else's name and were being floored?
21      A.  That's in the actual audit report --
22      Q.  Okay.
23      A.  -- that the audit team completes.
24      Q.  Okay. But you didn't make some oral --
25  separate oral report, I guess, is what I'm getting at?

## Page 28

1      A.  I might have told people it looked like
2  vehicles could have been double-floored.
3      Q.  Uh-huh. Okay. Who would you have told?
4      A.  That would have -- probably -- it might have
5  been Paul Boudreau potentially or Gary Byrd.
6      Q.  Okay. Okay. Did you ever come down here to
7  Lubbock to -- to work on the audit at all?
8      A.  No. I just got here Tuesday at 2 a.m.
9      Q.  All right. Glad to have you here.
10          Okay. Did you have anymore involvement
11  with Reagor-Dykes -- any Reagor-Dykes matters after
12  you -- after the completion of the emergency audit?
13      A.  No.
14      Q.  Okay. And to today's date, you haven't been
15  involved at all in trying to analyze anything further on
16  the case?
17      A.  Continue analyzing data, yes.
18      Q.  Okay.
19      A.  The data analysis will be ongoing for a while
20  because the project is ongoing.
21      Q.  Okay. What are you working towards? What are
22  you trying to do?
23          MR. LESLIE: Objection to the extent it
24  calls for attorney-client privilege and direct the
25  witness not to answer.

Page 29

1    A.  I won't answer.
2             MR. MULLIN:  You can't tell me what --
3    what he's currently working on that relates in this
4    case?
5             MR. LESLIE:  Does -- my understanding is
6    it doesn't relate to this case.
7    Q.  (BY MR. MULLIN)  Well, does it relate to
8    Reagor-Dykes?  I mean, I know you still have a job to
9    do.  But I'm talking about Reagor-Dykes.
10   A.  It's all the dealers in the United States I'm
11   looking into.
12   Q.  Well, can you at least tell me what generally
13   you're trying to find?
14            MR. LESLIE:  Objection; calls for
15   material -- information that's subject to the
16   attorney-client privilege and direct him not to answer.
17   A.  I'm not going to answer.
18   Q.  (BY MR. MULLIN)  Does the work you're
19   currently doing include Reagor-Dykes?
20   A.  Yes.
21   Q.  Okay.  Does it include Reagor-Dykes inventory
22   of vehicles?
23   A.  Yeah.  Yes.
24            MR. MULLIN:  Let's take a little break.
25            (Break from 4:31 p.m. to 4:35 p.m.)

Page 30

1    Q.  (BY MR. MULLIN)  Let me show you Exhibit
2    No. 11.
3             (Exhibit 11 marked.)
4    Q.  Have you seen that document before?
5    A.  I created this.
6    Q.  Okay.  And so this was created as part of your
7    work at Ford Motor Credit?
8    A.  Yes.
9    Q.  And what's it titled?
10   A.  "Registration Data Report Audit Trigger
11   Reporting Enhancement Black Belt Project 73597."
12   Q.  And what was Black Belt Project 73597?
13   A.  That's the Registration Data Report Audit
14   Trigger Report Enhancement Project.
15   Q.  All right.
16   A.  That is the reference to that.  Every project
17   has a reference number.
18   Q.  All right.  And is this a report that you were
19   telling us about earlier when you were talking about
20   the -- the 147 vehicles?  Or is this a different report?
21   A.  No, this is the one.
22   Q.  All right.  And did this report include your
23   analysis of the June 28th, 2018, audit that we were
24   looking at, Exhibit No. 4?
25   A.  Yes.

Page 31

1    Q.  And I'm going to come around behind because I
2    don't have an extra copy.  But if I'm bugging you by
3    coming around, tell me.
4    A.  You're fine.
5    Q.  The -- what's your second bullet point that
6    you comment about the audit, Exhibit No. 4?
7             MR. LESLIE:  Objection to form.
8    Q.  (BY MR. MULLIN)  You can answer what your
9    second bullet point is.
10   A.  "The audit indicates extremely high ratio of
11   sold and not due versus paid to the business center at
12   3,037 times."  And it's $9,401,090 divided by $3,075.
13   Q.  Okay.  And why do you characterize that as
14   extremely high?
15   A.  It's a huge percentage.
16   Q.  And what percentage is it?
17   A.  3,037 times.
18   Q.  Yeah.  Okay.
19            And in -- the figures on the sold not due
20   would be -- oh, my gosh.  I'm sorry.  This typeface is
21   so small.  I'm sorry.  I'm really having trouble reading
22   it.  I'm sorry.
23            Where would the sold not due numbers be
24   on -- it's -- it's not on this page, but it's on a
25   different page, I think.  I saw it.  Let me see if I can

Page 32

1    find it.
2             Okay.  Well, that's in the -- it's in this
3    report that we were looking at, right?  The sold not due
4    is on the last page of Exhibit 4?
5             MR. LESLIE:  Object to form.
6    Q.  (BY MR. MULLIN)  That's where the sold not due
7    number comes from, correct?
8    A.  Yes, that -- yeah.
9    Q.  Okay.  All right.  Which includes -- in other
10   words, it includes the -- the 225 vehicles at the -- the
11   Chevy lot in Floydada?
12   A.  This would include all the vehicles --
13   Q.  Yeah.
14   A.  -- for the whole group.
15   Q.  Including those 225 though?
16   A.  Correct.
17   Q.  All right.
18            MR. MULLIN:  I'll pass the witness.
19            EXAMINATION
20   BY MR. BUSTOS:
21   Q.  Good afternoon, sir.  Mr. Conlan, my name is
22   Fernando Bustos, and I represent Vista Bank.
23   A.  Okay.
24   Q.  I have a few questions for you.
25            Where do you office out of again?  What

Page 33

1   city?
2        A.  Greenville, South Carolina.
3        Q.  And in your analysis that you performed for
4   Ford Credit, you did not look at any lien issues in
5   terms of what other creditors may have liens on vehicles
6   that Ford considered as collateral, correct?
7        A.  Correct.  My data just showed whatever lien
8   was listed in the public data.
9        Q.  All right.  That was my assumption.  I just
10  wanted to confirm.
11       A.  Yes.
12            MR. BUSTOS:  I'll pass the witness.
13            EXAMINATION
14  BY MR. STROHSCHEIN:
15       Q.  Mr. Conlan, my name is Steve Strohschein.  I
16  represent GM Financial.
17            I was trying to understand a little bit
18  about the history of -- you mentioned your first run-in
19  with Reagor-Dykes was with regard to -- you found an 8
20  percent variance on one dealership on the registration
21  data.  Is that -- you talked about an 8 percent
22  variance.
23       A.  Correct.
24       Q.  As you dug further, you found 150 units that
25  the registration data was off on.  Is that fair?

Page 34

1        A.  On all their stores.
2        Q.  On all their stores, the 150?
3        A.  Correct.
4        Q.  And then, subsequently, you found a 1400
5   number as you dug even deeper?
6        A.  150 is on the June report.  The 1470 is on the
7   July emergency audit.
8        Q.  Okay.  So looking at -- you're looking at a
9   smaller inventory list from the June report that only
10  turned up 150?
11       A.  Correct.
12       Q.  And the 1400 is when you were looking at the
13  entire floor plan inventory of all stores.  Is --
14       A.  The day of the audit.
15       Q.  The day of the audit.
16            So that's why you generated a much larger
17  number?
18       A.  Correct.
19       Q.  Because I was trying to figure out why your
20  initial analysis didn't turn up the 1400 as opposed to
21  the 150.  And that's because you were starting with a
22  smaller data set of vehicles.  Is that fair?
23       A.  The 150 was on a report that we have.  The
24  1470 was a physical audit that we did.
25       Q.  Yeah.  So --

Page 35

1        A.  And it's a sample that I used -- you know,
2   obviously, that's a sample.  The sample on the report
3   was not all the vehicles.  Not all the vehicles
4   triggered on this report.  Only 150 vehicles triggered
5   on the report.
6        Q.  Yeah.  Out of the June audit, which was --
7   which was reporting sold units at that -- as of that
8   date?
9        A.  Right.
10       Q.  So it was 150 out of the sold units on the
11  June audit versus the 1400 is out of everything on the
12  floor plan?
13       A.  Right.
14       Q.  Okay.  Thank you.  No other questions.
15       A.  Uh-huh.
16            MR. CARDER:  Reserve.
17            MR. LASHAWAY:  Reserve.
18            EXAMINATION
19  BY MR. MASSOUH:
20       Q.  I'm going to apologize.  My name is John
21  Massouh for First Capital Bank.  I missed the very
22  beginning of your deposition.
23            You're what they refer to as Black Belt,
24  correct?
25       A.  That's correct.

Page 36

1        Q.  Okay.  Can you explain that to me?
2        A.  Six Sigma Black Belt uses -- it's a
3   data-driven approach to eliminate defects in any
4   process.  So we use data versus opinion or theory, and
5   we let the data -- the thing that we say is, the data
6   will set you free.  The data speaks for itself.
7        Q.  And you're a Six Sigma Black Belt certified
8   person?
9        A.  Correct.
10       Q.  And --
11       A.  There was a certification.
12       Q.  And when did you become certified?
13       A.  2007.
14       Q.  How long has Ford Motor Company had access to
15  the Black Belt data thing you just described?
16            MR. LESLIE:  Hold on a sec.  Could you
17  read that one back?
18            MR. MASSOUH:  Did I say Ford Motor --
19  what did I say?
20            MR. LESLIE:  I think you said Ford Motor
21  Company.
22       Q.  (BY MR. MASSOUH)  Ford Motor Credit.  Sorry.
23       A.  How long has Six Sigma been in use?
24       Q.  Yes, sir.
25       A.  Maybe 15 years.

## Page 37

```
 1          MR. MASSOUH: Pass the witness.
 2          MR. MULLIN: I don't have anything
 3    further.
 4          MR. LESLIE: Okay. Subject to being --
 5    reserve with respect to other topics. We're done with
 6    the witness for today.
 7          (Deposition concluded at 4:44 p.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 39

```
 1          I, JAMES CONLAN, have read the foregoing
      deposition and hereby affix my signature that same is
 2    true and correct, except as noted above.
 3
 4
 5          _____
             JAMES CONLAN
 6
 7    THE STATE OF _____)
      COUNTY OF _____)
 8
 9          Before me, _____, on this day
      personally appeared JAMES CONLAN, known to me (or proved
      to me under oath or through _____)
10    (description of identity card or other document)) to be
      the person whose name is subscribed to the foregoing
11    instrument and acknowledged to me that they executed the
      same for the purposes and consideration therein
12    expressed.
          Given under my hand and seal of office this
13    _____ day of _____, _____.
14
15
16          _____
             NOTARY PUBLIC IN AND FOR
             THE STATE OF _____
17          COMMISSION EXPIRES:_____
18
19
20
21
22
23
24
25
```

## Page 38

```
 1          CHANGES AND SIGNATURE
 2    WITNESS NAME: JAMES CONLAN
 3    DATE OF DEPOSITION: AUGUST 15, 2018
 4    PAGE LINE   CHANGE      REASON
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
```

## Page 40

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                   LUBBOCK DIVISION
 3    IN RE:            )
                        )
 4    REAGOR-DYKES MOTORS, LP,  )Case No. 18-50214-rlj11
                        )
 5    Debtor.           )
 6
 7    IN RE:            )
                        )
 8    REAGOR-DYKES IMPORTS, LP,  )Case No. 18-50215-rlj11
                        )
 9    Debtor.           )
10    IN RE:            )
                        )
11    REAGOR-DYKES AMARILLO, LP,  )Case No. 18-50216-rlj11
                        )
12    Debtor.           )
13
14    IN RE:            )
                        )
15    REAGOR-DYKES AUTO COMPANY,  )
      LP,                )Case No. 18-50217-rlj11
                        )
16    Debtor.           )
17
18    IN RE:            )
                        )
19    REAGOR-DYKES PLAINVIEW, LP,  )Case No. 18-50218-rlj11
                        )
20    Debtor.           )
21    IN RE:            )
                        )
22    REAGOR-DYKES FLOYDADA, LP,  )Case No. 18-50219-rlj11
                        )
23    Debtor.           )
24
25
```

Page 41

1.       REPORTER'S CERTIFICATION
2.      DEPOSITION OF JAMES CONLAN
3.              AUGUST 15, 2018

4.      I, Kailee Pereida, CSR No. 8398, Certified
Shorthand Reporter in and for the State of Texas, hereby
5.   certify to the following:

6.      That the foregoing proceedings were taken before me
at the time and place therein set forth, at which time
7.   the witness was put under oath by me;

8.      That the testimony of the witness, the questions
propounded, and all objections and statements made at
9.   the time of the examination were recorded
10.  stenographically by me and were thereafter transcribed;
         That a review of the transcript by the deponent was
11.  requested;

12.     That $_____ is the deposition officer's
charges to Mr. David Mullin, Attorney for Debtors, for
13.  preparing the original deposition transcript and any
14.  copies of exhibits;
         That the foregoing is a true and correct transcript
15.  of my shorthand notes so taken.

16.     I further certify that I am not a relative or
employee of any attorney of the parties, nor financially
17.  interested in the action.

18.     I declare under penalty of perjury under the laws
19.  of Texas that the foregoing is true and correct,
20.     Dated this 15th day of August, 2018.
21.
         _____
         Kailee Pereida, Texas CSR 8398
22.      Expiration Date: December 31, 2019
23.      Caprock Court Reporting, Inc.
         Firm Certificate Number: 374
24.      1112 Texas, Suite 200
         Lubbock, Texas 79401
25.      (806) 795-4202

App. 066

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

IN RE:                                        )
                                              )
REAGOR-DYKES MOTORS, LP,         )Case No. 18-50214-rlj11
                                              )
        Debtor.                           )

---

IN RE:                                        )
                                              )
REAGOR-DYKES IMPORTS, LP,        )Case No. 18-50215-rlj11
                                              )
        Debtor.                           )

---

IN RE:                                        )
                                              )
REAGOR-DYKES AMARILLO, LP,      )Case No. 18-50216-rlj11
                                              )
        Debtor.                           )

---

IN RE:                                        )
                                              )
REAGOR-DYKES AUTO COMPANY,     )
  LP,                                        )Case No. 18-50217-rlj11
                                              )
        Debtor.                           |

---

IN RE:                                        )
                                              )
REAGOR-DYKES PLAINVIEW, LP,     )Case No. 18-50218-rlj11
                                              )
        Debtor.                           |

---

IN RE:                                        )
                                              )
REAGOR-DYKES FLOYDADA, LP,      )Case No. 18-50219-rlj11
                                              )
        Debtor.                           )

---

**CORRECTION PAGES**

Page 3

```
 1                    --------------------------------
 2                       ORAL DEPOSITION OF
 3                          JAMES CONLAN
 4                        AUGUST 15, 2018
 5                           Volume 1
 6                    --------------------------------
 7           ORAL DEPOSITION OF JAMES CONLAN, produced as a
 8    witness at the instance of the DEBTOR, and duly sworn,
 9    was taken in the above-styled and numbered cause on
10    AUGUST 15, 2018, from 4:00 p.m. to 4:44 p.m., before
11    Kailee Pereida, CSR in and for the State of Texas,
12    reported by machine shorthand, at the law offices of
13    Mullin, Hoard & Brown, L.L.P., 1500 Broadway, Suite 700,
14    Lubbock, Texas, pursuant to the Federal Rules of Civil
15    Procedure.
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                         A P P E A R A N C E S

2    FOR THE DEBTORS:

3         MR. DAVID MULLIN
          MULLIN, HOARD & BROWN, L.L.P.
4         1500 Broadway, Suite 700
          P.O. Box 2585 (79408)
5         Lubbock, Texas 79401
          (806) 765-7491
6         dumllin@mhba.com

7    FOR FORD MOTOR CREDIT COMPANY, L.L.C.:

8         MR. CRAIG A. LESLIE
          PHILLIPS LYTLE LLP
9         One Canalside
          125 Main Street
10        Buffalo, New York 14203
          (716) 847-7012
11        cleslie@phillipslytle.com

12             -AND-

13        MR. DONALD H. CRAM, III
          SEVERSON & WERSON, P.C.
14        One Embarcadero Center
          26th Floor
15        San Francisco, California 94111
          (415) 398-3344
16

     FOR GM FINANCIAL:
17
          MR. STEPHEN P. STROHSCHEIN
18        MCGLINCHEY STAFFORD, P.L.L.C.
          301 Main Street
19        Fourteenth Floor
          Baton Rouge, Louisiana 70801
20        (225) 383-9000
          sstroh@mcglinchey.com
21
     FOR AIM BANK:
22
          MR. JEFF R. LASHAWAY
23        BOERNER, DENNIS & FRANKLIN, P.L.L.C.
          920 Avenue Q
24        Lubbock, Texas 79401
          (806) 763-0044
25        jlashaway@bdflawfirm.cpm

```
 1    FOR FIRST CAPITAL BANK:

 2           MR. JOHN F. MASSOUH
             SPROUSE, SHRADER, SMITH, P.L.L.C.
 3           701 South Taylor
             Suite 500
 4           Amarillo, Texas 79105
             (806) 468-3337
 5           john.massouh@sprouselaw.com

 6    FOR VISTA BANK:

 7           MR. FERNANDO BUSTOS
             BUSTOS LAW FIRM, P.C.
 8           1001 Main Street
             Suite 501
 9           Lubbock, Texas 79401
             (806) 780-3976
10           fbustos@bustoslawfirm.com

11    FOR FIRST BANK & TRUST:

12           MR. MARK S. CARDER
             STINSON, LEONARD, STREET, L.L.P.
13           1201 Walnut
             Suite 2900
14           Kansas City, Missouri 64106
             (816) 691-3415
15           mark.carder@stinson.com

16    FOR BART REAGOR:

17           MR. SCOTT R. WIEHLE
             KELLY, HART & HALLMAN, L.L.P.
18           201 Main Street
             Suite 2500
19           Fort Worth, Texas 76102
             (817) 332-2500
20           scott.wiehle@kellyhart.com

21
      FOR IBC BANK:
22
             MR. JOHN D. DALE
23           GABLE GOTWALS
             1100 ONEOK Plaza
24           100 West Fifth Street
             Tulsa, Oklahoma 74103
25           (918) 595-4828
```

Page 38

1          CHANGES AND SIGNATURE

2   WITNESS NAME:   JAMES CONLAN

3   DATE OF DEPOSITION:   AUGUST 15, 2018

4   PAGE LINE        CHANGE            REASON

5   12   15   *CHANGE* CONSUMER  TO  COMMERCIAL

6   REASON-STEUR'S  CORRECT   JOB  TITLE

7

8   27   10   *CHANGE* GWEN  SCHMUCKER WAS

9        ON  A  CONFERENCE  CALL ON

10   7-23-18  BUT  DID  NOT  SPEAK

11   ALSO  ON  THE  CALL  WAS

12   EMPLOYEES  FROM  THE  NASHVILLE

13   BUSINESS  CENTER  AND  QUALITY

14   ASSURANCE  SUPERVISOR  FROM  THE

15   GREENVILLE  BUSINESS  CENTER.

16   STEVE  GRACE  AND  PAUL  BOUDREAU

17   WERE  NOT  ON  THIS  CONFERENCE CALL-

18   I  ALSO  REVIEWED  MY  FINDINGS

19   WITH  MY  SUPERVISOR  AND  HIS

20   SUPERVISOR PRIOR  TO  THIS  MEETING.

21   REASON - REVIEWED  WHO  WAS  AT  THE

22        CONFERENCE  CALL.

23

24

25

Page 39

1          I, JAMES CONLAN, have read the foregoing
deposition and hereby affix my signature that same is
2  true and correct, except as noted above.

3

4

5                        JAMES CONLAN

6

7  THE STATE OF _SC_ )
    COUNTY OF _Greenville_ )
8

       Before me, _James Conlan_ , on this day
9  personally appeared JAMES CONLAN, known to me (or proved
    to me under oath or through _Driver License_ )
10  (description of identity card or other document)) to be
    the person whose name is subscribed to the foregoing
11  instrument and acknowledged to me that they executed the
    same for the purposes and consideration therein
12  expressed.
       Given under my hand and seal of office this
13  _29th_ day of _August_ , _2018_ .

14

15

16                 NOTARY PUBLIC IN AND FOR
                  THE STATE OF _South Carolina_
17                 COMMISSION EXPIRES: _6/4/2019_

18

19                    Falana Murray
                    NOTARY PUBLIC
                    State of South Carolina
20                My Commission Expires
                    June 4, 2019

21

22

23

24

25

Page 40

1                    IN THE UNITED STATES BANKRUPTCY COURT
                       FOR THE NORTHERN DISTRICT OF TEXAS
2                            LUBBOCK DIVISION

3                    IN RE:                                    )

4    REAGOR-DYKES MOTORS, LP,        )Case No. 18-50214-rlj11
                                     )
5              Debtor.               )

6    ─────────────────────────────────────────────────────

                          IN RE:                              )
7
     REAGOR-DYKES IMPORTS, LP,       )Case No. 18-50215-rlj11
8                                    )
               Debtor.               )
9

10   ─────────────────────────────────────────────────────
                          IN RE:                              )
11   REAGOR-DYKES AMARILLO, LP,      )Case No. 18-50216-rlj11
                                     )
12             Debtor.               )

13   ─────────────────────────────────────────────────────
                          IN RE:                              )
14
     REAGOR-DYKES AUTO COMPANY,      )
15   LP,                             )Case No. 18-50217-rlj11
                                     )
16             Debtor.               )

17   ─────────────────────────────────────────────────────
                          IN RE:                              )
18
     REAGOR-DYKES PLAINVIEW, LP,     )Case No. 18-50218-rlj11
19                                   )
               Debtor.               )
20

21   ─────────────────────────────────────────────────────
                          IN RE:                              )
22   REAGOR-DYKES FLOYDADA, LP,      )Case No. 18-50219-rlj11
                                     )
23             Debtor.               )

24   ─────────────────────────────────────────────────────

25

Page 41

REPORTER'S CERTIFICATION
DEPOSITION OF JAMES CONLAN
AUGUST 15, 2018

I, Kailee Pereida, CSR No. 8398, Certified
Shorthand Reporter in and for the State of Texas, hereby
certify to the following:

That the foregoing proceedings were taken before me
at the time and place therein set forth, at which time
the witness was put under oath by me;

That the testimony of the witness, the questions
propounded, and all objections and statements made at
the time of the examination were recorded
stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was
requested;

That $ _692.60_ is the deposition officer's
charges to Mr. David Mullin, Attorney for Debtors, for
preparing the original deposition transcript and any
copies of exhibits;

That the foregoing is a true and correct transcript
of my shorthand notes so taken.

I further certify that I am not a relative or
employee of any attorney of the parties, nor financially
interested in the action.

I declare under penalty of perjury under the laws
of Texas that the foregoing is true and correct.

Dated this 15th day of August, 2018.


_Kailee Pereida_
_____
Kailee Pereida, Texas CSR 8398
Expiration Date:   December 31, 2019

Caprock Court Reporting, Inc.
Firm Certificate Number:   374
1112 Texas, Suite 200
Lubbock, Texas 79401
(806) 795-4202

**App. 074**

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

IN RE: )
REAGOR-DYKES MOTORS, LP,   )Case No. 18-50214-rlj11
Debtor )

IN RE: )
REAGOR-DYKES IMPORTS, LP,   )Case No. 18-50215-rlj11
Debtor )

IN RE: )
REAGOR-DYKES AMARILLO, LP,   )Case No. 18-50216-rlj11
Debtor )

IN RE: )
REAGOR-DYKES AUTO COMPANY,   )
LP,   )Case No. 18-50217-rlj11
Debtor )

IN RE: )
REAGOR-DYKES PLAINVIEW, LP,   )Case No. 18-50218-rlj11
Debtor )

IN RE: )
REAGOR-DYKES FLOYDADA, LP,   )Case No. 18-50219-rlj11
Debtor )

## Page 2

ORAL DEPOSITION OF

RENE LEAL

AUGUST 15, 2018

Volume I

ORAL DEPOSITION OF RENE LEAL, produced as a witness at the instance of the DEBTOR, and duly sworn, was taken in the above-styled and numbered cause on AUGUST 15, 2018, from 2:23 p.m. to 3:42 p.m., before Kailee Pereida, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Mullin, Hoard & Brown, L.L.P., 1500 Broadway, Suite 700, Lubbock, Texas, pursuant to the Federal Rules of Civil Procedure.

## Page 3

APPEARANCES

FOR THE DEBTORS:
MR. DAVID MULLIN
-AND-
MR. DAVID R. LANGSTON
MULLIN, HOARD & BROWN, L.L.P.
1500 Broadway, Suite 700
P.O. Box 2585 (79408)
Lubbock, Texas 79401
(806) 765-7491
dmullin@mhba.com

FOR FORD MOTOR CREDIT COMPANY, L.L.C.:
MR. CRAIG A. LESLIE
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, New York 14203
(716) 847-7012
cleslie@phillipslytle.com
-AND-
MR. DONALD H. CRAM, III
SEVERSON & WERSON, P.C.
One Embarcadero Center
26th Floor
San Francisco, California 94111
(415) 398-3344

FOR GM FINANCIAL:
MR. STEPHEN P. STROHSCHEIN
MCGLINCHEY STAFFORD, P.L.L.C.
301 Main Street
Fourteenth Floor
Baton Rouge, Louisiana 70801
(225) 383-9000
sstroh@mcglinchey.com

## Page 4

FOR AIM BANK:
MR. JEFF R. LASHAWAY
BOERNER, DENNIS & FRANKLIN, P.L.L.C.
920 Avenue Q
Lubbock, Texas 79401
(806) 763-0044
jlashaway@bdflawfirm.cpm

FOR FIRST CAPITAL BANK:
MR. JOHN F. MASSOUH
SPROUSE, SHRADER, SMITH, P.L.L.C.
701 South Taylor
Suite 500
Amarillo, Texas 79105
(806) 468-3337
john.massouh@sprouselaw.com

FOR VISTA BANK:
MR. FERNANDO BUSTOS
BUSTOS LAW FIRM, P.C.
1001 Main Street
Suite 501
Lubbock, Texas 79401
(806) 780-3976
fbustos@bustoslawfirm.com

FOR FIRST BANK & TRUST:
MR. MARK S. CARDER
STINSON, LEONARD, STREET, L.L.P.
1201 Walnut
Suite 2900
Kansas City, Missouri 64106
(816) 691-3415
mark.carder@stinson.com

FOR BART REAGOR:
MR. SCOTT R. WIEHLE
KELLY, HART & HALLMAN, L.L.P.
201 Main Street
Suite 2500
Fort Worth, Texas 76102
(817) 332-2500
scott.wiehle@kellyhart.com

**EXHIBIT E**

Page 5

```
 1    FOR IBC BANK:
 2       MR. JOHN D. DALE
         GABLE GOTWALS
 3       1100 ONEOK Plaza
         100 West Fifth Street
 4       Tulsa, Oklahoma 74103
         (918) 595-4828
 5       jdale@gablelaw.com
 6    FOR RICK DYKES:
 7       MR. DAVID M. GUINN, JR.
         LAW OFFICE OF HURLEY & GUINN
 8       1805 13th Street
         Lubbock, Texas 79401
 9       (806) 771-0700
         david@hurleyguinn.com
10
      ALSO PRESENT:
11
         Mr. Mike Cannon
12       Mr. Toby Cecil
         Mr. Rick Dykes
13       Mr. Jonathan Hill
         Mr. Howie Ravitz
14       Mr. Scott Wade
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1
 2            INSTRUCTIONS FOR SIGNING A DEPOSITION
 3       Rules of Civil Procedure under which this
      deposition was taken provide that the deposition
 4    transcript shall be made available to the witness or his
      attorney of record for examination and signature by the
 5    witness.
 6       This deposition condensed transcript is provided
      for your review. It is yours to keep. Read it
 7    carefully before making any changes or corrections.
      Make transcript corrections on the Witness Signature
 8    Page.
 9       Changes and/or corrections must be made in the
      following manner:
10
         (1) Indicate by number the page and line you wish
11          to alter;
         (2) Indicate your change or correction;
12       (3) Give the reason for making the change.
13       When you have followed the instructions above, sign
      the Witness Signature Page before a Notary Public and
14    return it as soon as possible.
15       When we have received the signed and notarized
      transcript, we will forward all attorneys of record a
16    copy of the completed Witness Signature Page and deliver
      the original transcript to Mr. David Mullin for
17    safekeeping and use at trial.
18       If you have any questions about this procedure,
      please call my office at (806) 795-4202.
19
         Kailee Pereida, CSR
20       Caprock Court Reporting, Inc.
         1112 Texas, Suite 200
21       Lubbock, Texas 79401
         (806) 795-4202
22
23
24
25
```

Page 6

```
 1              INDEX
                            PAGE
 2    Appearances............................ 3
 3    Instructions for Signing a Deposition........... 7
 4    RENE LEAL
 5       EXAMINATION BY MR. MULLIN............ 8
         EXAMINATION BY MR. BUSTOS.......... 52
 6       EXAMINATION BY MR. STROHSCHEIN......... 53
         EXAMINATION BY MR. CARDER........... 55
 7       EXAMINATION BY MR. MASSOUH.......... 56
 8
      Signature and Changes................. 60
 9    Reporter's Certificate......... 63
10           EXHIBITS
11    NO.  DESCRIPTION              PAGE
12    9   Notice of Oral Deposition of Rene Leal..... 10
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1               (Witness sworn by court reporter.)
 2                      RENE LEAL,
 3    having been first duly sworn, testified as follows:
 4                    EXAMINATION
 5    BY MR. MULLIN:
 6       Q.  Could you state your full name?
 7       A.  Rene Leal.
 8       Q.  Mr. Leal, have you ever given a deposition
 9    before?
10       A.  Yes, but I believe it's been over 30 years,
11    so --
12       Q.  That's a while back.  So as a little
13    refresher --
14       A.  Yes.
15       Q.  -- the court reporter is taking down my
16    questions, your answers.  You're under oath.  It'll be
17    printed up in a little book.  And it can be read back in
18    a trial, hearing, or in connection with a motion in the
19    case.
20       A.  Okay.
21       Q.  Do you understand that?
22       A.  Yes.
23       Q.  So it's very important that you understand my
24    questions and that you can answer the questions I ask.
25           If at any time you don't understand the
```

Page 9

1  question, just go ahead and ask me to clarify it, okay?
2      A.  Okay.
3      Q.  And if you need a break, you can just ask for
4  a break and take a break.  I only ask that you answer
5  whatever the pending question is before you break.  Fair
6  enough?
7      A.  Yes.
8      Q.  And I ask that you let me finish my question.
9  I'll let you finish your answer.
10     A.  Okay.
11     Q.  And if I interrupt you, I want you to tell me.
12     A.  Okay.
13     Q.  And just stop me so that you can give your
14  full answer.
15     A.  Okay.
16     Q.  What did you do to prepare for your
17  deposition?
18     A.  The only thing I did was review the
19  declaration.
20     Q.  Okay.
21         MR. LESLIE:  And meet with your counsel.
22     A.  And meet with my counsel.
23     Q.  (BY MR. MULLIN)  And did you review any
24  documents other than the declaration?
25     A.  No.

Page 10

1      Q.  Okay.
2          MR. MULLIN:  Let's mark this as 9.
3          (Exhibit 9 marked.)
4      Q.  (BY MR. MULLIN)  Exhibit 9 is the notice of
5  your deposition.  Have you seen that before today?
6          MR. LESLIE:  Thank you.
7      A.  I'm -- this is the first time I've seen this.
8      Q.  (BY MR. MULLIN)  Okay.  Tell me what your job
9  title is with Ford Motor Credit.
10     A.  It is financial services manager.
11     Q.  And what are the duties that you have as the
12  financial service manager?
13     A.  Reviewing credit files for dealership lines of
14  credit, in addition to working with the Nashville
15  business center, the regional manager, and the BDM to
16  address dealers that are in a loss position and/or have
17  liquidity issues.  In addition to that, working with the
18  Nashville business center, regional manager, BDM,
19  working with them together to try to resolve SOT and
20  status situations with dealers.
21     Q.  Okay.  What's the second one?  SOT and --
22     A.  Status situations with dealers.
23     Q.  Okay.  What would that mean?
24     A.  Basically a situation where a dealer is unable
25  to pay us and so we've taken keys, MSO's, and we're

Page 11

1  basically working with the dealer to figure out next
2  steps.
3      Q.  Okay.  And how long have you been with Ford
4  Motor Credit?
5      A.  It'll be 33 years this month.
6      Q.  And where are you stationed?  Are you here in
7  Lubbock?
8      A.  I'm in -- I'm in Plano, Texas --
9      Q.  Okay.
10     A.  -- regional office.
11     Q.  Did you have involvement with the Reagor-Dykes
12  Auto Group?
13     A.  Can you be more specific?
14     Q.  Well, you said you reviewed credit files for
15  dealers.  Did you review the Reagor-Dykes Auto Group
16  credit file?
17     A.  I would be in the review routing, yes.
18     Q.  Okay.  Going back to the initiation of the
19  line?
20     A.  Again, be more specific because there was
21  different times where they had different lines.
22     Q.  Right.  They had a -- since they got their
23  Ford floor plan, were you involved in it, or was it some
24  later time?
25     A.  It was probably a later time.

Page 12

1      Q.  Okay.  Did you review the Ford -- the
2  Reagor-Dykes credit file, say, in 2017, 2016?
3      A.  2016, I did.
4      Q.  All right.  And how about 2017?
5      A.  2017, there was a review completed in the
6  fourth quarter; however, it was a -- what we call a risk
7  rating review.  And so what happens behind the scenes at
8  the Nashville business center, they will look at current
9  financial statements through a month in -- you know, in
10  2017.  And they'll compare that to the previous credit
11  file that was done in 2016.  And if there's no
12  significant changes to the financial position of the
13  dealership, the -- there's a risk rating where it
14  passes.  If there are significant, there will be a risk
15  rating result that says it failed.  If it fails, then
16  the business center would then produce an entire credit
17  file that would then have been routed through me and
18  through other folks through -- in the company.
19     Q.  Okay.  So with respect to Reagor-Dykes, so you
20  would have looked at it in 2016?
21     A.  Correct.
22     Q.  But it passed in --
23     A.  It passed in twenty -- in 2017.
24     Q.  So you didn't look at it that year?
25     A.  I did not look at it in 2017.

Page 13

1    Q.  Okay.  And then in 2018, did you look at the
2    credit file?
3    A.  It hasn't -- it hasn't been a year yet.  So in
4    the -- I believe in the fourth quarter, it would be due
5    to be reviewed again.
6    Q.  Okay.  Do you know if Ford Motor Credit
7    received the audited financial statements of
8    Reagor-Dykes Auto Group?
9    A.  Can you be more specific on which years?
10   Q.  Well, let's look at the -- there's one here
11   that's an exhibit.  This is the -- for year-end 2015.
12   So at some point in 2016, it would have been --
13   A.  I would --
14   Q.  -- issued.
15   A.  I would say, yes, that we did receive that.
16   Q.  Exhibit No. 7?  Exhibit No. 7 is the
17   document --
18   A.  Oh, I'm sorry.
19   Q.  -- that you're --
20   A.  Yes, Exhibit 7.  Sorry.
21   Q.  And did you have any interaction or
22   communication with the Reagor-Dykes Auto Group, let's
23   say, before the year 2018 where you were in
24   communication with people at the auto --
25   A.  No.

Page 14

1    Q.  -- group?
2        Were you one of the people who reviewed
3    the quarterly audits by Ford Motor Credit of
4    Reagor-Dykes Auto Group?
5    A.  I would say that the process for reviewing any
6    audits is typically routed to the regional manager.  And
7    the only time I would get results from an audit is if
8    there was an issue with the -- if the dealer had a high
9    percentage of payoff violations.
10   Q.  What would a high percentage be?
11   A.  Well, typically if we had a dealership that
12   had a percentage -- a high percentage of violations over
13   2 percent, then that -- typically, I would get notified.
14   I'd talk to the regional manager and -- yes.
15   Q.  And what is the -- what is the violation?  If
16   the payoff took place outside the seven days?
17   A.  That's correct.
18   Q.  Okay.  All right.  We looked at an audit
19   report this morning for -- and I don't know if you ever
20   saw it.  I wanted to see if you ever saw this one.
21       Look at Exhibit No. 4.  At the back,
22   there's an audit report.  And there's some cover e-mail
23   there where it was forwarded by Gwen Schmucker.
24   A.  Let me get my glasses on.
25       (Witness looks at document.)

Page 15

1    A.  I don't recall getting this specific e-mail.
2    Q.  Okay.  Did you -- did anybody ever give you
3    the attached report, that audit report that's attached
4    that's separate and apart from the e-mail?  Still
5    looking at Exhibit 4.
6    A.  Oh, I'm sorry.
7    Q.  Yeah.  But the report attached --
8    A.  Are you --
9    Q.  Yeah, that report.
10   A.  This report?
11   Q.  There's two pages.
12   A.  Okay.  I don't -- again, I don't recall
13   getting this report.
14   Q.  Okay.  That's dated June 28th, 2018.  Did
15   anybody ever inform you that there was a problem with
16   that audit report?
17   A.  I believe on June 28th, I was on vacation for
18   the next week because my son was getting married.  So
19   I'm familiar with the date.  I don't -- I do remember
20   getting something when I got back, but it was more -- it
21   was probably more of a verbal of -- you know, of the
22   percentage of -- of -- percentage was high.
23   Q.  Was high?
24   A.  Yes.
25   Q.  Okay.  Just so we're looking at the same

Page 16

1    thing -- if you'd look at -- it's the third page of
2    Exhibit 4.  But is it -- is it on that page where it
3    would reflect that the sold not paid was high or the
4    violations were high?
5        MR. LESLIE:  I'm going to object to the
6    extent he's already testified he hasn't seen that report
7    before.
8    Q.  (BY MR. MULLIN)  You can still answer.
9        MR. LESLIE:  If you have knowledge of --
10   repeat the question, please.  I want to hear it before
11   he answers.
12       (Reporter reads back requested portion.)
13       MR. LESLIE:  I'm just going to augment my
14   objection that I don't believe the foundation has been
15   established for the source of this actual page.
16       So you can answer if you understand.
17   A.  Can you repeat it one more time?  I'm sorry.
18   Q.  (BY MR. MULLIN)  Okay.  All I'm trying to get
19   at is, you said after you got back from vacation,
20   somebody said the sold not paid percentages were high at
21   Reagor-Dykes.  And I'm trying to determine if that is
22   reflected on the audit report itself.
23   A.  No.
24   Q.  Okay.  The audit report itself does not
25   reflect that they're -- that the violations were high,

Page 17

1  correct?
2       MR. LESLIE: Objection; form. He said
3  sold not due, not violations.
4       A. Sold not due, correct.
5       Q. (BY MR. MULLIN) Well, does it reflect that
6  the sold not due is high? It's on the next page that it
7  addresses that.
8            Does the audit report reflect that the
9  sold not due is high?
10      A. It reflects the dollar amount is high.
11      Q. Okay. And is that -- is that what the
12 conversation was that you had when you got back?
13      A. I believe so.
14      Q. Okay. And that dollar amount is the
15 $25 million?
16      A. I don't recall the exact dollar amount.
17      Q. But the report reflects $25 million --
18      A. Yes.
19      Q. -- correct?
20           And do you know who it was that told you
21 that, that the -- that the sold not dues reflected in
22 the audit were high?
23      A. I don't recall specifically who told me that.
24      Q. And what did you do in response?
25      A. I believe I met with the regional manager.

Page 18

1  And the direction was that we would continue to audit
2  him on accelerated basis.
3       Q. Okay. And the regional manager was
4  Mr. Boudreau or -- or Mr. Dykes -- or excuse me --
5  Mr. Byrd?
6       A. Mr. Byrd.
7       Q. I'm sorry.
8            And -- so you and Mr. Byrd decided that
9  you would continue to audit Reagor-Dykes?
10      A. That's my recollection, yes.
11      Q. Okay. And that would be in the second week of
12 July 2018?
13      A. Yes. When I returned, yes.
14      Q. All right. And was there any involvement in
15 that decision from people higher up in the company;
16 Mr. Boudreau or anybody from Dearborn or anything like
17 that?
18      A. I don't -- I don't -- I don't recall, no.
19      Q. All right. Do you recall any involvement of
20 Black Belt in deciding to perform the audit on the 26th
21 and 27th of July?
22      A. I wasn't involved with the process, so I -- if
23 you can maybe re-clarify that.
24      Q. Okay. You said you and Mr. Byrd discussed
25 continuing to audit Reagor-Dykes, right?

Page 19

1       A. That's correct.
2       Q. Okay. And what did you do in furtherance
3  of -- of that plan?
4       A. We did nothing until we were invited to a
5  conference call by our -- the Black Belt to review some
6  data that he had wanted to review with us.
7       Q. Okay. And who was Black -- who was Black
8  Belt?
9       A. It's -- his name is Jim Conlan.
10      Q. Okay. And what did Mr. Conlan say to you?
11      A. He set up a conference call on Monday
12 morning -- I believe it was July 23rd -- and invited the
13 business center credit team, invited the regional
14 manager, Gary Byrd, myself, and reviewed a project that
15 he had been working on.
16      Q. Okay. Did Mr. Conlan tell you how he had come
17 to be working on Reagor-Dykes?
18      A. I believe -- or excuse me.
19           MR. LESLIE: Hold on a sec.
20           THE WITNESS: Yeah.
21           MR. LESLIE: How is that relevant to
22 tomorrow's hearing?
23           MR. MULLIN: Well, I think it's relevant
24 to the valuation of the collateral as to how we -- you
25 know, how Ford came to the conclusion that the

Page 20

1  collateral was needed to be further inspected.
2            MR. LESLIE: I don't believe it's
3  relevant how he was directed to do it. I'm going to
4  object. Direct you not to answer.
5       Q. (BY MR. MULLIN) Are you going to follow your
6  counsel's instructions?
7       A. Yes.
8       Q. So you were on a conference call on Monday,
9  the 23rd?
10      A. Yes, sir.
11      Q. And what was discussed in that conference
12 call?
13      A. Mr. Conlan reviewed some data from a project
14 that he had been working on that revealed -- he had a
15 sample size of about 150 vehicles that had been sold
16 from a prior audit in June of 2018. He compared sale
17 dates that were given to us by the dealership and
18 utilized DMV and some other resources to determine that
19 the sale dates that we were given by the Reagor-Dykes
20 organization were false and incorrect.
21      Q. And were the sales dates earlier than the
22 sales dates that were reflected in Ford's records?
23           MR. LESLIE: Objection to form.
24           But if you understand, you can answer.
25      A. Repeat just to make sure I'm --

Page 21

1   Q. (BY MR. MULLIN) Well, the sale -- the actual
2   sales dates reflected in the DMV records --
3       A. Correct.
4       Q. -- were dates earlier than the dates that had
5   been reported to Ford?
6       A. That's correct.
7       Q. And was the audit that Mr. Conlan was
8   referring to the audit that's attached to Exhibit No. 4?
9       A. It was the June 28th audit, if that's what
10  this one is, yes.
11      Q. Okay. Okay. And so based on that
12  information, what did the three of you decide to do?
13      A. You know, our immediate decision was we needed
14  to re-audit the organization.
15      Q. And how did you carry out that plan?
16      A. We requested an audit through the Greenville
17  business center, who is the business center that does
18  all the coordinating of audits.
19      Q. Was there a person you were dealing with?
20      A. I don't -- I'm trying to think. I'm not sure.
21  Typically, I would not get involved with that. It was
22  arranged through the Nashville business center to the
23  Greenville business center.
24      Q. Okay. And tell me about how that audit was
25  conducted.

Page 22

1       A. It was conducted similar to other audits where
2   the soonest we could get out there was Thursday, is what
3   it was scheduled for. And the only thing that we did
4   differently for this audit, because we wanted to verify
5   that -- if the same issue was occurring with the sales
6   dates that had occurred on the June audit.
7           So as the audit began, typically the --
8   the AiM folks who complete the audits would -- were
9   providing sales dates and copies of documents. Those
10  were then sent to Jim Conlan, who was in the background
11  running DMV's to verify if those dates were accurate
12  based on the DMV and the other sources that he has.
13      Q. Okay. And who were you dealing with at
14  Reagor-Dykes?
15      A. I wasn't dealing with anyone.
16      Q. Okay. Was -- was Mr. Byrd dealing with
17  Reagor-Dykes?
18      A. Mr. Byrd was.
19      Q. And who was he dealing with?
20      A. I believe he was -- excuse me. My
21  understanding is, is that he was meeting with the CFO.
22      Q. Shane Smith?
23      A. Shane Smith.
24      Q. All right. But you did not meet with Shane
25  Smith?

Page 23

1       A. No.
2       Q. Did you -- did you ever have any conversations
3   with Shane Smith?
4       A. In the past, I have. He used to work for Ford
5   Credit, so -- but it's -- it's been very rare since he
6   left Ford Credit.
7       Q. Okay. How long did he work for Ford Credit?
8           MR. LESLIE: Objection. Don't answer.
9   It's not relevant to tomorrow's hearing. I direct you
10  not to answer.
11      Q. (BY MR. MULLIN) Did you talk to Mr. Dykes or
12  Mr. Reagor?
13      A. No.
14      Q. At any time?
15      A. Can you rephrase the time?
16      Q. Well, did you ever talk to Mr. Reagor or
17  Mr. Dykes?
18      A. I met Mr. Reagor, I believe, a few years ago
19  at a dealer grassroots-type meeting in Dallas.
20      Q. Other than that, any other conversations?
21      A. No. No.
22      Q. Any communications with Rick Dykes?
23      A. Never met him.
24      Q. Okay. Okay. Tell me about what happened
25  during the audit of July 26th and 27.

Page 24

1       A. As a typical audit goes, we checked inventory,
2   tried to figure out the missing units. From the missing
3   units, we -- we did figure out -- again, from the AiM
4   perspective, trying to figure out what vehicles had been
5   sold and then from that point, checking sale dates and
6   so forth.
7       Q. Okay. What did you find?
8       A. There was a large amount of vehicles that were
9   missing. And during -- it was probably early -- early
10  afternoon Friday, we had received data from -- from Jim
11  Conlan that a lot of the sale dates that had been
12  submitted to him were inaccurate, similar to what he
13  found in the June audit.
14      Q. And, again, the sale dates were earlier dates
15  per the DMV than the dates that were provided to you by
16  Mr. Smith?
17      A. That's correct.
18      Q. Was Ford's audit team looking at the actual
19  underlying contracts? Or were you given a list of dates
20  by Mr. Smith?
21      A. I don't -- I wasn't there, so I don't know
22  specifically what they looked at.
23      Q. Okay. You didn't look at any contracts
24  yourself?
25      A. No.

Page 25

1    Q.   And as a result of the audit, what did Ford
2    do?
3         MR. LESLIE:  Objection to any extent that
4    this question or the question you asked goes into
5    matters that are protected by attorney-client privilege.
6         If you have non-privileged information to
7    share, you can answer that question.
8    Q.   (BY MR. MULLIN)  I don't want you to -- yeah,
9    I don't want you to tell me what you discussed with your
10   attorneys.  I just want you to tell me what you did.
11   A.   Based on the inaccurate and false sales dates,
12   the decision was made to request that all missing and/or
13   sold vehicles be paid in -- paid in full that day.
14   Q.   And did Ford receive any payments?
15   A.   I don't -- I don't re- -- can you -- can you
16   re- -- can you repeat --
17   Q.   Did you receive any payments as a result of
18   the request for payment?
19   A.   Sorry.  Yes, we did.
20   Q.   Okay.  But it didn't pay -- it didn't pay off
21   the whole?
22   A.   One more time.  I'm sorry.
23   Q.   But it didn't pay off the -- the amount that
24   was owed?
25   A.   The amount that was paid on Friday was the

Page 26

1    amount that my understanding was due at that time.  We
2    made additional efforts to verify that that -- those
3    funds were available.  And -- and we were told -- my
4    understanding is, it was communicated from Shane to Gary
5    Byrd, the regional manager, that there would not be
6    enough funds to -- to clear, even though they had
7    submitted the funds via electronic funds.
8    Q.   Since -- since July 27th, have you had any
9    further involvement with the Reagor-Dykes matter?
10   A.   Yes.
11   Q.   And what has that been?
12        MR. LESLIE:  Objection; again, to the
13   extent it calls for anything that is attorney-client
14   privileged or any participation in the legal or
15   deliberative process.  Other than that, you can answer.
16   A.   I basically on a daily basis have been on the
17   phone with the folks that we have at each of the stores
18   attempting to continue to secure our collateral and take
19   possession of all keys, MSO's, and titles.
20   Q.   (BY MR. MULLIN)  Okay.  Has any of your
21   collateral disappeared, in your view, since July 27?
22   A.   Yes.
23   Q.   Okay.  What -- what collateral has disappeared
24   since then?
25   A.   I don't have specifics, but I will tell you --

Page 27

1    that I -- that I can give you right now, but there has
2    been vehicles that have been sold.  We found out they
3    had been sold to the Ram organization, which we don't --
4    don't do business with.
5    Q.   How many vehicles were those?
6    A.   I -- I don't have the number.
7    Q.   Do you have the dollar amount?
8    A.   No, I don't.
9    Q.   How did you find out about it?
10   A.   After the on-site folks did some investigation
11   and asked questions and then found that information out
12   from whoever was on site for the dealership.
13   Q.   Okay.  Who is the on-site people that
14   discovered that, that there have been vehicles sold to
15   Ram?
16   A.   I don't have specifics.  I would have to go
17   back and -- but I don't have any specifics on every
18   single vehicle that has disappeared.
19   Q.   Any?  Can you tell me any of them, where you
20   got the information?
21   A.   The one I'm thinking of is Lubbock Mitsubishi.
22   The vehicle was located at one of their -- not at the
23   main location, but a lot -- I believe they call it the
24   South Lot.  And the vehicle apparently had been
25   delivered from that lot to the Ram location.

Page 28

1    Q.   Is that one vehicle?
2    A.   It's one vehicle, yes.
3    Q.   Do we know what -- what make and model it was?
4    A.   I don't know.
5    Q.   Do you know if it was a vehicle that was
6    floored with Ford Motor Credit?
7    A.   My understanding is that it was floored with
8    Ford Credit.
9    Q.   Any others?
10   A.   There's a recent example of a vehicle that was
11   at an up-fitter.
12   Q.   What did you call them?
13   A.   Up-fitter.  So they were -- they were doing
14   some modifications to a vehicle.
15   Q.   Okay.
16   A.   And we had verified several -- I believe
17   two -- on two prior audits since -- since the 7/26
18   audit, we had verified the vehicle was there.  And we
19   determined yesterday that the vehicle had been -- was no
20   longer available and had been, I think, picked up by the
21   customer that had purchased the vehicle.
22   Q.   Okay.  So do you know when the customer had
23   purchased it?
24   A.   There was information in the file that said --
25   I believe it was a contract date of July 26th.  And the

## Page 29

1 vehicle was released to them from this up-fit company
2 Friday, August 3rd.
3    Q. Okay. And had the customer paid for the
4 vehicle?
5    A. We -- well, we believe, based on the contract,
6 that it had been funded.
7    Q. And was it a Ford Credit floor --
8    A. Yes.
9    Q. -- vehicle?
10    A. Yes, it is.
11    Q. Can you give me a make and model on that one?
12    A. It's an F-450, and there was a flatbed put on
13 it. And the balance -- the balance without the up-fit
14 was close to 60,000 is what's due today on the
15 wholesale.
16    Q. So your concern there is that the -- you're
17 not concerned about the customer taking the vehicle that
18 he paid for, right?
19    A. I'm concerned that the contract was dated
20 July 26th and we were not paid for it.
21    Q. Right.
22    A. Yeah.
23    Q. You hadn't been paid for the vehicle?
24    A. Correct.
25    Q. Not that the person actually has the vehicle?

## Page 30

1    (The witness nods head.)
2    Q. Okay. Anything else? Any other vehicles?
3    A. I don't -- offhand, I don't have other
4 examples.
5    Q. All right. And has -- has Ford Motor Credit
6 received payments since July 27th on -- on its loans?
7    A. We have received funds from customers that
8 have gone in to purchase vehicles with cashier's checks.
9 And we've received funds for -- from contract -- Ford
10 Credit contract proceeds where customers have purchased
11 the vehicle and financed with Ford Credit.
12    Q. Okay. Where the customer who's buying them
13 goes ahead and finances with Ford Motor Credit?
14    A. That's correct.
15    Q. All right. Let me show you a few documents,
16 see if you have seen these.
17    Have you seen Exhibit No. 2?
18    A. Is that all this -- this is all Exhibit 2?
19    (Witness looks at document.)
20    A. I don't recall seeing this specific exhibit.
21 I --
22    Q. Do you know the amount that Ford currently
23 claims that Reagor-Dykes Auto Group owes to Ford Motor
24 Credit?
25    A. It would be the amount on the declaration

## Page 31

1 page. So it was in the 40, 41 million range.
2    Q. That's the -- let's look at Exhibit No. 3.
3    Is this -- is this Ford's most current
4 report on the out-of-trust lending?
5    A. I -- I believe it is, yes.
6    Q. Okay.
7    A. As of this date, yes.
8    Q. Okay. So whatever those figures add up to,
9 that's the current amount --
10    A. Right.
11    Q. -- that you think is out of trust?
12    A. Correct.
13    Q. Okay. And then what I was getting was the
14 total indebtedness of --
15    A. Right.
16    Q. -- of Ford Motor Credit, which -- is that
17 what's supposed to be reflected on Exhibit 2? Do you
18 know if that's what that report shows?
19    A. I don't recall seeing this report, so I'm
20 not --
21    Q. Okay.
22    A. And there's no total, so I --
23    Q. Okay. Has Ford Motor Credit done a valuation
24 of its existing collateral?
25    A. I'm not sure I understand.

## Page 32

1    Q. Well, one of the issues that could come up at
2 hearings that are to be held in this case in the next
3 month or so, including tomorrow, would be the value of
4 your -- of Ford Motor Credit's existing collateral, how
5 much is that worth. Do you have any idea what that
6 number is?
7    A. No.
8    Q. How would you go about calculating it?
9    MR. LESLIE: Objection; calls for
10 speculation.
11    You can go ahead and answer it if you
12 understand or if you can.
13    A. I think it would be -- I -- I don't know. At
14 this point, I couldn't say.
15    Q. (BY MR. MULLIN) Okay. So as of -- as of
16 today, do you know anybody at Ford who knows the
17 valuation of your collateral?
18    A. No.
19    Q. And I mean Ford Motor Credit --
20    A. Right.
21    Q. -- not the -- all right. You understand --
22    A. Yes, I understand.
23    Q. -- what I'm saying? Okay.
24    Let me show you Exhibit Conner No. 1.
25    A. Okay.

Page 33

1    Q.   And these are what the previous witnesses have
2    identified as deals in transit.
3    A.   Okay.
4    Q.   Are -- have you seen this list before?
5    A.   I don't -- I don't recall seeing this list,
6    no.
7    Q.   Okay.  Do you know if Ford Motor Credit is
8    claiming that this -- any or all of this list of $8.2
9    million in receivables is towards Ford Credit's
10   collateral?
11          MR. LESLIE:  Objection; calls for a legal
12   conclusion.  Direct him not to answer.
13          MR. MULLIN:  I can't ask the witness what
14   the collateral is?
15          MR. LESLIE:  It's not his document.
16   You're giving him a number.  You're saying a portion of
17   this.  We have no knowledge about the accuracy of it,
18   nor was he involved in generating it.
19          MR. MULLIN:  Well --
20          MR. LESLIE:  So if you want to ask him
21   about what Ford Credit's position is or if he knows Ford
22   Credit's position regarding contracts in transit, ask
23   him.
24          MR. MULLIN:  I told him it was contracts
25   in transit.  I mean, what are you trying to do --

Page 34

1          MR. LESLIE:  You asked him about that
2    total, that number versus Ford Credit's claims.  He's
3    not going to speak to Ford Credit's claims.  If you ask
4    him about what Ford Credit believes to be the number and
5    he can answer that, he can answer that.
6          MR. MULLIN:  Again, I'm giving him a list
7    of receivables, and I'm asking him if Ford Motor Credit
8    is claiming those receivables as collateral.
9          MR. LESLIE:  There's an absolute lack of
10   foundation from where this information came from other
11   than Mr. Conner himself.  This witness has not seen it
12   before.  And I'm not going to have him answer questions
13   about that document or in any way validate that
14   document.  You're not entitled to that.  You can ask
15   him, does Ford Credit claim an interest in contracts in
16   transit?  And if so, what amount?  And if he knows --
17   Q.   (BY MR. MULLIN)  Do you claim -- do you claim
18   an interest in these contracts in transit?
19          MR. LESLIE:  Objection to --
20   Q.   (BY MR. MULLIN)  These particular contracts?
21          MR. LESLIE:  These contracts in transit?
22          MR. MULLIN:  Yes, yes.  That's what I
23   want to know.
24          MR. LESLIE:  He's never seen it before.
25          Do you have any knowledge about those

Page 35

1    particular vehicles in transit?
2          THE WITNESS:  No.
3    Q.   (BY MR. MULLIN)  Is Ford Motor Company
4    claiming a security interest in the vehicle receivables
5    on Conner Exhibit 1?
6          MR. LESLIE:  Objection; again calls for a
7    legal conclusion.  Direct him not to answer.
8          MR. MULLIN:  All right.  Well, don't
9    say -- don't say you have it tomorrow.  Today you can't
10   remember.  Nobody knows.  It's a legal conclusion.  It's
11   confusing.  But tomorrow --
12          MR. LESLIE:  You're asking --
13          MR. MULLIN:  -- it'll be clarified very
14   much.
15          MR. LESLIE:  Mr. Mullin, you're asking
16   specifically whether Ford Credit is claiming a security
17   interest.  You're asking for a legal position.  You're
18   not asking him what does -- what does Ford Credit claim
19   to have an interest in.  You're not asking him about
20   specific vehicles.  You're asking him about a list of
21   customer contracts provided by Mr. Conner that he's
22   never seen before.  You're asking him if we claim
23   security interest in these particular ones.  No, he's
24   not going to answer that question.  That's a legal
25   question.

Page 36

1          MR. MULLIN:  He's the one that signed the
2    declaration and --
3          MR. LESLIE:  And his declaration didn't
4    talk about contracts in transit or this list which
5    didn't even exist when he gave his declaration.
6          MR. MULLIN:  He certainly -- he certainly
7    is taking the position on the collateral.  And if he's
8    telling me he doesn't know whether it's your
9    collateral -- I mean, I don't think you're entitled -- I
10   don't think you have any right whatsoever to tell the
11   witness not to answer my question, absolutely not under
12   the Federal Rules, the Bankruptcy Rules, the Judge's
13   rulings, or anything else when I ask the witness, did
14   you have a collateral interest in these documents?
15          MR. LESLIE:  I do when the witness is
16   being presented with a document he's never seen before
17   and has no opportunity to go back, check any records, do
18   anything else.  And you're asking him for a legal
19   conclusion.  Are we asserting a security interest in
20   these specific vehicles?  That's not a question that
21   he's going to answer.  If you want to ask him about what
22   our security interest pertains to --
23          MR. MULLIN:  And he can say he doesn't
24   know, sir.  He can say he doesn't know.  He doesn't have
25   a right to not answer.  You can't just sit here and tell

Page 37

1  witnesses don't answer anything, don't tell anything.
2  You can't, okay?  You're violating the rules.  It's a
3  joke.
4           MR. LESLIE:  I respectfully disagree.
5           MR. MULLIN:  Well, you can respectfully
6  disagree.  But you're just wrong.
7      Q.  (BY MR. MULLIN)  Are you going to answer that
8  question?
9      A.  No.
10     Q.  All right.  Let me show you Conner Exhibit
11  No. 2.
12          Does Ford Motor Credit claim an
13  interest -- security interest in any of the un-floored
14  vehicles on Conner Exhibit No. 2?
15          MR. LESLIE:  Objection to the extent
16  again -- have you seen that document before?
17          THE WITNESS:  No.
18          MR. LESLIE:  The witness has never seen
19  the document.  You're asking him to assert whether or
20  not there's an interest in those particular items of
21  inventory.
22          Do you know, as you sit here today,
23  whether those are subject to our floor plan or not -- or
24  excuse me -- to our security interests or not?
25          THE WITNESS:  I don't know.

Page 38

1           MR. MULLIN:  I object to you asking the
2  witness questions instead of objecting, which is also a
3  violation of the rules.
4           MR. LESLIE:  Well, there's also a little
5  case called Donde, which says we're supposed to
6  cooperate and work.  And I'm trying to do that.  If
7  you're going to ask him a legal conclusion about a list
8  of vehicles he's never seen before, that's not a fair
9  question to him, and it does call for a legal
10 conclusion.
11          MR. MULLIN:  Well --
12          MR. LESLIE:  He's not going to give legal
13 conclusions.
14          MR. MULLIN:  -- this document was an
15 exhibit at the depositions on Monday.  And I -- I
16 certainly am entitled to ask him.  It has the list of
17 the vehicles, what they are, and tells you what -- what
18 they are and what the inventory value is.  I don't
19 know -- I don't understand why he can't answer that
20 question.  Either --
21          MR. LESLIE:  He's answered that he's
22 never seen it before.
23          MR. MULLIN:  It's either yes, no, or I
24 don't know.
25          MR. LESLIE:  He's said he's never seen it

Page 39

1  before and has no knowledge of whether these specific
2  vehicles are subject to security interest.  He's
3  answered it.
4           MR. MULLIN:  That's your testimony.  That
5  isn't his testimony.
6           MR. LESLIE:  He answered it.
7           MR. MULLIN:  You are testifying, not him.
8      Q.  (BY MR. MULLIN)  What is your answer?
9           MR. LESLIE:  Objection; direct him not to
10 answer.
11          MR. BUSTOS:  I join Mr. Mullin's
12 objections in terms of his narrative objections, which
13 is essentially coaching a witness or testifying for a
14 witness.
15          MR. MULLIN:  Yeah.  It's totally -- to
16 quote Donde back to me while you're doing what you're
17 doing is exactly what Donde was designed to prevent.
18     Q.  (BY MR. MULLIN)  All right.  Let's go back
19 to -- does -- has Ford Motor Credit -- are they claiming
20 an interest in -- a security interest in the -- any of
21 the Reagor-Dykes equipment, furniture, fixtures, any of
22 those items?
23     A.  Yes.
24     Q.  All right.  How -- what attempt has Ford Motor
25 Credit taken to value that equipment and furniture and

Page 40

1  fixtures?
2      A.  I'm not aware of any actions.
3      Q.  So Ford doesn't know what it's worth?
4           MR. LESLIE:  Objection.  That's not what
5  the witness testified.  You're assuming facts not in
6  evidence.
7           MR. MULLIN:  You are making speaking
8  objections.  You're making speaking objections, and
9  you're just -- you're just completely violating the
10 rules.  You are completely violating the rules by what
11 you're doing.  You're not allowed to put words in his
12 mouth.  Let the man answer the question.
13          MR. LESLIE:  If your question assumes
14 facts not in evidence or makes an assumption, I'm going
15 to object.  I've objected.
16          MR. MULLIN:  Assumes facts not in
17 evidence, that's a ridiculous objection in a deposition.
18 I mean, nothing is in evidence until we get in the
19 courtroom.
20     Q.  (BY MR. MULLIN)  So do you refuse to -- to
21 answer the question whether anyone at Ford has valued
22 the -- the other -- other collateral, the furniture,
23 fixtures, equipment that it's claiming -- that you say
24 they're claiming as collateral?
25          MR. LESLIE:  Could you read back, please,

Page 41

1    the last question that was answered by the witness?
2         (Reporter reads back requested portion.)
3         MR. LESLIE:  Thank you.  Objection; asked
4    and answered.
5         You can still answer.
6    A.  I'm unaware of any actions.
7    Q.  (BY MR. MULLIN)  And Ford has -- Ford Motor
8    Credit has conducted an inventory of all the vehicles at
9    all the dealerships of the Reagor-Dykes Auto Group?
10   A.  Yes.
11   Q.  Okay.  And is there a document that reflects
12   that -- the results of that inventory?
13   A.  There is a document that would show the
14   results of the -- of a wholesale audit, yes.
15   Q.  And what's that document called?
16   A.  I don't know that there's a name for it.  It's
17   just a -- they -- it's summary results of a wholesale
18   audit.
19   Q.  Okay.  And has that document been provided to
20   Reagor-Dykes?
21   A.  I'm unaware whether it has or not.
22   Q.  Do you know what it shows the total inventory
23   to be?
24   A.  No, I don't.
25   Q.  Does anybody at Ford know that -- what that

Page 42

1    total inventory amount is?
2    A.  I'm sure there probably is someone from our
3    business center that could show that information, yes.
4    Q.  Is it Paul Boudreau?
5    A.  I don't believe so.
6    Q.  Has -- has anybody at Ford Motor Credit done
7    an analysis of whether there are any transactions in
8    transit that -- in which Ford Motor Credit has a
9    security interest?
10   A.  Can you be more specific?
11   Q.  Well, have you tried to track down whether
12   there are any pending transactions where the funds have
13   not been received yet by the company, but where the --
14   the vehicle has been sold --
15   A.  Uh-huh.
16   Q.  -- and there's an expectation of receiving
17   funds in payment; in other words, the customer has not
18   paid for -- paid Reagor-Dykes for the vehicle, but the
19   customer already has obtained possession of the vehicle?
20   A.  I guess I'm still trying to --
21   Q.  Well, do you have a list of those --
22   A.  -- understand.  A list of what?
23   Q.  Of transactions where the -- where a vehicle
24   has been sold and the customer has taken possession of
25   the vehicle --

Page 43

1    A.  Uh-huh.
2    Q.  -- and the -- however the transaction was
3    being funded --
4    A.  Uh-huh.
5    Q.  -- by the -- the lender to the customer --
6    A.  Right.
7    Q.  -- has not yet paid the money to --
8    A.  Right.
9    Q.  -- Reagor-Dykes?
10   A.  So just to clarify, are you talking about
11   contracts in transit?
12   Q.  Yes.
13   A.  My understanding is there's someone at the
14   Nashville business center that has -- has issued
15   assignments to the lending source in order to acquire
16   funds that have not yet been sent to the Reagor-Dykes
17   Group.
18   Q.  Okay.  And who would that person be?
19   A.  I don't know that there's a specific person at
20   the Nashville business center, but I'd have to -- I
21   mean, we -- we could request the information and --
22   Q.  Okay.  Do you have a -- is there a list of
23   those transactions where the assignments have been
24   issued in Ford's possession?
25   A.  I believe we have a list of -- of -- of

Page 44

1    assignments.
2    Q.  And when you say an assignment, what's being
3    assigned?
4    A.  Proceeds from the -- from the contract.
5    Q.  And from whom to whom -- who's assigning what?
6    A.  We would send the assignment out to the
7    lending -- the lender advising them that we have
8    priority in receiving funds on those contracts.
9    Q.  Okay.  And do you know which lenders have been
10   communicated with?
11   A.  I don't know.
12   Q.  But there's a list of that information that
13   Ford has?
14   A.  That's my understanding, yes.
15   Q.  Do you know what the volume -- the dollar
16   volume of that is?
17   A.  I don't know.
18   Q.  Do you know if Ford has received any money as
19   a result of those assignments?
20   A.  My understanding, based on the information I
21   believe as of yesterday, the answer is, no.
22   Q.  Are you aware of any effort by Ford to
23   evaluate the amount of money that is -- is outstanding
24   for tax, title, and licenses on Ford floor plan vehicles
25   that were sold and then there were -- the checks for the

Page 45

1  tax, title, and license has either -- were never issued
2  or were not paid?
3      A.  I believe we're making an effort to try to
4  determine for specifically Ford accounts -- Ford Credit
5  accounts and for -- so I believe there is someone in the
6  Nashville business center that is looking into that.
7      Q.  Again, do you know that person?
8      A.  No, I don't specifically.
9      Q.  Do you know how much money is involved in this
10 that --
11     A.  I don't.
12     Q.  Has -- has Ford yet issued any checks to -- or
13 made payments on -- for the tax, title, and licenses on
14 any vehicles?
15     A.  I'm not aware that there's been any checks
16 issued.
17     Q.  Okay.  Has Ford done any analysis to determine
18 whether there are vehicles subject to Ford's floor plan
19 that were sold and there was a trade-in vehicle and the
20 trade-in was subject to a security interest in favor of
21 another lender, but that other lender hasn't been paid
22 off?
23     A.  I believe we, again, have a different team in
24 Nashville that's looking into that.
25     Q.  And have you -- is there a list of those

Page 46

1  transactions?
2      A.  Not that I'm aware of at this point.
3      Q.  Do you know if Ford has made any effort to pay
4  any of those liens off?
5      A.  I am not aware of that, no.
6      Q.  I may have asked you this, but have you had
7  any contact with Shane Smith since July 27th?
8      A.  No.
9      Q.  Has Ford done any analysis or investigation to
10 determine if any of the vehicles on which it's claiming
11 a lien are also subject to a claim of lien or security
12 interest by another lender?
13     A.  My understanding is, yes.  Once again, the
14 Nashville business center is -- has been trying to
15 figure that out.
16     Q.  Okay.  And is there any kind of a list or a
17 report on that?
18     A.  I believe there might be a list of vehicles
19 that were double-floored.
20     Q.  Okay.  Now, when you say, "double-floored," I
21 think what we've been referring to as double-floored in
22 this deposition has been vehicles where they have been
23 double-floored with Ford.
24     A.  Uh-huh.
25     Q.  In other words, you know, you advanced on it

Page 47

1  twice.
2      A.  Right.
3      Q.  But you're talking about as double-flooring
4  where it's floored with two different lenders?
5      A.  That's correct.
6      Q.  Okay.  And -- so Ford has a list of those, you
7  think?
8      A.  I believe we do.
9      Q.  Okay.  And who has that?
10     A.  It would be someone from the Nashville
11 business center.
12     Q.  Okay.  All right.  Have you seen the list?
13     A.  I believe I have seen the list in the early
14 stages.  I'm not -- we've had a lot going back and
15 forth.  So I believe I have seen the list, yes.
16     Q.  Do you know what the volume is of loans of
17 vehicles --
18     A.  Offhand --
19     Q.  -- that are subject to two liens?
20     A.  -- I don't specifically remember the numbers.
21     Q.  All right.  Let me take a little break.
22             (Break from 3:20 p.m. to 3:26 p.m.)
23     Q.  (BY MR. MULLIN)  Mr. Leal, let me ask you a
24 couple of questions about the -- July 26th and 27th.
25 Was that audit a -- out of the normal cycle?

Page 48

1      A.  Based on the information we received from the
2  Monday, July 23rd Webex meeting with Jim Conlan, based
3  on that information, we definitely accelerated the
4  audit.
5      Q.  Okay.  And so that audit -- well, let me ask
6  you this.  Was it usual practice in connection with an
7  audit -- if there were out-of-trust lending discovered,
8  how many days would the customer be given to pay that
9  off?  I mean the dealer.
10         MR. LESLIE:  Object to form.
11             You can answer if you understand the
12 question.
13     A.  Can you repeat again?
14     Q.  (BY MR. MULLIN)  In a usual audit situation
15 for Ford Motor Credit, if out-of-trust lending was
16 discovered in an audit, how many days would the dealer
17 be given to pay off the out-of-trust condition?
18     A.  I don't know that -- based on the
19 circumstances, that -- that -- and being in this
20 position, that we would have allowed additional
21 processing days based on the information we -- we knew
22 about.
23     Q.  Here with Reagor-Dykes?
24     A.  Yes.
25     Q.  But I was just saying in general.

Page 49

1     A.  It depends on the situation.

2     Q.  Okay.  Because in the Reagor-Dykes situation,

3   you essentially gave them just one day to make for it

4   whole, correct?

5     A.  That's correct.

6     Q.  Does -- does Ford have any information -- does

7   Ford Motor Credit have any information indicating that

8   anyone other than Shane Smith was involved in providing

9   Ford false data?

10            MR. LESLIE:  I'm just going to object to

11   the extent it calls for anything that's attorney-client

12   privileged.

13            Other than that, you can answer.

14     A.  I don't know.

15     Q.  (BY MR. MULLIN)  You're not aware of anything

16   at this time?

17     A.  No.

18     Q.  On the -- on the tax -- taxes, title, and

19   license money, is it true that there were customers of

20   Reagor-Dykes who paid for the tax, title, and licenses

21   on their cars or their unit that they purchased and that

22   Ford seized that money?

23     A.  I'm not aware of that, no.

24     Q.  You don't know about that happening?

25     A.  No.

Page 50

1     Q.  Let me ask you one -- one last question about

2   this Exhibit 4.

3            Have you been out to the lot in Floydada?

4     A.  No.

5     Q.  Do you know about the lot?  Do you know that

6   that's one of the Reagor-Dykes lots that's on this -- on

7   this Exhibit 4 on the last page?  It's one of the lots

8   on the audit.

9     A.  I'm not -- I'm not aware of a lot that's -- is

10   that the Chevrolet store you're --

11     Q.  Yes.

12     A.  -- speaking to?

13     Q.  Yes.

14     A.  I'm not aware of another lot.

15     Q.  In Floydada.  I'm just talking about that lot,

16   that particular --

17     A.  Oh.

18     Q.  That particular lot, not another one.

19     A.  I'm sorry.

20     Q.  I'm just calling it Floydada.

21     A.  I know there is a location there, but I've

22   never been.

23     Q.  Okay.  But you've seen data on that lot in

24   connection with your work after July 27th, correct?

25     A.  What type of data?

Page 51

1     Q.  Well, you've seen data on the inventory at the

2   Floydada lot, correct?

3     A.  I believe I have, yes.

4     Q.  All right.  And would you agree with me that

5   it's a red flag that as of June 28th, 2018, there were

6   225 vehicles having advances from Ford of $9.4 million

7   as of June 28th, 2018, that had not been paid?

8            MR. LESLIE:  Objection to form and

9   relevance.

10            You can answer if you understand the

11   question.

12     A.  I don't understand the question.

13     Q.  (BY MR. MULLIN)  Well, if 225 vehicles and

14   $9.4 million is substantially the entire inventory of

15   the Floydada lot, its entire capacity, would it be a red

16   flag to Ford that supposedly that entire inventory had

17   been sold in the seven business days before this

18   June 28th, 2018, audit?

19            MR. LESLIE:  Objection to relevance

20   regarding tomorrow's proceedings and direct you not to

21   answer.

22     A.  I'm not going to answer.

23            MR. MULLIN:  All right.  Well, subject to

24   asking the Court to compel this witness to answer the

25   many, many questions he's refused to answer, I'll pass

Page 52

1   the witness.

2            MR. LESLIE:  And objection to the

3   sidebar.

4            EXAMINATION

5   BY MR. BUSTOS:

6     Q.  Mr. Leal, I'm Fernando Bustos, and I represent

7   Vista Bank.  Good afternoon.

8     A.  Good afternoon.

9     Q.  Mr. Jim Conlan, is he an employee of Ford

10   Credit, or is he an outside consultant?

11     A.  He's an employee.

12     Q.  What's his job title?

13     A.  I believe it's -- it's Black Belt.  I don't

14   know specifically.

15     Q.  Okay.  So what little I seem to understand

16   about Six Sigma or whatever --

17     A.  Uh-huh.

18     Q.  So he may have that certification for having

19   gone through that kind of training, but is that his

20   title at Ford Motor Credit; John Conlan, comma, Black

21   Belt?  I'm just curious.

22     A.  I don't know.

23     Q.  Okay.

24     A.  I don't know.

25     Q.  All right.  You referenced vehicles being sold

Page 53

1   to the Ram organization. What is your understanding
2   what the Ram organization is?
3       A.  My understanding is it's a used car operation.
4       Q.  And located where to your knowledge?
5       A.  I don't specifically know the location.
6       Q.  Has Ford Credit undertaken a lien analysis to
7   see if cars on the lots may be subject to liens by other
8   lenders?
9       A.  I'm not aware of that at this point.
10      Q.  And to make sure I understand, you do not have
11  an understanding of what Ford's collateral is worth that
12  they're claiming right now, correct?
13      A.  At this point, no. Yeah.
14      Q.  Expand that answer, please.
15      A.  I guess can you expand the question when
16  you're talking about value?
17      Q.  Well, internal analysis that Ford has
18  performed in terms of deciding, well, we think our
19  collateral is worth X-million dollars?
20      A.  No.
21          MR. BUSTOS:  I'll pass the witness.
22              EXAMINATION
23  BY MR. STROHSCHEIN:
24      Q.  Mr. Leal, my name is Steve Strohschein. I
25  represent GM Financial in this matter.

Page 54

1       A.  Okay.
2       Q.  Ms. Schmucker testified earlier about a
3   capital loan made to the Reagor-Dykes dealerships last
4   year in the amount of about $5 million. Are you
5   familiar with that loan?
6       A.  I'm familiar with it, yes.
7       Q.  And is that the only capital -- does that
8   capital loan remain outstanding today?
9       A.  Yes.
10      Q.  Some portion of it.
11          Do you know what is the balance due today?
12      A.  I don't know the exact amount.
13      Q.  Would that be the only capital loan or only
14  non-floor plan indebtedness in Ford Motor Credit's
15  current indebtedness owed by the Reagor-Dykes entities?
16      A.  That is my understanding, yes.
17      Q.  So of the 116 million, whatever the total may
18  be, all of that would be floor plan indebtedness other
19  than the capital loan?
20      A.  That is my understanding, yes.
21      Q.  And do you recall the purpose of the capital
22  loan last year?
23      A.  My understanding is they originally had a
24  revolving line of credit with us with a balance, and the
25  $5 million cap loan paid off the revolver -- revolving

Page 55

1   line of credit and advanced additional funds up to the 5
2   million.
3       Q.  The revolver would have been in what credit
4   limit? Do you recall?
5       A.  I don't recall, no.
6       Q.  But the 5 million cap loan was an increase of
7   what the revolver was previously?
8       A.  That's correct.
9       Q.  And the 5 million cap loan is amortizing?
10      A.  Yes.
11      Q.  Over what period of time?
12      A.  I don't have that information.
13      Q.  And you don't recall a specific purpose for
14  the additional increase in the cap loan at that time?
15      A.  My understanding is working capital.
16      Q.  And the borrower of the cap loan, would that
17  be spread amongst all of the RDAG entities that you're
18  flooring, or is there one particular entity?
19      A.  I don't have that information.
20          MR. STROHSCHEIN:  I have no further
21  questions.
22              EXAMINATION
23  BY MR. CARDER:
24      Q.  I'm Mark Carder for First Bank.
25          You mentioned that you had seen the workup

Page 56

1   or a list that indicated that there were --
2   double-floorings were described between Ford Credit and
3   other third-party lenders. Do you recall that?
4       A.  Yes.
5       Q.  Do you know whether First Bank & Trust was
6   identified as one of those other lenders?
7       A.  I could not -- I don't -- don't recall.
8       Q.  Do you recall what the title on the document
9   of the list was?
10      A.  No.
11      Q.  Do you know who generated that?
12      A.  It would have been out of the -- someone out
13  of the Nashville business center.
14      Q.  But you don't recall a specific
15  representative?
16      A.  No, I don't.
17          MR. CARDER:  Pass the witness.
18          MR. LASHAWAY:  I'll reserve.
19              EXAMINATION
20  BY MR. MASSOUH:
21      Q.  John Massouh with First Capital Bank of Texas.
22          With regard to the double-floored vehicles
23  that you were discussing, there -- is a list of those --
24  has that list been fully completed and compiled by
25  someone in the Nashville business center?

Page 57

1    A.  I'm not aware that it's complete.  I
2    understand it's a work in progress.
3        Q.  With regard to an inventory of Ford Motor
4    Credit floored vehicles, has that list been completed?
5        A.  Inventory list of floor plan vehicles?  Yes,
6    that -- we have completed a wholesale audit, I guess.
7        Q.  Okay.  And does that list differentiate
8    between the locations where the vehicles are currently
9    located?
10       A.  Yes.
11       Q.  How long has the Black Belt system been
12   available to Ford Motor Credit?
13       A.  Can you expand on that or --
14       Q.  I guess, explain to me what the -- what the
15   Black Belt system is.  Maybe that might help.
16       A.  I -- I probably couldn't explain it to you
17   well.  I -- I'm aware of it, but --
18       Q.  What does it do?
19       A.  It -- my understanding is it analyzes data and
20   looks for areas of opportunity in looking for errors.
21   But I -- again, I'm not an expert in that.
22       Q.  Has that -- that Black Belt ability through
23   Jim Conlan been available to Ford Motor Credit for more
24   than a year?
25       A.  My understanding for that specific person --

Page 58

1    or purpose, my understanding is -- is no.
2        Q.  Okay.  Do you know how long it had been
3    available?
4        A.  My understanding is it's sometime this year.
5        Q.  Within the last six months?
6        A.  That's my understanding.
7        Q.  With regard to the contracts in transit, you
8    referenced that people at the Nashville business center
9    are working on assignments of those from the -- from
10   various lending sources.  Did I hear that right?
11       A.  That's correct.  We -- we have a list of
12   lenders that we've sent assignments to, but we have no
13   idea what's outstanding, if they have -- have financed
14   contracts that haven't been paid.  So we have no idea
15   about that.
16       Q.  With regard to the list of lenders relating
17   to -- those list of lenders would be related to an
18   actual vehicle that had been sold, correct?
19       A.  That's my understanding.
20       Q.  And have you made it -- has Ford Motor Credit
21   made a determination as to those vehicles in which they
22   are seeking an assignment from the lending source,
23   whether those vehicles are actually Ford Motor Credit
24   floored vehicles?  Or do you know, sir?
25       A.  I'm not aware of that at this point.

Page 59

1            MR. MASSOUH:  Pass the witness.
2            MR. MULLIN:  I don't have anything
3    further.
4            MR. LESLIE:  Okay.  Reserve and keeping
5    it open per the discussion with the Court and the
6    understanding of the parties.  Other than that, we're
7    done with this witness, I guess.
8            (Deposition concluded at 3:42 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 60

1            CHANGES AND SIGNATURE
2    WITNESS NAME:  RENE LEAL
3    DATE OF DEPOSITION:  AUGUST 15, 2018
4    PAGE LINE   CHANGE        REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

**App. 089**

Page 61

1    I, RENE LEAL, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5          _____
6
7  THE STATE OF _____)
   COUNTY OF _____)
8
9    Before me, _____, on this day
   personally appeared RENE LEAL, known to me (or proved to
   me under oath or through _____)
10  (description of identity card or other document)) to be
   the person whose name is subscribed to the foregoing
11  instrument and acknowledged to me that they executed the
   same for the purposes and consideration therein
12  expressed.
    Given under my hand and seal of office this
13  _____ day of _____, _____
14
15
16          NOTARY PUBLIC IN AND FOR
          THE STATE OF _____
17          COMMISSION EXPIRES:_____
18
19
20
21
22
23
24
25

Page 62

1      IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2             LUBBOCK DIVISION
3          IN RE:      )
                      )
4  REAGOR-DYKES MOTORS, LP,   )Case No. 18-50214-rlj11
                      )
5    Debtor.      )
6  _____)
          IN RE:      )
7                      )
   REAGOR-DYKES IMPORTS, LP,  )Case No. 18-50215-rlj11
8                      )
     Debtor.      )
9  _____)
10          IN RE:      )
                      )
11  REAGOR-DYKES AMARILLO, LP, )Case No. 18-50216-rlj11
                      )
12    Debtor.      )
13 _____)
          IN RE:      )
14                      )
   REAGOR-DYKES AUTO COMPANY, )
15  LP,      )Case No. 18-50217-rlj11
                      )
16    Debtor.      )
17 _____)
          IN RE:      )
18                      )
   REAGOR-DYKES PLAINVIEW, LP, )Case No. 18-50218-rlj11
19                      )
     Debtor.      )
20 _____)
21          IN RE:      )
                      )
22  REAGOR-DYKES FLOYDADA, LP, )Case No. 18-50219-rlj11
                      )
23    Debtor.      )
24 _____)
25

Page 63

1      REPORTER'S CERTIFICATION
       DEPOSITION OF RENE LEAL
2            AUGUST 15, 2018
3
4    I, Kailee Pereida, CSR No. 8398, Certified
   Shorthand Reporter in and for the State of Texas, hereby
5  certify to the following:
6    That the foregoing proceedings were taken before me
   at the time and place therein set forth, at which time
7  the witness was put under oath by me;
8    That the testimony of the witness, the questions
   propounded, and all objections and statements made at
9  the time of the examination were recorded
   stenographically by me and were thereafter transcribed;
10    That a review of the transcript by the deponent was
   requested;
11
12    That $_____ is the deposition officer's
   charges to Mr. David Mullin, Attorney for Debtors, for
13  preparing the original deposition transcript and any
14  copies of exhibits;
     That the foregoing is a true and correct transcript
   of my shorthand notes so taken.
15
16    I further certify that I am not a relative or
   employee of any attorney of the parties, nor financially
17  interested in the action.
18    I declare under penalty of perjury under the laws
19  of Texas that the foregoing is true and correct.
20    Dated this 15th day of August, 2018.
21
          _____
22          Kailee Pereida, Texas CSR 8398
23          Expiration Date: December 31, 2019
          Caprock Court Reporting, Inc.
          Firm Certificate Number: 374
24          1112 Texas, Suite 200
          Lubbock, Texas 79401
25          (806) 795-4202

**App. 090**

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

IN RE:                              )
                                    )
REAGOR-DYKES MOTORS, LP,            )Case No. 18-50214-rlj11
                                    )
        Debtor.                     )

---

IN RE:                              )
                                    )
REAGOR-DYKES IMPORTS, LP,           )Case No. 18-50215-rlj11
                                    )
        Debtor.                     )

---

IN RE:                              )
                                    )
REAGOR-DYKES AMARILLO, LP,          )Case No. 18-50216-rlj11
                                    )
        Debtor.                     )

---

IN RE:                              )
                                    )
REAGOR-DYKES AUTO COMPANY,          )
  LP,                               )Case No. 18-50217-rlj11
                                    )
        Debtor.                     )

---

IN RE:                              )
                                    )
REAGOR-DYKES PLAINVIEW, LP,         )Case No. 18-50218-rlj11
                                    )
        Debtor.                     )

---

IN RE:                              )
                                    )
REAGOR-DYKES FLOYDADA, LP,          )Case No. 18-50219-rlj11
                                    )
        Debtor.                     )

---

CORRECTION PAGES

Page 2

1                 ------------------------------------

2                        ORAL DEPOSITION OF

3                            RENE LEAL

4                        AUGUST 15, 2018

5                            Volume 1

6                 ------------------------------------

7           ORAL DEPOSITION OF RENE LEAL, produced as a witness

8       at the instance of the DEBTOR, and duly sworn, was taken

9       in the above-styled and numbered cause on AUGUST 15,

10      2018, from 2:23 p.m. to 3:42 p.m., before Kailee

11      Pereida, CSR in and for the State of Texas, reported by

12      machine shorthand, at the law offices of Mullin, Hoard &

13      Brown, L.L.P., 1500 Broadway, Suite 700, Lubbock, Texas,

14      pursuant to the Federal Rules of Civil Procedure.

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                   A P P E A R A N C E S

2

3    FOR THE DEBTORS:

4        MR. DAVID MULLIN
         -AND-
5        MR. DAVID R. LANGSTON
         MULLIN, HOARD & BROWN, L.L.P.
6        1500 Broadway, Suite 700
         P.O. Box 2585 (79408)
7        Lubbock, Texas 79401
         (806) 765-7491
8        dumllin@mhba.com

9    FOR FORD MOTOR CREDIT COMPANY, L.L.C.:

10       MR. CRAIG A. LESLIE
         PHILLIPS LYTLE LLP
11       One Canalside
         125 Main Street
12       Buffalo, New York 14203
         (716) 847-7012
13       cleslie@phillipslytle.com

14           -AND-

15       MR. DONALD H. CRAM, III
         SEVERSON & WERSON, P.C.
16       One Embarcadero Center
         26th Floor
17       San Francisco, California 94111
         (415) 398-3344

18

     FOR GM FINANCIAL:
19
         MR. STEPHEN P. STROHSCHEIN
20       MCGLINCHEY STAFFORD, P.L.L.C.
         301 Main Street
21       Fourteenth Floor
         Baton Rouge, Louisiana 70801
22       (225) 383-9000
         sstroh@mcglinchey.com

23

24

25

**App. 093**

Page 4

```
 1    FOR AIM BANK:

 2         MR. JEFF R. LASHAWAY
           BOERNER, DENNIS & FRANKLIN, P.L.L.C.
 3         920 Avenue Q
           Lubbock, Texas 79401
 4         (806) 763-0044
           jlashaway@bdflawfirm.cpm

 5
      FOR FIRST CAPITAL BANK:

 6
           MR. JOHN F. MASSOUH
 7         SPROUSE, SHRADER, SMITH, P.L.L.C.
           701 South Taylor
 8         Suite 500
           Amarillo, Texas 79105
 9         (806) 468-3337
           john.massouh@sprouselaw.com
10
      FOR VISTA BANK:
11
           MR. FERNANDO BUSTOS
12         BUSTOS LAW FIRM, P.C.
           1001 Main Street
13         Suite 501
           Lubbock, Texas 79401
14         (806) 780-3976
           fbustos@bustoslawfirm.com
15
      FOR FIRST BANK & TRUST:
16
           MR. MARK S. CARDER
17         STINSON, LEONARD, STREET, L.L.P.
           1201 Walnut
18         Suite 2900
           Kansas City, Missouri 64106
19         (816) 691-3415
           mark.carder@stinson.com
20
      FOR BART REAGOR:
21
           MR. SCOTT R. WIEHLE
22         KELLY, HART & HALLMAN, L.L.P.
           201 Main Street
23         Suite 2500
           Fort Worth, Texas 76102
24         (817) 332-2500
           scott.wiehle@kellyhart.com
25
```

**App. 094**

Page 5

```
 1   FOR IBC BANK:

 2         MR. JOHN D. DALE
           GABLE GOTWALS
 3         1100 ONEOK Plaza
           100 West Fifth Street
 4         Tulsa, Oklahoma 74103
           (918) 595-4828
 5         jdale@gablelaw.com

 6   FOR RICK DYKES:

 7         MR. DAVID M. GUINN, JR.
           LAW OFFICE OF HURLEY & GUINN
 8         1805 13th Street
           Lubbock, Texas 79401
 9         (806) 771-0700
           david@hurleyguinn.com
10
     ALSO PRESENT:
11
           Mr. Mike Cannon
12         Mr. Toby Cecil
           Mr. Rick Dykes
13         Mr. Jonathan Hill
           Mr. Howie Ravitz
14         Mr. Scott Wade

15

16

17

18

19

20

21

22

23

24

25
```

Page 60

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:   RENE LEAL

3    DATE OF DEPOSITION:   AUGUST 15, 2018

4    PAGE LINE        CHANGE              REASON

5    11   10   "Central MARKet AreA"

6    ____    Reason — Mistake; utilized previous

7    ____    name.

8

9    57   25   " The 6-Sigma process has

10   ____    been utilized by Ford Credit

11   ____    for many years. My understanding

12   ____    is that Jim Conlan began working on

13   ____    this specific project this year.

14   ____    Reason: Misunderstood Question

15

16

17

18

19

20

21

22

23

24

25

Page 61

1          I, RENE LEAL, have read the foregoing
    deposition and hereby affix my signature that same is
2   true and correct, except as noted above.

3

4

5                 RENE LEAL

6

7   THE STATE OF _Texas_ )
    COUNTY OF _Collin___ )
8
       Before me, _Valeta M Audrick_, on this day
9   personally appeared RENE LEAL, known to me (or proved to
    me under oath or through _Texas Drivers License_ )
10  (description of identity card or other document)) to be
    the person whose name is subscribed to the foregoing
11  instrument and acknowledged to me that they executed the
    same for the purposes and consideration therein
12  expressed.
       Given under my hand and seal of office this
13  _28th_ day of _August_ . _2018_

14

15

16        NOTARY PUBLIC IN AND FOR
    THE STATE OF _Texas_
17      COMMISSION EXPIRES: _2-21-19_

18
          VALETA M. AUDRICK
19          Notary Public, State of Texas
        Comm. Expires 02-21-2019
20          Notary ID 12852855-6

21

22

23

24

25

Page 62

1              IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
2                       LUBBOCK DIVISION

3                    IN RE:                              )
                                                         )
4       REAGOR-DYKES MOTORS, LP,        )Case No. 18-50214-rlj11
                                                         )
5              Debtor.                          )

6                    IN RE:                              )
                                                         )
7       REAGOR-DYKES IMPORTS, LP,       )Case No. 18-50215-rlj11
                                                         )
8              Debtor.                          )

9

10                   IN RE:                              )
                                                         )
11      REAGOR-DYKES AMARILLO, LP,      )Case No. 18-50216-rlj11
                                                         )
12             Debtor.                          )

13
                     IN RE:                              )
14                                                       )
        REAGOR-DYKES AUTO COMPANY,      )
15      LP,                             )Case No. 18-50217-rlj11
                                                         )
16             Debtor.                          )

17
                     IN RE:                              )
18                                                       )
        REAGOR-DYKES PLAINVIEW, LP,     )Case No. 18-50218-rlj11
19                                                       )
               Debtor.                          )
20

21                   IN RE:                              )
                                                         )
22      REAGOR-DYKES FLOYDADA, LP,      )Case No. 18-50219-rlj11
                                                         )
23             Debtor.                          )

24

25

Page 63

REPORTER'S CERTIFICATION
DEPOSITION OF RENE LEAL
AUGUST 15, 2018

I, Kailee Pereida, CSR No. 8398, Certified
Shorthand Reporter in and for the State of Texas, hereby
certify to the following:

That the foregoing proceedings were taken before me
at the time and place therein set forth, at which time
the witness was put under oath by me;

That the testimony of the witness, the questions
propounded, and all objections and statements made at
the time of the examination were recorded
stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was
requested;

That $ _955.00_ is the deposition officer's
charges to Mr. David Mullin, Attorney for Debtors, for
preparing the original deposition transcript and any
copies of exhibits;

That the foregoing is a true and correct transcript
of my shorthand notes so taken.

I further certify that I am not a relative or
employee of any attorney of the parties, nor financially
interested in the action.

I declare under penalty of perjury under the laws
of Texas that the foregoing is true and correct.

Dated this 15th day of August, 2018.

_Kailee Pereida_
Kailee Pereida, Texas CSR 8398
Expiration Date:   December 31, 2019

Caprock Court Reporting, Inc.
Firm Certificate Number:   374
1112 Texas, Suite 200
Lubbock, Texas 79401
(806) 795-4202

**App. 099**