IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| FORD MOTOR CREDIT COMPANY LLC, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | Civil Action No.: 5:18-cv-00186 |
| | § | |
| BART REAGOR AND RICK DYKES, | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

| Ex. No. | Description | RD App. |
|---|---|---|
| 1 | Declaration of Robert Schleizer | RD App. 0001 – 0003 |
| 1-1 | Chapter 11 Plan of Reorganization for Reagor-Dykes Auto Group | RD App. 0004 – 0063 |
| 1-2 | Notice of Private Sale | RD App. 0064 – 0070 |
| 2 | Deposition of Rene Leal | RD App. 0071 – 0098 |
| 3 | Affidavit of Timothy Conner | RD App. 0099 – 0102 |
| 4 | Declaration of D. Lyndon James | RD App. 0103 – 0104 |
| 4-A | Spreadsheet | RD App. 0105 |
| 5 | Affidavit of Rick Dykes | RD App. 0106 – 0111 |

Respectfully submitted,

*/s/ Marshall M. Searcy, Jr.*

Marshall M. Searcy, Jr.
State Bar No. 17955500
marshall.searcy@kellyhart.com
Scott R. Wiehle
State Bar No. 24043991
scott.wiehle@kellyhart.com
KELLY HART & HALLMAN, LLP
201 Main Street, Suite 2500
Fort Worth, Texas  76102
Telephone:  (817) 332-2500
Telecopy:  (817) 878-9280

**ATTORNEYS FOR BART REAGOR**


*/s/ Tom Kirkendall*

Tom Kirkendall
State Bar No. 11517300
Law Office of Tom Kirkendall
2 Violetta Court
The Woodlands, Texas 77381-4550
Telephone: (281) 364-9946
Telecopy:  (888) 582-0646
bigtkirk@kir.com

**ATTORNEY FOR RICK DYKES**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing to be delivered to the following parties in accordance with the Federal Rules of Civil Procedure on February 22, 2019.

Keith A. Langley
Brandon K. Bains
Langley LLP
1301 Solana Blvd
Bldg 1, Ste 1545
Westlake, TX 76262
Email: klangley@l-llp.com
Email: bbains@l-llp.com

Craig A Leslie
Joanna Dickinson
Phillips Lytle LLP
One Canalside
125 Main Street
Buffalo, NY 14203
Email: cleslie@phillipslytle.com
Email: jdickinson@phillipslytle.com

Michael S. Goldberg
Baker Botts LLP
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
Email: michael.goldberg@bakerbotts.com

Jessica B. Pulliam
Baker Botts LLP
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Email: jessica.pulliam@bakerbotts.com

_/s/ Marshall M. Searcy, Jr._
Marshall M. Searcy, Jr.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| **FORD MOTOR CREDIT COMPANY LLC,** | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| **v.** | § | **Civil Action No.: 5:18-cv-00186** |
| | § | |
| **BART REAGOR AND RICK DYKES,** | § | |
| Defendants. | § | |

## DECLARATION OF ROBERT SCHLEIZER

1.     My name is Robert Schleizer.  I am over eighteen (18) years of age, am of sound mind and am competent to make this declaration.  The facts stated herein are within my personal knowledge and are all true and correct.

2.     I am the Managing Partner of BlackBriar Advisors LLC ("BlackBriar"). The bankruptcy court approved BlackBriar to be the Chief Restructuring Officer ("CRO") to the Reagor-Dykes Dealerships in bankruptcy ("Dealerships").[1]  Part of that process is reviewing the financial records of the Reagor-Dykes Dealerships to determine the amounts owed to creditors.  Another part of that process is reviewing and proposing a sale or recapitalization of the dealership assets, the proceeds of which would be used to fund a reorganization plan to pay claims or creditors.  The CRO is also responsible for any claims and causes of action that the Dealerships and their bankruptcy estates may

---

[1]     The Reagor-Dykes entities in bankruptcy are Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Plainview, LP, Reagor-Dykes Floydada, LP, Reagor-Dykes Snyder, LP, Reagor Auto Mall Ltd., Reagor-Dykes III LLC, Reagor-Dykes II LLC, and Reagor Auto Mall I LLC

2877431_1.DOCX2875176_1

**EXHIBIT**
**1**

RD App. 0001

have against third parties, which include potential causes of action against Ford Motor Credit ("FMCC").

3.     As the CRO, BlackBriar has been working diligently with bankruptcy counsel to prepare the Chapter 11 Plan of Reorganization for the Reagor-Dykes Auto Group (the "Plan"), which was filed with the bankruptcy court on or about January 7, 2019, a copy of which is attached to this declaration as Exhibit 1. Negotiations relating to the plan between all parties in interest, including the Dealerships and FMCC, have continued since the filing of the Plan. The Dealerships and FMCC (and other key players in the bankruptcy case) are scheduled to mediate the bankruptcy case in Dallas, Texas, on February 25 and 26, 2019.

4.     The Dealerships dispute FMCC's secured claim and unsecured claim. The disputed nature of these claims is expressly reflected on page 2 of the Plan.

5.     As the CRO, I have spent much time reviewing the financial records of the Dealerships to determine the amounts owed to creditors. Based on my review of the financial records, I have determined that the Dealerships did not owe FMCC $112,041,555.36 as of August 1, 2018, as attested to by Rene Leal in support of FMCC's Motion for Summary Judgment.

6.     As the CRO, I have personal knowledge that the Dealerships have operated while in bankruptcy and have sold Ford and other vehicles, since August 1, 2018, with proceeds having been paid to FMCC. These proceeds are not accounted for in Rene Leal's declaration.

2877431_1.DOCX2875176_1

7.    As the CRO, I have personal knowledge that FMCC intends to sell its collateral soon.  Attached hereto as Exhibit 2 are true and correct copies of notices from FMCC regarding the sale of its collateral.

8.    Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct."

Executed on February 22, 2019.

Robert Schleizer

RD App. 0003

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **REAGOR-DYKES MOTORS, LP,** *et al.* | § | **Case No. 18-50214-rlj-11** |
| | § | **Jointly Administered** |
| Debtors. | § | |

---

## CHAPTER 11 PLAN OF REORGANIZATION
## FOR REAGOR-DYKES AUTO GROUP

---

Marcus A. Helt (TX 24052187)
C. Ashley Ellis (TX 00794824)
**FOLEY GARDERE**
**FOLEY & LARDNER, LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
mhelt@foley.com
aellis@foley.com

COUNSEL TO THE DEBTORS AND DEBTORS-IN-POSSESSION

Dated: January 7, 2019

**EXHIBIT**
**1-1**

i

# TABLE OF CONTENTS

**ARTICLE I      INTRODUCTION** ...................................................................... 9

    **1.1.**   Introduction. ........................................................................... 9
    **1.2.**   General Plan Structure; Funding Sources. ............................... 10

**ARTICLE II      DEFINITIONS AND INTERPRETATION** ........................ 10

    **2.1.**   Definitions. ............................................................................. 10
    **2.2.**   Interpretation, Rules of Construction, and Other Terms. ....... 21
    **2.3.**   Computation of Time. ............................................................ 21
    **2.4.**   Governing Law. ...................................................................... 21
    **2.5.**   Reference to Monetary Figures. .............................................. 22

**ARTICLE III      CLASSIFICATION OF CLAIMS AND INTERESTS** .......... 22

    **3.1.**   Administrative Claims and Priority Tax Claims. ..................... 22
    **3.2.**   Classes of Claims and Interests. ............................................. 22

**ARTICLE IV      TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS** ........ 23

    **4.1.**   Administrative Claims. ........................................................... 23
    **4.2.**   Post-Confirmation Date Fees and Expenses. .......................... 25
    **4.3.**   Priority Tax Claims. ............................................................... 25
    **4.4.**   Payment of Statutory Fees. .................................................... 25

**ARTICLE V      TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS** .............. 26

    **5.1.**   Class 1 – Allowed Priority Non-Tax Claims. .......................... 26
    **5.2.**   Class 2 – Secured Claim of Ford Credit. ................................ 26
    **5.3.**   Class 3 — Secured Claim of GM Financial. ............................ 27
    **5.4.**   Class 4 — Secured Claim of First Capital Bank. ..................... 27
    **5.5.**   Class 5 — Secured Claim of First Bank & Trust. .................... 27
    **5.6.**   Class 6 — Secured Claim of AIM Bank. ................................. 28
    **5.7.**   Class 7 — Secured Claim of Vista Bank. ................................ 28
    **5.8.**   Class 8 — Other Secured Claims. ........................................... 29
    **5.9.**   Class 9 — Claims of Qualified Retail Lenders for Payment of TT&L/Trade Liability. ...................................................................................... 29
    **5.10.**  Class 10 — Unsecured Trade Claims. ..................................... 30
    **5.11.**  Class 11 — General Unsecured Claims. ................................... 30
    **5.12.**  Class 12 — Unsecured Claims of Ford Credit ......................... 30
    **5.13.**  Class 13 — Unsecured Claims of GM Financial. ..................... 30
    **5.14.**  Class 14 — Unsecured Claims of Bart Reagor and Rick Dykes. ............. 31
    **5.15.**  Class 15 — Subordinated Unsecured Claims. .......................... 31
    **5.16.**  Class 16 — Holders of Allowed Interests in the Debtors. ....... 31

RD App. 0005

**ARTICLE VI      NON-VOTING AND UNIMPAIRED CLASSES** ................................................31

   **6.1.**   Impaired/Unimpaired Classes. ................................................................31
   **6.2.**   Controversy Concerning Impairment. ..................................................32
   **6.3.**   Elimination of Vacant Classes. .............................................................32
   **6.4.**   Subordinated Claims. ............................................................................32

**ARTICLE VII      MEANS FOR IMPLEMENTATION OF THE PLAN** .............................32

   **7.1.**   Continued Corporate Existence. ..........................................................32
   **7.2.**   Operations Between the Confirmation Date and the Effective Date. ......32
   **7.3.**   Implementation Transactions on or Prior to the Effective Date. ............33
   **7.4.**   Vesting of Assets. ..................................................................................35
   **7.5.**   Sources of Cash for Plan Distributions. ...............................................36
   **7.6.**   Approval of Agreements. .......................................................................36
   **7.7.**   Entry of Final Decree. ...........................................................................36
   **7.8.**   Retention of Rights to Pursue Causes of Action. .................................36

**ARTICLE VIII      THE CREDITORS TRUST** .......................................................................37

   **8.1.**   Creation of the Creditors Trust and Appointment of the Trustee. ........37
   **8.2.**   Property of the Trust. ............................................................................38
   **8.3.**   Purpose of the Creditor Trust. .............................................................38
   **8.4.**   Powers of the Trustee. ..........................................................................38
   **8.5.**   Cooperation Between the Trustee and Reorganized Debtors. ..............39
   **8.6.**   Termination of the Creditor Trust. ......................................................39

**ARTICLE IX      CONDITIONS PRECEDENT TO EFFECTIVE DATE; EFFECT**
                **OF PLAN CONFIRMATION** ......................................................39

   **9.1.**   Conditions to Confirmation. ................................................................39
   **9.2.**   Conditions Precedent to the Effective Date. ........................................40
   **9.3.**   Waiver of Conditions. ...........................................................................40
   **9.4.**   Effect of Non-Occurrence of the Effective Date. .................................40

**ARTICLE X      CLAIM      OBJECTIONS,      AND      MISCELLANEOUS**
                **DISTRIBUTION PROVISIONS** ..................................................40

   **10.1.**   Objections to Claims. ...........................................................................40
   **10.2.**   Estimation of Claims. ............................................................................41
   **10.3.**   Distributions Under the Plan. ...............................................................41
   **10.4.**   Setoffs. ...................................................................................................44

**ARTICLE XI      EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...................45

   **11.1.**   Executory Contracts and Unexpired Leases to be Rejected Unless Expressly
          Assumed. ...............................................................................................45
   **11.2.**   Approval of Assumptions. .....................................................................46
   **11.3.**   Objections to Assumption of Executory Contracts and Unexpired Leases. ............46

RD App. 0006

**11.4.**   Payments Related to Assumption of Executory Contracts and Unexpired Leases. ...........................................................................................................46
**11.5.**   Rejection of Executory Contracts. .....................................................................46
**11.6.**   Bar Date for Rejection Damages. .......................................................................46

**ARTICLE XII   RELEASES; INDEMNIFICATION; PLAN INJUNCTION** .....................47

**12.1.**   Binding Effect. .....................................................................................................47
**12.2.**   Compromise and Settlement of Claims, Interests, and Controversies. ..................47
**12.3.**   Discharge of Claims and Termination of Interests. ............................................47
**12.4.**   Releases by a Holder of a Claim. .......................................................................48
**12.5.**   Exculpation, Release, and Injunction. ................................................................48
**12.6.**   Injunction Related to Releases and Exculpation. ...............................................49
**12.7.**   Term of Stay or Injunctions. .............................................................................49
**12.8.**   Injunction Against Interference with Plan. .........................................................49

**ARTICLE XIII   MISCELLANEOUS** ...............................................................................49

**13.1.**   Retention of Jurisdiction. ...................................................................................49
**13.2.**   Successors and Assigns. ......................................................................................51
**13.3.**   Ipso Facto and Similar Provisions Ineffective. ..................................................51
**13.4.**   Cram Down. ........................................................................................................51
**13.5.**   Modification of the Plan. ...................................................................................52
**13.6.**   Withdrawal or Revocation of the Plan. ..............................................................52
**13.7.**   Notices. ...............................................................................................................52
**13.8.**   Severability. ........................................................................................................53
**13.9.**   All Claims. ..........................................................................................................53
**13.10.**   Immediate Binding Effect. .................................................................................53
**13.11.**   Reservation of Rights. ........................................................................................54

RD App. 0007

## LIST OF EXHIBITS

Exhibit A:          Owned Real Estate

RD App. 0008

The Debtors[1] in the above-referenced, jointly-administered Chapter 11 bankruptcy cases (collectively, "**Reagor-Dykes**" or the "**Debtors**") hereby propose this *Chapter 11 Plan of Reorganization for Reagor-Dykes* (the "**Plan**") pursuant to §1121(a) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**").

## SUMMARY OF THE PLAN

1.      **Summary Only.**  The following is a brief summary of the Plan's general terms and does not form a part of the Plan.  This summary is qualified in its entirety by reference to the provisions of the Plan.  Capitalized terms used in this summary are defined in the Plan.

2.      **General Description of the Business.**  Reagor-Dykes operates eight (8) new and pre-owned car Dealerships comprised historically of thirteen (13) Locations – twelve (12) in West Texas and one (1) location in Dallas – as a consolidated group.

3.      **Plan and Treatment of Claims.**  The Plan contemplates a reorganization of the Dealerships, the business, and the operations.  Pursuant to the terms of the Plan:

   a) The Dealerships will be recapitalized by the Plan Sponsor, McDougal-Dykes-Ewing Group or its designee, a Lubbock-based investment group created and funded by Mark McDougal, Rick Dykes, and Fin Ewing, and maybe others. The Reorganized Debtors will retain their operating assets together with Causes of Action not resolved by this Plan, and will continue to operate their business under a name selected by the Plan Sponsor.

   b) Post-confirmation, the Reorganized Debtors will benefit from the proven operational expertise of Fin Ewing and his consulting group (collectively, the "**Fin Ewing Group**"). The Fin Ewing Group will provide consulting services to the Reorganized Debtors. These consulting services will help the Reorganized Debtors accomplish their long-term business and financial goals as outlined in the Plan.

   c) The directors and officers of the Reorganized Debtors will be identified in the Plan Supplement Documents.

   d) The Reorganized Debtors will receive up to $20 million in cash (the "**New Equity Infusion**") from the Plan Sponsor.

   e) The Reorganized Debtors will use the New Equity Infusion as follows: (i) $7 million as initial post-confirmation working capital on an as-needed basis; (ii) up to $3 million to Qualified Retail

---

[1] The Debtors are Reagor-Dykes Motors, LP ("**RD Motors**") (Case No. 19-50214); Reagor-Dykes Imports, LP ("**RD Imports**") (Case No. 18-50215); Reagor-Dykes Amarillo ("**RD Amarillo**")(Case No. 18-50216); Reagor-Dykes Auto Company, LP ("**RDAC**")(Case No. 18-50217); Reagor-Dykes Plainview, LP ("**RD Plainview**")(Case No. 18-50218); Reagor-Dykes Floydada, LP ("**RD Floydada**")(Case No. 18-50219); Reagor-Dykes Snyder, L.P. ("**Snyder**") (Case No. 18-50321); Reagor Auto Mall Ltd ("**RAM**")(Case No. 18-50324); and Reagor-Dykes III LLC, (Case No. 18-50322), Reagor-Dykes II LLC (Case No. 18-50323), and Reagor Auto Mall I LLC (Case No. 18-50325) (collectively, the "**GP Debtors**").

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 1**

Lenders in Class 9 within sixty (60) days of the Effective Date; and (iii) $2 million to GM Financial on the Effective Date.

f)  The equity of the Reorganized Debtors will be owned 90% by the Plan Sponsor.

g)  The remaining 10% of the equity of the Reorganized Debtors will be placed in a Creditors Trust pursuant to this Plan for the express benefit of non-Ford Credit and non-GM Financial creditors holding Allowed Class 11 General Unsecured Claims against the Debtors.  Each Allowed Class 11 General Unsecured Claim will receive a beneficial interest in the Creditors Trust.  Each beneficial interest and the 10% equity will be subject to a redemption right that will allow the Reorganized Debtors to redeem this equity upon payment in full of the Allowed amount of Unsecured Claims converted to equity or such amount agreed by the holders of such Unsecured Claims and the Reorganized Debtors.  Each Class 11 Creditor will also receive its Pro Rata Share of Litigation Proceeds.

h)  The Creditors Trust will make distributions to all Allowed General Unsecured Claims in Class 11 pursuant to the terms and conditions of this Plan and a Creditors Trust Agreement.

i)  The Reorganized Debtors will assume certain unsecured Assumed Trade Claims under this Plan.  The identity of such unsecured Assumed Trade Claims will be disclosed in the Plan Supplement.  Such Assumed Trade Claims will not participate in Class 11.

j)  Ford Credit's secured claim is disputed.  It will receive no distribution until it is Allowed by the Bankruptcy Court.  If Ford Credit's secured claim is Allowed by the Bankruptcy Court, it will be paid as follows:  at the Reorganized Debtors' option, Ford Credit will receive (a) a promissory note equal to the allowed amount of its secured claim, payable over 5 years with interest at 3.0% per annum upon liquidation of Collateral, (b) surrender of Collateral, or (c) payment in full.  Until Ford Credit's secured claim is Allowed, all payments on this secured claim will be paid into a separate bank account that is subject to the jurisdiction of and administration by the Bankruptcy Court.

k)  Ford Credit's unsecured claim is also disputed.  It will receive no distribution until it is Allowed by the Bankruptcy Court.  If Ford Credit's unsecured claim is Allowed by the Bankruptcy Court, it will receive its Pro Rata Share of all Litigation Proceeds from Causes of Action.  Ford Motor Credit will not participate in Classes 10 or 11.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 2**

l)  GM Financial's secured claim will be paid as follows:  In full and final satisfaction of all GM Financial's secured claims, (i) the Reorganized Debtors will assume all obligations owed to GM Financial under its floor-plan financing arrangement with the Debtors equal to (a) the amount of the Collateral securing that arrangement or (b) such other amount as agreed by the Reorganized Debtors and GM Financial or (ii) at the Reorganized Debtors' option, (a) a promissory note equal to the allowed amount of GM Financial's secured claim, payable over 5 years with interest at 3.0% per annum upon liquidation of Collateral, (b) surrender of Collateral, or (c) payment in full.

m)  GM Financial's unsecured claim will be paid as follows:  As a settlement and full and final satisfaction and release of all unsecured claims, GM Financial will receive $2 million in cash on the Effective Date.  GM Financial will not participate in Classes 10 or 11.

n)  First Capital Bank's secured claim will be paid as follows:  In full and final satisfaction of all First Capital's secured claims against the Debtors, (i) the Reorganized Debtors will assume all obligations owed to First Capital under its floor-plan financing arrangement with the Debtors equal to (a) the amount of the Collateral securing that arrangement or (b) such other amount as agreed by the Reorganized Debtors and First Capital Bank or (ii) at the Debtors' option, (a) a promissory note equal to the allowed amount of First Capital Bank's secured claim, payable over 5 years with interest at 3.0% per annum upon liquidation of collateral, (b) surrender of collateral, or (c) payment in full.

o)  First Capital Bank's unsecured claim will be paid as follows:  In full and final satisfaction and release of all First Capital's unsecured claims against the Debtors, First Capital Bank will receive its Pro Rata Share of Creditors Trust Assets, which includes 10% equity securities of the Reorganized Debtors.

p)  FB&T's secured claim will be paid as follows:  In full and final satisfaction of all secured claims against the Debtors, (i) the Reorganized Debtors will assume all obligations owed to FB&T under its floor-plan financing arrangement with the Debtors·equal to (a) the amount of the Collateral securing that arrangement or (b) such other amount as agreed by the Reorganized Debtors and FB&T or (ii) at the Reorganized Debtors' option, (a) a promissory note equal to the allowed amount of FB&T's secured claim, payable over 5 years with interest at 3.0% per annum upon liquidation of Collateral, (b) surrender of Collateral, or (c) payment in full.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 3**

q) FB&T's unsecured claim will be paid as follows: In full and final satisfaction and release of all FB&T's unsecured claims against the Debtors, First Capital Bank will receive its Pro Rata Share of Creditors Trust Assets, which includes 10% equity securities of the Reorganized Debtors.

r) Pursuant to the Plan, the real estate owned by D&R Acquisitions, a non-debtor affiliate, will be transferred to the Reorganized Debtors or another entity or designee selected by the Plan Sponsor subject to the liens of IBC Bank and a Real Estate Note. All claims of IBC Bank against the Debtors and D&R Acquisitions will be fully and finally satisfied, released, and settled by the Real Estate Note.

s) Each Qualified Retail Lender who (i) executes a TT&L Agreement, (ii) provides the Reorganized Debtors with proof of payment of a TT&L/Trade Liability, and (iii) agrees to provide future retail lending to the Reorganized Debtors on terms mutually acceptable to the Reorganized Debtors and said Retail Lender, thereby becoming a Qualified Retail Lender, will be reimbursed for their payment of the Debtors' TT&L/Trade Liability within sixty (60) days after the Effective Date. Such reimbursement will be made from the Qualified Retail Lender Pool. This Qualified Retail Lender Pool will be up to $3.0 million.

t) Allowed Administrative Claims will be paid at or before the Effective Date, or upon such terms as the Reorganized Debtors and the holder of an Allowed Administrative Claim may otherwise agree.

u) Creditors holding Allowed Claims shall receive the following treatment under the Plan:

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
| 1. | **ALLOWED PRIORITY NON-TAX CLAIMS** | Shall receive (i) Cash in an amount equal to the Allowed amount of such Priority Non-Tax Claim on the Effective Date or (ii) other treatment consistent with the provisions of § 1129(a)(9) of the Bankruptcy Code; *provided, however*, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business. |
| | (Est. Amt. of Claims: $.100 million) | (Est. Recovery: 100%) |
| 2. | **SECURED CLAIM OF FORD CREDIT COMPANY, LLC** | Ford Credit's Class 2 Claim is disputed. It will receive no Distribution until it is Allowed by the Bankruptcy Court. If Ford Credit's Class 2 Claim is Allowed by the Bankruptcy Court, such Class 2 Claim will be paid as follows: Ford Credit |

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
| | | will receive (a) treatment agreed by the Reorganized Debtors and Ford Credit or (b), if no agreement is reached, at the Reorganized Debtors' sole and absolute discretion, (i) issuance of the Ford Credit Secured Note; (ii) delivery of the Collateral securing such Allowed Class 2 Claim, or (iii) payment of such Allowed Secured Claim in full in Cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code, from Exit Financing. Until Ford Credit's Class 2 Claim is Allowed, all payments on this Class 2 Claim will be paid when due to a separate bank account that is subject to the jurisdiction of and administration by the Bankruptcy Court.<br><br>The amount, validity, extent, value, and priority of the Allowed Secured Class 2 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 2 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 2 Claim shall be treated in Class 12. Ford Credit's Class 12 Claim is also disputed. |
| | (Est. Amt. of Claim: Disputed) | (Est. Recovery: 100%) |
| 3. | **SECURED CLAIM OF GM FINANCIAL** | The Class 3 Claim will be satisfied in full and final satisfaction, settlement, release, and discharge of such Class 3 Claim (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 3 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of the GM Financial Secured Note.<br><br>The amount, validity, extent, value, and priority of the Allowed Secured Class 3 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 3 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 3 Claim shall be treated in Class 13. |
| | (Est. Amt. of Claim: $12.6 million) | (Est. Recovery: 100%) |
| 4. | **SECURED CLAIM OF FIRST CAPITAL BANK** | The Class 4 Claim will be satisfied in full and final satisfaction, settlement, release, and discharge of such Class 4 Claim (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 4 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing |

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 5**

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
|  |  | such Allowed Secured Claim; or (iii) issuance of the First Capital Bank Secured Note. |
|  |  | The amount, validity, extent, value, and priority of the Allowed Secured Class 4 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 4 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 4 Claim shall be treated in Class 11. |
|  | (Est. Amt. of Claim: $6 million) | (Est. Recovery: 100%) |
| 5. | CLAIM OF FIRST BANK & TRUST | The Class 5 Claim will be satisfied in full and final satisfaction, settlement, release, and discharge of such Class 5 Claim (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 5 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of the FB&T Secured Note. |
|  |  | The amount, validity, extent, value, and priority of the Allowed Secured Class 5 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 5 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 5 Claim shall be treated in Class 11. |
|  | (Est. Amt. of Claim: $.000 million) | (Est. Recovery: 100%) |
| 6. | SECURED CLAIM OF AIM BANK | The Class 6 Claim will be satisfied in full and final satisfaction, settlement, release, and discharge of such Class 6 Claim (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 6 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of the AIM Secured Note. |
|  |  | The amount, validity, extent, value, and priority of the Allowed Secured Class 6 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 6 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 6 Claim shall be treated in Class 11. |
|  | (Est. Amt. of Claim: $1 million) | (Est. Recovery: 100%) |

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 6**

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
| 7. | SECURED CLAIM OF VISTA BANK | The Class 7 Claim will be satisfied in full and final satisfaction, settlement, release, and discharge of such Class 7 Claim (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 7 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of the Vista Secured Note. |
|  |  | The amount, validity, extent, value, and priority of the Allowed Secured Class 7 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 7 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 7 Claim shall be treated in Class 11. |
|  | (Est. Amt. of Claim: $2.5 million) | (Est. Recovery: 100%) |
| 8. | OTHER SECURED CLAIMS | Holders of Allowed Class 8 Claims, if any, shall be designated as Class 8A, Class 8B *et seq.* and shall be satisfied at the Reorganized Debtors' option by (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of a restructured note with a present value equal to the amount of the value of each Holder's Collateral with interest payable at a rate of 3% annually, and payable in full in ten (10) years. |
|  |  | The amount, validity, extent, value, and priority, of any asserted Class 8 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 8 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 8 Claim shall be treated in Class 11. |
|  | (Est. Amt. of Claims: Unknown) | (Est. Recovery: 100%) |
| 9. | CLAIMS OF QUALIFIED RETAIL LENDERS FOR PAYMENT OF TT&L/TRADE LIABILITY (Est. Amt. of Claims: $2.3 million)[2] | As full and final satisfaction, settlement, release, and discharge of such Class 9 Claim, each Qualified Retail Lender in Class 9 will receive its Pro Rata Share from the Qualified Retail Lender Pool for reimbursement for such Qualified Retail Lenders' payment of a TT&L/Trade Liability. (Est. Recovery: 100%) |

---

[2] This estimated amount is net of the value of the collateral securing any unpaid trade liability.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 7**

| CLASS | CLAIMANT | TREATMENT |
|-------|----------|-----------|
| | | |
| 10. | **ASSUMED TRADE CLAIMS** | As full and final satisfaction, settlement, release, and discharge of such Class 10 Claim, each member of the Plan Sponsor, the Debtors, and the Reorganized Debtors, each Holder of a Class 10 Claim will receive payment in full, over time, through the assumption of the indebtedness underlying the Allowed Class 10 Claim payable on terms to be agreed by each Holder of a Trade Claim and the Reorganized Debtors. |
| | (Est. Amt. of Claims: unknown) | (Est. Recovery: 100%) |
| 11. | **GENERAL UNSECURED CLAIMS** | As full and final satisfaction, settlement, release, and discharge of each Class 11 Claim, each member of the Plan Sponsor, the Debtors, and the Reorganized Debtors, each Holder of a Class 11 Claim shall be satisfied by Pro Rata Share of Distributions from Creditors Trust Assets. |
| | (Est. Amt. of Claims: unknown) | (Est. Recovery: unknown)[3] |
| 12. | **UNSECURED CLAIMS OF FORD CREDIT**[4] | Ford Credit's Class 12 Claim is disputed. It will receive no Distribution until it is Allowed by the Bankruptcy Court. If Ford Credit's Class 12 Claim is Allowed by the Bankruptcy Court, it will receive its Pro Rata Share of all Litigation Proceeds from Causes of Action.

The amount, validity, extent, value, and priority, of any asserted Class 12 Claim under § 502 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 12 Claim. |
| | (Est. Amt. of Claims: Disputed) | (Est. Recovery: Unknown) |

---

[3] Percentage Distribution to Holders of Allowed Class 11 Claims is dependent on a variety of risks and factors, including the success of the Reorganized Debtors' post-confirmation business operations, value of the Creditors Trust Assets, and the administration costs of the Creditor Trust.

[4] Classes 12 and 13 Claims are held by Ford Credit and GM Financial, respectively. Each is an affiliate of Original Equipment Manufacturers or "franchisors" that are parties to franchise or "dealer" agreements with one or more of the Debtors. The Class 12 and 13 Claims asserted by Ford Credit and GM Financial arise, in whole or in part from money loaned for the purchase of vehicles from the Original Equipment Manufacturers, and in Ford Credit's case from allegations of out-of-trust sales or double floor-planned inventory as stated in pleadings in this Chapter 11 Case and the Ford Litigation. For those reasons, the Claims in Classes 12 and 13 are qualitatively dissimilar to Assumed Trade Claims in Class 10 or General Unsecured Claims in Class 11.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 8**

| CLASS | CLAIMANT | TREATMENT |
|-------|----------|-----------|
| 13. | UNSECURED CLAIMS OF GM FINANCIAL[5]  (Est. Amt. of Claims: $2 million) | As full and final satisfaction, settlement, release, and discharge of such Class 13 Claims, each member of the Plan Sponsor, the Debtors, and the Reorganized Debtors, GM Financial will receive $ 2 million in Cash on the Effective Date.  (Est. Recovery: 100%) |
| 14. | UNSECURED CLAIMS OF BART REAGOR AND RICK DYKES  (Est. Amt. of Claims: Unknown) | There will be no Distributions to Claims in Class 14.  (Est. Recovery: 0%) |
| 15. | UNSECURED SUBORDINATED CLAIMS  (Est. Amt. of Claims: Unknown) | There will be no Distributions to Claims in Class 15.  (Est. Recovery: 0%) |
| 16. | INTERESTS IN THE DEBTORS  (Est. Amt. of Claims: Unknown) | All Interests will be cancelled and discharged on the Effective Date, and no holder of an Interest shall receive a Distribution on account of such Interest.  (Est. Recovery: 0%) |

# ARTICLE I
# INTRODUCTION

## 1.1. *Introduction.*

This Plan is proposed by and on behalf of the Debtors under Chapter 11 of the Bankruptcy Code. Reference is made to the Disclosure Statement accompanying the Plan for a discussion of the Debtors' history, results of operations, and for a summary and analysis of the Plan. All Holders of Claims against and Interests in the Debtors are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. Other than the Disclosure

---

[5] The Class 12 Claims are held by Ford Credit and GM Financial, each of which are affiliates of Original Equipment Manufacturers or "franchisors" that are parties to franchise or "dealer" agreements with one or more of the Debtors. The Unsecured Claims asserted by Ford Credit and GM Financial arise, in whole or in part from money loaned and/or allegations of out-of-trust sales or double floor-planned inventory, rendering them qualitatively dissimilar to Assumed Trade Claims in Class 10 or General Unsecured Claims in Class 11.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 9**

Statement and any exhibits and schedules referenced therein or herein, no materials have otherwise been approved by the Debtors for use in soliciting acceptances of this Plan.

### 1.2. *General Plan Structure; Funding Sources.*

The execution and consummation of this Plan will be facilitated through the New Equity Infusion from the Plan Sponsor, McDougal-Dykes-Ewing Group or its designee, a Lubbock-based investment group created and funded by Mark McDougal, Rick Dykes and Fin Ewing. This New Equity Infusion, in the form of up to $20 million contributed by the McDougal-Dykes-Ewing Group will be used either wholly or partially as working capital, to recapitalize and revitalize the Debtors' business operations. Distributions to be made pursuant to the Plan will be funded from the New Equity Infusion and/or Exit Financing, should Exit Financing be necessary to fund floor-plan purchases from manufacturers, dealers, auction houses, or trade-in customers.

# ARTICLE II
# DEFINITIONS AND INTERPRETATION

In addition to such other terms as may be defined in other provisions of the Plan, the following capitalized terms shall have the following meanings:

### 2.1. *Definitions.*

"**Administrative Claim**" means any cost or expense of administration in connection with this Case of a kind specified in §§ 503(b) or 507(a)(1), including, without limitation, (a) the actual, necessary costs and expenses of preserving the Estates and of operating the business of the Debtors, including wages, salaries, commissions, or any other compensation for services rendered after the commencement of the bankruptcy case; (b) compensation for legal or other services, and reimbursement of costs and expenses under §§ 330(a) or 331, 363, or otherwise allowed by the Court; and (c) all fees and charges assessed against the Estate under 28 U.S.C. § 1930. For the avoidance of doubt, Administrative Claims include (a) fees earned and expenses incurred by Professionals; and (b) expenses incurred, if any, by an Entity in making a substantial contribution in the Case pursuant to §§ 503(b)(3) or (4).

"**Affiliate**" means as set forth in § 101(2) of the Bankruptcy Code.

"**AIM Bank Secured Note**" means a secured promissory note with a present value equal to the amount of the value of AIM Bank's Collateral with principal and 3% per annum interest payable upon liquidation of that Collateral. The AIM Bank Secured Note will be a Plan Supplement Document.

"**Allowed**" means, with respect to Claims and Interests, (a) any Claim against or Interest in the Debtors, proof of which is timely Filed or by order of the Bankruptcy Court is not or will not be required to be Filed, (b) any Claim or Interest that has been or is hereafter listed in the Schedules as neither disputed, contingent nor unliquidated, and for which no timely Filed proof of Claim has been Filed, (c) any Interest registered in the Debtors' books and records as of the Petition Date or (d) any Claim allowed pursuant to the Plan and, in each such case in (a), (b) and (c) above, as to which either (i) no objection to the allowance thereof has been Filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (ii) such an objection

is so Filed and the Claim or Interest shall have been allowed pursuant to a Final Order (but only to the extent so allowed), or (iii) such an objection is so Filed and the Claim or Interest shall have been stipulated as allowed by the Reorganized Debtor, (but only to the extent so stipulated).

"**Assets**" means all assets of the Estates, including Causes of Action.

"**Assumed Trade Claims**" means Claims, in the sole and absolute discretion, of the Reorganized Debtors will be assumed by the Reorganized Debtors and paid pursuant to an agreement between each Holder of an Assumed Trade Claim and the Reorganized Debtors.

"**Ballot**" means the ballot form on which Holders of Impaired Claims entitled to vote on the Plan shall indicate their acceptance or rejection of the Plan.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as subsequently amended, principally codified at 11 U.S.C. § 101, *et seq.* Unless otherwise stated herein or the Disclosure Statement, all section (§) references contained in the Plan and Disclosure Statement are to the Bankruptcy Code.

"**Bankruptcy Court**" or "**Court**" means the United States Bankruptcy Court for the Northern District of Texas, Lubbock Division, or, if such court ceases to have jurisdiction over the Cases, such court or adjunct thereof having jurisdiction over the Case.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated by the United States Supreme Court pursuant to 28 U.S.C. § 2075 as subsequently amended, and, where appropriate, the Local Bankruptcy Rules of the Bankruptcy Court.

"**Bar Date**" means the deadline for timely Filing proofs of claim and proofs of interest by all parties other than governmental units. For RD Motors, RD Imports, RD Amarillo, RDAC, RD Plainview, RD Floydada, the Bar Date was December 5, 2018, for all parties other than governmental units and is/was January 28, 2019, for the Filing of proofs of claims by all governmental units. For RAM, Snyder and the GP Debtors, the Bar Date is/was March 28, 2019, for the Filing of proofs of claim and proofs of interest by all parties other than governmental units, and is/was May 1, 2019, for the Filing of proofs of claims by all governmental units. The Bar Date is the last date on which proofs of claim or proofs of interest may be timely Filed against the Debtors.

"**Business Day**" means any day except Saturday, Sunday, or any other day on which the law authorizes commercial banks in the State of Texas to be closed.

"**Cash**" means cash and cash equivalents that evidence immediately available funds.

"**Cash Collateral**" means any Cash of the Debtors, or interest in Cash of the Debtors, that serves as security for the repayment of a debt or the performance of an obligation owed by one or more of the Debtors to the holder of an Allowed Secured Claim.

"**Causes of Action**" means any action, cause of action, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, right to payment, and Claim, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or indirectly or derivatively, in law, equity or otherwise, including (a) Chapter 5

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 11**

Causes of Action; (b) those claims involved in those civil actions identified in each of the Debtors' Statements of Financial Affairs; (c) other damages (general, exemplary, or both) relating to or based on (i) fraud, negligence, gross negligence, willful misconduct, or any tort actions, (ii) violations of federal or state securities laws, (iii) violations of applicable corporate or partnership laws, (iv) breaches of fiduciary or agency duties, or (v) causes of action based upon alter ego or other liability theories; (vi) based on any other claim of the Debtors, to the extent not specifically compromised or released pursuant to the Plan or an agreement referred to, or incorporated into, the Plan or Final Order entered after notice and opportunity for hearing; (d) any claims of the Debtors for equitable subordination under § 510(c) or under other applicable laws; (e) any claim of the Debtors to recharacterize one or more Claims as Interests; and (f) any unresolved objection to any Disputed Claim.

"**Chapter 5 Causes of Action**" means any Cause of Action arising under §§ 510, 544 through 551 and 553 or otherwise under the Bankruptcy Code.

"**Chapter 7**" means chapter 7 of the Bankruptcy Code.

"**Chapter 11**" means chapter 11 of the Bankruptcy Code.

"**Chapter 11 Cases**" means, collectively, the voluntary Chapter 11 cases Filed by each of the Debtors, currently pending in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, each a Case, jointly administered under Case No. 18-50214.

"**Claim**" means a claim against any one of the Debtors, whether or not asserted, as defined in § 101(5), by whatever right the Creditor may have against such Debtor.

"**Claims Objection Deadline**" shall be 270 days after the Effective Date, unless extended by Order of the Court.

"**Class**" means any group of substantially similar Claims or Interests classified by the Plan pursuant to § 1122.

"**Collateral**" means any property of one or more of the Debtors or interest in property of one or more of the Debtors that serves as security for the repayment of a debt or the performance of an obligation owed by one or more of the Debtors to the holder of an Allowed Secured Claim.

"**Confirmation**" means the entry of an order by the Court confirming this Plan pursuant to § 1129 of the Bankruptcy Code.

"**Confirmation Date**" means the date of the entry of the Confirmation Order by the Bankruptcy Court.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court regarding Confirmation of the Plan, as such may be continued from time to time.

"**Confirmation Order**" means the order signed by the Court and caused to be entered that confirms this Plan pursuant to § 1129 of the Bankruptcy Code.

"**Contingent Claim**" means a Claim whose existence, or alleged liability of one or more of the Debtors thereon, is dependent on an event that has not occurred or may never occur.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 12**

"**Creditor**" means any Entity that is the holder of a Claim that arose on or before the Petition Date or a Claim of the kind specified in § 502(g), 502(h) or 502(i).

"**Creditors Trust**" means the trust to be created pursuant to Article VIII of the Plan.

"**Creditors Trust Agreement**" means the trust agreement governing the Creditors Trust, substantially in the form filed with the Bankruptcy Court as a Plan Supplement Document executed by the Debtors and the Trustee.

"**Creditors Trust Assets**" means (a) 10% of the New Equity of the Reorganized Debtors that will be issued to the Creditors Trust pursuant to this Plan for the express benefit of non-Ford Credit and non-GM Financial creditors holding Allowed Class 11 General Unsecured Claims against the Debtors, subject to New Equity Redemption Right, and (b) the Pro Rata Share of Litigation Proceeds. In no event shall the Creditors Trust Assets exceed the Allowed amount of Class 11 Claims.

"**Creditors Trust Beneficiaries**" means Holders of Allowed Class 11 Claims.

"**Creditors Trust Interest**" means the beneficial ownership interest in the Creditors Trust entitling the Holder of Allowed Class 11 Claims to share in Distribution of the Creditors Trust Assets.

"**Creditor Trustee or Trustee**" means the Person selected to serve as the initial trustee under the Creditors Trust. The Trustee and his/her terms of employment will be identified in the Plan Supplement.

"**D&R Acquisitions**" means D&R Acquisitions, LLC an Affiliate of the Debtors and the Debtors' landlord on real estate identified on Exhibit A.

"**Dealerships**" means one or more of the Debtor entities.

"**Debtors**" means Reagor-Dykes Motors, LP (Case NO. 18-50214), Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), Reagor-Dykes Floydada, LP (Case No. 18-50219), Reagor-Dykes Snyder, L.P. (Case No. 18-50321), Reagor-Dykes III LLC, (Case No. 18-50322), Reagor-Dykes II LLC (Case No. 18-50323), Reagor Auto Mall Ltd (Case No. 18-50324) and Reagor Auto Mall I LLC (Case No. 18-50325).

"**Deficiency Claim**" means any portion of a Claim (a) to the extent the value of the holder's interest in Assets securing such Claim is less than the amount of such Claim or (b) to the extent the amount of a Claim is subject to setoff is less than the amount of the Claim, each as determined by § 506(a) of the Bankruptcy Code.

"**Disallowed**" means, with respect to a Claim, any portion thereof, that (a) has been disallowed by either a Final Order or pursuant to a settlement, or (b)(i) is set forth in the Schedules at zero or as contingent, disputed, or unliquidated and (ii) as to which a Bar Date has been established but no proof of claim has been Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.

"**Disclosure Statement**" means that certain *Disclosure Statement in Support of Chapter 11 Plan of Reorganization for Reagor-Dykes* accompanying this Plan, as approved by the Bankruptcy Court for distribution pursuant to § 1125 [Docket No. __], together with any amendments or modifications thereto.

"**Disputed Claim**" means the portion (including, when appropriate, the whole) of a Claim that is not an Allowed Claim as to which: (a) a proof of Claim has been Filed, or deemed Filed under applicable law or order of the Bankruptcy Court; (b) an objection has been or may be timely Filed; and (c) such objection has not been: (i) withdrawn, (ii) overruled or denied in whole or in part pursuant to a Final Order, or (iii) granted in whole or part pursuant to a Final Order. Before the time that an objection has been or may be Filed, a Claim shall be considered a Disputed Claim (a) if the amount or classification of the Claim specified in the proof of Claim exceeds the amount or classification of any corresponding Claim scheduled by a Debtor in its Schedules, to the extent of such excess; (b) in its entirety, if any corresponding Claim scheduled by a Debtor has been scheduled as disputed, contingent or unliquidated in its Schedules; or (c) in its entirety, if no corresponding Claim has been scheduled by a Debtor in its Schedules.

"**Disputed Claim Reserve Account**" means the reserve account created pursuant to this Plan for the benefit of Class 11 Disputed Claims that become Allowed Claims.

"**Disputed Administrative Claim Reserve Account**" means the reserve account created pursuant to this Plan for the benefit of the Disputed Administrative, Priority Claims or Other Secured Claims that become Allowed Claims.

"**Distribution(s)**" means the payment of money or issuance of interest in accordance with this Plan.

"**Effective Date**" means the first Business Day on which all conditions to the occurrence of the Effective Date, as set forth in this Plan, have been satisfied or duly waived.

"**Entity(ies)**" means any individual, corporation, partnership, joint venture, association, joint stock company, unincorporated organization, estate, trust, governmental unit, or other entity including one of the Debtors and the United States Trustee, whether singular or plural.

"**Estates**" means the bankruptcy estates created in these Cases pursuant to § 541 of the Bankruptcy Code.

"**Estimated Claim**" means any Disputed Claim which is estimated in accordance with §502(c) of the Code. For purposes of distribution, the estimated amount of such Disputed Claim shall be deemed the Allowed Amount of such Claim. For the full satisfaction of its Estimated Claim, a Claimant shall have, as its sole and exclusive remedy, the rights to payment provided under this Plan and shall have no other rights or remedies and may not, following the Effective Date, assert any other right against the Debtors, Claimant's Estimated Claim being deemed Allowed and fully satisfied by the Debtors' payment obligations described in this Plan, and any amount in excess thereof being fully released, voided and discharged by the confirmation of this Plan.

"**Executory Contract**" means any prepetition executory contract or unexpired lease governed by § 365 of the Code.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 14**

"**Exit Financing**" means replacement floor-plan financing for one or more of the Dealerships or Locations provided pursuant to the Exit Financing Documents, if necessary.

"**Exit Financing Documents**" means any credit agreement between the Debtors and an Exit Lender providing replacement floor-plan financing for one or more of the Dealerships or Locations, and all documents related to that credit agreement.

"**Exit Lender**" means an entity or financial institution, other than Ford Credit or GM Financial, that provides the Reorganized Debtors with replacement floor-plan financing post-confirmation.

"**Face Amount**" means (a) with respect to a particular Claim, (i) if the Claim is listed in the Schedules and the holder of such Claim has not Filed a proof of Claim within the applicable period of limitation fixed by the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules or other applicable law, the amount of such Claim that is listed in the Schedules as not disputed, contingent or unliquidated; or (ii) if the holder of such Claim has Filed a proof of Claim with the Bankruptcy Court within the applicable period of limitation fixed by the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules or other applicable law, the liquidated amount stated in such proof of Claim, or such amount as is determined by the Final Order of the Bankruptcy Court; (b) in the case of an Administrative Claim, the liquidated amount set forth in any application Filed with respect thereto, or the amount set forth in the Debtors' books and records or such amount as is determined pursuant to a Final Order; or (c) in all other cases, zero or such amount as shall be fixed or estimated pursuant to a Final Order.

"**FB&T**" means First Bank & Trust.

"**FB&T Secured Note**" means a secured promissory note with a present value equal to the amount of the value of FB&T's Collateral with principal and 3% per annum interest payable upon liquidation of that Collateral. The FB&T Secured Note will be a Plan Supplement Document.

"**Fee Claim**" means a Claim by a Professional or any other party-in-interest pursuant to §§ 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code or otherwise relating to services performed after the Petition Date and prior to and including the Effective Date.

"**File**" or "**Filed**" or "**Filing**" means File or Filed or filing with the Bankruptcy Court in this Case.

"**Final Decree**" means an Order of the Bankruptcy Court closing the Case.

"**Final Distribution**" means the last and final Distribution made by the Trustee to Holders of Allowed Class 11 Claims such that the Trustee may proceed to dissolve and terminate the Creditors Trust.

"**Final Order**" means an Order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari,* new trial, reargument or rehearing thereof has been sought, such order or judgment of the

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 15**

Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order, shall not cause such order not to be a Final Order.

"**First Capital Bank**" means FirstCapital Bank of Texas, N.A., the prepetition floor-plan lender to RAM.

"**First Capital Bank Secured Note**" means a secured promissory note with a present value equal to the amount of the value of First Capital Bank's Collateral with principal and 3% per annum interest payable upon liquidation of that Collateral. The First Capital Bank Secured Note will be a Plan Supplement Document.

"**Ford Credit**" means Ford Motor Credit Company, LLC, the prepetition floor-plan lender to RDAC, RD Floydada, RD Amarillo, RD Imports, RD Motors and RD Plainview.

"**Ford Credit Secured Note**" means the secured promissory note with a present value equal to the amount of the value of Ford Credit's Collateral with principal and 3% per annum interest payable upon liquidation of that Collateral. The Ford Credit Secured Note will be a Plan Supplement Document. For the avoidance of doubt, the Ford Credit Secured Note is subject to all defenses, other offsets, and counterclaims.

"**Ford Litigation**" means the lawsuit styled Ford Motor Credit Company LLC v. Reagor-Dykes Amarillo, L.P. *et al.*, Civil Action No. 5:18-cv-00186, in the United States District Court for the Northern District of Texas (Lubbock Division).

"**Ford Motor**" means Ford Motor Company.

"**GM Financial**" means AmeriCredit Financial Services, Inc., d/b/a GM Financial, the prepetition floor-plan lender to Snyder.

"**GM Financial Secured Note**" means secured promissory note with a present value equal to the amount of the value of GM Financial's Collateral with principal and 3% per annum interest payable upon liquidation of that Collateral. The GM Financial Secured Note will be a Plan Supplement Document.

"**General Unsecured Claim**" means every Claim against each of the Debtors that is not an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, an Assumed Trade Claim, an Unsecured Claim of Ford Motor Credit, an Unsecured Claim of GM Financial, an Unsecured Claim of Bart Reagor, an Unsecured Claim of Rick Dykes, a Subordinated Claim, or an Interest in the Debtors.

"**Holder**" means an Entity holding a Claim or Interest.

"**IBC Bank**" means International Bank of Commerce.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 16**

"**Impaired**" means as set forth in § 1124 of the Bankruptcy Code.

"**Interest**" means equity in a Debtor, whether or not asserted, by an equity security holder as defined in § 101(17).

"**Insider**" means any Entity that is either an "affiliate" or an "insider" as those terms are defined in § 101(2) and (31) of the Bankruptcy Code.

"**Lien**" means any security interest, charge against, encumbrance on or other interest in property, the purpose of which is to secure payment of a debt or performance of an obligation.

"**Litigation Proceeds**" means the net proceeds received from Causes of Action, after payment of (a) all fees incurred and expenses reimbursed related to the prosecution, litigation, or liquidation of such Causes of Action and (b) all other Administrative Expenses. In no event will the Creditors Trust receive Litigation Proceeds in excess of the Allowed Amount of General Unsecured Claims.

"**Locations**" means one or more of the following brick and mortar automobile dealerships operated by the Debtors, as the context requires: Reagor-Dykes Plainview Ford, Reagor-Dykes Chevrolet Floydada, Reagor-Dykes Amarillo Mitsubishi, Reagor-Dykes Mitsubishi Lubbock, Spike Dykes Ford Lamesa, Reagor-Dykes Auto Mall, Reagor-Dykes Auto Mall Downtown, Reagor-Dykes Auto Mall Dallas (permanently closed), Reagor-Dykes Auto Mall Imports, Reagor-Dykes Auto Mall of Midland, Reagor-Dykes Chevrolet Buick GMC, Reagor-Dykes Toyota Plainview, Reagor-Dykes Auto Mall West Lubbock, and Reagor-Dykes Auto Mall Leveland.

"**McDougal-Dykes-Ewing Group**" means the Lubbock-based investment group created and funded by Mark McDougal, Rick Dykes and Fin Ewing. McDougal-Dykes-Ewing Group or its designee is the Plan Sponsor and will receive 90% of the New Equity.

"**New Equity**" means all shares of partnership interests, stock, or membership interests, as the case may be, in the Reorganized Debtors.

"**New Equity Infusion**" means the $20 million in cash that the Plan Sponsor will invest in the Reorganized Debtors on the Effective Date of this Plan to be used for working capital and as set forth pursuant to the terms and conditions of this Plan.

"**New Equity Infusion Documents**" means all documents executed by and between the Debtors and the Plan Sponsor governing the $20 million New Equity Infusion by the Plan Sponsor pursuant to the terms and conditions of this Plan.

"**New Equity Redemption Right**" means the redemption right under which the Plan Sponsor may choose, at its sole discretion, to redeem the 10% of the New Equity owned by the Trust in exchange for payment to the Trust of the total amount of Allowed Class 11 Claims entitled to Distributions from the Trust pursuant to this Plan or each Beneficial Interest in the Creditors Trust on the payment of the value of that Beneficial Interest or an amount agreed by the Holder of the Beneficial Interest.

"**Order**" means any mandate, precept, command, or direction given by a court.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 17**

"**Other Secured Claim**" means any Secured Claim other than the asserted alleged Secured Claims of Ford Credit, GM Financial, First Capital, FB&T, AIM Bank, and Vista Bank.

"**Owned Real Estate**" means the real estate owned by affiliated entities listed on Exhibit "A" that will be transferred as part of this Plan to the Reorganized Debtors.

"**Person**" means a person as defined in § 101(41) of the Bankruptcy Code.

"**Petition Date**" means, for RD Motors, RD Imports, RD Amarillo, RDAC, RD Plainview, RD Floydada, August 1, 2018, and, for RAM, Snyder and the GP Debtors, November 2, 2018, each the date on which the referenced Cases were commenced.

"**Plan**" means this *Chapter 11 Plan of Reorganization for Reagor-Dykes*, dated January 7, 2019, including any amendments or modifications hereto.

"**Plan Documents**" means the agreements, documents and instruments entered into on or as of the Effective Date as contemplated by, and in furtherance of, the Plan (including all documents necessary to consummate the transactions contemplated in the Plan), copies of which shall be available to Creditors upon request to Debtors' counsel.

"**Plan Sponsor**" means McDougal-Dykes-Ewing Group or its designee.

"**Plan Supplement Document(s)**" means the documents, including the Schedule of Assumed Contracts and Non-Real Property Leases, the Creditors Trust Agreement, the New Equity Infusion Documents, the Exit Financing Documents (if any), and the identity of the individuals who will serve on the Reorganized Debtors' initial board(s) of directors, all of which shall be included in a notice Filed with the Bankruptcy Court at least fifteen (15) days prior to the Confirmation Hearing. The Plan Supplement Documents may be reviewed via the Bankruptcy Court's ECF docket for this Case, via www.jndla.com/cases/rdmotors, or requested in writing from the Debtors' counsel.

"**Post-Confirmation Business Plan**" means the five-year (5) projections of the income and expenses of the Reorganized Debtors (inclusive of a variance of up to 15% in the aggregate), including payroll, professional fees, operational expenses, and payments due to Allowed Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims, a copy of which shall be included in a notice Filed with the Bankruptcy Court at least fifteen (15) days prior to the Confirmation Hearing.

"**Priority Non-Tax Claim**" means a Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in payment under § 507(a).

"**Priority Tax Claim**" means a Claim entitled to priority in payment pursuant to §§ 502(i) and 507(a)(8).

"**Professional**" means each Entity that is either (a) employed pursuant to an order of the Court in accordance with §§ 327 or 1103 providing for compensation for services rendered prior to the Effective Date pursuant to §§ 327, 328, 329, 330 331, and 363, (b) seeking compensation and reimbursement pursuant to §§ 503(b)(2) or (4), or (c) awarded compensation and reimbursement by the Bankruptcy Code pursuant to § 503(b)(4) of the Bankruptcy Code inclusive of such Entities' predecessors, professionals, successors, assigns, affiliates, current officers and directors, principals, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board

members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

"**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

"**Pro Rata Share**" means, at any time, the proportion that the Face Amount of the Allowed Claim in a particular Class bears to the aggregate Face Amount of all Allowed Claims in such Class.

"**Qualified Retail Lender**" means a Retail Lender who casts a ballot accepting this Plan and i) executes a TT&L Agreement, (ii) provides the Reorganized Debtors with proof of payment of a TT&L/Trade Liability, and (iii) agrees to provide future retail lending on terms mutually acceptable to the Reorganized Debtors and said Retail Lender.

"**Qualified Retail Lender Pool**" means the up to $3.0 million available to reimburse all Qualified Retail Lenders.

"**Real Estate Note**" means that $40 million promissory note executed by the Reorganized Debtors and IBC that is secured by the Owned Real Estate.

"**Rejection Damages Claim**" means any Claim arising from the rejection of any executory contract or unexpired lease, including any Claim of (a) a lessor for damages resulting from the rejection of a lease of real property as any such Claim shall be calculated in accordance with § 502(b)(6) or (b) an employee for damages resulting from the rejection of an employment agreement as any such Claim shall be calculated in accordance with § 502(b)(7). A Rejection Damages Claim shall constitute a General Unsecured Claim treated in Class 11.

"**Rejection Damages Bar Date**" means the later of thirty (30) days after such Rejection Damages Claim is Allowed by Final Order or thirty (30) days after the Effective Date.

"**Released Parties**" means the Debtors, current officers of the Debtors, Holders of Interests, Professionals of the Estates, and the Plan Sponsor.

"**Releasing Parties**" means (a) Holders of Claims who vote to accept the Plan but do not opt out of the releases on the Ballot, (b) Holders of Claims that are Unimpaired under this Plan; (c) Holders of Claims whose vote to accept or reject this Plan is solicited but who do not vote to either accept or reject this Plan; and (d) Holders of Claims who vote to reject the Plan but do not opt out of the releases on the Ballot.

"**Reorganized Debtors**" means the Debtors, as reorganized as of the Effective Date.

"**Restructuring**" means the Debtors' financial and operational restructuring, the principal terms of which are in the Plan and the Plan Supplement Documents and Plan Documents.

"**Retail Lenders**" means a retail financing lender that provided prepetition financing to a consumer customer of Reagor-Dykes in the ordinary course of business, inclusive of funds loaned to pay tax, title and license fees on a consumer's newly purchased vehicle and/or funds loaned to payoff liens on a consumer's trade-in vehicle.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 19**

"**Schedules**" means the *Schedules of Assets and Liabilities* Filed by the Debtors under § 521 and Bankruptcy Rule 1007 on October 19, 2018 [Docket Nos. 421, 423, 425, 427, 429 and 431 for RD Motors, RD Plainview, RD Amarillo, RDAC, RD Floydada, RD Imports], on December 17, 2018 [Docket Nos. 720-722 for the GP Debtors], on December 19, 2018 [Docket No. 731 for Snyder] and on December 27, 2018 [Docket No. 750 for RAM], each as amended from time to time.

"**Schedule of Assumed Executory Contracts and Unexpired Leases**" means the list of each Executory Contract not already identified in this Plan for assumption that the Debtors intend to assume on the Effective Date or as soon as reasonably practicable thereafter. For the avoidance of doubt, this Schedule of Assumed Contracts and Unexpired Leases includes all real property leases to be assumed and non-real-property leases and executory contracts to be assumed, and will be Filed as part of the Plan Supplement Documents.

"**Secured Claim**" means a Claim that arose before the Petition Date, to the extent secured by a lien or other security interest on property of the Debtors, which lien is valid, perfected, and enforceable under applicable law and which is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law and which is duly established in the Case.

"**Security Interest**" means as defined in § 101(51) of the Bankruptcy Code.

"**TT&L/Trade Liability**" means the dollar amount of funds actually advanced by a retail financing lender *post-petition* to pay the outstanding (a) tax, title and license fees on a vehicle purchased *prepetition* and/or (b) amount of a *prepetition* lien (exclusive of legal fees) against a trade-in vehicle of a Reagor-Dykes consumer customer.

"**Unclaimed Property**" means any Cash or other property unclaimed made in respect of the relevant Allowed Claim or Allowed Interest. Unclaimed Property shall include: (a) checks (and the funds represented thereby) mailed to an address of a holder of an Allowed Claim or Interest and returned as undeliverable without a proper forwarding address; (b) funds for uncashed checks; and (c) checks (and the funds represented thereby) not mailed or delivered because no address to mail or deliver such property was available.

"**Unexpired Lease**" means a lease to which one of the Debtors is a party that is subject to assumption or rejection under § 365 of the Bankruptcy Code.

"**Unimpaired**" means not Impaired.

"**Unsecured Claim**" means a Claim that is not secured by Collateral.

"**U.S. Trustee**" means the United States Trustee for the Northern District of Texas.

"**Vista Bank Secured Note**" means a secured promissory note with a present value equal to the amount of the value of Vista Bank's Collateral with principal and 3% per annum interest payable upon liquidation of that Collateral. The Vista Bank Secured Note will be a Plan Supplement Document.

"**Voting Deadline**" means_____, 2019, at 4:00 p.m. (prevailing Central Time), which is the deadline established by the Court for the submission of Ballots to counsel for the Debtors in accordance with the Voting Procedures.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 20**

"**Voting Procedures**" means the procedures for submitting a Ballot in which a holder of a Claim votes for or against the Plan as described in the Disclosure Statement.

## 2.2. *Interpretation, Rules of Construction, and Other Terms.*

(a)     Any term used in this Plan that is not defined herein, whether in Article I or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules and shall be construed in accordance with the rules of construction thereunder.

(b)     If a conflict between the Plan and the Disclosure Settlement exists, the Plan will govern over the Disclosure Statement.  If a conflict between the Plan and any document implementing the Plan exists, the document shall govern. If a conflict between the Plan and the Confirmation Order exists, the Confirmation Order shall govern.

(c)     The words "herein," "hereof," "hereto," "hereunder," and others of similar import, refer to the Plan as a whole and not to any particular article, section, or clause contained in this Plan.

(d)     Unless specified otherwise in a particular reference, a reference in this Plan to an article or section is a reference to that article or section of this Plan.

(e)     Unless otherwise provided for herein, any reference in this Plan to an existing document or instrument means such document or instrument as it may have been amended, modified, or supplemented from time to time.

(f)     As contextually appropriate, each term stated in either the singular or plural shall include both the singular and the plural.

(g)     In addition to the above, the rules of construction set forth in § 102 of the Bankruptcy Code shall apply to this Plan.

(h)     Use of the word "include" or any form thereof means "including without limitation" without repeating the same each time used.  Further, each definition above includes the plural as the context requires.

(i)     All exhibits to this Plan are incorporated into this Plan, and shall be deemed to be included in this Plan, regardless of when Filed with the Court.

## 2.3. *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## 2.4. *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 21**

entered into in connection with the Plan (except as otherwise set forth in those agreements; in which case, the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, not incorporated in Texas shall be governed by the laws of the state or province of incorporation of the Debtors.

**2.5.**    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly stated.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to § 1122 of the Bankruptcy Code, and for the purposes of voting and all confirmation matters, except as otherwise provided herein, all Claims against and all Interests in the Debtors shall be classified as set forth in this Article III.

**3.1.**    *Administrative Claims and Priority Tax Claims.*

As provided in § 1123(a) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified; thus, they are excluded from the Classes of Claims and Interests set forth in the Plan.

**3.2.**    *Classes of Claims and Interests.*

A Claim or Interest is in a particular Class only to the extent the Claim or Interest is an Allowed Claim or Allowed Interest as defined herein. For purposes of organization, voting, and all confirmation matters, except as otherwise provided herein, all Claims (except for Administrative Claims and Priority Tax Claims) and Interests shall be classified as follows:

| Class | Type of Allowed Claim or Interest | Treatment | Status |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Cash Distribution | Unimpaired; Deemed to Accept. |
| 2 | Secured Claim of Ford Credit | Cash Distributions, Return of Collateral and/or Restructured Note | Disputed; Impaired; Entitled to Vote |
| 3 | Secured Claim of GM Financial | Cash Distributions, Return of Collateral and/or Restructured Note | Impaired; Entitled to Vote |
| 4 | Secured Claim of First Capital Bank | Cash Distributions, Return of Collateral and/or Restructured Note | Impaired; Entitled To Vote |
| 5 | Secured Claim of FB&T | Cash Distributions, Return of Collateral and/or Restructured Note | Impaired; Entitled to Vote |
| 6 | Secured Claim of AIM Bank | Cash Distributions, Return of Collateral and/or Restructured Note | Impaired, Entitled to Vote |
| 7 | Secured Claim of Vista Bank | Cash Distributions, Return of Collateral and/or Restructured Note | Impaired, Entitled to Vote |
| 8 | Other Secured Claim | Cash Distributions, Return of Collateral and/or Restructured Note | Impaired, Entitled to Vote |
| 9 | Claims of Qualified Retail Lenders For Payment of TT&L/Trade Liability | Cash from Qualified Retail Lender Pool | Impaired; Entitled to Vote |
| 10 | Assumed Trade Claims | As Agreed by Reorganized Debtors and Holders of Class 10 Claims | Impaired; Entitled to Vote |
| 11 | General Unsecured Claims | Distributions from Creditors Trust | Impaired; Entitled to Vote |
| 12 | Unsecured Claims of Ford Credit | Ford Motor Credit Unsecured Note | Disputed; Impaired, Entitled to Vote |
| 13 | Unsecured Claims of GM Financial | GM Financial Unsecured Note | Impaired, Deemed to Reject |
| 14 | Unsecured Claims of Bart Reagor and Rick Dykes | No Distributions to Such Claims | Impaired; Deemed to Reject |
| 15 | Unsecured Subordinated Claims | No Distributions to Such Claims | Impaired; Deemed to Reject |
| 16 | Interests in the Debtors | Interests shall not be retained | Impaired; Deemed to Reject. |

## ARTICLE IV
## TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS

### 4.1. *Administrative Claims.*

(a)     **Time for Filing Administrative Claims.**

For any Administrative Claim, other than (i) a Professional Fee Claim, (ii) a liability incurred and payable in the ordinary course of business by the Debtors, or (iii) an Administrative Claim that has been Allowed on or before the Effective Date, an application or request for payment must be Filed with the Bankruptcy Court and served on the Reorganized Debtors, the Trustee, the Office of the United States Trustee, within thirty (30) days after the Effective Date, unless an earlier date is established by the Bankruptcy Court.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 23**

Such notice must include at a minimum (i) the name of the holder of the Claim, (ii) the amount of the Claim, and (iii) the basis of the Claim. Failure to timely and properly File and serve the application required under this subsection shall result in the Administrative Claim being forever barred and discharged. Any party in interest may File an objection to an Administrative Claim Filed pursuant to this subsection in accordance with the timeframes and procedures set forth in the Bankruptcy Rules.

(b)     **Time for Filing Fee Claims.**

Each Professional who holds or asserts an Administrative Claim that is a Fee Claim for compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date shall be required to File with the Bankruptcy Court and serve on all parties required to receive such notice a fee application within sixty (60) days after the Effective Date. Failure to timely and properly File and serve a fee application as required under this Section shall result in the Fee Claim being forever barred and discharged. No Fee Claim will be deemed Allowed until an order allowing the Fee Claim becomes a Final Order. Any party in interest may File an objection to a Fee Claim, but any objection must be Filed in accordance with the timeframes and procedures set forth in the Bankruptcy Rules.

(c)     **Payment of Allowed Administrative Claims.**

Except to the extent that any Person entitled to payment of an Administrative Claim agrees otherwise, each Holder of an Allowed Administrative Claim (other than Fee Claims) shall, in full and final satisfaction of any Administrative Claim, receive Cash from the Reorganized Debtors in an amount equal to such Allowed Administrative Claim on or as soon as reasonably practicable following the later to occur of: (a) the Effective Date and (b) the date on which such Administrative Claim becomes an Allowed Administrative Claim; provided, however, Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtors may be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, provided that either (x) such Allowed Administrative Claims were included in the cash-collateral budgets previously approved by the Bankruptcy Court, or (y) the Bankruptcy Court approves such payments in writing.

Each Professional that intends to File a Fee Claim must provide the Debtors a reasonable estimate of the amount of such Fee Claim at least fifteen (15) days prior to the Confirmation Hearing. On the Effective Date, the Debtors shall transfer Cash in an amount sufficient to pay the Fee Claims reasonably estimated by such Professionals to a trust account maintained by the Debtors' counsel. The Debtors' counsel shall hold such Cash in trust for the exclusive purpose of paying Allowed Fee Claims, and any excess funds remaining after all Fee Claims have been resolved by a Final Order of the Bankruptcy Court shall be transferred to and retained by the Reorganized Debtors. Each Allowed Fee Claim, after deducting any retainer, shall be paid from such trust account maintained by the Debtors' counsel within five (5) Business Days after such Claim is Allowed by a Final Order.

Notwithstanding any other provision of the Plan, all fees, expenses and other compensation arising after the Effective Date and due and payable to Professionals retained by the Reorganized Debtors shall be paid by the Reorganized Debtors first from funds remaining from those reserved for fees and then from operations of the Reorganized Debtors.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 24**

All trade payables and current liabilities of the Debtors, excluding payments to utility service providers, that (a) arise in the ordinary course of business after the Effective Date, including payroll and salaries which have accrued prior to the Effective Date, and (b) otherwise qualify as Administrative Claims, shall be paid by the Reorganized Debtors in the ordinary course of business.

### 4.2. *Post-Confirmation Date Fees and Expenses.*

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without further notice or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to the implementation and consummation of the Plan incurred by the Reorganized Debtors through and including the Effective Date. Upon the Confirmation Date, any requirement that Professionals comply with §§ 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without further notice to any party or action, order, or approval of the Bankruptcy Court.

### 4.3. *Priority Tax Claims.*

At the election of the Debtors, each holder of an Allowed Priority Tax Claim will receive from the Reorganized Debtors in full satisfaction of such Allowed Priority Tax Claim (i) payments in Cash, in regular installments over a period ending not later than five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) a lesser amount in one Cash payment as may be agreed in writing by such holder; or (iii) such other treatment as may be agreed in writing by such holder; *provided*, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Priority Tax Claim or that is less favorable than the treatment provided to the most favored nonpriority Unsecured Claims under the Plan. The Confirmation Order shall enjoin any holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Reorganized Debtors that otherwise would be liable to such holder for payment of an Allowed Priority Tax Claim so long as the Debtors are in compliance with this Section. So long as the holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer, or director under this Section or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled. To the extent interest is required to be paid on any Allowed Priority Tax Claim, the rate of such interest shall be the rate provided in § 511 of the Bankruptcy Code. Notwithstanding the foregoing, any penalty arising with respect to or in connection with an Allowed Priority Tax Claim shall be treated as a Class 11 General Unsecured Claim.

### 4.4. *Payment of Statutory Fees.*

All fees due and payable on or before the Effective Date (i) pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, and (ii) to the United States Trustee, shall be paid by the Debtors on or before the Effective Date. All such fees payable after the Effective Date shall be paid by the Reorganized Debtors until entry of the final decree in the Bankruptcy Case.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 25**

# ARTICLE V
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**5.1.** *Class 1 – Allowed Priority Non-Tax Claims.*

    (a) **Classification.** Class 1 consists of Priority Non-Tax Claims.

    (b) **Treatment.** Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less-favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid (a) in full in Cash by the Reorganized Debtors on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim, or (iii) such other date as may be agreed by the parties or ordered by the Bankruptcy Court; Date or (b) shall receive treatment consistent with the provisions of § 1129(a)(9) of the Bankruptcy Code; *provided, however,* that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business.

    (c) **Impairment and Voting.** Class 1 is Unimpaired. In accordance with § 1126(f) of the Bankruptcy Code, each Holder of a Class 1 Claim is presumed to accept this Plan; therefore, no such Holder is entitled to vote to accept or reject this Plan.

**5.2.** *Class 2 – Secured Claim of Ford Credit.*

    (a) **Claim and Lien Determination.** Ford Credit's Class 2 Claim is disputed. The amount, validity, extent, value, and priority of the Allowed Secured Class 2 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 2 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 2 Claim shall be treated in Class 12. Ford Credit's Class 12 Claim is also disputed.

    (b) **Treatment.** Ford Credit's Class 2 Claim will receive no Distribution until it is Allowed by the Bankruptcy Court. If Ford Credit's Class 2 Claim is Allowed by the Bankruptcy Court, such Class 2 Claim will be paid as follows: Except to the extent that a Holder of an Allowed Class 2 Claim agrees to less-favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Class 2 Claim, each Class 2 Claim shall be satisfied (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 2 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, by (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code, from Exit Financing; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of the Ford Credit Secured Note. Until Ford Credit's Class 2 Claim is Allowed, all payments on this Class 2 Claim will be paid when due to a separate bank account that is subject to the jurisdiction of and administration by the Bankruptcy Court.

    (c) **Impairment and Voting.** Class 2 is Impaired under the Plan. Class 2 includes only the Secured Claim of Ford Credit. The Holder of a Class 2 Claim is entitled to vote to accept or reject the Plan.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 26**

### 5.3. Class 3 — Secured Claim of GM Financial.

(a) **Claim and Lien Determination.** The amount, validity, extent, value, and priority of the Allowed Secured Class 3 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 3 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 3 Claim shall be treated in Class 13.

(b) **Treatment.** Except to the extent that a Holder of an Allowed Class 3 Claim agrees to less-favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Class 3 Claim, each Class 3 Claim shall be satisfied (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 3 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, by (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of the GM Financial Secured Note.

(c) **Impairment and Voting.** Class 3 is Impaired under the Plan. Class 3 includes only the Secured Claim of GM Financial. The Holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

### 5.4. Class 4 — Secured Claim of First Capital Bank.

(a) **Claim and Lien Determination.** The amount, validity, extent, value, and priority of the Allowed Secured Class 4 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 4 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 4 Claim shall be included as a Class 11 General Unsecured Claim.

(b) **Treatment.** Except to the extent that a Holder of an Allowed Class 4 Claim agrees to less-favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Class 4 Claim, each Class 4 Claim shall be satisfied (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 4 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, by (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of the First Capital Bank Secured Note.

(c) **Impairment and Voting.** Class 4 is Impaired under the Plan. Class 4 includes only the Secured Claim of First Capital Bank. Each Holder of a Class 4 Claim is entitled to vote to accept or reject the Plan.

### 5.5. Class 5 — Secured Claim of First Bank & Trust.

(a) **Claim and Lien Determination.** The amount, validity, extent, value, and priority, of the Allowed Secured Class 5 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 27**

Reorganized Debtors and the Holder of the Class 5 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 5 Claim shall be included as a Class 11 General Unsecured Claim.

(b)     **Treatment.** Except to the extent that a Holder of an Allowed Class 5 Claim agrees to less-favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Class 5 Claim, each Class 5 Claim shall be satisfied (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 5 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, by (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of the FB&T Secured Note.

(c)     **Impairment and Voting.** Class 5 is Impaired under the Plan. Class 5 includes only the Secured Claim of FB&T. Each Holder of a Class 5 Claim is entitled to vote to accept or reject the Plan.

### 5.6.    *Class 6 — Secured Claim of AIM Bank.*

(a)     **Claim and Lien Determination.** The amount, validity, extent, value, and priority of the Allowed Secured Class 6 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 6 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 6 Claim shall be included as a Class 11 General Unsecured Claim.

(b)     **Treatment.** Except to the extent that a Holder of an Allowed Class 6 Claim agrees to less-favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Class 6 Claim, each Class 6 Claim shall be satisfied (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 6 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, by (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of the AIM Secured Note.

(c)     **Impairment and Voting.** Class 6 is Impaired under the Plan. Class 6 includes only the Secured Claim of AIM Bank. Each Holder of a Class 6 Claim is entitled to vote to accept or reject the Plan.

### 5.7.    *Class 7 — Secured Claim of Vista Bank.*

(a)     **Claim and Lien Determination.** The amount, validity, extent, value, and priority of the Allowed Secured Class 7 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 7 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 7 Claim shall be included as a Class 11 General Unsecured Claim.

(b)     **Treatment.** Except to the extent that a Holder of an Allowed Class 7 Claim agrees to less-favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Class 7 Claim, each Class 7 Claim shall be satisfied (a) pursuant to an

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 28**

agreement between the Reorganized Debtors and the Holder of Class 7 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, by (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of the Vista Secured Note.

(c)     **Impairment and Voting.**  Class 7 is Impaired under the Plan.  Class 7 includes only the Secured Claim of Vista Bank.  Each Holder of a Class 7 Claim is entitled to vote to accept or reject the Plan.

### 5.8.    *Class 8 — Other Secured Claims.*

(a)     **Claim and Lien Determination.**  The amount, validity, extent, value, and priority of the Allowed Other Secured Class 8 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of a Class 8 Claim.  Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 8 Claim shall be included as a Class 11 General Unsecured Claim.

(b)     **Treatment**. Holders of Allowed Class 8 Claims, if any, shall be designated as Class 8A, Class 8B *et seq.* and shall be satisfied at the Reorganized Debtors' option by (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of a restructured note with a present value equal to the amount of the value of their Collateral with interest payable from Net Profits at a rate of 5% annually, and payable in full in ten (10) years.

(c)     **Impairment and Voting.**  Class 8 is Impaired under the Plan.  Class 8 includes only Secured Claims not otherwise classified under this Plan.  Each Holder of a Class 8 Claim is entitled to vote to accept or reject the Plan

### 5.9.    *Class 9 — Claims of Qualified Retail Lenders for Payment of TT&L/Trade Liability.*

(a)     **Class 9 Eligibility.**  A Retail Lender who accepts the Plan and, on such accepting Ballot, indicates its agreement to (i) execute a TT&L Agreement, (ii) provide the Reorganized Debtors with proof of payment of a TT&L/Trade Liability, and (iii) provide future retail lending on terms mutually acceptable to the Reorganized Debtors will be given a Class 9 Claim for the amount payment pursuant to (a)(ii) above.

(b)     **Treatment.**  As full and final satisfaction, settlement, release, and discharge of each Class 9 Claim, each Holder of a Class 9 Claim will receive is Pro Rata Share of the Qualified Retail Lender Pool.

(c)     **Impairment and Voting.**  Class 9 is Impaired under the Plan.  Class 9 includes only the Claims of Qualified Retail Lenders.  Each Holder of a Class 9 Claim is entitled to vote to accept or reject the Plan; however, any Retail Lender who does not qualify for a Class 9 Claim but asserts a Claim against the Debtors will have that Claim treated as a Class 11 Claim.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 29**

**5.10.** *Class 10 — Unsecured Trade Claims.*

  (a)  **Class 10 Eligibility.** The Plan Sponsor may, not less than fifteen (15) days before the Voting Deadline, identify certain Unsecured Claims held by Creditors whose future cooperation the Plan Sponsor deems critical to the success of the business operations of the Reorganized Debtors and designate each a Trade Claim. Claims denominated as Assumed Trade Claims by the Plan Sponsor will be treated in Class 10.

  (b)  **Treatment.** As full and final satisfaction, settlement, release, and discharge of such Class 10 Claim, each Holder of a Class 10 Claim will receive payment in full, over time, through the assumption of the indebtedness underlying the Allowed Class 10 Claim payable on terms to be agreed by each Holder of a Trade Claim and the Reorganized Debtors.

  (c)  **Impairment and Voting.** Class 10 is Impaired under the Plan. Class 10 includes only Unsecured Assumed Trade Claims. The Holders of Class 10 Claims are entitled to vote to accept or reject the Plan.

**5.11.** *Class 11 — General Unsecured Claims.*

  (a)  **Treatment.** As full and final satisfaction, settlement, and release, and discharge of each Class 11 Claim, each Holder of a Class 11 Claim shall be satisfied by Pro Rata Share of Distributions from the Creditors Trust.

  (b)  **Impairment and Voting.** Class 11 is Impaired under the Plan. Class 11 includes only General Unsecured Claims. The Holders of Class 11 Claims are entitled to vote to accept or reject the Plan

**5.12.** *Class 12 — Unsecured Claims of Ford Credit.*

  (a)  **Claim Determination.** The amount, validity, extent, value, and priority, of any asserted Class 12 Claim under § 502 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 12 Claim.

  (b)  **Treatment.** Ford Credit's Class 12 Claim is disputed. It will receive no Distribution until it is Allowed by the Bankruptcy Court. If Ford Credit's Class 12 Claim is Allowed by the Bankruptcy Court, it will receive its Pro Rata Share of all Litigation Proceeds from Causes of Action.

  (c)  **Impairment and Voting.** Class 12 is Impaired under the Plan. Class 12 includes only the Unsecured Claim of Ford Credit. The Holders of Class 12 Claims are entitled to vote to accept or reject the Plan.

**5.13.** *Class 13 — Unsecured Claims of GM Financial.*

  (a)  As full and final satisfaction, settlement, release, and discharge of such Class 13 Claims, GM Financial will receive $ 2 million in Cash on the Effective Date.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 30**

(b)    **Impairment and Voting.**  Class 13 is Impaired under the Plan. Class 13 includes only the Unsecured Claim of Ford Credit. The Holders of Class 13 Claims are entitled to vote to accept or reject the Plan.

### 5.14.  *Class 14 — Unsecured Claims of Bart Reagor and Rick Dykes.*

(a)    **Treatment.**  The Holders of Class 14 Claims are not entitled to receive any Distribution under the Plan.

(b)    **Impairment and Voting.**  Class 14 includes only the Unsecured Claims of Bart Reagor and Rick Dykes and such Claims are Impaired under the Plan. Because such Claims will receive no Distribution under the Plan, Class 14 is deemed to have rejected the Plan under § 1126(g) of the Bankruptcy Code.

### 5.15.  *Class 15 — Subordinated Unsecured Claims.*

(a)    **Treatment.**  The Holders of Class 15 Claims are not entitled to receive any Distribution under the Plan.

(b)    **Impairment and Voting.**  Class 15 includes only Unsecured Claims that are subordinated pursuant to contractual, legal, or equitable subordination, whether arising under general principles of equitable subordination, § 510(b) of the Bankruptcy Code, or otherwise. Because Class 15 Claims are disallowed in full and will receive no Distribution under the Plan, Class 15 is deemed to have rejected the Plan under § 1126(g) of the Bankruptcy Code.

### 5.16.  *Class 16 — Holders of Allowed Interests in the Debtors.*

(a)    **Treatment.**  On the Effective Date, all Interests shall be cancelled and discharged.

(b)    **Impairment and Voting.**  Class 16 consists of all Interests. Holders in Class 15 are not entitled to a Distribution under the Plan; therefore, they are deemed to have rejected the Plan under § 1126(g) of the Bankruptcy Code.

## ARTICLE VI
## NON-VOTING AND UNIMPAIRED CLASSES

### 6.1.  *Impaired/Unimpaired Classes.*

Holders of Allowed Claims in Class 1 are Unimpaired; therefore, they are presumed to accept the Plan. Holders of Claims in Classes 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 are Impaired under the Plan; therefore, they are entitled to vote to accept or reject the Plan. Holders of Allowed Claims in Classes 14 and 15 and Interests in Class 16 are Impaired and will receive no Distributions under the Plan on account of said Claims or Interests; therefore, they are presumed to reject the Plan under § 1126(g) of the Bankruptcy Code. The Debtors need not solicit acceptances of the Plan from Holders of Claims in Class 1. All other Classes are Impaired for purposes of voting on the Plan and will be solicited to vote on the Plan. Except as otherwise provided in the Plan, nothing under the Plan shall

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 31**

affect the Debtors' rights regarding any Claim that is not Impaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims.

### 6.2. *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claim or Interest, or any class of Claims or Interests, is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

### 6.3. *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to § 1129(a)(8) of the Bankruptcy Code.

### 6.4. *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable-subordination rights relating thereto, whether arising under general principles of equitable subordination, § 510(b) of the Bankruptcy Code, or otherwise. Pursuant to § 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE VII
## MEANS FOR IMPLEMENTATION OF THE PLAN

### 7.1. *Continued Corporate Existence.*

The Debtors shall each continue to exist after the Effective Date as Reorganized Debtors in accordance with applicable laws of the jurisdiction in which each is incorporated or organized. On or after the Effective Date, the Reorganized Debtors may, in each of their sole and absolute discretion, take such action as permitted by applicable law and each of the Reorganized Debtors' organizational documents as the Reorganized Debtors may determine is reasonable and appropriate.

### 7.2. *Operations Between the Confirmation Date and the Effective Date.*

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their business as debtors-in-possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

**7.3.**   *Implementation Transactions on or Prior to the Effective Date.*

(a)   New Equity Infusion.   On the Effective Date, the Reorganized Debtors will execute the New Equity Infusion Documents and receive the up to $20 million in cash from the Plan Sponsor to be used for working capital and to pay Allowed Claims pursuant to the terms and conditions of this Plan and the Post-Confirmation Business Plan.

(b)   Issuance of New Equity.   On the Effective Date, the Interests in the Debtors shall be cancelled and discharged, and the Reorganized Debtors are authorized to issue or cause to be issued the New Equity with 90% of the New Equity issued to the Plan Sponsor in exchange for the contribution of up to $20,000,000 of Cash, and 10% of the New Equity placed into the Creditors Trust, subject to the New Equity Redemption Right. The issuance of the New Equity and the Distribution thereof shall be exempt from registration under applicable securities laws pursuant to § 1145(a) of the Bankruptcy Code.

(c)   Post-Confirmation Business Plan.   The Debtors, with the support and input of the Plan Sponsor, have prepared five-year projections of the income and expenses of the Reorganized Debtors (inclusive of a variance of up to 15% in the aggregate) including payroll, professional fees, operational expenses, and payments due to Allowed Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims pursuant to this Plan.

(d)   Exit Financing, If Necessary.   If the Reorganized Debtors need to find replacement floor-plan financing, then the Reorganized Debtors are authorized to obtain Exit Financing and execute and deliver Exit Financing Documents to an Exit Lender on the Effective Date. This Exit Financing will be from an entity or financial institution in an amount sufficient to allow the Reorganized Debtors to execute the Ford Credit Secured Note and/or the GM Financial Secured Note. Without limiting the generality of the foregoing, it is anticipated that the obligations of the Reorganized Debtors under such Exit Financing Documents shall be secured by a first-priority lien in and on substantially all of the assets of the Dealerships or Locations to which such financing relates, subject only to certain customary permitted liens.

(e)   Restructuring Transactions.   On the Effective Date, the Reorganized Debtors shall execute the Creditors Trust Agreement and shall execute and deliver to the Plan Sponsor and, if necessary, to an Exit Lender, documents necessary to implement the Plan, including, without limitation, (i) the New Equity Issuance Documents and (ii) Exit Financing Documents, if necessary. Without limiting the generality of the foregoing, these documents shall provide that (i) the obligations of the Reorganized Debtors to the Plan Sponsor shall be secured by a first-priority lien in and on substantially all of the Reorganized Debtors' assets, potentially subject to a superior lien of a floor-plan lender in specified Collateral of the Dealerships or Locations to which such floor-plan financing relates. The issuance of these documents shall be exempt from registration under applicable securities laws pursuant to § 1145(a) of the Bankruptcy Code. Further, on the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may also take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments

of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

(f)     Corporate Action.  Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (a) execution and entry into the New Equity Infusion Documents and, if necessary, Exit Financing Documents; (b) Distribution of the New Equity Interests; (c) selection of the directors and officers for the Reorganized Debtors; (d) implementation of the restructuring transactions contemplated by this Plan, as applicable; and (e) all other actions contemplated by the Plan (whether to occur before on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by one of the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors or the Reorganized Debtors. On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors (as applicable) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by and consistent with the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Infusion Documents and, if necessary, Exit Financing Documents, and any and all related and ancillary agreements, documents, and filings, New Equity Interests, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article shall be effective notwithstanding any requirements under non-bankruptcy law.  The issuance of the New Equity Interests shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

(g)     New Certificates of Incorporation and New By-Laws.  On or around the Effective Date, the Reorganized Debtors will File each of their respective New Certificates of Incorporation with the applicable Secretary of State and/or other applicable authorities in its state.  Pursuant to § 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate its New Certificate of Incorporation and New By-Laws and other constituent documents as permitted by the laws of its state.

(h)     Cancellation of Prepetition Interests.  Except as expressly provided herein, on the Effective Date, all notes, instruments, certificates evidencing Interests in the Debtors shall be deemed surrendered and cancelled and the Debtors' obligations thereunder shall be discharged.

(i)     Release of Liens.  Upon full payment or other satisfaction of Secured Claims pursuant to this Plan, the Holders of such Secured Claims shall deliver to the Debtors or the Reorganized Debtors, as applicable, any Collateral or other property of the Debtors held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to Allowed Secured Claims that may be reasonably required to terminate any related

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 34**

financing statements, mortgages, mechanics' or other statutory liens, or *lis pendens*, or similar interests or documents. The Reorganized Debtors are authorized to file any such UCC-3 termination statement(s) as may be necessary to fulfill the terms of this Section.

(j)     Directors and Officers of the Reorganized Debtors. As of the Effective Date, a new initial board of directors of the Reorganized Debtor shall be appointed by the Reorganized Debtors. Pursuant to § 1129(a)(5) of the Bankruptcy Code, the initial board of directors for the Reorganized Debtors will be as identified in the Plan Supplement Documents. To the extent any such director or officer is an "insider" as such term is defined in § 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed in the Plan Supplement Documents. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the organizational and other constituent documents of the Reorganized Debtors.

(k)     Effectuating Documents; Further Transactions. Entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors and the Debtors, pursuant to § 1123(a)(5)(D), and the officers and members of the new board of directors to issue, execute, deliver, File, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

(l)     Exemption from Certain Taxes and Fees. Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) the creation of any mortgage, deed-of-trust, lien, or other security interest, (ii) the making or assignment of any lease or sublease, (iii) any restructuring transaction authorized by the Plan, or (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any restructuring transaction occurring under the Plan.

### 7.4.     *Vesting of Assets.*

On the Effective Date, except as otherwise expressly provided herein, title to all Assets shall remain/vest in the Reorganized Debtors, as applicable, free and clear of all liens, Claims, Causes of Action, interests, rights, security interests, and other encumbrances and without further order of the Bankruptcy Court. On and after the Effective Date, <u>except</u> as otherwise provided herein, the Debtors and the Reorganized Debtors may operate their business and may use, acquire, and dispose of their Assets free of any restrictions of the Bankruptcy Code.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 35**

### 7.5. *Sources of Cash for Plan Distributions.*

All Cash necessary for the Debtors, Reorganized Debtors, or the Creditors Trustee, as the case may be, to make Distributions to Holders of Allowed Claims shall be obtained from the proceeds of the New Equity Infusion and/or Exit Financing.

### 7.6. *Approval of Agreements.*

The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Supplement Documents and all transactions contemplated by the Plan. Entry of the Confirmation Order shall constitute approval of the Plan Supplement Documents and such transactions and authorization for the Reorganized Debtors and the Debtors, as appropriate, to execute and deliver each of the Plan Documents.

### 7.7. *Entry of Final Decree.*

As soon as is practicable after the Effective Date, the Reorganized Debtors shall File an application with the Clerk of the Court requesting the entry of a Final Decree closing the Case. The Reorganized Debtors shall be responsible for all U.S. Trustee fees owed pursuant to 28 U.S.C. § 1930 until entry of the final decree and closing of the bankruptcy case. Neither the Reorganized Debtors nor the Creditors Trust shall be responsible for any U.S. Trustee fees after the bankruptcy case is closed.

### 7.8. *Retention of Rights to Pursue Causes of Action.*

Pursuant to § 1123(b) of the Bankruptcy Code, all Causes of Action (including Chapter 5 Causes of Action) are hereby preserved by this Plan, notwithstanding the occurrence of the Effective Date. The Reorganized Debtors shall, on behalf of the Debtors, retain the exclusive authority and all rights to enforce, commence, and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement Document, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved. For the avoidance of doubt, the preservation of Causes of Action herein includes, without limitation, the right to object to all Claims, including Secured Claims, Administrative Claims, Priority Claims, and General Unsecured Claims.

The Debtors have not fully investigated any potential Causes of Action against any Persons or Entities at this time. The failure to list or describe any unknown Cause of Action herein is not intended to limit the rights of the Reorganized Debtors to pursue any known or unknown Cause of Action. Unless Causes of Action against a Person or Entity are expressly waived, relinquished, released, compromised or settled herein or in any Final Order, the Debtors or the Estates (before the Effective Date) and the Debtors and the Reorganized Debtors (as applicable), expressly reserve all Causes of Action (including the unknown Causes of Action) for later adjudication and therefore, no preclusion doctrine or other rule of law, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a result of the confirmation or Effective Date of the Plan, or the Confirmation Order. In addition, the Debtors and the Estates, and the Reorganized Debtors, expressly reserve the right to pursue or adopt any Claims not so waived, relinquished, released, compromised, or settled that are alleged in any lawsuit in which one of the Debtors or Estates

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 36**

is a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs and co-defendants in such lawsuits. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement Documents, or the Disclosure Statement to any Cause of Action against them as any indication that the Trustee, on behalf of the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action other than Causes of Action settled, resolved or released pursuant to this Plan.

For the avoidance of doubt, the Reorganized Debtors reserve and shall retain all Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The Reorganized Debtors shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Such retained potential causes of action include, without limitation, (i) any potential Cause of Action arising from or related to any transfer or other actions or omissions referenced in each of the Debtors' Schedules or Statement of Financial Affairs, as same may be amended (ii) any potential Causes of Action against any past or present insider of the Debtors, (iii) any causes of action related to the extent, validity, and priority of any liens, (iv) any actions for breach of contract, and (v) any actions arising in tort. The Reorganized Debtors will continue to review payments made by and transactions involving the Debtors prior to the Petition Date to determine whether preference and other actions to avoid such payments and transactions should be brought. Failure to specifically identify potential actions herein shall not be deemed a waiver of any such action by the Debtors or any other party. The Reorganized Debtors shall have the right to identify any additional Causes of Action prior to the Effective Date of the Plan.

## ARTICLE VIII
## THE CREDITORS TRUST

### 8.1. *Creation of the Creditors Trust and Appointment of the Trustee.*

(a)     On the Effective Date, the Trust will be created pursuant to the Creditors Trust Agreement.

(b)     The Trust shall be administered by the Trustee who shall be selected by the Debtors and the Plan Sponsor and identified no later than fifteen (15) days prior to the Voting Deadline and notice of same shall be filed and served via ECF. The appointment of the initial Trustee and the terms of his/her compensation shall be subject to the approval of the Bankruptcy Court at the Confirmation Hearing.

(c)     On the Effective Date, all of the Creditor Trust Assets shall transfer to and vest in the Trust free and clear of all Claims, Liens, interests, rights, and encumbrances without the need for any action by the Debtors or the Bankruptcy Court.

(d)     Compensation owed to the Trustee and the Trustee's counsel shall be paid from the Creditor Trust Assets, not from the Reorganized Debtors.

### 8.2.  *Property of the Trust.*

On the Effective Date, notwithstanding any prohibition of assignability under applicable law, the Reorganized Debtors shall be deemed to have automatically transferred to the Trust all of its right, title, and interest in and to the Creditors Trust Assets, and the right to object to any Claims, unless otherwise agreed.  By and through the Trustee, the Creditors Trust shall be authorized and is granted standing for all purposes, including to prosecute, resolve, and otherwise take steps, in its discretion, to monetize and otherwise maximize the value of the Causes of Action.  The Reorganized Debtors shall reasonably cooperate with the Trustee to provide access to the Reorganized Debtors' books and records, necessary accounting information and documentation to enable the Trustee to efficiently and timely perform the functions of this Plan, including as set forth in the preceding sentence.

### 8.3.  *Purpose of the Creditor Trust.*

On the Effective Date, the Trust will be established and become effective for the benefit of the Creditors Trust Beneficiaries and for the primary purpose of liquidating its assets in accordance with Treas. Reg. § 301.7701-4(d) with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.  The Debtors, all Claimants, and all Holders of Interests shall be deemed to have adopted and approved the Creditors Trust Agreement.  The purpose of the Trust is to (a) liquidate all Creditors Trust Assets, including the investigation and prosecution of the Causes of Action pursuant to the Plan, and (b) distribute the proceeds of the Creditors Trust Assets to the Creditors Trust Beneficiaries.  The Trust shall not be deemed a successor-in-interest of the Debtors or Reorganized Debtors for any purpose other than as specifically set forth herein or in the Creditors Trust Agreement.  The Trust is intended to qualify as a "grantor trust" for federal income tax purposes, with the Holders of the Creditors Trust Interests treated as grantors and owners of the Trust.  As soon as practicable after the Effective Date, the Trustee (to the extent that the Trustee deems it necessary or appropriate in his or her sole discretion) shall value the assets of the Trust based on the good faith determination of the Trustee.  The valuation shall be used consistently by all parties for all federal income tax purposes.  The Bankruptcy Court shall resolve any dispute regarding such valuation.

### 8.4.  *Powers of the Trustee.*

The Trustee shall have the power to administer the assets of the Trust in a manner consistent with the Creditors Trust Agreement, and the Trustee shall be the estate representative designated to prosecute the Causes of Action transferred to the Trust as a representative of the Estates pursuant to § 1123(b)(3)(B) and otherwise.  Without limiting the generality of the foregoing, the Trustee shall (a) hold, administer, and prosecute the assets of the Trust and any proceeds thereof; (b) have the power and authority to retain, as an expense of the Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Trustee hereunder or in the Creditors Trust Agreement; (c) make distributions to Holders of Allowed Class 11 Claims; and (d) provide periodic reports and updates to the Reorganized Debtors regarding the status of the administration of the Trust.  The Trustee shall step into the shoes of the Reorganized Debtors under the Plan when making Distributions to Creditors Trust Beneficiaries pursuant to the Creditors Trust Agreement.  The Bankruptcy Court shall retain jurisdiction over the Causes of Action to the extent

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 38**

permissible under applicable law, to resolve any disputes regarding the Trust, hear objections to Claims, and otherwise address such additional matters brought by the Trustee in the fulfillment of his/her duties pursuant to the Plan and the Creditors Trust Agreement.

### 8.5. *Cooperation Between the Trustee and Reorganized Debtors.*

The Trustee and the Reorganized Debtors shall consult and cooperate reasonably in the performance of their duties under the Plan.

### 8.6. *Termination of the Creditor Trust.*

The Trust shall continue to exist until the earlier of the time the Trustee has (i) administered all Creditors Trust Assets and made a final Distribution to Holders of Allowed Claims in accordance with the terms of the Plan, (ii) the Reorganized Debtors have redeemed all Creditor Trust Beneficial Interests, and (iii) performed all other duties required by the Plan and the Creditor Trust Agreement. Multiple extensions of the termination of the Trust may be obtained so long as Bankruptcy Court approval is obtained prior to the expiration of each extended term. As soon as reasonably practicable after the Final Distribution, the Trustee shall dissolve the Trust pursuant to the Creditors Trust Agreement. Upon dissolution, the Trustee's duties under the Creditors Trust Agreement and the Plan shall terminate.

## ARTICLE IX
## CONDITIONS PRECEDENT TO EFFECTIVE DATE;
## EFFECT OF PLAN CONFIRMATION

### 9.1. *Conditions to Confirmation.*

The following are conditions precedent to confirmation of the Plan:

(a)    The Clerk of the Bankruptcy Court shall have made findings and/or entered an order or orders (i) approving the Disclosure Statement as containing "adequate information" pursuant to § 1125 of the Bankruptcy Code, (ii) authorizing solicitation of votes with respect to the Plan, (iii) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan, (iv) confirming and giving effect to the terms and provisions of the Plan, (v) determining that all applicable tests, standards, and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan, (vi) approving the Plan Documents, and (vii) authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to the transactions and transfer of assets contemplated by the Plan and the Plan Documents;

(b)    The Confirmation Order, the Plan Documents, and the Plan are each in a form satisfactory to the Debtors and the Plan Sponsor; and

(c)    The Confirmation Order shall include a determination that all of the settlements and compromises contained herein meet the applicable standards under § 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 for approval and implementation.

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 39**

**9.2.** *Conditions Precedent to the Effective Date.*

The following are conditions precedent to the occurrence of the Effective Date:

(a)     The New Equity Infusion Documents have been executed and all conditions to the effectiveness thereof shall have been satisfied or waived;

(b)     All additional documents effectuating the Plan and the transactions thereunder have been executed and delivered by the parties thereto, and all conditions to the effectiveness of such documents have been satisfied or waived as provided therein;

(c)     Payment of the New Equity Infusion by the Plan Sponsor to the Reorganized Debtors;

(d)     The Confirmation Order has become a Final Order, and it authorizes and directs the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to implement and consummate the provisions of, and transactions described or contemplated in, the Plan;

(e)     The Creditors Trust has been created; and

(f)     The New Equity has been issued.

**9.3.** *Waiver of Conditions.*

The Debtors may waive any one or more of the conditions set forth in Sections 9.1 or 9.2 in a writing executed by the Debtors without notice or order of the Bankruptcy Court and without notice to any parties in interest other than the Plan Sponsor.

**9.4.** *Effect of Non-Occurrence of the Effective Date.*

If the Effective Date shall not occur, the Plan shall be null and void, and nothing contained herein shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors, (b) prejudice in any manner the Debtors' rights, including, without limitation, any right to seek a further extension of the exclusivity periods under § 1121(d) of the Bankruptcy Code; or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors.

## ARTICLE X
## CLAIM OBJECTIONS, AND
## MISCELLANEOUS DISTRIBUTION PROVISIONS

**10.1.** *Objections to Claims.*

(a)     All objections to Claims must be Filed on or before the Claims Objection Deadline, which is two hundred seventy (270) days after the Effective Date, unless extended by the Bankruptcy Court for cause shown.  Any Disputed Claim to which an objection is not Filed on or before the Claims Objection Deadline will be deemed to constitute an Allowed Claim following the Claims Objection Deadline.  The Reorganized Debtors may, on or before the Claims Objection Deadline, File a motion with the Bankruptcy Court requesting an extension of the Claim Objection Deadline. Any such motion Filed by the Claims Objection Deadline shall, if granted, toll the Claims Objection

Deadline solely with respect to the Claim that is the subject of the motion, until and including the date that is ten (10) business days following the date of entry of the Order granting the motion.

(b)     Until a Contingent Claim becomes an Allowed Claim or is Disallowed, the Claim will be treated as a Disputed Claim. The Holder of a Contingent Claim will be entitled to a Distribution under the Plan only when the Contingent Claim becomes an Allowed Claim. Any Contingent Claim for reimbursement or contribution held by a Person that may be liable with the Debtors on a Claim of a Claimant is Disallowed as of the Effective Date if: (a) that Claimant's Claim is Disallowed; (b) the Claim for reimbursement or contribution is contingent as of the Effective Date; or (c) that Person asserts a right of subrogation to the rights of the Claimant under § 509 of the Bankruptcy Code.

(c)     To facilitate the timely and effective administration of Claims, except as otherwise expressly stated herein, following the later of the Effective Date and the applicable Bar Date, no original or amended proof of Claim may be Filed in any of the Chapter 11 Cases to assert a Claim against one of the Debtors or the Estates without prior authorization of the Bankruptcy Court, and any such proof of Claim which is Filed without such authorization shall be deemed null, void and of no force or effect; *provided, however,* that the Holder of a Claim that has been evidenced in the Chapter 11 Cases by the filing of a proof of Claim on or before the Bar Date shall be permitted to File an amended proof of Claim in relation to such Claim at any time if the sole purpose of the amendment is to reduce the amount of the Claim asserted.

### 10.2.     *Estimation of Claims.*

As applicable, the Reorganized Debtors or the Trustee may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to § 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either (a) the Allowed amount of such Claim or (b) a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Trustee may pursue supplementary proceedings to object to the allowance of such Claim.

### 10.3.     *Distributions Under the Plan.*

(a)     *Allowed Claims*

Distributions by the Trust will only be made to Holders of Allowed Claims in Class 11 in accordance with the terms of this Plan, the Plan Documents, and the Plan Supplement Documents. No payment or Distribution provided under this Plan shall be made on account of a Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim. Distribution will be made by the Reorganized Debtors to Holders of Allowed Claims in all other Classes entitled to Distribution pursuant to the Plan.

Any Holder of an Allowed Claim may receive, instead of the Distribution or treatment to which it is entitled under this Plan, any other Distribution or treatment that it and the Trustee (as it

applies to Classes 11) or the Reorganized Debtors (as to other Classes) may agree to in writing, so long as such alternative treatment is (a) substantially the same or less favorable to the Claimant than the treatment otherwise prescribed herein and (b) does not violate any term of this Plan, the Plan Documents, or the Plan Supplement Documents.

(b)      *No Post-Petition Interest on Claims*

Except as otherwise specifically provided in the Plan or Confirmation Order, post-petition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

(c)      *Due Authorization by Claimants*

Every Claimant who elects to participate in the Distributions provided in this Plan warrants that the Claimant is authorized to accept in consideration of its Claim against the Debtors the Distributions provided for in this Plan and that there are no outstanding commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by the Claimant under the Plan.

(d)      *De Minimis Distributions and Rounding*

Ratable Distributions to holders of Allowed Claims will not be made if such Distribution will result in a Distribution amount of less than $150.00, unless a request therefore is made in writing to the Trustee.

(e)      *Distribution Record Date*

As of the close of business on the Effective Date, the various lists of Holders of Claims in each Class, as maintained by the Debtors or their respective agent(s), shall be deemed closed, and there shall be no further changes in the record Holders of any Claims after the Effective Date. Neither the Debtors, the Reorganized Debtors, nor the Trustee has any obligation to recognize any transfer of a Claim occurring after the close of business on the Effective Date.

(f)      *Delivery of Distributions and Other Notices*

As applicable, the Reorganized Debtors or the Trustee will issue or cause to be issued, the applicable consideration under this Plan and, subject to Bankruptcy Rule 9010, will make Distributions to any Holder of an Allowed Claim as and when required by this Plan at (i) the address of such Holder on the books and records of the Debtors; (ii) the address set forth in any timely-filed proof of Claim; or (iii) the address listed in any "address-change" notice delivered to the Reorganized Debtors and the Trustee, including any addresses included on any transfers of Claim Filed pursuant to Bankruptcy Rule 3001 prior to the Effective Date. If any Distribution to any Holder is returned as undeliverable, no Distribution or payment to such Holder shall be made unless and until the Reorganized Debtors or the Trustee, as applicable, has been notified of the then-current address of such Holder. The Trustee may require any Creditors Trust Beneficiary or other party receiving a Distribution to furnish to the Trustee in writing his/her/its employer or taxpayer-identification number, as assigned by the IRS. The Trustee may condition any Distribution to any Creditors Trust Beneficiary or other party receiving a Distribution on the receipt of such identification number. Notwithstanding the foregoing, neither

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 42**

the Trustee nor the Reorganized Debtors is under any duty to take any action to either attempt to locate any holder of a Claim, or obtain an executed Internal Revenue Service Form W-9 from any holder of a Claim. The Trustee has no responsibility to ensure that it has the correct mailing address and taxpayer or employer-identification number for a Creditor

(g) *Distributions to be Pro Rata Within a Class*

Except as otherwise provided herein, all Distributions constituting a partial payment to holders of Allowed Claims within a specific Class shall be made on a Pro Rata basis to the holders of Allowed Claims in such Class.

(h) *Distributions on Account of Disputed Claims*

No Distributions will be made on a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim. In determining the amount of Distributions to be made under the Plan to Holders of Allowed Claims on the Effective Date or a Distribution date, the appropriate Distributions shall be made as if all the Disputed Claims as of such Distribution date were Allowed Claims in the full amount claimed by the Holders thereof, unless otherwise ordered or estimated by the Bankruptcy Court.

(i) *Disputed Claim Reserves*

(i) *Disputed Claim Reserve Account*

In addition to as provided otherwise in the Plan, the Trustee shall, as it applies to Class 11 Claims only, reserve for the account of each Holder of a Disputed Claim in the Disputed Claim Reserve Account (x) Creditors Trust Assets that would otherwise be distributable to such Holder on such date in accordance with the Plan were such Disputed Claim an Allowed Claim on such date or (y) such other property as may be agreed between Trustee, the Holder of the Disputed Claim, and the Reorganized Debtors.

Property reserved under this Section shall be set aside and, to the extent practicable, held by the Trustee in an interest-bearing account to be maintained by the Trustee pending resolution of such Disputed Claims; provided, however, that Cash shall be invested in a manner consistent with the requirements of § 345 or as otherwise ordered by the Bankruptcy Court. All interest accruing on funds held in the Disputed Claim Reserve Account shall revert to the Trust.

If a Disputed Claim becomes an Allowed Claim, property of the Trust reserved for the Holder thereof shall be distributed by the Trustee to such Holder as soon as practicable after such Claim becomes an Allowed Claim pursuant to, and to the extent provided for in, the Plan. To the extent an objection to a Disputed Claim is upheld or a Claim is withdrawn or reduced, the reserves held on account of such Disputed or withdrawn Claim shall be reallocated to the Allowed Claimants in the applicable Class pursuant to their respective Pro Rata Share.

(ii) *Disputed Administrative Claim Reserve Account*

As to Priority Claims, Administrative Claims, and Other Secured Claims, the Reorganized Debtors shall reserve in the Disputed Administrative Claim Reserve Account on account of the

Holder of a Disputed Claim (a) Assets of the Reorganized Debtors that would otherwise be distributable to such Holder on such date in accordance with the Plan were such Disputed Claim an Allowed Claim on such date or (b) such other property as may be agreed between the Reorganized Debtors and the Holder of the Disputed Claim.

Property reserved under this Section shall be set aside and, to the extent practicable, held by the Reorganized Debtors in an interest-bearing account to be maintained by the Reorganized Debtors pending resolution of such Disputed Claims; provided, however, that Cash shall be invested in a manner consistent with the requirements of § 345 or as otherwise ordered by the Bankruptcy Court. All interest accruing on funds held in the Disputed Administrative Claims Reserve Account shall revert to the Reorganized Debtors.

If a Disputed Claim becomes an Allowed Claim, property of the Reorganized Debtors reserved for the Holder thereof shall be distributed by the Reorganized Debtors to such Holder as soon as practicable after such Claim becomes an Allowed Claim pursuant to (i) and to the extent provided for in the Plan; (ii) an agreement between the Holder of the Disputed Claim and the Reorganized Debtors; or (iii) to a final and non-appealable order of the Bankruptcy Court. To the extent an objection to a Disputed Claim is upheld or a Claim is withdrawn or reduced, the reserves held on account of such Disputed or withdrawn Claim shall be reallocated to the Reorganized Debtors.

(j)     *Undeliverable or Unclaimed Distributions*

Any Entity that is entitled to receive a Cash Distribution under the Plan but that fails to cash a check within 90 days of its issuance shall be entitled to receive a reissued check from the Creditor Trust for the amount of the original check, without any interest, if such Entity requests the Creditor Trust to reissue such check and provides such documentation as may be requested to verify that such Entity is entitled to such check prior to the later of (a) the first anniversary of the Effective Date and (b) 180 days after such Entity's Claim becomes an Allowed Claim. If an Entity fails to cash a check within 90 days of its issuance and fails to request reissuance of such check pursuant to the terms of this Plan, such Entity shall not be entitled to receive any distribution under the Plan with respect to the amount of such check. If the distribution to any holder of an Allowed Claim is returned to the Creditor Trust as undeliverable, no further Distributions will be made to such holder unless and until the Creditor Trust is notified in writing of such Holder's current address; provided, however, that the Creditor Trust shall make reasonable efforts to contact the Holder of such Allowed Claim, identify the correct mailing address and resend the Distribution. All unclaimed property shall revert to the Creditors Trust for further disbursement in accordance with this Plan, and the Claim of any Holder or successor to such Holder with respect to such Claim shall be discharged and forever barred notwithstanding any federal or state escheatment laws to the contrary. In no event shall any funds escheat to the State of Texas.

**10.4.**     *Setoffs.*

Except as otherwise expressly provided herein, pursuant to §§ 502(d) or 553 of the Bankruptcy Code or any applicable non-bankruptcy law, agreements entered into in connection with the Plan, the Confirmation Order, or in agreements previously approved by Final Order of the Bankruptcy Court, the Debtors, the Trustee, and the Reorganized Debtors may, but will not be required to, setoff against any Claim and the Distributions made with respect to the Claim, before any Distribution is made on

account of such Claim, any and all of the claims, rights and Causes of Action of any nature that any of the Debtors may hold against the Holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, any other action or omission of the Debtors, nor any provision of the Plan shall constitute a waiver or release by the Debtors or the Trustee of any such claims, rights and Causes of Action that the Debtors may possess against such Holder. If the Debtors fail to setoff against a Holder of a Claim and seek to collect a claim from the Holder of such Claim after a Distribution to the Holder of such Claim pursuant to the Plan, the Reorganized Debtors or Creditor, as applicable, shall be entitled to full recovery on its claim, if any, against the Holder of such Claim or Interest.

## ARTICLE XI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**11.1.** *Executory Contracts and Unexpired Leases to be Rejected Unless Expressly Assumed.*

To the extent necessary, the Plan operates as a motion under § 365 to assume all agreements, including sales and service agreements, under which it operates automotive / vehicle franchise agreements at the Dealerships, including such agreements with Mitsubishi, Toyota, General Motors, and Ford Motor Company. For all other Executory Contracts or Unexpired Leases, except as otherwise provided herein or in any order of the Bankruptcy Court, on the Effective Date or no later than thirty (30) days after the Effective Date, every Executory Contract and Unexpired Lease shall be deemed rejected unless it is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to § 365 of the Bankruptcy Code, effective as of the Petition Date. Any party to an Executory Contract identified for rejection as provided herein may, within the same deadline and in the same manner established for Filing objections to Confirmation, File any objection thereto. Failure to File any such objection within the time period set forth above shall constitute consent and agreement to the rejection

Each Executory Contract on the Schedule of Assumed Executory Contracts and Unexpired Leases shall be assumed only to the extent that it constitutes an executory contract or unexpired lease as contemplated by § 365 of the Bankruptcy Code. Nothing contained in this Plan constitutes an admission by the Debtors that any such contracts or leases are "executory" or that the Debtors have any liability thereunder. Further, such assumption is subject to the same rights that the Debtors held or hold on or after the Petition Date to modify or terminate such agreement(s) under applicable non-bankruptcy law. If the Bankruptcy Court or any other court of competent jurisdiction determines before, on, or after the Effective Date, that any agreement in the form of a lease of real or personal property identified for assumption on the Schedule of Assumed Executory Contracts and Unexpired Leases is, in fact, a secured transaction, the resulting secured indebtedness arising from such determination shall be treated as a Class 8 Claim. Each Executory Contract assumed pursuant to this section shall be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law. The Debtors/Reorganized Debtors reserve the right to modify the treatment of an Executory Contract pursuant to this Plan.

RD App. 0053

**11.2.  *Approval of Assumptions.***

Subject to the occurrence of the Closing, the Confirmation Order (except as otherwise provided therein) shall approve the assumptions, revestments, and, to the extent not subject to dispute, the cure amounts described in this Article and listed on the Schedule of Assumed Contracts pursuant to § 365 of the Bankruptcy Code.

**11.3.  *Objections to Assumption of Executory Contracts and Unexpired Leases.***

Any Entity objecting to the proposed assumption of an Executory Contract based on any ground, including a lack of adequate assurance of future performance or the adequacy of the cure amount listed in the Schedule of Assumed Contracts and Unexpired Leases, shall File and serve a written objection to the proposed assumption of such Executory Contract by the same deadline and in the same manner established for filing objections to Confirmation.

Failure to File an objection within the time period set forth above shall constitute consent to the assumption of those Executory Contracts by the Reorganized Debtors, including an acknowledgment that the proposed assumption provides adequate assurance of future performance. If any Entity files an objection to the proposed assumption of an Executory Contract by the applicable Debtor based on any ground other than the adequacy of the cure amount set forth in the Schedule of Assumed Contracts and Unexpired Leases, and the Bankruptcy Court ultimately determines that the Debtors cannot assume such contract or lease or that the Debtors cannot provide adequate assurance of future performance as proposed or in any modified proposal submitted by the Debtors, then the Executory Contract shall automatically be deemed to have been rejected pursuant to this Article.

**11.4.  *Payments Related to Assumption of Executory Contracts and Unexpired Leases.***

If not the subject of *bona-fide* dispute pursuant to this Article as of Confirmation Date, monetary defaults, if any, under each Executory Contract to be assumed under the Plan shall be satisfied by the Debtors pursuant to § 365(b)(1) by payment in Cash of the amount set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases or such other amount as ordered by the Bankruptcy Court or agreed to by the parties on or as soon after the Effective Date as practicable or on such other terms as agreed to by the parties to such Executory Contract.

**11.5.  *Rejection of Executory Contracts.***

The Plan constitutes and incorporates a motion by the Debtors to reject, as of the Effective Date, all Executory Contracts to which one of the Debtors is a party, except for Executory Contracts that (a) have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (b) are the subject of a separate motion pursuant to § 365 of the Bankruptcy Code to be Filed and served by the Debtors on or before the Confirmation Date, or (c) are specifically designated on the Schedule of Assumed Contracts and Unexpired Leases.

**11.6.  *Bar Date for Rejection Damages.***

If the rejection of an Executory Contract pursuant to this Article gives rise to a Claim by the other party or parties to such Executory Contract, such Claim must be Filed with the Bankruptcy

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 46**

Court by the Rejection Damages Bar Date. If such Claim is timely Filed and is an Other Secured Claim, it shall be classified in Class 8. If such Claim is timely Filed and is a General Unsecured Claim, it shall be classified in Class 11; provided, however, that in either event, any Claim arising from the rejection of an Executory Contract shall be forever barred and shall not be enforceable against the Debtors or the Estates, affiliates, successors, or properties, unless a proof of Claim is Filed by the Rejection Damages Bar Date.

## ARTICLE XII
## RELEASES; INDEMNIFICATION; PLAN INJUNCTION

### 12.1. *Binding Effect.*

Except as otherwise provided in § 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of this Plan shall bind every Holder of a Claim against or Interest in each of the Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is impaired under this Plan and whether such Holder has accepted the Plan.

### 12.2. *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to §§ 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise of substantially all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest or any Distribution to be made on account of such Allowed Claim or Interest. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, the Estates, and Holders, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to § 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Trustee, in conjunction with the Reorganized Debtors, may compromise and settle Claims against them and Causes of Action against other Entities.

### 12.3. *Discharge of Claims and Termination of Interests.*

Upon the Effective Date, and in consideration of the Distributions to be made under this Plan, except as otherwise provided in this Plan or in the Confirmation Order, each Holder of a Claim or Interest and any successor, assign, or affiliate of such Holder shall be deemed to have forever waived, released, and discharged the Debtors of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such Holders of Claims and Interests and their successors, assigns, and affiliates shall be forever precluded and enjoined, pursuant to §§ 105, 524, and 1141 of the Bankruptcy Code, from asserting any such discharged Claim against or terminated Interest in the Debtors or Reorganized Debtors.

**12.4.** *Releases by a Holder of a Claim.*

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan, the Plan Supplement Documents, and the Plan Documents, for good and valuable consideration, including the contributions and services of the Released Parties to the Debtors' reorganization, the adequacy of which is hereby confirmed, and except as otherwise expressly provided in the Plan or the Confirmation Order, as an integral component of this Plan, the Released Parties are deemed forever released and discharged by the Releasing Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of one or more of the Holders of Claims or other Entity, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that one or more of the Holders of Claims or other Entities would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Debtors or the Estates or other Entities, based on or related to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the subject matter of or the transactions or events giving rise or related to, any Claim or Interest that is treated in this Plan, the Debtors' business, contractual arrangements between the Debtors and any Released Party, the restructuring of any Claim before or during the Chapter 11 Cases, the Disclosure Statement, this Plan, the Plan Support Documents, and the negotiation, formulation, or preparation thereof or the terms therein, the solicitation of votes with respect to this Plan, or any act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act, willful misconduct, or gross negligence.

**12.5.** *Exculpation, Release, and Injunction.*

(a) *Exculpation and Release*

To the extent permitted by applicable law, the Professionals of the Estates are hereby released and exculpated from any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, including, without limitation, the planning, filing or the administration of the Chapter 11 Cases, the formulation, preparation, dissemination, approval, confirmation, administration, or consummation of the Plan, the Disclosure Statement, the solicitation of votes for or confirmation of the Plan or consummation or administration of the Plan, except to the extent arising out of or related to any act or omission of such Professional that is a criminal act, willful misconduct, or gross negligence. The protections of this section shall be in addition to, and shall not limit, all other releases, injunctions, exculpations, and any other applicable law or rule protecting the Professionals of the Estates and the Released Parties from liability. By accepting Distributions to this Plan, each Holder of an Allowed Claim will be deemed to have affirmatively and specifically consented to be bound by this Plan, including the injunctions set forth in this Plan.

(b) *Bankruptcy Court Jurisdiction.*

The Bankruptcy Court shall retain exclusive jurisdiction over any suit brought on any claim or Cause of Action against a Released Party or one of the Professionals of the Estates in connection with or arising out of the administration of the Chapter 11 Cases, including the negotiation and pursuit of the Disclosure Statement, the Plan Supplement Documents, the Plan Documents, the Restructuring, the solicitation of votes for, or confirmation of, this Plan, the funding of the Plan, the occurrence of

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 48**

the Effective Date, the administration of this Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with this Plan or the transactions in furtherance of any of the foregoing, and any Entity bringing such suit shall do so in the Bankruptcy Court or such other court as the Bankruptcy Court may direct.

**12.6.** *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to this Plan.

**12.7.** *Term of Stay or Injunctions.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases or pursuant to §§ 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**12.8.** *Injunction Against Interference with Plan.*

Upon entry of the Confirmation Order, all Holders of Claims and Interests and all other parties in interest, along with their respective successors and assigns and present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or occurrence of the Effective Date and, after the occurrence of the Effective Date, shall be further enjoined from obstruction or interference, directly or indirectly, with the business operations, business relationships, existing contracts, or prospective contractual relationships of the Reorganized Debtors and/or any effort to impede the Reorganized Debtors' ability to meet the Post-Confirmation Business Plan or otherwise perform their obligations under this Plan.

## ARTICLE XIII
## MISCELLANEOUS

**13.1.** *Retention of Jurisdiction.*

Notwithstanding entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the following purposes:

(a) to determine (i) any Disputed Claims, Disputed Interests and all related Claims accruing after the Confirmation Date including rights and liabilities under contracts giving rise to such Claims, (ii) the validity, extent, priority and avoidability of consensual and nonconsensual Liens and other encumbrances, (iii) preconfirmation tax liability pursuant to § 505, and (iv) controversies and disputes regarding the interpretation of the Plan and documents executed in connection therewith;

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 49**

(b)     to allow, disallow, estimate, liquidate or determine any Claim or Interest against a Debtor and to enter or enforce any order requiring the filing of any such Claim or Interest before a particular date;

(c)     to approve all matters related to the assumption, assumption and assignment, or rejection of any Executory Contract of the Debtor pursuant to § 365 and this Plan;

(d)     to determine any request for payment of an Administrative Claim entitled to priority under § 507(a)(1), including compensation of parties entitled thereto, or fees and reimbursements to the Reorganized Debtors;

(e)     to resolve controversies and disputes regarding the interpretation and implementation of the Plan, any disputes relating to whether or not a timely and proper proof of Claim was Filed or whether a Disallowed Claim or Disallowed Interest should be reinstated;

(f)     to implement the provisions of the Plan and entry of orders in aid of confirmation and consummation of the Plan, including any disputes concerning the enforceability or applicability of the releases and injunctions contained herein;

(g)     to modify the Plan pursuant to § 1127 of the Plan;

(h)     to adjudicate any and all Causes of Action that arose in the Case prior to the Confirmation Date or in connection with the implementation of the Plan, whether or not pending on the Confirmation Date, including without limitation, any remands of appeals;

(i)     to resolve disputes concerning any reserves with respect to Disputed Claims, Disputed Interests or the administration thereof;

(j)     to resolve disputes, including to hear, adjudicate, and resolve any matter or dispute brought by the Reorganized Debtors or the Trustee, including (i) Claims objections and (ii) any other matter relating to Class 11, a Creditors Trust Asset, this Plan, a Plan Document, a Plan Supplement Document, or anything related to the Plan and the Confirmation Order;

(k)     to resolve any disputes concerning whether a person or entity had sufficient notice of the Case, the applicable Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate information, or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(l)     to determine any and all applications, Claims, Interests, pending adversary proceedings and contested matters (including, without limitation, any adversary proceeding or other proceeding to recharacterize agreements or reclassify Claims or Interests) in these Case;

(m)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(n)     to seek the issuance of such orders in aid of execution of the Plan, to the extent authorized by § 1142 of the Bankruptcy Code;

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 50**

(o)     to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(p)     to recover all Assets of the Debtors and property of the Estates, wherever located, including any Cause of Action;

(q)     to resolve any dispute relating to the approval and payment of the fees and expenses of the Debtors or its respective professionals;

(r)     to resolve matters concerning state, local, and federal taxes in accordance with §§ 346, 505, and 1146;

(s)     to hear any other matter not inconsistent with the Bankruptcy Code;

(t)     to resolve any and all disputes or controversies relating to distributions to be made, and/or reserves or escrows to be established, under the Plan;

(u)     to enter one or more final decrees closing the Case;

(v)     to enforce the Plan, including the releases, injunctions, and exculpations granted herein; and

(w)     to approve settlements relating to the above.

### 13.2.     *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

### 13.3.     *Ipso Facto and Similar Provisions Ineffective.*

Any term of any policy, contract, instrument, or other obligation applicable to the Debtors shall be void and of no further force or effect with respect to the Debtors to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtors as a result of or gives rise to a right of any Entity based on any of the following (a) the insolvency or financial condition of the Debtors, (b) the commencement of the Chapter 11 Cases, and (c) the confirmation or consummation of this Plan.

### 13.4.     *Cram Down.*

If all of the applicable requirements for Confirmation of the Plan are met as set forth in § 1129(a) except subsection (8) thereof, the Debtors may request the Bankruptcy Court to confirm the Plan pursuant to § 1129(b), notwithstanding the requirements of § 1129(a)(8), on the basis that the Plan is fair and equitable as to the Creditors and does not discriminate unfairly with respect to any Impaired Class of Claims against the Debtors that does not vote to accept the Plan as described in the

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 51**

Disclosure Statement. The Debtors reserve the right to alter the treatment of any Class in order to effectuate a cram down under § 1129(b).

**13.5.** *Modification of the Plan.*

The Debtors reserve the right, in accordance with the Bankruptcy Code, to amend or modify this Plan prior to the Confirmation Date. After the Confirmation Date, the Debtors may, upon order of the Court, amend or modify this Plan in accordance with § 1127(b), or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purposes and intent of this Plan.

**13.6.** *Withdrawal or Revocation of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan is revoked or withdrawn by the Debtors, or if the Confirmation Date does not occur with respect to the Debtors, the Plan shall be of no further force or effect.

**13.7.** *Notices.*

All notices, requests, elections, or demands in connection with the Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested, and sent to the following:

| | |
|---|---|
| To the Debtors or Reorganized Debtors: | Reorganized Reagor-Dykes<br>Attn: Rick Dykes<br>1215 Avenue J.<br>Lubbock, Texas 79401<br>Telephone: (806) 776-8700<br>Facsimile: (806) 687-3608 |
| Counsel for the Debtors: | Marcus A. Helt<br>C. Ashley Ellis<br>Foley Gardere<br>2021 McKinney Avenue<br>Suite 1600<br>Dallas, Texas 75201<br>Telephone: (214) 999-3000<br>Facsimile: (214) 999-4667 |
| To the Trustee: | _____<br>_____<br>_____<br>_____<br>Telephone: (___) ___-____<br>Facsimile: (___) ___-____ |

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 52**

| | |
|---|---|
| To the Trustee's Counsel: | _____ |
| | _____ |
| | _____ |
| | _____ |
| | Telephone: (___) ___-____ |
| | Facsimile: (___) ___-____ |
| To the Plan Sponsor: | Marc McDougal |
| | McDougal Companies |
| | 5001 W Loop 289 |
| | Lubbock, Texas 79414 |
| | Telephone: (806) 797-3162 |
| | Facsimile: (806) 589-0199 |
| To the Plan Sponsor's Counsel: | Mont McClendon |
| | McDougal Companies |
| | 5001 W Loop 289 |
| | Lubbock, Texas 79414 |
| | Telephone: (806) 797-3162 |
| | Facsimile: (806) 589-0199 |

### 13.8. *Severability.*

Should any term or provision of the Plan be determined the Bankruptcy Court to be invalid, void or unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any other provision of the Plan. If any term or provision of the Plan is of such a character as to deny Confirmation, the Debtors reserve the right to strike such provisions from the Plan and seek Confirmation of the Plan as modified. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.9. *All Claims.*

This Plan is intended to deal with all Claims against each of the Debtors of whatever character whether or not disputed, contingent, or liquidated and whether or not allowed by the Bankruptcy Court under § 502 of the Bankruptcy Code. However, only those Claims Allowed under § 502 shall be entitled to receive the treatment afforded by the Plan.

### 13.10. *Immediate Binding Effect.*

This Plan shall be binding on and inure to the benefit of each of the Debtors, the Reorganized Debtors, all present and future Holders of Claims and Interests, and their respective successors and assigns, and all other parties in interest in the Case. In addition, notwithstanding Bankruptcy Rules

**CHAPTER 11 PLAN OF REORGANIZATION FOR REAGOR-DYKES – PAGE 53**

3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement Documents shall be immediately effective and enforceable and deemed binding on the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property right under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with one of the Debtors.

**13.11.  *Reservation of Rights.***

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement Document shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders before the Effective Date.

Dated: January 7, 2019                           Respectfully submitted,

                                                 Reagor-Dykes Motors, LP *et al.*

                                         By:     */s/ Robert Schleizer*
                                                 Chief Restructuring Officer

Prepared by:

Marcus A. Helt (TX 24052187)
C. Ashley Ellis (TX 00794824)
**FOLEY GARDERE**
**FOLEY & LARDNER**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667

**COUNSEL FOR DEBTORS AND**
**DEBTORS-IN-POSSESSION**

Reagor Dykes Auto Group                                   Owned Real Estate

| Property Location | Property Address | Owner | Tenant | IBC - Refinance |
|---|---|---|---|---|
| Amarillo | 4710-4706 Canyon Drive | D&R | RD Amarillo | Yes |
| | 4791 Maverick | D&R | RD Amarillo | Yes |
| Plainview | 1220 I-27 | D&R | RD Plainview | Yes |
| Floydada | 215 S. Main (et al) | D&R | RD Floydada | Yes |
| | 1013 Broadway | D&R | Vacant | Yes |
| | 1215-1219 Ave. J | RD7 | RDAG | Yes |
| | | | CASA | |
| | | | Make-a-Wish | |
| | | | Italian Gardens | |
| | | | Blair Chiropatric | |
| | | | RD7 Investments | |
| | 1101 13th Street | RD7 | RDAG E-Commerce | Yes |
| | 1313 Ave. J | D&R | Parking Garage | Yes |
| | | | Soooo Granola | |
| | 311 - 405 19th Street | RD7 | RAM (RD Body Shop) | ? |
| | 1111 19th Street | D&R | Tex-Fi Capital / D&R | Yes |
| | 1121, 1211. 1301 19th Street | D&R | Reagor Auto Mall | Yes |
| | 1313 19th Street | D&R | Reagor Auto Mall | Yes |
| | 10501 Hwy 87 | D&R | Vacant | Yes |
| Levelland | 2379 E. Hwy 114 | D&R | RAM (RD Levelland) | Yes |
| Lamesa | 205 S. 10th Street | D&R | RD Motors - Accesory | Yes |
| | 1207 S. Lynn | D&R | RD Motors - Dealership | Yes |
| Snyder | 4004 Business Spur 84 | D&R | RD Snyder - Dealership | Yes |



RD App. 0063

 | FORD CREDIT

Notification of Disposition of Collateral

Date:  January 25, 2019

TO:   Reagor-Dykes Amarillo, L.P., 4710 Canyon Drive, Amarillo TX 79109
      Robert Schleizer, BlackBriar, Chief Restructuring Officer, 3131 McKinney Ave. Suite 600,
      Dallas, TX 75204
      Mr. Rick Dykes, 2106 Vicksburg Avenue, Lubbock TX 79407
      Mr. Bart Reagor, 4811 115th Street, Lubbock TX 79424
      Reagor-Dykes Motors, L.P., 1207 South Lynn, Lamesa TX, 79331
      Reagor Auto Mall I, LLC, 1215 Avenue J, Lubbock TX 79401
      Reagor-Dykes II, LLC, 1211 19th Street, Lubbock TX 79401
      Reagor-Dykes III, LLC, 1211 19th Street, Lubbock TX 79401
      Reagor-Dykes Auto Company, L.P., 808 N IH 27, Plainview TX 79072
      Reagor-Dykes Imports, L.P., 6540 82nd Street, Lubbock TX 79424
      Reagor-Dykes Plainview, L.P., 1220 S. I-27, Plainview, TX 79072
      Reagor-Dykes Floydada, L.P., 221 S. Main St., TX 79235
      Snap-On Credit, LLC, 950 Technology Way Suite 301, Libertyville, IL 60048
      Tex-Fi Capital, LLC 1211 19th Street, Lubbock TX 79401
      VISTA Bank, 4621 50th Street, Lubbock, TX 79414
      International Bank of Commerce, 2250 East 73rd Street, Tulsa, OK 74136
      FirstCapital Bank of Texas, N.A., 6811 Indiana Avenue, Lubbock, TX 79413
      American Tire Distributors Inc., 12200 Herbert Wayne Court Suite 150, Huntersville, NC 28078


FROM:   Ford Motor Credit Company LLC
        9009 Carothers Pkwy
        Dept 1000
        Franklin, TN 37067

DEBTOR:   Reagor-Dykes Amarillo, L.P., 4710 Canyon Drive, Amarillo TX 79109

SUBJECT:   Notice of Private Sale


We will sell the following described property privately sometime after February 11, 2019:

1.  Equipment, furniture, machinery, demonstrators and service vehicles, supplies and other goods of every kind.
2.  Motor vehicles, tractor, trailers, implements, service parts and accessories, and other inventory of every kind and any accessions thereto.
3.  Accounts, instruments, chattel paper, general intangibles, contract rights, documents and supporting obligations thereto.
4.  Fixtures located at the Debtor's address and at any other address from which the Debtor conducts business.

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell for a charge of $25.00.  You may request an accounting by calling us at the telephone number listed below.

Ford Motor Credit Company
866-881-8418 x52508

BY:  _____
     Dwayne Streat
     Center Operations Manager

EXHIBIT
1-2

 FORD **CREDIT**

Notification of Disposition of Collateral

Date: January 25, 2019

TO:    Reagor-Dykes Auto Company, L.P., 808 N IH 27, Plainview TX 79072
Robert Schleizer, BlackBriar, Chief Restructuring Officer, 3131 McKinney Ave. Suite 600, Dallas, TX 75204
Mr. Rick Dykes, 2106 Vicksburg Avenue, Lubbock TX 79407
Mr. Bart Reagor, 4811 115th Street, Lubbock TX 79424
Reagor-Dykes Motors, L.P., 1207 South Lynn, Lamesa TX, 79331
Reagor Auto Mall I, LLC, 1215 Avenue J, Lubbock TX 79401
Reagor-Dykes II, LLC, 1211 19th Street, Lubbock TX 79401
Reagor-Dykes III, LLC, 1211 19th Street, Lubbock TX 79401
Reagor-Dykes Amarillo, L.P., 4710 Canyon Drive, Amarillo TX 79109
Reagor-Dykes Imports, L.P., 6540 82nd Street, Lubbock TX 79424
Reagor-Dykes Plainview, L.P., 1220 S. I-27, Plainview, TX 79072
Reagor-Dykes Floydada, L.P., 221 S. Main St., Floydada TX 79235
Snap-On Credit, LLC, 950 Technology Way Suite 301, Libertyville, IL 60048
AIMBank, 3004 Slide Rd., Lubbock, TX 79407
Tex-Fi Capital, LLC 1211 19th Street, Lubbock TX 79401
VISTA Bank, 4621 50th Street, Lubbock, TX 79414
International Bank of Commerce, 2250 East 73rd Street, Tulsa, OK 74136

FROM:    Ford Motor Credit Company, LLC
9009 Carothers Pkwy
Dept 1000
Franklin, TN 37067

DEBTOR:    Reagor-Dykes Auto Company, L.P., 808 N IH 27, Plainview TX 79072

SUBJECT:    Notice of Private Sale

We will sell the following described property privately sometime after February 11, 2019:

1. Equipment, furniture, machinery, demonstrators and service vehicles, supplies and other goods of every kind.
2. Motor vehicles, tractor, trailers, implements, service parts and accessories, and other inventory of every kind and any accessions thereto.
3. Accounts, instruments, chattel paper, general intangibles, contract rights, documents and supporting obligations thereto.
4. Fixtures located at the Debtor's address and at any other address from which the Debtor conducts business.

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell for a charge of $25.00. You may request an accounting by calling us at the telephone number listed below.

Ford Motor Credit Company
866-881-8418 x52508

BY: _____
Dwayne Streat
Center Operations Manager

DOC 331-22. FC 6/26/2018 Previous Editions must not be used.

 FORD **CREDIT**

Notification of Disposition of Collateral

Date:  January 25, 2019

TO:   Reagor-Dykes Plainview, L.P., 1220 S. I-27, Plainview, TX 79072
      Robert Schleizer, BlackBriar, Chief Restructuring Officer, 3131 McKinney Ave. Suite 600,
      Dallas, TX 75204
      Mr. Rick Dykes, 2106 Vicksburg Avenue, Lubbock TX 79407
      Mr. Bart Reagor, 4811 115th Street, Lubbock TX 79424
      Reagor-Dykes Motors, L.P., 1207 South Lynn, Lamesa TX, 79331
      Reagor Auto Mall I, LLC, 1215 Avenue J, Lubbock TX 79401
      Reagor-Dykes II, LLC, 1211 19th Street, Lubbock TX 79401
      Reagor-Dykes III, LLC, 1211 19th Street, Lubbock TX 79401
      Reagor-Dykes Auto Company, L.P., 808 N IH 27, Plainview TX 79072
      Reagor-Dykes Amarillo, L.P.,  4710 Canyon Drive, Amarillo TX 79109
      Reagor-Dykes Imports, L.P., 6540 82nd Street, Lubbock TX 79424
      Reagor-Dykes Floydada, L.P., 221 S. Main St., Floydada TX 79235
      Snap-On Credit, LLC, 950 Technology Way Suite 301, Libertyville, IL 60048
      Tex-Fi Capital, LLC 1211 19th Street, Lubbock TX 79401
      VISTA Bank, 4621 50th Street, Lubbock TX, 79414
      International Bank of Commerce, 2250 East 73rd Street, Tulsa, OK 74136


FROM:   Ford Motor Credit Company, LLC
        9009 Carothers Pkwy
        Dept 1000
        Franklin, TN 37067

DEBTOR:   Reagor-Dykes Plainview, L.P., 1220 S. I-27, Plainview, TX 79072

SUBJECT:   Notice of  Private Sale


We will sell the following described property privately sometime after February 11, 2019:

1.  Equipment, furniture, machinery, demonstrators and service vehicles, supplies and other goods of every kind.
2.  Motor vehicles, tractor, trailers, implements, service parts and accessories, and other inventory of every kind and
    any accessions thereto.
3.  Accounts, instruments, chattel paper, general intangibles, contract rights, documents and supporting obligations
    thereto.
4.  Fixtures located at the Debtor's address and at any other address from which the Debtor conducts business.

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell for a
charge of $25.00.  You may request an accounting by calling us at the telephone number listed below.

Ford Motor Credit Company
866-881-8418 x52508

BY: _____
      Dwayne Streat
      Center Operations Manager


DOC 331-22, FC 6/26/2018 Previous Editions must not be used.

 | FORD **CREDIT**

Notification of Disposition of Collateral

Date:  January 25, 2019

TO:     Reagor-Dykes Plainview, L.P., 1220 S. I-27, Plainview, TX 79072
Robert Schleizer, BlackBriar, Chief Restructuring Officer, 3131 McKinney Ave. Suite 600,
Dallas, TX 75204
Mr. Rick Dykes, 2106 Vicksburg Avenue, Lubbock TX 79407
Mr. Bart Reagor, 4811 115th Street, Lubbock TX 79424
Reagor-Dykes Motors, L.P., 1207 South Lynn, Lamesa TX, 79331
Reagor Auto Mall I, LLC, 1215 Avenue J, Lubbock TX 79401
Reagor-Dykes II, LLC, 1211 19th Street, Lubbock TX 79401
Reagor-Dykes III, LLC, 1211 19th Street, Lubbock TX 79401
Reagor-Dykes Auto Company, L.P., 808 N IH 27, Plainview TX 79072
Reagor-Dykes Amarillo, L.P., 4710 Canyon Drive, Amarillo TX 79109
Reagor-Dykes Imports, L.P., 6540 82nd Street, Lubbock TX 79424
Reagor-Dykes Floydada, L.P., 221 S. Main St., Floydada TX 79235
Snap-On Credit, LLC, 950 Technology Way Suite 301, Libertyville, IL 60048
Tex-Fi Capital, LLC 1211 19th Street, Lubbock TX 79401
VISTA Bank, 4621 50th Street, Lubbock, TX 79414
International Bank of Commerce, 2250 East 73rd Street, Tulsa, OK 74136


FROM:    Ford Motor Credit Company, LLC
9009 Carothers Pkwy
Dept 1000
Franklin, TN 37067

DEBTOR:    Reagor-Dykes Plainview, L.P., 1220 S. I-27, Plainview, TX 79072

SUBJECT:    Notice of Private Sale


We will sell the following described property privately sometime after February 11, 2019:

1.  Equipment, furniture, machinery, demonstrators and service vehicles, supplies and other goods of every kind.
2.  Motor vehicles, tractor, trailers, implements, service parts and accessories, and other inventory of every kind and any accessions thereto.
3.  Accounts, instruments, chattel paper, general intangibles, contract rights, documents and supporting obligations thereto.
4.  Fixtures located at the Debtor's address and at any other address from which the Debtor conducts business.

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell for a charge of $25.00.  You may request an accounting by calling us at the telephone number listed below.

Ford Motor Credit Company
866-881-8418 x52508

BY: _____
Dwayne Streat
Center Operations Manager


DOC 331-22. FC 6/26/2018 Previous Editions must not be used.



Notification of Disposition of Collateral

Date:  January 25, 2019

TO:    Reagor-Dykes Floydada, L.P., 221 S. Main St., Floydada TX 79235
       Robert Schleizer, BlackBriar, Chief Restructuring Officer, 3131 McKinney Ave. Suite 600,
       Dallas, TX 75204
       Mr. Rick Dykes, 2106 Vicksburg Avenue, Lubbock TX 79407
       Mr. Bart Reagor, 4811 115th Street, Lubbock TX 79424
       Reagor-Dykes Motors, L.P., 1207 South Lynn, Lamesa TX, 79331
       Reagor Auto Mall I, LLC, 1215 Avenue J, Lubbock TX 79401
       Reagor-Dykes II, LLC, 1211 19th Street, Lubbock TX 79401
       Reagor-Dykes III, LLC, 1211 19th Street, Lubbock TX 79401
       Reagor-Dykes Auto Company, L.P., 808 N IH 27, Plainview TX 79072
       Reagor-Dykes Amarillo, L.P., 4710 Canyon Drive, Amarillo TX 79109
       Reagor-Dykes Imports, L.P., 6540 82nd Street, Lubbock TX 79424
       Reagor-Dykes Plainview, L.P., 1220 S. I-27, Plainview, TX 79072
       International Bank of Commerce, 2250 East 73rd Street, Tulsa, OK 74136
       GreatAmerica Financial Services Corporation, 625 First Street, Cedar Rapids, IA 52401-2030
       FirstCapital Bank of Texas, N.A. 6811 Indiana Avenue, Lubbock, TX 79413


FROM:   Ford Motor Credit Company, LLC
        9009 Carothers Pkwy
        Dept 1000
        Franklin, TN 37067

DEBTOR:   Reagor-Dykes Floydada, L.P., 221 S. Main St., Floydada TX 79235

SUBJECT:   Notice of Private Sale


We will sell the following described property privately sometime after February 11, 2019:

1.  Equipment, furniture, machinery, demonstrators and service vehicles, supplies and other goods of every kind.
2.  Motor vehicles, tractor, trailers, implements, service parts and accessories, and other inventory of every kind and any accessions thereto.
3.  Accounts, instruments, chattel paper, general intangibles, contract rights, documents and supporting obligations thereto.
4.  Fixtures located at the Debtor's address and at any other address from which the Debtor conducts business.

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell for a charge of $25.00.  You may request an accounting by calling us at the telephone number listed below.

Ford Motor Credit Company
866-881-8418 x52508

BY: _____
    Dwayne Streat
    Center Operations Manager


DOC 331-22. FC 6/26/2018 Previous Editions must not be used.

RD App. 0068

 | FORD **CREDIT**

Notification of Disposition of Collateral

Date:   January 25, 2019

TO:        Reagor-Dykes Imports, L.P., 6540 82nd Street, Lubbock TX 79424
           Robert Schleizer, BlackBriar, Chief Restructuring Officer, 3131 McKinney Ave. Suite 600,
           Dallas, TX 75204
           Mr. Rick Dykes, 2106 Vicksburg Avenue, Lubbock TX 79407
           Mr. Bart Reagor, 4811 115th Street, Lubbock TX 79424
           Reagor-Dykes Motors, L.P., 1207 South Lynn, Lamesa TX, 79331
           Reagor Auto Mall I, LLC, 1215 Avenue J, Lubbock TX 79401
           Reagor-Dykes II, LLC, 1211 19th Street, Lubbock TX 79401
           Reagor-Dykes III, LLC, 1211 19th Street, Lubbock TX 79401
           Reagor-Dykes Auto Company, L.P., 808 N 1H 27, Plainview TX 79072
           Reagor-Dykes Amarillo, L.P., 4710 Canyon Drive, Amarillo TX 79109
           Reagor-Dykes Plainview, L.P., 1220 S. I-27, Plainview, TX 79072
           Reagor-Dykes Floydada, L.P., 221 S. Main St. Floydada, TX 79235
           Snap-On Credit, LLC, 950 Technology Way Suite 301, Libertyville, IL 60048
           AIMBank, 3004 Slide Rd., Lubbock, TX 79407
           Tex-Fi Capital, LLC, 1211 19th Street, Lubbock TX 79401
           VISTA Bank, 4621 50th Street, Lubbock, TX 79414
           International Bank of Commerce, 2250 East 73rd Street, Tulsa, OK 74136


FROM:      Ford Motor Credit Company, LLC
           9009 Carothers Pkwy
           Dept 1000
           Franklin, TN 37067

DEBTOR:    Reagor-Dykes Imports, L.P., 6540 82nd Street, Lubbock TX 79424

SUBJECT:   Notice of  Private Sale


We will sell the following described property privately sometime after February 11, 2019:

1.  Equipment, furniture, machinery, demonstrators and service vehicles, supplies and other goods of every kind.
2.  Motor vehicles, tractor, trailers, implements, service parts and accessories, and other inventory of every kind and any
    accessions thereto.
3.  Accounts, instruments, chattel paper, general intangibles, contract rights, documents and supporting obligations thereto.
4.  Fixtures located at the Debtor's address and at any other address from which the Debtor conducts business.


You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell for a charge of
$25.00.  You may request an accounting by calling us at the telephone number listed below.

Ford Motor Credit Company
866-881-8418 x57508

BY: _____
        Dwayne Streat
        Center Operations Manager


DOC 331-22. FC 6/26/2018 Previous Editions must not be used.

(Ford) | FORD CREDIT

Notification of Disposition of Collateral

Date:  January 25, 2019

TO:      Reagor-Dykes Motors, L.P., 1207 South Lynn, Lamesa TX, 79331
         Robert Schleizer, BlackBriar, Chief Restructuring Officer, 3131 McKinney Ave. Suite 600,
         Dallas, TX 75204
         Mr. Rick Dykes, 2106 Vicksburg Avenue, Lubbock TX 79407
         Mr. Bart Reagor, 4811 115th Street, Lubbock TX 79424
         Reagor Auto Mall I, LLC, 1215 Avenue J, Lubbock TX 79401
         Reagor-Dykes II, LLC, 1211 19th Street, Lubbock TX 79401
         Reagor-Dykes III, LLC, 1211 19th Street, Lubbock TX 79401
         Reagor-Dykes Auto Company, L.P., 808 N IH 27, Plainview TX 79072
         Reagor-Dykes Amarillo, L.P., 4710 Canyon Drive, Amarillo TX 79109
         Reagor-Dykes Imports, L.P., 6540 82nd Street, Lubbock TX 79424
         Reagor-Dykes Plainview, L.P., 1220 S. I-27, Plainview, TX 79072
         Reagor-Dykes Floydada, L.P., 221 S. Main St., Floydada TX 79235
         American Tire Distributors Inc., 12200 Herbert Wayne Court Ste. 150, Huntersville NC
         28078
         Tex-Fi Capital, LLC, 1211 19th Street, Lubbock TX 79401
         International Bank of Commerce, 2250 East 73rd Street, Tulsa OK 74136

FROM:    Ford Motor Credit Company, LLC
         9009 Carothers Pkwy
         Dept 1000
         Franklin, TN 37067

DEBTOR:  Reagor-Dykes Motors, L.P., 1207 South Lynn, Lamesa TX, 79331

SUBJECT: Notice of Private Sale


We will sell the following described property privately sometime after February 11, 2019:

1.  Equipment, furniture, machinery, demonstrators and service vehicles, supplies and other goods of every kind.
2.  Motor vehicles, tractor, trailers, implements, service parts and accessories, and other inventory of every kind and
    any accessions thereto.
3.  Accounts, instruments, chattel paper, general intangibles, contract rights, documents and supporting obligations
    thereto.
4.  Fixtures located at the Debtor's address and at any other address from which the Debtor conducts business.


You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell for a
charge of $25.00.  You may request an accounting by calling us at the telephone number listed below.

Ford Motor Credit Company
866-881-8418 x52508

BY: _____
     Dwayne Streat
     Center Operations Manager


DOC 331-22. FC 6/26/2018 Previous Editions must not be used.

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

IN RE:                                          )

REAGOR-DYKES MOTORS, LP,    )Case No. 18-50214-rlj11

    Debtor.                              )

---

IN RE:                                          )

REAGOR-DYKES IMPORTS, LP,    )Case No. 18-50215-rlj11

    Debtor.                              )

---

IN RE:                                          )

REAGOR-DYKES AMARILLO, LP,    )Case No. 18-50216-rlj11

    Debtor.                              )

---

IN RE:                                          )

REAGOR-DYKES AUTO COMPANY,  )
LP,                          )Case No. 18-50217-rlj11

    Debtor.                              )

---

IN RE:                                          )

REAGOR-DYKES PLAINVIEW, LP,  )Case No. 18-50218-rlj11

    Debtor.                              )

---

IN RE:                                          )

REAGOR-DYKES FLOYDADA, LP,  )Case No. 18-50219-rlj11

    Debtor.                              )

## Page 2

```
 1          --------------------------------
 2               ORAL DEPOSITION OF
 3                    RENE LEAL
 4                 AUGUST 15, 2018
 5                    Volume 1
 6          --------------------------------
 7       ORAL DEPOSITION OF RENE LEAL, produced as a witness
 8   at the instance of the DEBTOR, and duly sworn, was taken
 9   in the above-styled and numbered cause on AUGUST 15,
10   2018, from 2:23 p.m. to 3:42 p.m., before Kailee
11   Pereida, CSR in and for the State of Texas, reported by
12   machine shorthand, at the law offices of Mullin, Hoard &
13   Brown, L.L.P., 1500 Broadway, Suite 700, Lubbock, Texas,
14   pursuant to the Federal Rules of Civil Procedure.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                 A P P E A R A N C E S
 2
 3   FOR THE DEBTORS:
 4       MR. DAVID MULLIN
             -AND-
 5       MR. DAVID R. LANGSTON
         MULLIN, HOARD & BROWN, L.L.P.
 6       1500 Broadway, Suite 700
         P.O. Box 2585 (79408)
 7       Lubbock, Texas 79401
         (806) 765-7491
 8       dumllin@mhba.com
 9   FOR FORD MOTOR CREDIT COMPANY, L.L.C.:
10       MR. CRAIG A. LESLIE
         PHILLIPS LYTLE LLP
11       One Canalside
         125 Main Street
12       Buffalo, New York 14203
         (716) 847-7012
13       cleslie@phillipslytle.com
14           -AND-
15       MR. DONALD H. CRAM, III
         SEVERSON & WERSON, P.C.
16       One Embarcadero Center
         26th Floor
17       San Francisco, California 94111
         (415) 398-3344
18
     FOR GM FINANCIAL
19
20       MR. STEPHEN P. STROHSCHEIN
         MCGLINCHEY STAFFORD, P.L.L.C.
21       301 Main Street
         Fourteenth Floor
22       Baton Rouge, Louisiana 70801
         (225) 383-9000
23       sstroh@mcglinchey.com
24
25
```

## Page 4

```
 1   FOR AIM BANK:
 2       MR. JEFF R. LASHAWAY
         BOERNER, DENNIS & FRANKLIN, P.L.L.C.
 3       920 Avenue Q
         Lubbock, Texas 79401
 4       (806) 763-0044
         jlashaway@bdflawfirm.opm
 5
     FOR FIRST CAPITAL BANK:
 6
         MR. JOHN F. MASSOUH
 7       SPROUSE, SHRADER, SMITH, P.L.L.C.
         701 South Taylor
 8       Suite 500
         Amarillo, Texas 79105
 9       (806) 468-3337
         john.massouh@sprouselaw.com
10
     FOR VISTA BANK:
11
         MR. FERNANDO BUSTOS
12       BUSTOS LAW FIRM, P.C.
         1001 Main Street
13       Suite 501
         Lubbock, Texas 79401
14       (806) 780-3976
         fbustos@bustoslawfirm.com
15
     FOR FIRST BANK & TRUST:
16
         MR. MARK S. CARDER
17       STINSON, LEONARD, STREET, L.L.P.
         1201 Walnut
18       Suite 2900
         Kansas City, Missouri 64106
19       (816) 691-3415
         mark.carder@stinson.com
20
     FOR BART REAGOR:
21
         MR. SCOTT R. WIEHLE
22       KELLY, HART & HALLMAN, L.L.P.
         201 Main Street
23       Suite 2500
         Fort Worth, Texas 76102
24       (817) 332-2500
         scott.wiehle@kellyhart.com
25
```

EXHIBIT 2

1 (Pages 1 to 4)

RD App. 0071

Page 5

```
 1   FOR IBC BANK:
 2     MR. JOHN D. DALE
       GABLE GOTWALS
 3     1100 ONEOK Plaza
       100 West Fifth Street
 4     Tulsa, Oklahoma 74103
       (918) 595-4828
 5     jdale@gablelaw.com
 6   FOR RICK DYKES:
 7     MR. DAVID M. GUINN, JR.
       LAW OFFICE OF HURLEY & GUINN
 8     1805 13th Street
       Lubbock, Texas 79401
 9     (806) 771-0700
       david@hurleyguinn.com
10
     ALSO PRESENT:
11
       Mr. Mike Cannon
12     Mr. Toby Cecil
       Mr. Rick Dykes
13     Mr. Jonathan Hill
       Mr. Howie Ravitz
14     Mr. Scott Wade
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1            INSTRUCTIONS FOR SIGNING A DEPOSITION
 2       Rules of Civil Procedure under which this
 3   deposition was taken provide that the deposition
     transcript shall be made available to the witness or his
 4   attorney of record for examination and signature by the
     witness.
 5
         This deposition condensed transcript is provided
 6   for your review.  It is yours to keep.  Read it
     carefully before making any changes or corrections.
 7   Make transcript corrections on the Witness Signature
     Page.
 8
 9       Changes and/or corrections must be made in the
     following manner:
10
         (1) Indicate by number the page and line you wish
11          to alter;
         (2) Indicate your change or correction;
12       (3) Give the reason for making the change.
13       When you have followed the instructions above, sign
     the Witness Signature Page before a Notary Public and
14   return it as soon as possible.
15       When we have received the signed and notarized
     transcript, we will forward all attorneys of record a
16   copy of the completed Witness Signature Page and deliver
     the original transcript to Mr. David Mullin for
17   safekeeping and use at trial.
18       If you have any questions about this procedure,
     please call my office at (806) 795-4202.
19
         Kailee Pereida, CSR
20       Caprock Court Reporting, Inc.
         1112 Texas, Suite 200
21       Lubbock, Texas 79401
         (806) 795-4202
22
23
24
25
```

Page 6

```
 1                    INDEX
                                     PAGE
 2   Appearances...........................  3
 3   Instructions for Signing a Deposition.............  7
 4   RENE LEAL
 5     EXAMINATION BY MR. MULLIN....................  8
       EXAMINATION BY MR. BUSTOS.................. 52
 6     EXAMINATION BY MR. STROHSCHEIN................ 53
       EXAMINATION BY MR. CARDER.................... 55
 7     EXAMINATION BY MR. MASSOUH.................... 56
 8
     Signature and Changes............................ 60
 9   Reporter's Certificate........................... 63
10                  EXHIBITS
11   NO.   DESCRIPTION                          PAGE
12   9    Notice of Oral Deposition of Rene Leal......... 10
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1            (Witness sworn by court reporter.)
 2                   RENE LEAL,
 3   having been first duly sworn, testified as follows:
 4                  EXAMINATION
 5   BY MR. MULLIN:
 6       Q.  Could you state your full name?
 7       A.  Rene Leal.
 8       Q.  Mr. Leal, have you ever given a deposition
 9   before?
10       A.  Yes, but I believe it's been over 30 years,
11   so --
12       Q.  That's a while back.  So as a little
13   refresher --
14       A.  Yes.
15       Q.  -- the court reporter is taking down my
16   questions, your answers.  You're under oath.  It'll be
17   printed up in a little book.  And it can be read back at
18   a trial, hearing, or in connection with a motion in the
19   case.
20       A.  Okay.
21       Q.  Do you understand that?
22       A.  Yes.
23       Q.  So it's very important that you understand my
24   questions and that you can answer the questions I ask.
25           If at any time you don't understand the
```

## Page 9

1  question, just go ahead and ask me to clarify it, okay?
2      A.  Okay.
3      Q.  And if you need a break, you can just ask for
4  a break and take a break.  I only ask that you answer
5  whatever the pending question is before you break.  Fair
6  enough?
7      A.  Yes.
8      Q.  And I ask that you let me finish my question.
9  I'll let you finish your answer.
10     A.  Okay.
11     Q.  And if I interrupt you, I want you to tell me.
12     A.  Okay.
13     Q.  And just stop me so that you can give your
14  full answer.
15     A.  Okay.
16     Q.  What did you do to prepare for your
17  deposition?
18     A.  The only thing I did was review the
19  declaration.
20     Q.  Okay.
21        MR. LESLIE:  And meet with your counsel.
22     A.  And meet with my counsel.
23     Q.  (BY MR. MULLIN)  And did you review any
24  documents other than the declaration?
25     A.  No.

## Page 10

1      Q.  Okay.
2        MR. MULLIN:  Let's mark this as 9.
3        (Exhibit 9 marked.)
4      Q.  (BY MR. MULLIN)  Exhibit 9 is the notice of
5  your deposition.  Have you seen that before today?
6        MR. LESLIE:  Thank you.
7      A.  I'm -- this is the first time I've seen this.
8      Q.  (BY MR. MULLIN)  Okay.  Tell me what your job
9  title is with Ford Motor Credit.
10     A.  It is financial services manager.
11     Q.  And what are the duties that you have as the
12  financial service manager?
13     A.  Reviewing credit files for dealership lines of
14  credit, in addition to working with the Nashville
15  business center, the regional manager, and the BDM to
16  address dealers that are in a loss position and/or have
17  liquidity issues.  In addition to that, working with the
18  Nashville business center, regional manager, BDM,
19  working with them together to try to resolve SOT and
20  status situations with dealers.
21     Q.  Okay.  What's the second one?  SOT and --
22     A.  Status situations with dealers.
23     Q.  Okay.  What would that mean?
24     A.  Basically a situation where a dealer is unable
25  to pay us and so we've taken keys, MSO's, and we're

## Page 11

1  basically working with the dealer to figure out next
2  steps.
3      Q.  Okay.  And how long have you been with Ford
4  Motor Credit?
5      A.  It'll be 33 years this month.
6      Q.  And where are you stationed?  Are you here in
7  Lubbock?
8      A.  I'm in -- I'm in Plano, Texas --
9      Q.  Okay.
10     A.  -- regional office.
11     Q.  Did you have involvement with the Reagor-Dykes
12  Auto Group?
13     A.  Can you be more specific?
14     Q.  Well, you said you reviewed credit files for
15  dealers.  Did you review the Reagor-Dykes Auto Group
16  credit file?
17     A.  I would be in the review routing, yes.
18     Q.  Okay.  Going back to the initiation of the
19  line?
20     A.  Again, be more specific because there was
21  different times where they had different lines.
22     Q.  Right.  They had a -- since they got their
23  Ford floor plan, were you involved in it, or was it some
24  later time?
25     A.  It was probably a later time.

## Page 12

1      Q.  Okay.  Did you review the Ford -- the
2  Reagor-Dykes credit file, say, in 2017, 2016?
3      A.  2016, I did.
4      Q.  All right.  And how about 2017?
5      A.  2017, there was a review completed in the
6  fourth quarter; however, it was a -- what we call a risk
7  rating review.  And so what happens behind the scenes at
8  the Nashville business center, they will look at current
9  financial statements through a month in -- you know, in
10  2017.  And they'll compare that to the previous credit
11  file that was done in 2016.  And if there's no
12  significant changes to the financial position of the
13  dealership, the -- there's a risk rating where it
14  passes.  If there are significant, there will be a risk
15  rating result that says it failed.  If it fails, then
16  the business center would then produce an entire credit
17  file that would then have been routed through me and
18  through other folks through -- in the company.
19     Q.  Okay.  So with respect to Reagor-Dykes, so you
20  would have looked at it in 2016?
21     A.  Correct.
22     Q.  But it passed in --
23     A.  It passed in twenty -- in 2017.
24     Q.  So you didn't look at it that year?
25     A.  I did not look at it in 2017.

Page 13

1 Q. Okay. And then in 2018, did you look at the
2 credit file?
3 A. It hasn't -- it hasn't been a year yet. So in
4 the -- I believe in the fourth quarter, it would be due
5 to be reviewed again.
6 Q. Okay. Do you know if Ford Motor Credit
7 received the audited financial statements of
8 Reagor-Dykes Auto Group?
9 A. Can you be more specific on which years?
10 Q. Well, let's look at the -- there's one here
11 that's an exhibit. This is the -- for year-end 2015.
12 So at some point in 2016, it would have been --
13 A. I would --
14 Q. -- issued.
15 A. I would say, yes, that we did receive that.
16 Q. Exhibit No. 7? Exhibit No. 7 is the
17 document --
18 A. Oh, I'm sorry.
19 Q. -- that you're --
20 A. Yes, Exhibit 7. Sorry.
21 Q. And did you have any interaction or
22 communication with the Reagor-Dykes Auto Group, let's
23 say, before the year 2018 where you were in
24 communication with people at the auto --
25 A. No.

Page 14

1 Q. -- group?
2 Were you one of the people who reviewed
3 the quarterly audits by Ford Motor Credit of
4 Reagor-Dykes Auto Group?
5 A. I would say that the process for reviewing any
6 audits is typically routed to the regional manager. And
7 the only time I would get results from an audit is if
8 there was an issue with the -- if the dealer had a high
9 percentage of payoff violations.
10 Q. What would a high percentage be?
11 A. Well, typically if we had a dealership that
12 had a percentage -- a high percentage of violations over
13 2 percent, then that -- typically, I would get notified.
14 I'd talk to the regional manager and -- yes.
15 Q. And what is the -- what is the violation? If
16 the payoff took place outside the seven days?
17 A. That's correct.
18 Q. Okay. All right. We looked at an audit
19 report this morning for -- and I don't know if you ever
20 saw it. I wanted to see if you ever saw this one.
21 Look at Exhibit No. 4. At the back,
22 there's an audit report. And there's some cover e-mail
23 there where it was forwarded by Gwen Schmucker.
24 A. Let me get my glasses on.
25 (Witness looks at document.)

Page 15

1 A. I don't recall getting this specific e-mail.
2 Q. Okay. Did you -- did anybody ever give you
3 the attached report, that audit report that's attached
4 that's separate and apart from the e-mail? Still
5 looking at Exhibit 4.
6 A. Oh, I'm sorry.
7 Q. Yeah. But the report attached --
8 A. Are you --
9 Q. Yeah, that report.
10 A. This report?
11 Q. There's two pages.
12 A. Okay. I don't -- again, I don't recall
13 getting this report.
14 Q. Okay. That's dated June 28th, 2018. Did
15 anybody ever inform you that there was a problem with
16 that audit report?
17 A. I believe on June 28th, I was on vacation for
18 the next week because my son was getting married. So
19 I'm familiar with the date. I don't -- I do remember
20 getting something when I got back, but it was more -- it
21 was probably more of a verbal of -- you know, of the
22 percentage of -- of -- percentage was high.
23 Q. Was high?
24 A. Yes.
25 Q. Okay. Just so we're looking at the same

Page 16

1 thing -- if you'd look at -- it's the third page of
2 Exhibit 4. But is it -- is it on that page where it
3 would reflect that the sold not paid was high or the
4 violations were high?
5 MR. LESLIE: I'm going to object to the
6 extent he's already testified he hasn't seen that report
7 before.
8 Q. (BY MR. MULLIN) You can still answer.
9 MR. LESLIE: If you have knowledge of --
10 repeat the question, please. I want to hear it before
11 he answers.
12 (Reporter reads back requested portion.)
13 MR. LESLIE: I'm just going to augment my
14 objection that I don't believe the foundation has been
15 established for the source of this actual page.
16 So you can answer if you understand.
17 A. Can you repeat it one more time? I'm sorry.
18 Q. (BY MR. MULLIN) Okay. All I'm trying to get
19 at is, you said after you got back from vacation,
20 somebody said the sold not paid percentages were high at
21 Reagor-Dykes. And I'm trying to determine if that is
22 reflected on the audit report itself.
23 A. No.
24 Q. Okay. The audit report itself does not
25 reflect that they're -- that the violations were high,

## Page 17

1  correct?
2          MR. LESLIE:  Objection; form.  He said
3  sold not due, not violations.
4      A.  Sold not due, correct.
5      Q.  (BY MR. MULLIN)  Well, does it reflect that
6  the sold not due is high?  It's on the next page that it
7  addresses that.
8          Does the audit report reflect that the
9  sold not due is high?
10     A.  It reflects the dollar amount is high.
11     Q.  Okay.  And is that -- is that what the
12 conversation was that you had when you got back?
13     A.  I believe so.
14     Q.  Okay.  And that dollar amount is the
15 $25 million?
16     A.  I don't recall the exact dollar amount.
17     Q.  But the report reflects $25 million --
18     A.  Yes.
19     Q.  -- correct?
20         And do you know who it was that told you
21 that, that the -- that the sold not dues reflected in
22 the audit were high?
23     A.  I don't recall specifically who told me that.
24     Q.  And what did you do in response?
25     A.  I believe I met with the regional manager.

## Page 18

1  And the direction was that we would continue to audit
2  him on accelerated basis.
3      Q.  Okay.  And the regional manager was
4  Mr. Boudreau or -- or Mr. Dykes -- or excuse me --
5  Mr. Byrd?
6      A.  Mr. Byrd.
7      Q.  I'm sorry.
8          And -- so you and Mr. Byrd decided that
9  you would continue to audit Reagor-Dykes?
10     A.  That's my recollection, yes.
11     Q.  Okay.  And that would be in the second week of
12 July 2018?
13     A.  Yes.  When I returned, yes.
14     Q.  All right.  And was there any involvement in
15 that decision from people higher up in the company;
16 Mr. Boudreau or anybody from Dearborn or anything like
17 that?
18     A.  I don't -- I don't -- I don't recall, no.
19     Q.  All right.  Do you recall any involvement of
20 Black Belt in deciding to perform the audit on the 26th
21 and 27th of July?
22     A.  I wasn't involved with the process, so I -- if
23 you can maybe re-clarify that.
24     Q.  Okay.  You said you and Mr. Byrd discussed
25 continuing to audit Reagor-Dykes, right?

## Page 19

1      A.  That's correct.
2      Q.  Okay.  And what did you do in furtherance
3  of -- of that plan?
4      A.  We did nothing until we were invited to a
5  conference call by our -- the Black Belt to review some
6  data that he had wanted to review with us.
7      Q.  Okay.  And who was Black -- who was Black
8  Belt?
9      A.  It's -- his name is Jim Conlan.
10     Q.  Okay.  And what did Mr. Conlan say to you?
11     A.  He set up a conference call on Monday
12 morning -- I believe it was July 23rd -- and invited the
13 business center credit team, invited the regional
14 manager, Gary Byrd, myself, and reviewed a project that
15 he had been working on.
16     Q.  Okay.  Did Mr. Conlan tell you how he had come
17 to be working on Reagor-Dykes?
18     A.  I believe -- or excuse me.
19         MR. LESLIE:  Hold on a sec.
20         THE WITNESS:  Yeah.
21         MR. LESLIE:  How is that relevant to
22 tomorrow's hearing?
23         MR. MULLIN:  Well, I think it's relevant
24 to the valuation of the collateral as to how we -- you
25 know, how Ford came to the conclusion that the

## Page 20

1  collateral was needed to be further inspected.
2          MR. LESLIE:  I don't believe it's
3  relevant how he was directed to do it.  I'm going to
4  object.  Direct you not to answer.
5      Q.  (BY MR. MULLIN)  Are you going to follow your
6  counsel's instructions?
7      A.  Yes.
8      Q.  So you were on a conference call on Monday,
9  the 23rd?
10     A.  Yes, sir.
11     Q.  And what was discussed in that conference
12 call?
13     A.  Mr. Conlan reviewed some data from a project
14 that he had been working on that revealed -- he had a
15 sample size of about 150 vehicles that had been sold
16 from a prior audit in June of 2018.  He compared sale
17 dates that were given to us by the dealership and
18 utilized DMV and some other resources to determine that
19 the sale dates that we were given by the Reagor-Dykes
20 organization were false and incorrect.
21     Q.  And were the sales dates earlier than the
22 sales dates that were reflected in Ford's records?
23         MR. LESLIE:  Objection to form.
24         But if you understand, you can answer.
25     A.  Repeat just to make sure I'm --

Page 21

1    Q.  (BY MR. MULLIN)  Well, the sale -- the actual
2  sales dates reflected in the DMV records --
3    A.  Correct.
4    Q.  -- were dates earlier than the dates that had
5  been reported to Ford?
6    A.  That's correct.
7    Q.  And was the audit that Mr. Conlan was
8  referring to the audit that's attached to Exhibit No. 4?
9    A.  It was the June 28th audit, if that's what
10  this one is, yes.
11    Q.  Okay.  Okay.  And so based on that
12  information, what did the three of you decide to do?
13    A.  You know, our immediate decision was we needed
14  to re-audit the organization.
15    Q.  And how did you carry out that plan?
16    A.  We requested an audit through the Greenville
17  business center, who is the business center that does
18  all the coordinating of audits.
19    Q.  Was there a person you were dealing with?
20    A.  I don't -- I'm trying to think.  I'm not sure.
21  Typically, I would not get involved with that.  It was
22  arranged through the Nashville business center to the
23  Greenville business center.
24    Q.  Okay.  And tell me about how that audit was
25  conducted.

Page 22

1    A.  It was conducted similar to other audits where
2  the soonest we could get out there was Thursday, is what
3  it was scheduled for.  And the only thing that we did
4  differently for this audit, because we wanted to verify
5  that -- if the same issue was occurring with the sales
6  dates that had occurred on the June audit.
7         So as the audit began, typically the --
8  the AiM folks who complete the audits would -- were
9  providing sales dates and copies of documents.  Those
10  were then sent to Jim Conlan, who was in the background
11  running DMV's to verify if those dates were accurate
12  based on the DMV and the other sources that he has.
13    Q.  Okay.  And who were you dealing with at
14  Reagor-Dykes?
15    A.  I wasn't dealing with anyone.
16    Q.  Okay.  Was -- was Mr. Byrd dealing with
17  Reagor-Dykes?
18    A.  Mr. Byrd was.
19    Q.  And who was he dealing with?
20    A.  I believe he was -- excuse me.  My
21  understanding is, is that he was meeting with the CFO.
22    Q.  Shane Smith?
23    A.  Shane Smith.
24    Q.  All right.  But you did not meet with Shane
25  Smith?

Page 23

1    A.  No.
2    Q.  Did you -- did you ever have any conversations
3  with Shane Smith?
4    A.  In the past, I have.  He used to work for Ford
5  Credit, so -- but it's -- it's been very rare since he
6  left Ford Credit.
7    Q.  Okay.  How long did he work for Ford Credit?
8         MR. LESLIE:  Objection.  Don't answer.
9  It's not relevant to tomorrow's hearing.  I direct you
10  not to answer.
11    Q.  (BY MR. MULLIN)  Did you talk to Mr. Dykes or
12  Mr. Reagor?
13    A.  No.
14    Q.  At any time?
15    A.  Can you rephrase the time?
16    Q.  Well, did you ever talk to Mr. Reagor or
17  Mr. Dykes?
18    A.  I met Mr. Reagor, I believe, a few years ago
19  at a dealer grassroots-type meeting in Dallas.
20    Q.  Other than that, any other conversations?
21    A.  No.  No.
22    Q.  Any communications with Rick Dykes?
23    A.  Never met him.
24    Q.  Okay.  Okay.  Tell me about what happened
25  during the audit of July 26th and 27.

Page 24

1    A.  As a typical audit goes, we checked inventory,
2  tried to figure out the missing units.  From the missing
3  units, we -- we did figure out -- again, from the AiM
4  perspective, trying to figure out what vehicles had been
5  sold and then from that point, checking sale dates and
6  so forth.
7    Q.  Okay.  What did you find?
8    A.  There was a large amount of vehicles that were
9  missing.  And during -- it was probably early -- early
10  afternoon Friday, we had received data from -- from Jim
11  Conlan that a lot of the sale dates that had been
12  submitted to him were inaccurate, similar to what he
13  found in the June audit.
14    Q.  And, again, the sale dates were earlier dates
15  per the DMV than the dates that were provided to you by
16  Mr. Smith?
17    A.  That's correct.
18    Q.  Was Ford's audit team looking at the actual
19  underlying contracts?  Or were you given a list of dates
20  by Mr. Smith?
21    A.  I don't -- I wasn't there, so I don't know
22  specifically what they looked at.
23    Q.  Okay.  You didn't look at any contracts
24  yourself?
25    A.  No.

Page 25

1    Q.  And as a result of the audit, what did Ford
2  do?
3        MR. LESLIE:  Objection to any extent that
4  this question or the question you asked goes into
5  matters that are protected by attorney-client privilege.
6        If you have non-privileged information to
7  share, you can answer that question.
8    Q.  (BY MR. MULLIN)  I don't want you to -- yeah,
9  I don't want you to tell me what you discussed with your
10  attorneys.  I just want what you did.
11    A.  Based on the inaccurate and false sales dates,
12  the decision was made to request that all missing and/or
13  sold vehicles be paid in -- paid in full that day.
14    Q.  And did Ford receive any payments?
15    A.  I don't -- I don't re- --- can you -- can you
16  re- -- can you repeat --
17    Q.  Did you receive any payments as a result of
18  the request for payment?
19    A.  Sorry.  Yes, we did.
20    Q.  Okay.  But it didn't pay -- it didn't pay off
21  the whole?
22    A.  One more time.  I'm sorry.
23    Q.  But it didn't pay off the -- the amount that
24  was owed?
25    A.  The amount that was paid on Friday was the

Page 26

1  amount that my understanding was due at that time.  We
2  made additional efforts to verify that that -- those
3  funds were available.  And -- and we were told -- my
4  understanding is, it was communicated from Shane to Gary
5  Byrd, the regional manager, that there would not be
6  enough funds to -- to clear, even though they had
7  submitted the funds via electronic funds.
8    Q.  Since -- since July 27th, have you had any
9  further involvement with the Reagor-Dykes matter?
10    A.  Yes.
11    Q.  And what has that been?
12        MR. LESLIE:  Objection; again, to the
13  extent it calls for anything that is attorney-client
14  privileged or any participation in the legal or
15  deliberative process.  Other than that, you can answer.
16    A.  I basically on a daily basis have been on the
17  phone with the folks that we have at each of the stores
18  attempting to continue to secure our collateral and take
19  possession of all keys, MSO's, and titles.
20    Q.  (BY MR. MULLIN)  Okay.  Has any of your
21  collateral disappeared, in your view, since July 27?
22    A.  Yes.
23    Q.  Okay.  What -- what collateral has disappeared
24  since then?
25    A.  I don't have specifics, but I will tell you --

Page 27

1  that I -- that I can give you right now, but there has
2  been vehicles that have been sold.  We found out they
3  had been sold to the Ram organization, which we don't --
4  don't do business with.
5    Q.  How many vehicles were those?
6    A.  I -- I don't have the number.
7    Q.  Do you have the dollar amount?
8    A.  No, I don't.
9    Q.  How did you find out about it?
10    A.  After the on-site folks did some investigation
11  and asked questions and then found that information out
12  from whoever was on site for the dealership.
13    Q.  Okay.  Who is the on-site people that
14  discovered that, that there have been vehicles sold to
15  Ram?
16    A.  I don't have specifics.  I would have to go
17  back and -- but I don't have any specifics on every
18  single vehicle that has disappeared.
19    Q.  Any?  Can you tell me any of them, where you
20  got the information?
21    A.  The one I'm thinking of is Lubbock Mitsubishi.
22  The vehicle was located at one of their -- not at the
23  main location, but a lot -- I believe they call it the
24  South Lot.  And the vehicle apparently had been
25  delivered from that lot to the Ram location.

Page 28

1    Q.  Is that one vehicle?
2    A.  It's one vehicle, yes.
3    Q.  Do we know what -- what make and model it was?
4    A.  I don't know.
5    Q.  Do you know if it was a vehicle that was
6  floored with Ford Motor Credit?
7    A.  My understanding is that it was floored with
8  Ford Credit.
9    Q.  Any others?
10    A.  There's a recent example of a vehicle that was
11  at an up-fitter.
12    Q.  What did you call them?
13    A.  Up-fitter.  So they were -- they were doing
14  some modifications to a vehicle.
15    Q.  Okay.
16    A.  And we had verified several -- I believe
17  two -- on two prior audits since -- since the 7/26
18  audit, we had verified the vehicle was there.  And we
19  determined yesterday that the vehicle had been -- was no
20  longer available and had been, I think, picked up by the
21  customer that had purchased the vehicle.
22    Q.  Okay.  So do you know when the customer had
23  purchased it?
24    A.  There was information in the file that said --
25  I believe it was a contract date of July 26th.  And the

Page 29

1  vehicle was released to them from this up-fit company
2  Friday, August 3rd.
3      Q.  Okay.  And had the customer paid for the
4  vehicle?
5      A.  We -- well, we believe, based on the contract,
6  that it had been funded.
7      Q.  And was it a Ford Credit floor --
8      A.  Yes.
9      Q.  -- vehicle?
10     A.  Yes, it is.
11     Q.  Can you give me a make and model on that one?
12     A.  It's an F-450, and there was a flatbed put on
13  it.  And the balance -- the balance without the up-fit
14  was close to 60,000 is what's due today on the
15  wholesale.
16     Q.  So your concern there is that the -- you're
17  not concerned about the customer taking the vehicle that
18  he paid for, right?
19     A.  I'm concerned that the contract was dated
20  July 26th and we were not paid for it.
21     Q.  Right.
22     A.  Yeah.
23     Q.  You hadn't been paid for the vehicle?
24     A.  Correct.
25     Q.  Not that the person actually has the vehicle?

Page 30

1          (The witness nods head.)
2      Q.  Okay.  Anything else?  Any other vehicles?
3      A.  I don't -- offhand, I don't have other
4  examples.
5      Q.  All right.  And has -- has Ford Motor Credit
6  received payments since July 27th on -- on its loans?
7      A.  We have received funds from customers that
8  have gone in to purchase vehicles with cashier's checks.
9  And we've received funds for -- from contract -- Ford
10  Credit contract proceeds where customers have purchased
11  the vehicle and financed with Ford Credit.
12     Q.  Okay.  Where the customer who's buying them
13  goes ahead and finances with Ford Motor Credit?
14     A.  That's correct.
15     Q.  All right.  Let me show you a few documents,
16  see if you have seen these.
17          Have you seen Exhibit No. 2?
18     A.  Is that all this -- this is all Exhibit 2?
19          (Witness looks at document.)
20     A.  I don't recall seeing this specific exhibit.
21  I --
22     Q.  Do you know the amount that Ford currently
23  claims that Reagor-Dykes Auto Group owes to Ford Motor
24  Credit?
25     A.  It would be the amount on the declaration

Page 31

1  page.  So it was in the 40, 41 million range.
2      Q.  That's the -- let's look at Exhibit No. 3.
3          Is this -- is this Ford's most current
4  report on the out-of-trust lending?
5      A.  I -- I believe it is, yes.
6      Q.  Okay.
7      A.  As of this date, yes.
8      Q.  Okay.  So whatever those figures add up to,
9  that's the current amount --
10     A.  Right.
11     Q.  -- that you think is out of trust?
12     A.  Correct.
13     Q.  Okay.  And then what I was getting was the
14  total indebtedness of --
15     A.  Right.
16     Q.  -- of Ford Motor Credit, which -- is that
17  what's supposed to be reflected on Exhibit 2?  Do you
18  know if that's what that report shows?
19     A.  I don't recall seeing this report, so I'm
20  not --
21     Q.  Okay.
22     A.  And there's no total, so I --
23     Q.  Okay.  Has Ford Motor Credit done a valuation
24  of its existing collateral?
25     A.  I'm not sure I understand.

Page 32

1      Q.  Well, one of the issues that could come up at
2  hearings that are to be held in this case in the next
3  month or so, including tomorrow, would be the value of
4  your -- of Ford Motor Credit's existing collateral, how
5  much is that worth.  Do you have any idea what that
6  number is?
7      A.  No.
8      Q.  How would you go about calculating it?
9          MR. LESLIE:  Objection; calls for
10  speculation.
11          You can go ahead and answer it if you
12  understand or if you can.
13     A.  I think it would be -- I -- I don't know.  At
14  this point, I couldn't say.
15     Q.  (BY MR. MULLIN)  Okay.  So as of -- as of
16  today, do you know anybody at Ford who knows the
17  valuation of your collateral?
18     A.  No.
19     Q.  And I mean Ford Motor Credit --
20     A.  Right.
21     Q.  -- not the -- all right.  You understand --
22     A.  Yes, I understand.
23     Q.  -- what I'm saying?  Okay.
24          Let me show you Exhibit Conner No. 1.
25     A.  Okay.

Page 33

1   Q.  And these are what the previous witnesses have
2   identified as deals in transit.
3       A.  Okay.
4       Q.  Are -- have you seen this list before?
5       A.  I don't -- I don't recall seeing this list,
6   no.
7       Q.  Okay.  Do you know if Ford Motor Credit is
8   claiming that this -- any or all of this list of $8.2
9   million in receivables is towards Ford Credit's
10  collateral?
11          MR. LESLIE:  Objection; calls for a legal
12  conclusion.  Direct him not to answer.
13          MR. MULLIN:  I can't ask the witness what
14  the collateral is?
15          MR. LESLIE:  It's not his document.
16  You're giving him a number.  You're saying a portion of
17  this.  We have no knowledge about the accuracy of it,
18  nor was he involved in generating it.
19          MR. MULLIN:  Well --
20          MR. LESLIE:  So if you want to ask him
21  about what Ford Credit's position is or if he knows Ford
22  Credit's position regarding contracts in transit, ask
23  him.
24          MR. MULLIN:  I told him it was contracts
25  in transit.  I mean, what are you trying to do --

Page 34

1          MR. LESLIE:  You asked him about that
2   total, that number versus Ford Credit's claims.  He's
3   not going to speak to Ford Credit's claims.  If you ask
4   him about what Ford Credit believes to be the number and
5   he can answer that, he can answer that.
6          MR. MULLIN:  Again, I'm giving him a list
7   of receivables, and I'm asking him if Ford Motor Credit
8   is claiming those receivables as collateral.
9          MR. LESLIE:  There's an absolute lack of
10  foundation from where this information came from other
11  than Mr. Conner himself.  This witness has not seen it
12  before.  And I'm not going to have him answer questions
13  about that document or in any way validate that
14  document.  You're not entitled to that.  You can ask
15  him, does Ford Credit claim an interest in contracts in
16  transit?  And if so, what amount?  And if he knows --
17      Q.  (BY MR. MULLIN)  Do you claim -- do you claim
18  an interest in these contracts in transit?
19          MR. LESLIE:  Objection to --
20      Q.  (BY MR. MULLIN)  These particular contracts?
21          MR. LESLIE:  These contracts in transit?
22          MR. MULLIN:  Yes, yes.  That's what I
23  want to know.
24          MR. LESLIE:  He's never seen it before.
25          Do you have any knowledge about those

Page 35

1   particular vehicles in transit?
2          THE WITNESS:  No.
3       Q.  (BY MR. MULLIN)  Is Ford Motor Company
4   claiming a security interest in the vehicle receivables
5   on Conner Exhibit 1?
6          MR. LESLIE:  Objection; again calls for a
7   legal conclusion.  Direct him not to answer.
8          MR. MULLIN:  All right.  Well, don't
9   say -- don't say you have it tomorrow.  Today you can't
10  remember.  Nobody knows.  It's a legal conclusion.  It's
11  confusing.  But tomorrow --
12          MR. LESLIE:  You're asking --
13          MR. MULLIN:  -- it'll be clarified very
14  much.
15          MR. LESLIE:  Mr. Mullin, you're asking
16  specifically whether Ford Credit is claiming a security
17  interest.  You're asking for a legal position.  You're
18  not asking him what does -- what does Ford Credit claim
19  to have an interest in.  You're not asking him about
20  specific vehicles.  You're asking him about a list of
21  customer contracts provided by Mr. Conner that he's
22  never seen before.  You're asking him if we claim
23  security interest in these particular ones.  No, he's
24  not going to answer that question.  That's a legal
25  question.

Page 36

1          MR. MULLIN:  He's the one that signed the
2   declaration and --
3          MR. LESLIE:  And his declaration didn't
4   talk about contracts in transit or this list which
5   didn't even exist when he gave his declaration.
6          MR. MULLIN:  He certainly -- he certainly
7   is taking the position on the collateral.  And if he's
8   telling me he doesn't know whether it's your
9   collateral -- I mean, I don't think you're entitled -- I
10  don't think you have any right whatsoever to tell the
11  witness not to answer my question, absolutely not under
12  the Federal Rules, the Bankruptcy Rules, the Judge's
13  rulings, or anything else when I ask the witness, did
14  you have a collateral interest in these documents?
15          MR. LESLIE:  I do when the witness is
16  being presented with a document he's never seen before
17  and has no opportunity to go back, check any records, do
18  anything else.  And you're asking him for a legal
19  conclusion.  Are we asserting a security interest in
20  these specific vehicles?  That's not a question that
21  he's going to answer.  If you want to ask him about what
22  our security interest pertains to --
23          MR. MULLIN:  And he can say he doesn't
24  know, sir.  He can say he doesn't know.  He doesn't have
25  a right to not answer.  You can't just sit here and tell

Page 37

1    witnesses don't answer anything, don't tell anything.
2    You can't, okay?  You're violating the rules.  It's a
3    joke.
4            MR. LESLIE:  I respectfully disagree.
5            MR. MULLIN:  Well, you can respectfully
6    disagree.  But you're just wrong.
7        Q.  (BY MR. MULLIN)  Are you going to answer that
8    question?
9        A.  No.
10       Q.  All right.  Let me show you Conner Exhibit
11   No. 2.
12           Does Ford Motor Credit claim an
13   interest -- security interest in any of the un-floored
14   vehicles on Conner Exhibit No. 2?
15           MR. LESLIE:  Objection to the extent
16   again -- have you seen that document before?
17           THE WITNESS:  No.
18           MR. LESLIE:  The witness has never seen
19   the document.  You're asking him to assert whether or
20   not there's an interest in those particular items of
21   inventory.
22           Do you know, as you sit here today,
23   whether those are subject to our floor plan or not -- or
24   excuse me -- to our security interests or not?
25           THE WITNESS:  I don't know.

Page 38

1            MR. MULLIN:  I object to you asking the
2    witness questions instead of objecting, which is also a
3    violation of the rules.
4            MR. LESLIE:  Well, there's also a little
5    case called Donde, which says we're supposed to
6    cooperate and work.  And I'm trying to do that.  If
7    you're going to ask him a legal conclusion about a list
8    of vehicles he's never seen before, that's not a fair
9    question to him, and it does call for a legal
10   conclusion.
11           MR. MULLIN:  Well --
12           MR. LESLIE:  He's not going to give legal
13   conclusions.
14           MR. MULLIN:  -- this document was an
15   exhibit at the depositions on Monday.  And I -- I
16   certainly am entitled to ask him.  It has the list of
17   the vehicles, what they are, and tells you what -- what
18   they are and what the inventory value is.  I don't
19   know -- I don't understand why he can't answer that
20   question.  Either --
21           MR. LESLIE:  He's answered that he's
22   never seen it before.
23           MR. MULLIN:  It's either yes, no, or I
24   don't know.
25           MR. LESLIE:  He's said he's never seen it

Page 39

1    before and has no knowledge of whether these specific
2    vehicles are subject to security interest.  He's
3    answered it.
4            MR. MULLIN:  That's your testimony.  That
5    isn't his testimony.
6            MR. LESLIE:  He answered it.
7            MR. MULLIN:  You are testifying, not him.
8        Q.  (BY MR. MULLIN)  What is your answer?
9            MR. LESLIE:  Objection; direct him not to
10   answer.
11           MR. BUSTOS:  I join Mr. Mullin's
12   objections in terms of his narrative objections, which
13   is essentially coaching a witness or testifying for a
14   witness.
15           MR. MULLIN:  Yeah.  It's totally -- to
16   quote Donde back to me while you're doing what you're
17   doing is exactly what Donde was designed to prevent.
18       Q.  (BY MR. MULLIN)  All right.  Let's go back
19   to -- does -- has Ford Motor Credit -- are they claiming
20   an interest in -- a security interest in the -- any of
21   the Reagor-Dykes equipment, furniture, fixtures, any of
22   those items?
23       A.  Yes.
24       Q.  All right.  How -- what attempt has Ford Motor
25   Credit taken to value that equipment and furniture and

Page 40

1    fixtures?
2        A.  I'm not aware of any actions.
3        Q.  So Ford doesn't know what it's worth?
4            MR. LESLIE:  Objection.  That's not what
5    the witness testified.  You're assuming facts not in
6    evidence.
7            MR. MULLIN:  You are making speaking
8    objections.  You're making speaking objections, and
9    you're just -- you're just completely violating the
10   rules.  You are completely violating the rules by what
11   you're doing.  You're not allowed to put words in his
12   mouth.  Let the man answer the question.
13           MR. LESLIE:  If your question assumes
14   facts not in evidence or makes an assumption, I'm going
15   to object.  I've objected.
16           MR. MULLIN:  Assumes facts not in
17   evidence, that's a ridiculous objection in a deposition.
18   I mean, nothing is in evidence until we get in the
19   courtroom.
20       Q.  (BY MR. MULLIN)  So do you refuse to -- to
21   answer the question whether anyone at Ford has valued
22   the -- the other -- other collateral, the furniture,
23   fixtures, equipment that it's claiming -- that you say
24   they're claiming as collateral?
25           MR. LESLIE:  Could you read back, please,

Page 41

1    the last question that was answered by the witness?
2         (Reporter reads back requested portion.)
3         MR. LESLIE: Thank you. Objection; asked
4    and answered.
5         You can still answer.
6         A.   I'm unaware of any actions.
7         Q.   (BY MR. MULLIN) And Ford has -- Ford Motor
8    Credit has conducted an inventory of all the vehicles at
9    all the dealerships of the Reagor-Dykes Auto Group?
10        A.   Yes.
11        Q.   Okay. And is there a document that reflects
12   that -- the results of that inventory?
13        A.   There is a document that would show the
14   results of the -- of a wholesale audit, yes.
15        Q.   And what's that document called?
16        A.   I don't know that there's a name for it. It's
17   just a -- they -- it's summary results of a wholesale
18   audit.
19        Q.   Okay. And has that document been provided to
20   Reagor-Dykes?
21        A.   I'm unaware whether it has or not.
22        Q.   Do you know what it shows the total inventory
23   to be?
24        A.   No, I don't.
25        Q.   Does anybody at Ford know that -- what that

Page 42

1    total inventory amount is?
2         A.   I'm sure there probably is someone from our
3    business center that could show that information, yes.
4         Q.   Is it Paul Boudreau?
5         A.   I don't believe so.
6         Q.   Has -- has anybody at Ford Motor Credit done
7    an analysis of whether there are any transactions in
8    transit that -- in which Ford Motor Credit has a
9    security interest?
10        A.   Can you be more specific?
11        Q.   Well, have you tried to track down whether
12   there are any pending transactions where the funds have
13   not been received yet by the company, but where the --
14   the vehicle has been sold --
15        A.   Uh-huh.
16        Q.   -- and there's an expectation of receiving
17   funds in payment; in other words, the customer has not
18   paid for -- paid Reagor-Dykes for the vehicle, but the
19   customer already has obtained possession of the vehicle?
20        A.   I guess I'm still trying to --
21        Q.   Well, do you have a list of those --
22        A.   -- understand. A list of what?
23        Q.   Of transactions where the -- where a vehicle
24   has been sold and the customer has taken possession of
25   the vehicle --

Page 43

1         A.   Uh-huh.
2         Q.   -- and the -- however the transaction was
3    being funded --
4         A.   Uh-huh.
5         Q.   -- by the -- the lender to the customer --
6         A.   Right.
7         Q.   -- has not yet paid the money to --
8         A.   Right.
9         Q.   -- Reagor-Dykes?
10        A.   So just to clarify, are you talking about
11   contracts in transit?
12        Q.   Yes.
13        A.   My understanding is there's someone at the
14   Nashville business center that has -- has issued
15   assignments to the lending source in order to acquire
16   funds that have not yet been sent to the Reagor-Dykes
17   Group.
18        Q.   Okay. And who would that person be?
19        A.   I don't know that there's a specific person at
20   the Nashville business center, but I'd have to -- I
21   mean, we -- we could request the information and --
22        Q.   Okay. Do you have a -- is there a list of
23   those transactions where the assignments have been
24   issued in Ford's possession?
25        A.   I believe we have a list of -- of -- of

Page 44

1    assignments.
2         Q.   And when you say an assignment, what's being
3    assigned?
4         A.   Proceeds from the -- from the contract.
5         Q.   And from whom to whom -- who's assigning what?
6         A.   We would send the assignment out to the
7    lending -- the lender advising them that we have
8    priority in receiving funds on those contracts.
9         Q.   Okay. And do you know which lenders have been
10   communicated with?
11        A.   I don't know.
12        Q.   But there's a list of that information that
13   Ford has?
14        A.   That's my understanding, yes.
15        Q.   Do you know what the volume -- the dollar
16   volume of that is?
17        A.   I don't know.
18        Q.   Do you know if Ford has received any money as
19   a result of those assignments?
20        A.   My understanding, based on the information I
21   believe as of yesterday, the answer is, no.
22        Q.   Are you aware of any effort by Ford to
23   evaluate the amount of money that is -- is outstanding
24   for tax, title, and licenses on Ford floor plan vehicles
25   that were sold and then there were -- the checks for the

## Page 45

1  tax, title, and license has either -- were never issued
2  or were not paid?
3     A.  I believe we're making an effort to try to
4  determine for specifically Ford accounts -- Ford Credit
5  accounts and for -- so I believe there is someone in the
6  Nashville business center that is looking into that.
7     Q.  Again, do you know that person?
8     A.  No, I don't specifically.
9     Q.  Do you know how much money is involved in this
10 that --
11    A.  I don't.
12    Q.  Has -- has Ford yet issued any checks to -- or
13 made payments on -- for the tax, title, and licenses on
14 any vehicles?
15    A.  I'm not aware that there's been any checks
16 issued.
17    Q.  Okay.  Has Ford done any analysis to determine
18 whether there are vehicles subject to Ford's floor plan
19 that were sold and there was a trade-in vehicle and the
20 trade-in was subject to a security interest in favor of
21 another lender, but that other lender hasn't been paid
22 off?
23    A.  I believe we, again, have a different team in
24 Nashville that's looking into that.
25    Q.  And have you -- is there a list of those

## Page 46

1  transactions?
2     A.  Not that I'm aware of at this point.
3     Q.  Do you know if Ford has made any effort to pay
4  any of those liens off?
5     A.  I am not aware of that, no.
6     Q.  I may have asked you this, but have you had
7  any contact with Shane Smith since July 27th?
8     A.  No.
9     Q.  Has Ford done any analysis or investigation to
10 determine if any of the vehicles on which it's claiming
11 a lien are also subject to a claim of lien or security
12 interest by another lender?
13    A.  My understanding is, yes.  Once again, the
14 Nashville business center is -- has been trying to
15 figure that out.
16    Q.  Okay.  And is there any kind of a list or a
17 report on that?
18    A.  I believe there might be a list of vehicles
19 that were double-floored.
20    Q.  Okay.  Now, when you say, "double-floored," I
21 think what we've been referring to as double-floored in
22 this deposition has been vehicles where they have been
23 double-floored with Ford.
24    A.  Uh-huh.
25    Q.  In other words, you know, you advanced on it

## Page 47

1  twice.
2     A.  Right.
3     Q.  But you're talking about as double-flooring
4  where it's floored with two different lenders?
5     A.  That's correct.
6     Q.  Okay.  And -- so Ford has a list of those, you
7  think?
8     A.  I believe we do.
9     Q.  Okay.  And who has that?
10    A.  It would be someone from the Nashville
11 business center.
12    Q.  Okay.  All right.  Have you seen the list?
13    A.  I believe I have seen the list in the early
14 stages.  I'm not -- we've had a lot going back and
15 forth.  So I believe I have seen the list, yes.
16    Q.  Do you know what the volume is of loans of
17 vehicles --
18    A.  Offhand --
19    Q.  -- that are subject to two liens?
20    A.  -- I don't specifically remember the numbers.
21    Q.  All right.  Let me take a little break.
22       (Break from 3:20 p.m. to 3:26 p.m.)
23    Q.  (BY MR. MULLIN)  Mr. Leal, let me ask you a
24 couple of questions about the -- July 26th and 27th.
25 Was that audit a -- out of the normal cycle?

## Page 48

1     A.  Based on the information we received from the
2  Monday, July 23rd Webex meeting with Jim Conlan, based
3  on that information, we definitely accelerated the
4  audit.
5     Q.  Okay.  And so that audit -- well, let me ask
6  you this.  Was it usual practice in connection with an
7  audit -- if there were out-of-trust lending discovered,
8  how many days would the customer be given to pay that
9  off?  I mean the dealer.
10       MR. LESLIE:  Object to form.
11       You can answer if you understand the
12 question.
13    A.  Can you repeat again?
14    Q.  (BY MR. MULLIN)  In a usual audit situation
15 for Ford Motor Credit, if out-of-trust lending was
16 discovered in an audit, how many days would the dealer
17 be given to pay off the out-of-trust condition?
18    A.  I don't know that -- based on the
19 circumstances, that -- that -- and being in this
20 position, that we would have allowed additional
21 processing days based on the information we -- we knew
22 about.
23    Q.  Here with Reagor-Dykes?
24    A.  Yes.
25    Q.  But I was just saying in general.

Page 49

1    A.  It depends on the situation.
2    Q.  Okay.  Because in the Reagor-Dykes situation,
3  you essentially gave them just one day to make for it
4  whole, correct?
5    A.  That's correct.
6    Q.  Does -- does Ford have any information -- does
7  Ford Motor Credit have any information indicating that
8  anyone other than Shane Smith was involved in providing
9  Ford false data?
10       MR. LESLIE:  I'm just going to object to
11  the extent it calls for anything that's attorney-client
12  privileged.
13       Other than that, you can answer.
14    A.  I don't know.
15    Q.  (BY MR. MULLIN)  You're not aware of anything
16  at this time?
17    A.  No.
18    Q.  On the -- on the tax -- taxes, title, and
19  license money, is it true that there were customers of
20  Reagor-Dykes who paid for the tax, title, and licenses
21  on their cars or their unit that they purchased and that
22  Ford seized that money?
23    A.  I'm not aware of that, no.
24    Q.  You don't know about that happening?
25    A.  No.

Page 50

1    Q.  Let me ask you one -- one last question about
2  this Exhibit 4.
3       Have you been out to the lot in Floydada?
4    A.  No.
5    Q.  Do you know about the lot?  Do you know that
6  that's one of the Reagor-Dykes lots that's on this -- on
7  this Exhibit 4 on the last page?  It's one of the lots
8  on the audit.
9    A.  I'm not -- I'm not aware of a lot that's -- is
10  that the Chevrolet store you're --
11    Q.  Yes.
12    A.  -- speaking to?
13    Q.  Yes.
14    A.  I'm not aware of another lot.
15    Q.  In Floydada.  I'm just talking about that lot,
16  that particular --
17    A.  Oh.
18    Q.  That particular lot, not another one.
19    A.  I'm sorry.
20    Q.  I'm just calling it Floydada.
21    A.  I know there is a location there, but I've
22  never been.
23    Q.  Okay.  But you've seen data on that lot in
24  connection with your work after July 27th, correct?
25    A.  What type of data?

Page 51

1    Q.  Well, you've seen data on the inventory at the
2  Floydada lot, correct?
3    A.  I believe I have, yes.
4    Q.  All right.  And would you agree with me that
5  it's a red flag that as of June 28th, 2018, there were
6  225 vehicles having advances from Ford of $9.4 million
7  as of June 28th, 2018, that had not been paid?
8       MR. LESLIE:  Objection to form and
9  relevance.
10       You can answer if you understand the
11  question.
12    A.  I don't understand the question.
13    Q.  (BY MR. MULLIN)  Well, if 225 vehicles and
14  $9.4 million is substantially the entire inventory of
15  the Floydada lot, its entire capacity, would it be a red
16  flag to Ford that supposedly that entire inventory had
17  been sold in the seven business days before this
18  June 28th, 2018, audit?
19       MR. LESLIE:  Objection to relevance
20  regarding tomorrow's proceedings and direct you not to
21  answer.
22    A.  I'm not going to answer.
23       MR. MULLIN:  All right.  Well, subject to
24  asking the Court to compel this witness to answer the
25  many, many questions he's refused to answer, I'll pass

Page 52

1  the witness.
2       MR. LESLIE:  And objection to the
3  sidebar.
4           EXAMINATION
5  BY MR. BUSTOS:
6    Q.  Mr. Leal, I'm Fernando Bustos, and I represent
7  Vista Bank.  Good afternoon.
8    A.  Good afternoon.
9    Q.  Mr. Jim Conlan, is he an employee of Ford
10  Credit, or is he an outside consultant?
11    A.  He's an employee.
12    Q.  What's his job title?
13    A.  I believe it's -- it's Black Belt.  I don't
14  know specifically.
15    Q.  Okay.  So what little I seem to understand
16  about Six Sigma or whatever --
17    A.  Uh-huh.
18    Q.  So he may have that certification for having
19  gone through that kind of training, but is that his
20  title at Ford Motor Credit; John Conlan, comma, Black
21  Belt?  I'm just curious.
22    A.  I don't know.
23    Q.  Okay.
24    A.  I don't know.
25    Q.  All right.  You referenced vehicles being sold

Page 53

1  to the Ram organization.  What is your understanding
2  what the Ram organization is?
3       A.  My understanding is it's a used car operation.
4       Q.  And located where to your knowledge?
5       A.  I don't specifically know the location.
6       Q.  Has Ford Credit undertaken a lien analysis to
7  see if cars on the lots may be subject to liens by other
8  lenders?
9       A.  I'm not aware of that at this point.
10      Q.  And to make sure I understand, you do not have
11  an understanding of what Ford's collateral is worth that
12  they're claiming right now, correct?
13      A.  At this point, no.  Yeah.
14      Q.  Expand that answer, please.
15      A.  I guess can you expand the question when
16  you're talking about value?
17      Q.  Well, internal analysis that Ford has
18  performed in terms of deciding, well, we think our
19  collateral is worth X-million dollars?
20      A.  No.
21           MR. BUSTOS:  I'll pass the witness.
22              EXAMINATION
23  BY MR. STROHSCHEIN:
24      Q.  Mr. Leal, my name is Steve Strohschein.  I
25  represent GM Financial in this matter.

Page 54

1       A.  Okay.
2       Q.  Ms. Schmucker testified earlier about a
3  capital loan made to the Reagor-Dykes dealerships last
4  year in the amount of about $5 million.  Are you
5  familiar with that loan?
6       A.  I'm familiar with it, yes.
7       Q.  And is that the only capital -- does that
8  capital loan remain outstanding today?
9       A.  Yes.
10      Q.  Some portion of it.
11           Do you know what is the balance due today?
12      A.  I don't know the exact amount.
13      Q.  Would that be the only capital loan or only
14  non-floor plan indebtedness in Ford Motor Credit's
15  current indebtedness owed by the Reagor-Dykes entities?
16      A.  That is my understanding, yes.
17      Q.  So of the 116 million, whatever the total may
18  be, all of that would be floor plan indebtedness other
19  than that capital loan?
20      A.  That is my understanding, yes.
21      Q.  And do you recall the purpose of the capital
22  loan last year?
23      A.  My understanding is they originally had a
24  revolving line of credit with us with a balance, and the
25  $5 million cap loan paid off the revolver -- revolving

Page 55

1  line of credit and advanced additional funds up to the 5
2  million.
3       Q.  The revolver would have been in what credit
4  limit?  Do you recall?
5       A.  I don't recall, no.
6       Q.  But the 5 million cap loan was an increase of
7  what the revolver was previously?
8       A.  That's correct.
9       Q.  And the 5 million cap loan is amortizing?
10      A.  Yes.
11      Q.  Over what period of time?
12      A.  I don't have that information.
13      Q.  And you don't recall a specific purpose for
14  the additional increase in the cap loan at that time?
15      A.  My understanding is working capital.
16      Q.  And the borrower of the cap loan, would that
17  be spread amongst all of the RDAG entities that you're
18  flooring, or is there one particular entity?
19      A.  I don't have that information.
20           MR. STROHSCHEIN:  I have no further
21  questions.
22              EXAMINATION
23  BY MR. CARDER:
24      Q.  I'm Mark Carder for First Bank.
25           You mentioned that you had seen the workup

Page 56

1  or a list that indicated that there were --
2  double-floorings were described between Ford Credit and
3  other third-party lenders.  Do you recall that?
4       A.  Yes.
5       Q.  Do you know whether First Bank & Trust was
6  identified as one of those other lenders?
7       A.  I could not -- I don't -- don't recall.
8       Q.  Do you recall what the title on the document
9  of the list was?
10      A.  No.
11      Q.  Do you know who generated that?
12      A.  It would have been out of the -- someone out
13  of the Nashville business center.
14      Q.  But you don't recall a specific
15  representative?
16      A.  No, I don't.
17           MR. CARDER:  Pass the witness.
18           MR. LASHAWAY:  I'll reserve.
19              EXAMINATION
20  BY MR. MASSOUH:
21      Q.  John Massouh with First Capital Bank of Texas.
22           With regard to the double-floored vehicles
23  that you were discussing, there -- is a list of those --
24  has that list been fully completed and compiled by
25  someone in the Nashville business center?

Page 57

1      A.  I'm not aware that it's complete.  I
2  understand it's a work in progress.
3      Q.  With regard to an inventory of Ford Motor
4  Credit floored vehicles, has that list been completed?
5      A.  Inventory list of floor plan vehicles?  Yes,
6  that -- we have completed a wholesale audit, I guess.
7      Q.  Okay.  And does that list differentiate
8  between the locations where the vehicles are currently
9  located?
10     A.  Yes.
11     Q.  How long has the Black Belt system been
12  available to Ford Motor Credit?
13     A.  Can you expand on that or --
14     Q.  I guess, explain to me what the -- what the
15  Black Belt system is.  Maybe that might help.
16     A.  I -- I probably couldn't explain it to you
17  well.  I -- I'm aware of it, but --
18     Q.  What does it do?
19     A.  It -- my understanding is it analyzes data and
20  looks for areas of opportunity in looking for errors.
21  But I -- again, I'm not an expert in that.
22     Q.  Has that -- that Black Belt ability through
23  Jim Conlan been available to Ford Motor Credit for more
24  than a year?
25     A.  My understanding for that specific person --

Page 58

1  or purpose, my understanding is -- is no.
2      Q.  Okay.  Do you know how long it had been
3  available?
4      A.  My understanding is it's sometime this year.
5      Q.  Within the last six months?
6      A.  That's my understanding.
7      Q.  With regard to the contracts in transit, you
8  referenced that people at the Nashville business center
9  are working on assignments of those from the -- from
10  various lending sources.  Did I hear that right?
11     A.  That's correct.  We -- we have a list of
12  lenders that we've sent assignments to, but we have no
13  idea what's outstanding, if they have -- have financed
14  contracts that haven't been paid.  So we have no idea
15  about that.
16     Q.  With regard to the list of lenders relating
17  to -- those list of lenders would be related to an
18  actual vehicle that had been sold, correct?
19     A.  That's my understanding.
20     Q.  And have you made it -- has Ford Motor Credit
21  made a determination as to those vehicles in which they
22  are seeking an assignment from the lending source,
23  whether those vehicles are actually Ford Motor Credit
24  floored vehicles?  Or do you know, sir?
25     A.  I'm not aware of that at this point.

Page 59

1          MR. MASSOUH:  Pass the witness.
2          MR. MULLIN:  I don't have anything
3  further.
4          MR. LESLIE:  Okay.  Reserve and keeping
5  it open per the discussion with the Court and the
6  understanding of the parties.  Other than that, we're
7  done with this witness, I guess.
8          (Deposition concluded at 3:42 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 60

1          CHANGES AND SIGNATURE
2  WITNESS NAME:  RENE LEAL
3  DATE OF DEPOSITION:  AUGUST 15, 2018
4  PAGE LINE    CHANGE        REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 61

```
 1        I, RENE LEAL, have read the foregoing
          deposition and hereby affix my signature that same is
 2        true and correct, except as noted above.
 3
 4
            _____
 5            RENE LEAL
 6
 7        THE STATE OF _____)
          COUNTY OF _____)
 8
            Before me, _____, on this day
 9        personally appeared RENE LEAL, known to me (or proved to
          me under oath or through _____)
10        (description of identity card or other document) to be
          the person whose name is subscribed to the foregoing
11        instrument and acknowledged to me that they executed the
          same for the purposes and consideration therein
12        expressed.
            Given under my hand and seal of office this
13        _____ day of _____, _____.
14
15
16            NOTARY PUBLIC IN AND FOR
              THE STATE OF _____
17            COMMISSION EXPIRES:_____
18
19
20
21
22
23
24
25
```

Page 63

```
 1            REPORTER'S CERTIFICATION
              DEPOSITION OF RENE LEAL
 2               AUGUST 15, 2018
 3
 4        I, Kailee Pereida, CSR No. 8398, Certified
          Shorthand Reporter in and for the State of Texas, hereby
 5        certify to the following:
 6            That the foregoing proceedings were taken before me
          at the time and place therein set forth, at which time
          the witness was put under oath by me;
 7
          That the testimony of the witness, the questions
 8        propounded, and all objections and statements made at
          the time of the examination were recorded
 9        stenographically by me and were thereafter transcribed;
              That a review of the transcript by the deponent was
10        requested;
11            That $_____ is the deposition officer's
          charges to Mr. David Mullin, Attorney for Debtors, for
12        preparing the original deposition transcript and any
          copies of exhibits;
13            That the foregoing is a true and correct transcript
          of my shorthand notes so taken.
14
15            I further certify that I am not a relative or
          employee of any attorney of the parties, nor financially
16        interested in the action.
17            I declare under penalty of perjury under the laws
18        of Texas that the foregoing is true and correct.
19        Dated this 15th day of August, 2018.
20
21            _____
              Kailee Pereida, Texas CSR 8398
22            Expiration Date: December 31, 2019
23            Caprock Court Reporting, Inc.
              Firm Certificate Number: 374
24            1112 Texas, Suite 200
              Lubbock, Texas 79401
25            (806) 795-4202
```

Page 62

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                 LUBBOCK DIVISION
 3        IN RE:              )
 4    REAGOR-DYKES MOTORS, LP,   )Case No. 18-50214-rlj11
                                )
 5        Debtor.              )
 6    _____
 7        IN RE:              )
      REAGOR-DYKES IMPORTS, LP,   )Case No. 18-50215-rlj11
 8                                )
          Debtor.              )
 9    _____
10        IN RE:              )
11    REAGOR-DYKES AMARILLO, LP,   )Case No. 18-50216-rlj11
                                  )
12        Debtor.              )
13    _____
14        IN RE:              )
      REAGOR-DYKES AUTO COMPANY, )
15    LP,      )Case No. 18-50217-rlj11
                                  )
16        Debtor.              )
17    _____
18        IN RE:              )
      REAGOR-DYKES PLAINVIEW, LP, )Case No. 18-50218-rlj11
19                                )
          Debtor.              )
20    _____
21        IN RE:              )
22    REAGOR-DYKES FLOYDADA, LP,  )Case No. 18-50219-rlj11
                                  )
23        Debtor.              )
24
25
```

MULLIN HOARD & BROWN, L.L.P.
David R. Langston, SBN: 11923800
Brad W. Odell, SBN: 24065839
P.O. Box 2585
Lubbock, Texas 79408-2585
Telephone: (806) 765-7491
Facsimile: (806) 765-0553
drl@mhba.com
bodell@mhba.comrE
*Counsel for Debtors, Reagor-Dykes*
*Motors, LP; Reagor-Dykes Imports, LP;*
*Reagor-Dykes Amarillo, LP; Reagor-Dykes*
*Auto Company, LP; Reagor-Dykes*
*Plainview, LP; Reagor-Dykes Floydada, LP*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE:<br><br>REAGOR-DYKES MOTORS, LP<br><br>Debtor. | §<br>§<br>§<br>§<br>§ | Case No. 18-50214-rlj11 |
| IN RE:<br><br>REAGOR-DYKES IMPORTS, LP<br><br>Debtor. | §<br>§<br>§<br>§<br>§ | Case No. 18-50215-rlj11<br>(Jointly Administered Under<br>Case No. 18-50214) |
| IN RE:<br><br>REAGOR-DYKES AMARILLO, LP<br><br>Debtor. | §<br>§<br>§<br>§<br>§ | Case No. 18-50216-rlj11<br>(Jointly Administered Under<br>Case No. 18-50214) |
| IN RE:<br><br>REAGOR-DYKES AUTO COMPANY,<br>LP<br><br>Debtor. | §<br>§<br>§<br>§<br>§ | Case No. 18-50217-rlj11<br>(Jointly Administered Under<br>Case No. 18-50214) |
| IN RE:<br><br>REAGOR-DYKES PLAINVIEW, LP<br><br>Debtor. | §<br>§<br>§<br>§<br>§ | Case No. 18-50218-rlj11<br>(Jointly Administered Under |



EXHIBIT

Von App 0087

Case No. 18-50214)

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| REAGOR-DYKES FLOYDADA, LP | § | Case No. 18-50219-rlj11 |
| | § | (Jointly Administered Under |
| Debtor. | § | Case No. 18-50214) |

## NOTICE OF ORAL DEPOSITION OF RENE LEAL

To:   Rene Leal, an employee of Ford Motor Credit, by and through their attorney of record, Keith Langley, Langley LLP; 1301 Solana Blvd., Bldg. 1, Suite 1545, Westlake, Tx, 76262, Email: klangley@l-llp.com

Please take notice that, pursuant to Federal Rules of Bankruptcy Procedure 7030, 7033 and 7045, Debtors, Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Plainview, LP, and Reagor-Dykes Floydada, LP (each a "Debtor," and collectively, the "Debtors"), by and through their attorneys, will take the oral deposition of **Rene Leal, an employee of Ford Motor Credit Company on Wednesday, August 15, 2018, at 1:00 p.m. (CDT)** and continue from day to day until completed. The deposition shall take place at the Reagor-Dykes headquarters located at 1215, Ave. J., 5th Floor, Lubbock, Texas.

The deposition will be taken before an authorized court reporter. The deposition may be videotaped.

Respectfully Submitted,

MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Telephone: (806) 765-7491
Facsimile: (806) 765-0553

/s/ David R. Langston
David R. Langston, SBN: 11923800
Brad W. Odell, SBN: 24065839
*Counsel for Debtors, Reagor-Dykes*
*Motors, LP; Reagor-Dykes Imports, LP;*
*Reagor-Dykes Amarillo, LP; Reagor-Dykes*
*Auto Company, LP; Reagor-Dykes*
*Plainview, LP; Reagor-Dykes Floydada, LP*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Motion was served via e-mail on this the 10th day of August, 2018, to the following listed parties in interest:

1.   Keith Langley
     Langley LLP
     1301 Solana Blvd.
     Bldg. 1, Suite 1545
     Westlake, TX. 76262
     Email: klangley@l-llp.com
     *Attorneys for Ford Motor Credit*

     /s/ David R. Langston
     David R. Langston

Notice of Oral Deposition – Page 7

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

IN RE:                              )

REAGOR-DYKES MOTORS, LP,           )Case No. 18-50214-rlj11
                                    )
        Debtor.                     )

---

        IN RE:                      )

REAGOR-DYKES IMPORTS, LP,          )Case No. 18-50215-rlj11
                                    )
        Debtor.                     )

---

        IN RE:                      )

REAGOR-DYKES AMARILLO, LP,         )Case No. 18-50216-rlj11
                                    )
        Debtor.                     )

---

        IN RE:                      )

REAGOR-DYKES AUTO COMPANY,         )
  LP,                               )Case No. 18-50217-rlj11
                                    )
        Debtor.                     )

---

        IN RE:                      )

REAGOR-DYKES PLAINVIEW, LP,        )Case No. 18-50218-rlj11
                                    )
        Debtor.                     )

---

        IN RE:                      )

REAGOR-DYKES FLOYDADA, LP,         )Case No. 18-50219-rlj11
                                    )
        Debtor.                     )

---

CORRECTION PAGES

Page 2

```
 1              ----------------------------------

 2                   ORAL DEPOSITION OF

 3                      RENE LEAL

 4                   AUGUST 15, 2018

 5                      Volume 1

 6              ----------------------------------

 7        ORAL DEPOSITION OF RENE LEAL, produced as a witness

 8    at the instance of the DEBTOR, and duly sworn, was taken

 9    in the above-styled and numbered cause on AUGUST 15,

10    2018, from 2:23 p.m. to 3:42 p.m., before Kailee

11    Pereida, CSR in and for the State of Texas, reported by

12    machine shorthand, at the law offices of Mullin, Hoard &

13    Brown, L.L.P., 1500 Broadway, Suite 700, Lubbock, Texas,

14    pursuant to the Federal Rules of Civil Procedure.

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE DEBTORS:

 4         MR. DAVID MULLIN
                -AND-
 5         MR. DAVID R. LANGSTON
           MULLIN, HOARD & BROWN, L.L.P.
 6         1500 Broadway, Suite 700
           P.O. Box 2585 (79408)
 7         Lubbock, Texas 79401
           (806) 765-7491
 8         dumllin@mhba.com

 9    FOR FORD MOTOR CREDIT COMPANY, L.L.C.:

10         MR. CRAIG A. LESLIE
           PHILLIPS LYTLE LLP
11         One Canalside
           125 Main Street
12         Buffalo, New York 14203
           (716) 847-7012
13         cleslie@phillipslytle.com

14              -AND-

15         MR. DONALD H. CRAM, III
           SEVERSON & WERSON, P.C.
16         One Embarcadero Center
           26th Floor
17         San Francisco, California 94111
           (415) 398-3344
18
      FOR GM FINANCIAL:
19
           MR. STEPHEN F. STROHSCHEIN
20         MCGLINCHEY STAFFORD, P.L.L.C.
           301 Main Street
21         Fourteenth Floor
           Baton Rouge, Louisiana 70801
22         (225) 383-9000
           sstroh@mcglinchey.com
23

24

25
```

Page 4

```
1    FOR AIM BANK:
2         MR. JEFF R. LASHAWAY
          BOERNER, DENNIS & FRANKLIN, P.L.L.C.
3         920 Avenue Q
          Lubbock, Texas 79401
4         (806) 763-0044
          jlashaway@bdflawfirm.cpm
5
     FOR FIRST CAPITAL BANK:
6
          MR. JOHN F. MASSOUH
7         SPROUSE, SHRADER, SMITH, P.L.L.C.
          701 South Taylor
8         Suite 500
          Amarillo, Texas 79105
9         (806) 468-3337
          john.massouh@sprouselaw.com
10
     FOR VISTA BANK:
11
          MR. FERNANDO BUSTOS
12        BUSTOS LAW FIRM, P.C.
          1001 Main Street
13        Suite 501
          Lubbock, Texas 79401
14        (806) 780-3976
          fbustos@bustoslawfirm.com
15
     FOR FIRST BANK & TRUST:
16
          MR. MARK S. CARDER
17        STINSON, LEONARD, STREET, L.L.P.
          1201 Walnut
18        Suite 2900
          Kansas City, Missouri 64105
19        (816) 691-3415
          mark.carder@stinson.com
20
     FOR BART REAGOR:
21
          MR. SCOTT R. WIEHLE
22        KELLY, HART & HALLMAN, L.L.P.
          201 Main Street
23        Suite 2500
          Fort Worth, Texas 76102
24        (817) 332-2500
          scott.wiehle@kellyhart.com
25
```

Page 5

```
 1    FOR IBC BANK:

 2          MR. JOHN D. DALE
            GABLE GOTWALS
 3          1100 ONEOK Plaza
            100 West Fifth Street
 4          Tulsa, Oklahoma 74103
            (918) 595-4828
 5          jdale@gablelaw.com

 6    FOR RICK DYKES:

 7          MR. DAVID M. GUINN, JR.
            LAW OFFICE OF HURLEY & GUINN
 8          1805 13th Street
            Lubbock, Texas 79401
 9          (806) 771-0700
            david@hurleyquinn.com
10
      ALSO PRESENT:
11
            Mr. Mike Cannon
12          Mr. Toby Cecil
            Mr. Rick Dykes
13          Mr. Jonathan Hill
            Mr. Howie Ravitz
14          Mr. Scott Wade

15

16

17

18

19

20

21

22

23

24

25
```

Page 60

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:   RENE LEAL

3    DATE OF DEPOSITION:   AUGUST 15, 2018

4    PAGE LINE      CHANGE          REASON

5    11   10   "Central Market Area"

6    Reason — Mistake; utilized previous

7              name.

8

9    57   25   " The 6-Sigma process has

10             been utilized by Ford Credit

11             for many years. My understanding

12             is that Jim Conlan began working on

13             this specific project this year.

14   Reason: Misunderstood Question

15

16

17

18

19

20

21

22

23

24

25

Page 61

1          I, RENE LEAL, have read the foregoing
deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3

4                        *Rene Leal* (signature)

5                    RENE LEAL

6

7    THE STATE OF Texas    )
     COUNTY OF Collin      )
8
          Before me, Valeta M Audrick , on this day
9    personally appeared RENE LEAL, known to me (or proved to
me under oath or through Texas Drivers License )
10   (description of identity card or other document)) to be
the person whose name is subscribed to the foregoing
11   instrument and acknowledged to me that they executed the
same for the purposes and consideration therein
12   expressed.
          Given under my hand and seal of office this
13   28th    day of _August            , 2018 .

14

15                   *Valeta M Audrick* (signature)

16                   NOTARY PUBLIC IN AND FOR
                     THE STATE OF Texas
17                   COMMISSION EXPIRES: 2-21-19

18
                     ┌─────────────────────────┐
19                   │    VALETA M. AUDRICK     │
                     │ Notary Public, State of Texas │
                     │  Comm. Expires 02-21-2019  │
20                   │   Notary ID 12852655-6   │
                     └─────────────────────────┘
21

22

23

24

25

Page 62

1           IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                     LUBBOCK DIVISION

3           IN RE:                          )

4    REAGOR-DYKES MOTORS, LP,    )Case No. 18-50214-rlj11
                                 )
5          Debtor.               )

6    ────────────────────────────────────────────────────

             IN RE:                          )
7
     REAGOR-DYKES IMPORTS, LP,   )Case No. 18-50215-rlj11
8                                )
          Debtor.                )
9

10           IN RE:                          )

11   REAGOR-DYKES AMARILLO, LP,  )Case No. 18-50216-rlj11
                                 )
12         Debtor.               )

13   ────────────────────────────────────────────────────

             IN RE:                          )
14
     REAGOR-DYKES AUTO COMPANY,  )
15   LP,                         )Case No. 18-50217-rlj11
                                 )
16         Debtor.               )

17   ────────────────────────────────────────────────────

             IN RE:                          )
18
     REAGOR-DYKES PLAINVIEW, LP, )Case No. 18-50218-rlj11
19                               )
          Debtor.                )
20

21           IN RE:                          )

22   REAGOR-DYKES FLOYDADA, LP,  )Case No. 18-50219-rlj11
                                 )
23         Debtor.               )

24   ────────────────────────────────────────────────────

25

Page 63

1          REPORTER'S CERTIFICATION
            DEPOSITION OF RENE LEAL
2              AUGUST 15, 2018

3

        I, Kailee Pereida, CSR No. 8398, Certified
4   Shorthand Reporter in and for the State of Texas, hereby
    certify to the following:
5
        That the foregoing proceedings were taken before me
6   at the time and place therein set forth, at which time
    the witness was put under oath by me;
7
        That the testimony of the witness, the questions
8   propounded, and all objections and statements made at
    the time of the examination were recorded
9   stenographically by me and were thereafter transcribed;

10      That a review of the transcript by the deponent was
    requested;
11
        That $ _955.00_ is the deposition officer's
12  charges to Mr. David Mullin, Attorney for Debtors, for
    preparing the original deposition transcript and any
13  copies of exhibits;

14      That the foregoing is a true and correct transcript
    of my shorthand notes so taken.
15
        I further certify that I am not a relative or
16  employee of any attorney of the parties, nor financially
    interested in the action.
17
        I declare under penalty of perjury under the laws
18  of Texas that the foregoing is true and correct.

19      Dated this 15th day of August, 2018.

20

21                    _Kailee Pereida_
                      _____
                      Kailee Pereida, Texas CSR 8398
22                    Expiration Date:   December 31, 2019

23                    Caprock Court Reporting, Inc.
                      Firm Certificate Number:   374
24                    1112 Texas, Suite 200
                      Lubbock, Texas 79401
25                    (806) 795-4202

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| FORD MOTOR CREDIT COMPANY LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 5:18-cv-00186 |
| | § | |
| BART REAGOR AND RICK DYKES, | § | (Jury Trial Demanded) |
| | § | |
| *Defendants.* | § | |

## AFFIDAVIT OF TIMOTHY CONNER

| | |
|---|---|
| STATE OF TEXAS § | |
| | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF LUBBOCK § | |

BEFORE ME, the undersigned authority, on this day personally appeared Timothy Conner, who upon oath, after first being duly sworn, deposed and stated:

1.      "My name is Timothy Conner. I am a certified public accountant licensed by, and in good standing with, the Texas State Board of Public Accountancy. I am over 18 years of age and I am competent and authorized to make this Affidavit. I hold a Master of Business Administration Degree (2011) and a Bachelor of Business Degree (2010) from Wayland Baptist University. During my business career, I have developed expertise in financial reporting, project management. financial analysis, cost saving measures, corporate tax planning, forecasting, budgeting, and long-term strategic planning.

2.      I have been continuously employed by the Reagor-Dykes Auto Group since January, 2018 and I am currently the controller of Reagor-Dykes Auto Group. In my capacity as the controller, I have become familiar with the series of agreements entered into between 2011 and 2015 under which plaintiff Ford Motor Credit Company ("Ford Credit") provided comprehensive automobile inventory financing ("floor-plan financing") for six of the Reagor Dyke Auto Group dealerships. Ford Credit's financing is secured by a blanket lien on most of the assets of those six dealerships, as well as a lien on certain other Reagor-Dykes Auto Group assets.

3.      For the past 11 years until August 1, 2018, Shane Smith was the chief financial officer of Reagor-Dykes Auto Group. In that role, Mr. Smith

EXHIBIT
3

coordinated and managed all financing arrangements for Reagor-Dykes Auto Group, including the Ford Credit floor-plan financing. Mr. Smith managed all material financial transactions of Reagor-Dykes Auto Group and was responsible for providing accurate information regarding those transactions to the lenders of Reagor-Dykes Auto Group, including Ford Credit.

4.      A key monitoring aspect of Ford Credit's floor-plan financing with the Reagor-Dykes Auto Group is Ford Credit's right to conduct quarterly on-site audits of Reagor-Dykes financial records. Those audits are important because it allows Ford Credit to verify the accuracy of Reagor-Dykes Auto Group's financial transactions and reporting, as well as providing an evaluation to the owners of Reagor-Dykes Auto Group regarding any problems that the company may have in regard to its financial transactions and reporting.

5.      Mr. Smith managed all aspects of Reagor-Dykes Auto Group's participation in connection with Ford Credit's audits. Bart Reagor, the chief executive officer and co-owner of Reagor-Dykes Auto Group, was not materially involved in the audits. Rick Dykes, the other co-owner of Reagor-Dykes Auto Group, had no day-to-day management role with Reagor-Dykes Auto Group and had no involvement in Ford Credit's audits.

6.      At the conclusion of each such audit, Ford Credit would advise Reagor-Dykes Auto Group of any problems that arose in the audit and the amount of short-term indebtedness (i.e., debt payable to Ford Credit within roughly the following week) that Reagor-Dykes Auto Group owed to Ford Credit relating to sales of inventory. For example, at the conclusion of Ford Credit's most recent quarterly audit (the June, 2018 audit), Ford Credit cited no problems with the audit, complimented Reagor-Dykes Auto Group personnel in cooperating with the audit, and confirmed that the outstanding amount of indebtedness owed to Ford Credit from inventory sales was approximated $25 million.

7.      In late July 2018 – less than a month after the quarterly June 2018 audit, – Ford Credit undertook an emergency on-site audit of the Reagor-Dykes Auto Group. On July 27, 2018, Ford Credit declared defaults under its floor-plan financing agreements with Reagor-Dykes Auto Group and terminated providing any further financing under those agreements.

8.      Shortly thereafter, Ford Credit publicly announced that the reason for its termination of its floor-plan financing agreements was that Reagor-Dykes Auto Group had defrauded Ford Credit by selling over 1,100 vehicles and not remitting to Ford Credit over $40 million in sales proceeds attributable to those vehicles as required under the floor-plan financing agreements ("out-of-trust sales"). On August 1, 2018, the six Reagor-Dykes Auto Group dealerships to which Ford Credit provided floor-plan financing commenced chapter 11 cases in the U.S.

Bankruptcy Court for the Northern District of Texas, Lubbock Division ("the Bankruptcy Court").

9.      In my position at Reagor-Dykes Auto Group prior to August 1, 2018, I had no involvement with Ford Credit's audits. After August 1st and in my role as controller of Reagor Dykes Auto Group, I undertook a review of the results of each Ford Credit quarterly audit from the final audit of 2016 through the June, 2018 audit.

10.      My review of the quarterly audits was prompted by the unusual circumstances of the June 2018 audit and the late July 2018 audit described above. In short, why did Ford Credit not discover a high level of out-of-trust sales during the June 2018 audit.?

11.      My conclusion based upon my review is that representatives of Ford Credit involved in the quarterly audits of Reagor-Dykes Auto Group knew or should have known that Reagor-Dykes Auto Group regularly owed millions of dollars in out-of-trust sales to Ford Credit in excess of the short-term indebtedness of Reagor-Dykes Auto Group that Ford Credit confirmed at the conclusion of each such audit.

12.      The value of the inventory that Ford Credit audits reported being sold from certain Reagor-Dykes Auto Group dealerships was a clear signal that Ford Credit audit representatives were either ignoring or allowing out-of-trust sales by Reagor-Dykes Auto Group. For example, at the conclusion of the June 2018 audit, Ford Credit confirmed with Reagor-Dykes Auto Group that Reagor-Dykes Chevrolet in Floydada owed Ford Credit approximately $9.4 million from inventory sales payable within the following week. At that time, the average value of the entire inventory of vehicles at that dealership was between $9-10 million. No reasonable interpretation of the data from that audit would conclude that it was possible that the dealership could have sold vehicles roughly equal to the entire floor-plan inventory of the dealership in a time frame where the amounts due Ford Credit were due within the following week.

13.      The foregoing is simply an example of similar issues that I examined in reviewing the results of each quarterly audit from the end of 2016-June 2018. In my opinion, Ford Credit representatives involved in those audits knew or should have known that out-of-trust sales of inventory were taking place because the level of confirmed inventory sales in regard to the dealerships often did not correspond realistically with the value of the inventory of those dealerships. In my review, I found no notice from Ford Credit to either Mr. Reagor or Mr. Dykes that the information being provided to Ford Credit by Mr. Smith in connection with those audits indicated that Reagor-Dykes Auto Group was selling inventory out-of-trust.

Affiant sayeth further not."

Timothy Conner

SUBSCRIBED AND SWORN TO before me on this 22nd day of February, 2019.

SHARLA K. MATHES
ID #6809625
My Commission Expires
June 15, 2020

Notary Public in and for the State of Texas

My Commission expires:

6-15-2020

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| FORD MOTOR CREDIT COMPANY LLC, | § | |
|     Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | Civil Action No.: 5:18-cv-00186 |
| | § | |
| BART REAGOR AND RICK DYKES, | § | |
|     Defendants. | § | |

## DECLARATION OF D. LYNDON JAMES

1.      My name is D. Lyndon James.  I am over eighteen (18) years of age, am of sound mind and am competent to make this declaration.  The facts stated herein are within my personal knowledge and are all true and correct.

2.      I am a founding partner of BlackBriar Advisors LLC ("BlackBriar").  The bankruptcy court approved BlackBriar to be the Chief Restructuring Officer ("CRO") to the Reagor-Dykes Dealerships in bankruptcy ("Dealerships").[1]

3.      I have worked as part of the BlackBriar team that was also employed to provide CFO services, which is the service component I have overseen.

4.      Attached hereto as Exhibit A is a spreadsheet prepared by BlackBriar, specifically reviewed by me, that represents the schedule of amounts paid or credited to Ford Motor Credit by the Dealerships during the bankruptcy cases of the Dealerships, through January 31, 2019.  I know of my own knowledge that the payments and credits,

---

[1]      The Reagor-Dykes entities in bankruptcy are Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Plainview, LP, Reagor-Dykes Floydada, LP, Reagor-Dykes Snyder, LP, Reagor Auto Mall Ltd., Reagor-Dykes III LLC, Reagor-Dykes II LLC, and Reagor Auto Mall I LLC

MSJ Declaration of lyndon james (2)

EXHIBIT
4

RD App. 0103

and the aggregate payment/credit amount reflected in Exhibit A reflects the actual amount of value credited to Ford Motor Credit.

5.      The amount of $10,359,368 has been paid and/or credited to Ford Motor Credit by the Dealerships between August 1, 2018 and January 31, 2019.

6.      Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct."

Executed on February 22, 2019.

D. Lyndon James

MSJ Declaration of lyndon james (2)

| | Notes | Filing Date 8/01/18 | at 1/31/19 | Filing Date to 1/31/19 Change |
|---|---|---|---|---|
| **Reagor-Dykes Amarillo, LP** | AMITSU | | | |
| Case Number: 18-50216 | | | | |
| Support MOR-1 - Liabilities & Equity | | | | |
| Prepetition Liabilities & Equity | | | | |
| | Notes | Filing Date 8/01/18 | | |
| NOTES PAYABLE - SECURED | | | | |
| Ford Motor Credit (FMCC) | 8.1 | 9,287,556 | 9,025,801 | (261,755) |
| Less Cash Management Offset | 8.2 | - | (68,000) | (68,000) |
| NET FMCC NOTES PAYABLE | | 9,287,556 | 8,957,801 | (329,755) |
| **Reagor-Dykes Imports, LP** | LMITSU | | | |
| Case Number: 18-20215 | | | | |
| Support MOR-1 - Liabilities & Equity | | | | |
| Prepetition Liabilities & Equity | | | | |
| | Notes | Filing Date 8/01/18 | | |
| NOTES PAYABLE - SECURED | | | | |
| Ford Motor Credit (FMCC) | 8.1 | 12,894,778 | 12,807,421 | (87,357) |
| Less Cash Management Offset | 8.2 & 10.2 | - | (99,500) | (99,500) |
| NET FMCC NOTES PAYABLE | | 12,894,778 | 12,707,921 | (186,857) |
| **Reagor-Dykes Auto Company, LP** | RDAC | | | |
| Case Number: 18-50217 | | | | |
| Support MOR-1 - Liabilities & Equity | | | | |
| Prepetition Liabilities & Equity | | | | |
| | Notes | Filing Date 8/01/18 | | |
| NOTES PAYABLE - SECURED | | | | |
| Ford Motor Credit (FMCC) | 8.1 | 16,223,320 | 14,671,055 | (1,552,265) |
| Less Cash Management Offset | 8.2 | - | (98,458) | (98,458) |
| NET FMCC NOTES PAYABLE | | 16,223,320 | 14,572,597 | (1,650,723) |
| **Reagor-Dykes Plainview, LP** | RDT | | | |
| Case Number: 18-20218 | | | | |
| Support MOR-1 - Liabilities & Equity | | | | |
| Prepetition Liabilities & Equity | | | | |
| | Notes | Filing Date 8/01/18 | | |
| NOTES PAYABLE - SECURED | | | | |
| Ford Motor Credit (FMCC) | 8.3 | 15,964,252 | 15,185,971 | (778,281) |
| Less Cash Management Offset | 8.1 & 10.1 | - | (123,000) | (123,000) |
| NET FMCC NOTES PAYABLE | | 15,964,252 | 15,062,971 | (901,281) |
| **Reagor-Dykes Floydada, LP** | RDC | | | |
| Case Number: 18-20219 | | | | |
| Support MOR-1 - Liabilities & Equity | | | | |
| Prepetition Liabilities & Equity | | | | |
| | Notes | Filing Date 8/01/18 | | |
| NOTES PAYABLE - SECURED | | | | |
| Ford Motor Credit (FMCC) | 8.1 | 18,821,873 | 18,789,382 | (32,491) |
| Less Cash Management Offset | 8.2 | - | (128,000) | (128,000) |
| NET FMCC NOTES PAYABLE | 10.1 | 18,821,873 | 18,661,382 | (160,491) |
| **Reagor-Dykes Motors, LP** | SDF | | | |
| Case Number: 18-20214 | | | | |
| Support MOR-1 - Liabilities & Equity | | | | |
| Prepetition Liabilities & Equity | | | | |
| | Notes | Filing Date 8/01/18 | | |
| NOTES PAYABLE - SECURED | | | | |
| Ford Motor Credit (FMCC) | 8.1 & 10.2 | 31,983,008 | 25,235,748 | (6,747,260) |
| Less Cash Management Offset | 8.2 | - | (383,000) | (383,000) |
| NET FMCC NOTES PAYABLE | | 31,983,008 | 24,852,748 | (7,130,260) |
| **RDAG - FMCC Notes Payable Total** | | 105,174,787 | 94,815,419 | (10,359,368) |
| | | | | (10,359,368) |

**EXHIBIT 4-A**

RD App. 0105

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| FORD MOTOR CREDIT COMPANY LLC, | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 5:18-cv-00186 |
| | § | |
| BART REAGOR AND RICK DYKES, | § | (Jury Trial Demanded) |
| | § | |
| *Defendants.* | § | |

### AFFIDAVIT OF RICK DYKES

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF LUBBOCK | § |

KNOW ALL MEN BY THESE PRESENTS:

BEFORE ME, the undersigned authority, on this day personally appeared Franklin Andrew ("Rick") Dykes, who upon oath, after first being duly sworn, deposed and stated:

1.      "My name is Rick Dykes. I am over 18 years of age and I am competent to make this Affidavit. I hold a Master of Business Administration Degree from Rice University (1985) and a Bachelor of Arts Degree in History from the University of New Mexico (1982). I am a co-owner of the Reagor-Dykes Auto Group, a Lubbock-based group of automobile dealerships and related businesses. Over the past 13 years,  Reagor-Dykes Auto Group steadily grew into one of the largest auto dealership operations in West Texas, generating over $780 million in revenue in 2017. During the same time period, Reagor-Dykes Auto Group also became one of the largest employers in West Texas.

2.      I was primarily an investor in Reagor-Dykes Auto Group. As a co-owner of Reagor-Dykes Auto Group, I provided extensive credit enhancements for indebtedness of Reagor-Dykes Auto Group and assisted management in various matters upon request. However, I had no day-to-day management role in Reagor-Dykes Auto Group. Defendant Bart Reagor, my co-owner in Reagor-Dykes Auto Group, is the chief executive officer of Reagor-Dykes Auto Group.

3.      From 2011 through 2015, Reagor-Dykes Auto Group entered into a series of agreements under which plaintiff Ford Motor Credit Company ("Ford Credit") provided comprehensive automobile inventory financing ("floor-plan financing") for six auto dealerships. Ford Credit's financing is secured by a blanket lien on

EXHIBIT
**5**

RD App. 0106

most of the assets of those six dealerships, as well as a lien on certain other Reagor-Dykes Auto Group assets.

4.      For the past 11 years until August 1, 2018, Shane Smith was the chief financial officer of Reagor-Dykes Auto Group. In that role, Mr. Smith coordinated and managed all financing arrangements for Reagor-Dykes Auto Group, including the Ford Credit floor-plan financing. Both Mr. Reagor and I relied on and trusted Mr. Smith to manage all material financial transactions of Reagor-Dykes Auto Group and to provide accurate information regarding those transactions.

5.      Prior to becoming the CFO of Reagor-Dykes Auto Group, Mr. Smith was an employee of Ford Credit, the plaintiff in this civil action. Over the past 11 years while at Reagor-Dykes Auto Group, Mr. Smith maintained a close professional and personal relationship with Gary Byrd, Jr., the Dallas Regional Manager of  Ford Credit and the person primarily responsible for overseeing Ford Credit's floor-plan financing of the Reagor-Dykes Auto Group. Mr. Byrd knew that Mr. Smith was responsible for managing the financial transactions between Reagor-Dykes Auto Group and Ford Credit and for reporting Reagor-Dykes Auto Group's financial information to Ford Credit.

6.      A key monitoring aspect of Ford Credit's floor-plan financing with the Reagor-Dykes Auto Group is Ford Credit's right to conduct quarterly on-site audits of Reagor-Dykes financial records. Those audits are important because it allows Ford Credit to verify the accuracy of Reagor-Dykes Auto Group's financial transactions and reporting, as well as providing an evaluation to Mr. Reagor and me regarding any problems that Reagor-Dykes Auto Group may have in regard to its financial transactions and reporting. Mr. Smith managed all aspects of Reagor-Dykes Auto Group's participation in connection with Ford Credit's audits. Mr. Reagor was not materially involved in the audits. I had no involvement in Ford Credit's audits.

7.      At the conclusion of each quarterly audit, Ford Credit would advise Reagor-Dykes Auto Group of any problems that arose in the audit and the amount of short-term indebtedness (i.e., debt payable to Ford Credit within roughly the following week)  that Reagor-Dykes Auto Group owed to Ford Credit relating to sales of inventory. For example, at the conclusion of Ford Credit's most recent quarterly audit (the June, 2018 audit), Ford Credit cited no problems with the audit, complimented Reagor-Dykes Auto Group personnel in cooperating with the audit, and confirmed that the outstanding amount of indebtedness owed to Ford Credit from inventory sales was approximated $25 million.

8.      In late July 2018 – less than a month after the June 2018 quarterly audit – Ford Credit notified Mr. Smith that it was undertaking an emergency on-site

review of the Reagor-Dykes Auto Group's financial records. Ford Credit did not notify either Mr. Reagor or me of the emergency audit.

9.      Mr. Smith called me on Thursday, July 26, 2018 while I was out of town to inform me about Ford Credit's emergency audit. Given the smooth nature of the June 2018 quarterly audit that Ford Credit had completed less than a month earlier, I was surprised by the audit. However, Mr. Smith told me that the main problem he was confronting with regard to the audit was that many of the employees on his financial staff were on vacation and unavailable to help with the audit. I told Mr. Smith that I would return to Lubbock the next morning (Friday, July 27, 2018).

10.      On Friday July 27, 2018, I returned to Lubbock and went directly to the downtown office of Reagor-Dykes Auto Group. Gary Byrd of Ford Credit was directing Ford Credit's audit when I arrived at the offices. Mr. Byrd was working out of Mr. Smith's office. I spoke briefly to Mr. Byrd on Friday in greeting him, but he did not talk to me about any problems with the audit. Mr. Smith reiterated to me that the main problem with the audit were resulting from his inability to respond because of the number of his financial staff that were on vacation.

11.      On Saturday July 28, 2018, I returned to the office of Reagor-Dykes Auto Group in the morning. Mr. Byrd was still working out of Mr. Smith's office. I offered Mr. Byrd the use of the conference table in my office, which Mr. Byrd accepted While Mr. Byrd was working in my office, Mr. Byrd stated to me: "Y'all have some big problems." This was the first indication that I had that something was wrong with regard to the audit. Mr. Byrd did not go into specifics initially, but he eventually told me for the first time that Reagor-Dykes Auto Group had failed to remit to Ford Credit a substantial amount of inventory sales proceeds attributable to Ford Credit's floor-plan financing ("out-of-trust sales").

12.      Later that morning, Mr. Byrd informed me that one of the "red flags" that alerted Ford Credit that there were problems with the reported sales of Reagor-Dykes Auto Group inventory was that Reagor-Dykes Auto Group was "loading" (i.e., reporting) a disproportionately large number of inventory sales in the week immediately preceding each Ford Credit quarterly audit. Inasmuch as this was the first time that I had ever heard of such a practice, I was surprised and asked Mr Bryd: "How long has this (i.e., the reporting of disproportionately large inventory sales) going on?"

"For quite awhile," replied Mr. Byrd.

"Why weren't Bart (Reagor) and I notified about this?" I asked.

Mr. Byrd looked at me with a blank expression on his face and did not immediately respond to my question. After a pause, Mr. Byrd replied: "Well, I did tell Shane."

I just shook my head and did not say anything further in response to the futility of Mr. Byrd notifying the person at Reagor-Dykes Auto Group who was responsible for creating the red flags that alerted Ford Credit of problems rather than notifying the owners who could do something about the problems.

13.     At this time, Ford Credit declared defaults under its floor-plan financing agreements with Reagor-Dykes Auto Group and terminated providing any further financing under those agreements. Shortly thereafter, Ford Credit publicly announced that the reason for its termination of its floor-plan financing agreements was that Reagor-Dykes Auto Group had defrauded Ford Credit by selling over 1,100 vehicles and not remitting to Ford Credit over $40 million in out-of-trust sales of inventory.

14.     As a result of my exchange with Mr. Byrd in my office on July 27, 2018, I strongly suspected that Mr. Byrd and perhaps others at Ford Credit involved with audits of Reagor-Dykes Auto Group knew or should have known about the out-of-trust sales by Reagor-Dykes Auto Group long before the emergency audit of late July 2018. Ford Credit did not notify either Mr. Reagor or me of those out-of-trust sales until terminating the floor-plan financing in late July 2018. Ford Credit's indulgence of such out-of-trust sales effectively constituted an extension of additional unsecured credit to Reagor-Dykes Auto Group that neither Mr. Reagor nor I approved or guaranteed.

15.     On August 1, 2018, the six Reagor-Dykes Auto Group dealerships to which Ford Credit provided floor-plan financing commenced chapter 11 cases in the U.S. Bankruptcy Court for the Northern District of Texas, Lubbock Division ("the Bankruptcy Court"). Two weeks later, on August 13, 2018, the depositions of Mr. Smith and me were taken in connection with the bankruptcy case of the Reagor-Dykes Auto Group dealerships. Mr. Smith refused to answer questions relating to the Ford Credit audits or his relationship with Mr. Byrd and invoked his Fifth Amendment privilege against self-incrimination. On the other hand, I answered all questions posed to me in my deposition to the best of my ability.

16.     Two days later, on August 15, 2018, the deposition of Mr. Byrd was taken in connection with the bankruptcy case of the Reagor-Dykes Auto Group dealerships. Mr. Byrd refused to answer questions relating to the Ford Credit audits and his relationship with Mr. Smith. Mr. Byrd's refusal to answer those questions was consistent with my suspicion from my exchange with him on July 27th in my office related in paragraph 12 above that he and perhaps others at Ford

Credit knew or should have known about out-of-trust sales by Reagor-Dykes Auto Group and failed to notify either Mr. Reagor or me about those sales.

17.     Since the commencement of the Reagor-Dykes Auto Group bankruptcy case, I have reviewed additional information that supports my suspicion and has led me to conclude that Mr. Byrd and perhaps others at Ford Credit knew or should have known about the out-of-trust sales by Reagor-Dykes Auto Group well before the late July 2018 audit and did not inform Mr. Reagor or me about those sales. The value of the inventory that Ford Credit audits regularly reported being sold from certain Reagor-Dykes Auto Group dealerships was a clear signal that Ford Credit audit representatives were either ignoring or allowing out-of-trust sales by Reagor-Dykes Auto Group. For example, at the conclusion of the June 2018 audit, Ford Credit confirmed with Reagor-Dykes Auto Group that Reagor-Dykes Chevrolet in Floydada owed Ford Credit approximately $9.4 million from inventory sales payable within the following week. At that time, the average value of the entire inventory of vehicles at that dealership was between $9-10 million. No reasonable interpretation of the data from that audit would conclude that it was possible that the dealership could have sold vehicles roughly equal to the entire floor-plan inventory of the dealership in a time frame where the amounts due Ford Credit were due within the following week.

18.     The foregoing is simply an example of similar issues that Reagor-Dykes Auto Group accounting personnel have found in reviewing the results of each quarterly audit from the end of 2016-June 2018. In my opinion, Ford Credit representatives involved in those audits knew or should have known that out-of-trust sales of inventory were taking place because the level of confirmed inventory sales in regard to the dealerships often did not correspond realistically with the value of the inventory of those dealerships. Neither Mr. Reagor nor I were notified by Ford Credit of these out-of-trust sales.

19.     In my opinion, Ford Credit's indulgence of the out-of-trust sales by Reagor-Dykes Auto Group constituted an extension of additional unsecured credit by Ford Credit to Reagor-Dykes Auto Group that neither Mr, Reagor nor I approved or guaranteed. Moreover, I believe that Ford Credit's actions in that regard constituted a material modification of the floor-plan financing agreements between Ford Credit and Reagor-Dykes Auto Group that neither Mr. Reagor nor I approved.

20.     The reorganization phase of the Reagor-Dykes Auto Group is drawing to a close. As a result, the financial data of Reagor-Dykes Auto Group will be available for forensic review and accounting analysis that has not been possible while such data was being used during the reorganization phase of the bankruptcy case. I believe that such forensic review and accounting analysis will reveal additional evidence that Ford Credit knew or should have known about the out-of-trust sales of Reagor-Dykes Auto Group.

Affiant sayeth further not."

_Franklin Rick Dykes_
Franklin Andrew "Rick" Dykes

SUBSCRIBED AND SWORN TO before me on this 22nd day of February, 2019.


Jessica Ann Palacios
My Commission Expires
06/29/2021
ID No. 131190897

Notary Public in and for the State of Texas

My Commission expires:

6|29|2021